```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Norfolk Division

 3

 4  - - - - - - - - - - - - - - - - - -
    UNITED STATES OF AMERICA,       )
 5                                   )
            Plaintiff,              )
 6                                   )      CRIMINAL CASE NO.
    v.                              )           2:11cr33
 7                                   )
    MOHAMMAD SAAILI SHIBIN,          )
 8  a/k/a "Khalif Ahmed Shibin,"     )
    a/k/a "Mohammad Ali,"            )
 9  a/k/a "Ali Jama,"                )
                                     )
10          Defendant.              )
    - - - - - - - - - - - - - - - - - -
11

12

13              TRANSCRIPT OF PROCEEDINGS
            (Testimony of W. Dale Anderson)

14                 Norfolk, Virginia
                    April 24, 2012
15

16

    BEFORE:   THE HONORABLE ROBERT G. DOUMAR,
17            United States District Judge, and a jury

18

19  APPEARANCES:

20          UNITED STATES ATTORNEY'S OFFICE
            By:  Joseph E. DePadilla, Esquire
21               Benjamin L. Hatch, Esquire
                 Brian J. Samuels, Esquire
22               Paul Casey, Esquire
                 Assistant United States Attorneys
23               Counsel for the United States

24          ZOBY & BROCCOLETTI, P.C.
            By:  James O. Broccoletti, Esquire
25               Counsel for the Defendant
```

1                        I N D E X

2

3    ON BEHALF OF THE GOVERNMENT:     Direct   Cross   Red.   Rec.

4    W. D. Anderson                      3       52     56     --

5

6

7

8

9

10                       E X H I B I T S

11   No.                                                   Page

12   Government's Exhibit 2-6 C                              13

13   Government's Exhibit 2-2 A                              15

14   Government's Exhibit 2-2 B                              15

15   Government's Exhibit 2-2 C                              15

16   Government's Exhibit 2-2 D                              15

17   Government's Exhibit 2-2 E                              15

18   Government's Exhibit 2-1 A                              24

19   Government's Exhibit 2-1 B                              24

20   Government's Exhibit 2-2 I                              41

21   Government's Exhibit 2-2 F                              46

22   Government's Exhibit 2-2 G                              46

23   Government's Exhibit 2-2 H                              46

24

25

```
                        ─── W. D. Anderson - Direct ───
 1                    *****      *****     *****

 2

 3           THE COURT:  Who is your next witness?

 4           MR. SAMUELS:  Judge, the United States calls Dale

 5   Anderson.

 6               (The witness was sworn by the clerk.)

 7           WALTER DALE ANDERSON, called as a witness, having

 8   been first duly sworn, testified as follows:

 9                         DIRECT EXAMINATION

10   BY MR. SAMUELS:

11   Q.  Good morning, sir.

12   A.  Good morning.

13   Q.  Would you tell us your name, please?

14   A.  Walter Dale, D-A-L-E, Anderson.

15   Q.  And, Mr. Anderson, where do you work, sir?

16   A.  I'm with the FBI.  I'm the Assistant Legal Attache in

17   Baghdad, Iraq.

18   Q.  How long have you held that position?

19   A.  Since July of 2011.

20   Q.  And prior to becoming Assistant Legal Attache in Baghdad

21   what did you do with the FBI?

22   A.  I was a supervisory special agent with the Crisis

23   Negotiation Unit in Quantico, Virginia, from December, 2009,

24   until I went to Iraq.

25   Q.  Prior to 2009 were you also involved in the hostage
```

W. D. Anderson - Direct

1    rescue field with the FBI?

2    A.   Yes.  I've been with the hostage rescue team since 1998,

3    with a two-year intermission when I went to the

4    Counterterrorism Division from the years 2003 to 2005.

5    Q.   And how long have you been with the FBI altogether?

6    A.   Since 1996.

7    Q.   As an agent the entire time, sir?

8    A.   Yes.

9    Q.   Prior to joining the FBI did you have any military

10   experience?

11   A.   Yes, sir.

12   Q.   And what was that?

13   A.   I was eight years in the United States Army, four years

14   of that as an infantry officer and four years as a special

15   forces officer.

16   Q.   When did you leave the U.S. Army?

17   A.   1994.

18   Q.   I'd like to talk to you a little bit about your role as a

19   supervisory special agent in the Crisis Negotiation Unit, the

20   position that you held from 2009 to 2011.  Now, could you

21   generally describe for the jury your duties in that position,

22   sir?

23   A.   My primary duty was operational with American citizen

24   kidnap -- dealing with kidnappings of American citizens

25   abroad, also any hostage/barricade situations within the

W. D. Anderson - Direct

1  United States that had an FBI nexus or things that were too

2  large for the locals to handle that would kick up to the FBI.

3  Q.  What's a hostage/barricade situation?

4  A.  A hostage/barricading situation, more so than a

5  kidnapping, is, other than domestic violence situations,

6  where you have a barricade at the house.  The more typical

7  hostage/barricade would be when law enforcement interrupts a

8  crime in commission I would -- I would -- this probably best

9  typifies like a bank robbery where the bank robbers don't get

10  away.  Law enforcement interrupts them, and you now have a

11  hostage/barricade situation within the bank --

12  Q.  How would --

13  A.  -- because you interrupted them.  I'm sorry.

14  Q.  That's all right, sir.

15       How would you or the FBI get involved in an overseas

16  incident involving kidnapping or hostage-taking?

17  A.  The FBI negotiators or the United States Government

18  negotiators -- and in an incident involving hostage-taking,

19  hostage-taking of American citizens overseas, the FBI is

20  going to have responsibility for the collection of evidence,

21  negotiations and the conduct of the investigation.

22  Q.  And in the course of doing so, as a supervisory special

23  agent with that unit is it important to establish lines of

24  communication?

25  A.  Yes.

———— W. D. Anderson - Direct ————

1   Q.   Important to establish and to speak to someone in

2   authority?

3   A.   Yes.

4   Q.   Agent Anderson, are you familiar with the terms "proof of

5   life," "proof of possession" and "proof of control"?

6   A.   Yes.

7   Q.   And let's go through those and explain to the jury what

8   they mean.

9        What about proof of life?

10  A.   Proof of life -- when you're engaged in dialogue or

11  negotiations with hostage-takers you want to make sure that

12  the victims are still alive and you're dealing with a hostage

13  situation and not a murder.

14       Proof of possession -- you want to make sure you're

15  dealing with the people who are actually holding the victim.

16  It's very easy for people to become -- other criminals to

17  become aware that a hostage or someone is missing or has been

18  taken by another group and other criminals try to extort the

19  victim family by claiming to have the hostages and extort the

20  family.  I mean, it's even progressed to the point we have

21  virtual kidnappings where people post, "Hey, I'm going out to

22  the woods for five days" and criminals will extort the family

23  and say, "We've got your loved one; give us money."  So we

24  want to make sure we're talking to the people who are

25  actually holding the victims.

—— W. D. Anderson - Direct ——

1   Q.  And, finally, proof of control?

2   A.  Proof of control -- we want to make sure the person we're

3   dealing with is the person who has the authority within that

4   criminal group to release the victims once you've reached

5   some sort of agreement.

6   Q.  And in your work in the Crisis Negotiation Unit is it

7   common to work in teams?

8   A.  Primarily, we try at a minimum to work in a two-person

9   team.

10  Q.  Why is that, sir?

11  A.  We'll have a primary negotiator and a coach.  Ideally,

12  four people, but at a minimum, two people.

13  Q.  In February of 2011 were you involved in an overseas

14  incident involving a sailing vessel called the Quest?

15  A.  Yes, sir.

16          MR. SAMUELS:  Judge, at this time I'd like to read

17  two stipulations into the record that have been agreed to

18  among the parties.

19          THE COURT:  All right.

20          MR. SAMUELS:  This is stipulation No. 4:

21          "On February 18th, 2011, when the S/V Quest was

22  seized by certain individuals, the Quest was at that time in

23  an area on the high seas.  In other words, the Quest was at

24  the time of its seizure in international waters more than

25  12 nautical miles from the coast of any nation.  On

———————————— W. D. Anderson - Direct ————————————

1    February 22nd, 2011, in the time leading up to and including

2    when the United States Navy took control of the Quest, the

3    Quest was at that time still in an area of the high seas,

4    more than 12 nautical miles from the coast of any nation."

5         And Stipulation No. 5 reads:

6         "At all times relevant to the superseding

7    indictment, the Quest was a 'covered ship,' as that term is

8    defined in 18 United States Code, Section 2280(e), because it

9    was navigating and was scheduled to navigate into, through

10   and from waters beyond the outer limit of the territorial sea

11   of a single country.  The parties further stipulate and agree

12   that Scott and Jean Adam, Phyllis Macay and Robert Riggle

13   were all United States citizens in the time period of

14   February 18th to February 22nd, 2011.  During that same time

15   period, the Quest was a United States flagged vessel."

16        Thank you, Judge.

17   BY MR. SAMUELS:

18   Q.  Agent Anderson, did the incident involving the Quest

19   involve American victims who had been taken hostage?

20   A.  Yes.

21   Q.  What were the names of these victims, sir?

22   A.  Scott Adams, Jean Adams (sic), Phyllis Macay and Robert

23   Riggle.

24   Q.  Agent Anderson, you discussed a few minutes ago a

25   hostage/barricade situation.  Did that term apply to this

———— W. D. Anderson - Direct ————

1    incident with the Quest?

2    A.   Yes.

3    Q.   Why?

4    A.   We've interrupted criminals in commission of a crime.

5    They weren't trying to deal with the situation at that point

6    in time and space.   They were effectively barricaded by the

7    conditions at sea, a small boat in the middle of the ocean,

8    with hostages there to be able to be used as shields.   I

9    would use "hostage/barricade" versus "international

10   kidnapping" because it wasn't a kidnapping in the sense we

11   knew they were missing, but we had no reference to where they

12   were spatially -- or where they were, where their location

13   was.

14         Here we knew where they were, again, in time and

15   space, but we couldn't get to them because of the nature of

16   the -- the barricade nature of them being on a small vessel

17   in the middle of the ocean.

18   Q.   Agent Anderson, where were you first stationed or

19   assigned when you learned of the incident involving the

20   Quest?

21   A.   I was actually at my residence in Alexandria, Virginia,

22   on my day off, and I got the phone call -- a series of

23   e-mails and phone calls that there was a piracy incident

24   involving the sailing vessel Quest.   Shortly after that my

25   boss asked me if I could go to the Department of State, what

W. D. Anderson - Direct

1   we call Main State, the Department of State headquarters, to

2   participate in a video teleconference to get the particulars

3   of the matter.

4   Q.   And were you ultimately selected to travel out to the

5   Indian Ocean to assist with the matter?

6   A.   Yes.  Upon leaving the video conference I received

7   telephone calls from the commander of the Hostage Rescue Team

8   telling me to deploy to Virginia Beach as soon as I could;

9   that I would be deploying to the incident site, to the crisis

10  site.

11  Q.   Agent Anderson, at the time that you first learned of the

12  situation and before you actually traveled out there, did you

13  know how many pirates were involved in this?

14  A.   Looking at my notes from that afternoon, I think I wrote

15  down it was approximately 15.

16  Q.   All right.  Was there a timing element to this situation

17  when you first learned about it, Agent Anderson?

18  A.   Yes, timing is always very critical in any crisis

19  negotiation.

20  Q.   And why was that so in this particular situation?

21  A.   Again, we know where they are.  They're in a moving

22  location, but we have the location of the victims.  The big

23  concern is are they going to be able to get to land, at which

24  point we lose the ability to know where they are.

25          Early on on the 18th it looked like -- I think what

W. D. Anderson - Direct

1   I had written down was the 22nd would have been their first

2   chance to make landfall.  Skipping ahead to when I got on the

3   Sterett, it looked like the early morning hours of the 22nd

4   it would be off Puntland, but we were thinking we would have

5   until -- we would have until sometime on the 23rd before they

6   would make landfall where the typical pirate safe havens

7   were.  So that's the time period I thought I had to work

8   with.

9   Q.  All right.  From the 18th, when you first learned of the

10  situation, until the 23rd?

11  A.  Until midday the 23rd.

12  Q.  Prior to travelling out to the Indian Ocean, did you have

13  an occasion to talk with some of the Navy personnel on scene

14  and learn whether communications had been established with

15  the pirates that had taken the Quest?

16  A.  At that time I think the Sterett was still moving towards

17  the Quest.

18  Q.  And the Sterett is what, sir?

19  A.  I believe it's a destroyer.  It's a U.S. Navy vessel, the

20  USS Sterett.  It was -- again, when I left Main State it was

21  approximately -- I want to say it was approximately eight

22  hours out.  It was steaming towards the Quest.  I spoke to

23  the naval officer -- but to more directly answer your

24  question, I spoke directly to the naval officer that was

25  deploying to the Sterett who was going to take over the

———— W. D. Anderson - Direct ————

1    position of -- I don't know what it would be called in the

2    military, but in law enforcement terms it would be the

3    on-scene commander.  He would be the Navy officer responsible

4    for addressing this crisis.

5    Q.  And did you learn whether there had been communications

6    between the pirates on the Quest and the Navy before you

7    deployed out to the Indian Ocean?

8    A.  I'm not aware that they had been in contact yet.  My

9    conversation with that on-scene commander was to prepare him

10   for his initial contact with the Quest once he got there.

11   Q.  Okay.  And at this point that you learned of this had the

12   Navy gotten involved, and had they found and located the

13   Quest?

14   A.  Yes, its location was known.

15   Q.  All right.  And, Agent Anderson, how did you travel out

16   to the Indian Ocean, sir?

17   A.  I flew by C-17 from here at Oceana Naval Air Station to

18   the Indian Ocean.

19   Q.  All right.  And you traveled with United States Navy

20   personnel?

21   A.  Yes, sir.

22   Q.  I'd like to show you a number of exhibits, sir.  Let's

23   start with -- I'll hand you a set, and then I'd like to ask

24   you first to look at 2-6 C.

25        Agent Anderson, do you recognize what that depicts,

————— W. D. Anderson - Direct —————

1   sir, in 2-6 C?

2   A.  Yes, sir.  It's the portion of the Indian Ocean off the

3   coast of Somalia.

4   Q.  All right.  Is that where you traveled to with the Navy

5   personnel and where this incident was ongoing?

6   A.  Yes, sir.

7           MR. SAMUELS:  Your Honor, I would offer 2-6 C into

8   evidence.

9           THE COURT:  2-6 C is received in evidence.

10          (The exhibit was admitted into evidence.)

11  BY MR. SAMUELS:

12  Q.  Agent Anderson, do you recall approximately where you

13  traveled, sir, in relation to this map?  Was it at the top

14  right-hand corner or the bottom?  Where did you go, sir?

15  A.   In this map it would be the upper right-hand portion of

16  this map.  We traveled to the south of Socotra Island.

17  Q.  Okay.  So if I put my cursor somewhere in that area,

18  sir --

19  A.  Probably a little further north, but in that general

20  area, to the south of Socotra Island.

21  Q.  All right.  And what date did you arrive, Agent Anderson?

22  A.  Early the morning of the 20th.

23  Q.  And when you arrived what vessels from the United States

24  Navy were on the scene?

25  A.  The USS Enterprise, which is where I first arrived, and

W. D. Anderson - Direct

1   then I went from the USS Enterprise to the USS Sterett.

2   There was a third Navy vessel in the area as well, and I

3   don't recall the name of that third vessel.  It was

4   primarily -- I was on the Sterett and the Enterprise, and

5   then there was a third vessel of similar size to the Sterett.

6   Q.  And the Enterprise is what kind of vessel, sir?

7   A.  The Enterprise is an aircraft carrier.

8   Q.  All right.  What was the closest vessel to the Quest?

9   A.  The USS Sterett, which is where we set up shop as the

10  command center in the negotiations there.

11  Q.  And did you travel to the Sterett first, or did you go to

12  a different vessel when you arrived on the scene?

13  A.  I arrived on the Enterprise, was there approximately 30

14  minutes before I took a helicopter, flew it to the

15  USS Sterett, and was on the scene pretty quick after

16  arriving.

17  Q.  And when you arrived on the Sterett were communications

18  being conducted with the pirates on the Quest?

19  A.  Yes, communications were being conducted by

20  bridge-to-bridge radio from the bridge of the Sterett to the

21  Quest.

22  Q.  Okay.  And was that the only means by which

23  communications could occur with these pirates?

24  A.  Yes.

25  Q.  And do you know why that was, sir?

———————— W. D. Anderson - Direct ————————

1    A.  We were outside of cell phone service, and they were

2    using -- you know the Quest had a commercially available

3    marine band radio, and that's got the -- that was the

4    bridge-to-bridge coms.

5    Q.  When you arrived on the Sterett was the Quest visible in

6    relation to the Sterett?

7    A.  Yes, sir.

8    Q.  I'd like to hand you another set of photographs -- these

9    are 2-2 A through 2-2 E -- and ask you if you recognize

10   these, sir.

11   A.  Yes, sir.  I recognize 2-2 A and 2-2 B as the Quest -- I

12   recognize them as the Quest, and the approximate -- that

13   looks like the approximate relative distance from the Sterett

14   to the Quest when I arrived.

15   Q.  And how about C, D and E, sir?

16   A.  2-2 C and 2-2 D are close-up pictures of the Quest.

17   Q.  All right.

18   A.  And 2-2 C --

19   Q.  I believe 2-2 E is the one you've got.

20   A.  I'm sorry, yes.  2-2 E is the USS Sterett.

21          MR. SAMUELS:  Your Honor, I would offer 2-2 A, B, C,

22   D and E into evidence.

23          THE COURT:  2-2 A, B, C, D and E are received in

24   evidence.

25          (The exhibits were admitted into evidence.)

──────── W. D. Anderson - Direct ────────

1    BY MR. SAMUELS:

2    Q.  Now, when you arrived on scene at the Sterett, wasn't the

3    Sterett some distance away from the Quest, sir?

4    A.  Yes.  I don't recall the specific distance.  I want to

5    say it was approximately a thousand feet.

6    Q.  All right.  And if we make that a little larger, it

7    appears as if there's something behind the Quest.  What's

8    that item behind the Quest?

9    A.  That's the dingy that the pirates used to get to the

10   Quest.

11   Q.  All right.  Looking at 2-2 B, that also shows the Quest,

12   again towing the boat that the pirates had used?

13   A.  Yes, sir.

14   Q.  And when you arrived at the Sterett did you learn how

15   many pirates had taken control of the Quest, sir?

16   A.  There were 19 personnel on board; four victims and 15

17   pirates.

18   Q.  Okay.  Let me also show you 2-2 E here.  And 2-2 E shows

19   what, Agent Anderson?

20   A.  The USS Sterett.

21   Q.  Where did you conduct your communications when you were

22   on the Sterett, sir?

23   A.  From the bridge of the USS Sterett.

24   Q.  When you arrived on the Sterett were you able to assess

25   the communication situation with the pirates?

Heidi L. Jeffreys, Official Court Reporter

---
W. D. Anderson - Direct
---

1  A.  Yes.  We had -- we had relatively clear radio

2  communications with the pirates.

3  Q.  All right.  And how did the dialogue with the pirates

4  occur?  How was this set up?

5  A.  We would use a microphone at front and center of the

6  bridge area, and we were at windows where we could visually

7  see the Quest as we were speaking to it.

8          The individual on the microphone was a Somali

9  interpreter.  First we used a U.S. Navy interpreter; later we

10 used an FBI linguist.

11 Q.  Was there a Somali interpreter that was used throughout

12 any bridge-to-bridge communications with the pirates on the

13 Quest?

14 A.  Yes.

15 Q.  Okay.

16 A.  The only time it wasn't used would be when we spoke

17 directly to either Captain Adams or Mr. Riggle.

18 Q.  And who was directly involved in the communications with

19 the pirates on the Quest?  How was that established and set

20 up?

21 A.  You would have the interpreter, you had a Navy

22 commander -- he was subordinate to the on-scene commander.

23 He was the Navy commander that the on-scene commander had

24 given responsibility to for the negotiations portion for the

25 Navy.  And then immediately kind of forming a triangle you

1    had the interpreter, the Navy commander responsible for

2    negotiations, and then myself as the negotiations subject

3    matter expert/advisor/coach, was my role.

4    Q.   Okay.  So were you ever on the radio directly talking to

5    anyone on the Quest?

6    A.   Only on one occasion.  On the -- I think the morning of

7    the 22nd I spoke briefly to Captain Adams directly.

8    Q.   And we talked about proof of life, proof of possession,

9    proof of control.  When you got there on the 20th which of

10   those factors were present; which were absent?

11   A.   Throughout we were able to obtain proof of life and

12   consistently re-establish proof of life by being able to talk

13   to Captain Adams, who would let us know the condition of the

14   four American citizens.

15        Proof of possession is pretty self-evident; we are

16   dealing with the people who are physically in possession of

17   the four hostages.

18        Proof of control -- we had identified a pirate

19   leader on board going by the name of Abdullahi.

20   Q.   Was that the individual you spoke with over the -- that

21   the translator spoke with?

22   A.   Yes, primarily.  And -- but he maintained that he did not

23   have control of the situation; that he was merely the pirate

24   who would go get the vessel, take vessels and hostages, and

25   then get that vessel and those hostages or cargo or whatever

————————— W. D. Anderson - Direct —————————

1    to Somalia, where the English-speaking negotiator would then

2    take over and negotiate directly with the U.S. Government.

3    Q.  All right.  Let's talk about that.

4         Were these pirates that were on the Quest willing to

5    negotiate with the Navy while they were at sea?

6    A.  They were willing to engage in dialogue --

7    Q.  Okay.

8    A.  -- but they did not engage in what I would term

9    substantive negotiations.

10   Q.  Are you familiar with the terms "demand" and "offer" in

11   describing or dealing with negotiations?

12   A.  Yes.  There was no ransom demand placed, which I would

13   term a substantive demand.  The demands made were more of the

14   nonsubstantive nature, like "Back up," "Don't come any

15   closer," "Turn your lights off," "Turn your lights on," "Stop

16   flying the helicopters."

17        I would categorize -- as a negotiator, I would

18   categorize those as nonsubstantive demands, but there was an

19   absence of a substantive demand, which I would define a

20   substantive demand as, "If you give me this, then I will

21   provide that," a quid pro quo.

22   Q.  What was the position the pirates then took in the

23   dialogue you were having with them?

24   A.  That they were going to continue to Somalia, they

25   would -- and then once they got within approximately

W. D. Anderson - Direct

1    30 minutes of shore then they would start substantive

2    negotiations.

3    Q.   All right.  And did they talk about having another

4    individual involved when they got to Somalia?

5    A.   Yes.  They said they had an English-speaking negotiator

6    who would deal directly with us.

7    Q.   And what did the Navy personnel tell the pirates about

8    approaching Somalia?

9    A.   We made it clear throughout the dialogue that they would

10   not be allowed to reach Somalia.

11   Q.   And was this relayed to the hostages as well when there

12   were occasions when the actual hostages got on the radio?

13   A.   Yes.

14   Q.   And who among the hostages primarily talked on the radio

15   to the Navy when that opportunity arose?

16   A.   Captain Adams.

17   Q.   Was there an offer that the Navy made to the pirates if

18   they would release the hostages?

19   A.   The consistent offer throughout was we did not care about

20   the boat, we did not care about the Quest, we only cared

21   about the four hostages; that if they would just put the

22   hostages in the dingy and set it free they could take the

23   boat and keep going.

24   Q.   And what was the pirates' response to that offer?

25   A.   They refused the offer.

W. D. Anderson - Direct

1  Q.  Did the pirates make any threats as to the safety of the

2  hostages?

3  A.  They made it clear that life had little value, that they

4  were not afraid to die, they were not afraid to kill the

5  hostages.

6  Q.  All right.  You mentioned that the pirates referred to

7  other individuals that would be involved in negotiations if

8  they would reach closer to Somalia.  What was significant for

9  the pirates in terms of being able to get closer to Somalia

10 in terms of their communications?

11 A.  My assumption was that they were hoping as they

12 approached the shore of Somalia they would be able to

13 establish cell phone contact --

14 Q.  Okay.

15 A.  -- some other means of communication than the

16 bridge-to-bridge radio, which is a line-of-sight means of

17 communication.  It's a relatively short range.

18 Q.  Agent Anderson, after you had been there for a day or so,

19 on February 21st, was there a request made to the pirates for

20 a point of contact that the Navy could reach out to who would

21 have the authority to engage in negotiations?

22 A.  Yes.  Trying to maximize the time we had for negotiations

23 and trying to achieve the safe release of the hostages, since

24 they were maintaining that they did not have control, that

25 they did not have the ability to negotiate with us for the

————— W. D. Anderson - Direct —————

1   release, but trying to use the time we had, versus waiting

2   until we got to Somalia, which wasn't really an option.  We

3   asked them to provide the name and contact information of

4   their American -- excuse me -- their English-speaking --

5   excuse me -- their English-speaking negotiator, if they could

6   provide me name and contact information, so we could begin

7   dialogue and negotiations directly with that negotiator while

8   they were at sea, versus waiting until they got to Somalia,

9   in an attempt to resolve this as quickly as possible.

10  Q.  And were the discussions that you and the other members

11  of the team were having with the pirates on the Quest

12  recorded?

13  A.  Yes.

14  Q.  All right.  And when they were recorded and when they

15  were going back and forth were you receiving a

16  contemporaneous translation of the substance of what was said

17  by the pirates in Somalia on the Quest over to the translator

18  on the Sterett?

19  A.  Yes.  And I would categorize this as consecutive

20  translation.  We would speak in English, he would translate

21  into Somali, speak in Somali, he would get the reply in

22  Somali, which he would then translate into English to us.  So

23  consecutive versus simultaneous.

24  Q.  Agent Anderson, I'd like to hand you Government's

25  Exhibits 2-1 A and 2-1 B, sir.

W. D. Anderson - Direct

1          Agent Anderson, do you recognize 2-1 A, sir?

2    A.   Yes, sir.

3    Q.   And what is 2-1 A and 2-1 B as associated with it?

4    A.   2-1 A is a recording of a portion of the bridge to bridge

5    communications.

6    Q.   And what is 2-1 B, sir?

7    A.   2-1 B is the written translation, written transcript, of

8    the contents of 2-1 A.

9    Q.   Okay.  Have you listened to 2-1 A, sir?

10   A.   Yes, sir.

11   Q.   And are your initials on that disk that contains the

12   audio?

13   A.   Yes, sir.

14   Q.   All right.  And have you reviewed 2-1 B as well, sir?

15   A.   Yes, sir.

16   Q.   And does your review of 2-1 B match with your

17   recollection of what the substance was of 2-1 A, as explained

18   by the translator on February 21st?

19   A.   Yes, sir.

20          MR. SAMUELS:  Judge, I'd like to read a stipulation

21   at this time.

22          THE COURT:  All right.

23          MR. SAMUELS:  Thank you, sir.

24          "United States Exhibits 2-1 A and 2-1 B are the

25   audio recording and associated translated transcriptions,

W. D. Anderson - Direct

1    respectively, of communications that occurred between the

2    United States Navy and individuals on board the Quest on

3    February 21st, 2011.  The parties agree that the audio

4    recordings are fair and accurate recordings of the

5    communications that took place.  The parties agree that the

6    transcripts of the recordings are fair and accurate

7    translations into English of the communications into Somali.

8    United States Exhibits 2-1 A and 2-1 B have therefore been

9    properly authenticated and are admissible in evidence with no

10   further showing by the government."

11          Your Honor, at this time I would offer Government's

12   Exhibits 2-1 A and 2-1 B into evidence.

13          THE COURT:  2-1 A and 2-1 B are received in

14   evidence.

15          (The exhibits were admitted into evidence.)

16   BY MR. SAMUELS:

17   Q.  Agent Anderson, I'm going to play a version of 2-1 A, but

18   before I do, sir, you've listened to it?

19   A.  Yes, sir.

20   Q.  And what is the primary language that's spoken on 2-1 A?

21   A.  Somali.

22   Q.  2-1 A -- is there a discussion of this point of contact

23   in Somali that can begin negotiations?

24   A.  Yes, sir.

25   Q.  And is there a name that is revealed in the course of

––––––––––––––– W. D. Anderson - Direct –––––––––––––––

1  this recording?

2  A.  Yes, sir.

3  Q.  And what's that name?

4  A.  Mohammad Salah Shibin.

5  Q.  And is there a phone number that you can hear going back

6  and forth, sir?

7  A.  228675.

8  Q.  And are there some lead-up numbers with it as well with

9  respect to the country code and --

10  A.  Yes, sir, the country code, 00525, and then I think

11  there's a service provider code, 90, and then 226875.

12  Q.  All right.  Agent Anderson, we're going to play 2-1 A up

13  through that portion.

14          (The audio recording was played.)

15  BY MR. SAMUELS:

16  Q.  Agent Anderson, could you make out the last name that was

17  given in the course of that dialogue, sir?

18  A.  Yes, sir, Shibin.

19  Q.  All right.  And, Agent Anderson, I'd now like to show

20  you --

21  A.  Sir, I misspoke earlier when I said the country code was

22  525.  It's 252.  I transposed those numbers earlier.  I'm

23  sorry, sir.

24  Q.  Agent Anderson, now I'd like to go to that transcript and

25  review that with you, sir.

W. D. Anderson - Direct

1      Agent Anderson, if we look at the top of the

2  transcript there's a key there, sir.  Who are the parties

3  that are identified in the course of this translation?

4  A.  The abbreviations are, for unidentified male, UM; UI for

5  unintelligible; PH for phonetic.

6  Q.  All right.  And who is the pirate representative that's

7  being talked to by the United States Navy at this point?

8  A.  Abdullahi.

9  Q.  So, Agent Anderson, the UM -- is that the Navy personnel,

10  sir?

11  A.  The unidentified male in this translation, in this

12  transcript, is the U.S. Navy Somali interpreter.

13  Q.  All right.  And Abdullahi represents the pirates?

14  A.  Yes, represents the lead pirate.

15  Q.  Agent Anderson, if you can see that on the scene there,

16  sir, I'd like you to begin reading this into the record, the

17  first page here, sir, that you see.

18  A.  Unidentified male:  "Okay.  And tell us his name and

19  where he comes from."

20      Abdullahi:  "He is from Puntland.  He is in Galkayo

21  now.  He will come and can be contacted.  We will all contact

22  him.  We will talk to that man when we arrive to a place

23  where we think we are" -- and then it's unintelligible -- "in

24  Puntland near Hafun.  He is a known man.  He is a well-known

25  person."

Heidi L. Jeffreys, Official Court Reporter

W. D. Anderson - Direct

1         Unidentified male:  "Okay.  His name, what is his

2    name?"

3         That continues with, "Hey, we want the name and the

4    number of the man who you said is in Galkayo, speaks English

5    and lives in Puntland, please, his name and his number."

6         Abdullahi:  "I will call you back shortly, after a

7    short time.  Okay, I will call you.  I will call you after I

8    get the number."

9         Unidentified male:  "So, how are you going to

10   contact this man.  Hello?  Can you hear me?"

11        Abdullahi:  "Yes, yes, I hear you."

12        Unidentified male:  "Okay.  You said wait, that you

13   will call me back.  Are you going to contact him, and how are

14   you going to contact him now?"

15        Abdullahi:  "I do not have any equipment, and the

16   phones are not working -- ahem -- but we will search the

17   telephones -- we will search the telephones.  I mean, some of

18   the youngsters among the men know it, so I will ask them and

19   call you back, brother."

20        Abdullahi:  "Do you hear me, Uncle?"

21        Unidentified male:  "Yes, yes."

22   Q.  And, Agent Anderson, at the top here where it starts with

23   the unidentified male saying, "Okay, and tell us his name and

24   where he comes from," was there a couple of sentences of

25   lead-in that the recording did not capture asking for the

——— W. D. Anderson - Direct ———

1    identity of this point of contact?

2    A.  Yes, sir.  As I was saying earlier in this conversation,

3    that we were asking -- since the pirates were saying that

4    they could not negotiate substantively with us, we asked them

5    for the name and the -- we let them know that we wanted to

6    talk to their negotiator on shore in Somalia so we could try

7    to resolve this while they were still at sea, versus waiting

8    until we got to Somalia.

9    Q.  And this recording follows that, sir, correct?

10   A.  Yes, sir.

11   Q.  All right.  Let's go on to the bottom of the recording,

12   and if you could pick it up with Abdullahi there, sir.

13   A.  Abdullahi:  "Do you hear me, Uncle?"

14          Unidentified male:  "Yes, yes."

15          Abdullahi:  "I believe that you know the country

16   code for Somalia."

17          Unidentified male:  "What is the country code for

18   Somalia?"

19          Abdullahi:  "00252."

20          Then unidentified male:  "Did you say 00525?"

21          Abdullahi:  "90."

22          Unidentified male:  "Repeat that.  Repeat that to

23   me, please."

24   Q.  Let's go to the next page, Agent Anderson.  Would you

25   continue, sir?

W. D. Anderson - Direct

1  A.  Abdullahi:  "00."

2        Unidentified male:  "Go on."

3        Abdullahi:  "252."

4        Unidentified male:  "252."

5        Abdullahi:  "90, 90."

6        Unidentified male:  "Go on."

7        Abdullahi:  "22."

8        Unidentified male:  "22."

9        Abdullahi:  "86."

10        Unidentified male:  "86."

11        Abdullahi:  "75."

12        Unidentified male:  "Is that the number for the

13  person we must contact?"

14  Q.  And, Agent Anderson, what is the framework that Somalis

15  use for their -- what we would use as a seven-digit number,

16  what do they use?

17  A.  Well, overseas you're going to have to have a country

18  code, sometimes a service provider or a city code, and then

19  the actual phone number.

20  Q.  If we strip away the country code and the city code, what

21  number is given here that we're left with?

22  A.  228675.

23  Q.  All right.  If we can go to the bottom and read this

24  portion as well, sir.

25  A.  "Yes, and his name is Shibin."

--- W. D. Anderson - Direct ---

1            "What is his name?"

2            "Shibin, Shibin."

3       I'm sorry.  Let me start all over.

4       Abdullahi:  "Yes, and his name is Shibin."

5       Unidentified male:  "What is his name?"

6       Abdullahi:  "Shibin, Shibin."

7       Abdullahi:  "Do you hear me?"

8       Unidentified male:  "Yes, I hear you.  I mean give

9  me his full name, his full name."

10       Abdullahi:  "Mohammad Salah Shibin."

11       Unidentified male:  "Is that Farah or Salah?"

12       Abdullahi:  "Mohammad Salah Shibin."

13       Abdullahi:  "Hello?"

14       Unidentified male:  "Yes, yes, speak.  I hear you."

15       Abdullahi:  "I told you the number.  I also want to

16  tell you -- I mean, we -- the men who are in the boat include

17  many people.  There are people who are novices and are not

18  used to the planes that are searching for people.  Every time

19  the plane takes off it will affect the people on board.  For

20  that reason we are asking that the planes stop and" --

21  Q.  Let's go to the third page.

22       And, Agent Anderson, continue with that first

23  sentence there, which is left over from the previous page and

24  stop for a moment, if you would.

25  A.  "...that the ships back off from us so that the health

———— W. D. Anderson - Direct ————

1  and safety of the people here is maintained and they do not

2  get scared and do not panic.  That way we can continue safely

3  and peacefully and you continue following us from afar."

4  Q.  And is this discussion about the ship not being in the

5  area -- is that an example of one of the requests -- or the

6  positions that the pirates took not in exchange for the

7  hostages but what they wanted the Navy to do?

8  A.  Right, a nonsubstantive demand; "We want you to back off,

9  or, Stop the airplanes from flying," or --

10  Q.  Agent Anderson, as we continue in the transcript is there

11  a discussion about the background of this Shibin that they

12  have identified?

13  A.  Yes, sir.

14  Q.  All right.  If you would just pick it up there with the

15  unidentified male and read at the bottom, sir.

16  A.  Unidentified male:  "Okay.  If you -- if you are" --

17  unintelligible -- "people -- I mean -- put these people in

18  the small boat and leave.  What do you say if you put them in

19  the small boat that you are towing and leave?"

20       Abdullahi:  "We spoke about that.  We made an

21  agreement.  Dear brother, we do not like to repeat ourselves.

22  We will reach Somali waters in order to protect our lives.

23  We will release this boat.  We will give it back to you.  We

24  will use it to get to Somali waters to protect our lives.  I

25  mean, we will go to a place where we can" --

———— W. D. Anderson - Direct ————

1  unintelligible -- "and we are confident ten miles up to eight

2  miles but let us continue smoothly and" -- unintelligible --

3  "we will not do any harm if we are not harmed.  Do you

4  understand?  And we did not have any contact with the man we

5  told you about, Shibin.  He is an interpreter, a known naval

6  negotiator.  We was the interpreter for the last ship, a

7  German ship that was" -- unintelligible -- "and was released

8  after receipt of ransom money.  However, we have not had any

9  contact with him as of now because we have lost

10  communication.  I wish you well.  Over."

11          Unidentified male:  "Okay.  When was the last time

12  that this man was an interpreter for you?"

13          Abdullahi:  "He was not for us, but he was for the

14  ship called BELINA MARGARET" -- phonetic -- "a German ship

15  recently released for which he was the interpreter, and, as I

16  was telling you he was previously for us for the ship from

17  Greece with a Filipinos and Greek crew which he handled for

18  us.  So I am telling you that I make contact with him;

19  however, you can talk to him and ask him about us.  I mean,

20  that we are regular... I mean, we can see that you suspect us

21  to be al-Shabaab or al Qaeda.  We are not al-Shabaab, and we

22  are not al Qaeda.  We are not the people who own the land,

23  either.  You can contact the bases of the Bossaso government,

24  the PIS, the regional bases and the presidency."

25  Q.  All right.  And then, continuing, if you would continue

---
W. D. Anderson - Direct
---

1   on with the next paragraph, Agent Anderson.

2   A.   That's not on my screen, sir.

3   Q.   Oh.  Is it on there now, Agent Anderson?

4   A.   No, sir.

5           (There was a pause in the proceedings.)

6           THE WITNESS:  Unidentified male:  "Okay.  Mohammad

7   Salah Shibin, where did he come from?  Where was he born?"

8           Abdullahi:  "Shibin is a man from Puntland.  He is a

9   man from the Majerten.  He is a Puntlandese who was born in a

10  locality called Qardho in the Karkar (phonetic) region.  He

11  is a well-know man.  You can ask the government and the PIS.

12  He used to work with African Oil that used to operate in

13  Puntland, known as African Oil or Metals, whichever way you

14  know it.  Lately he was a mediator between the people who

15  capture ships and the foreigners held captive by them."

16          Unidentified male:  "They are telling you that they

17  will contact this man whose name and number you gave them so

18  you do not do any harm and do not see it as a problem.  We

19  will contact you in like..."

20          Abdullahi:  "We will not do any harm if we are not

21  harmed.  We will not harm anyone."

22          Unidentified male:  "Okay."

23  Q.   Agent Anderson, after you had obtained this information,

24  the name and a telephone number, did you pass this on to

25  other investigators who were working on this incident?

––––––– W. D. Anderson - Direct –––––––

1    A.  Yes, it was passed to a U.S. Navy intelligence officer.

2    Q.  All right.  Did you, in your capacity, attempt to cold

3    call the number in any way?

4    A.  No, sir.

5    Q.  All right.  And is that something that you would have

6    done as part of the investigation at this point?

7    A.  No.  We would have conducted some form of investigation

8    to obtain more information about the individual, attempt to

9    locate the individual versus making a cold call to the

10   individual.

11   Q.  And do you know if -- by Mr. Shibin if this information

12   was followed up on or located prior to this incident ending

13   the next day, on February 22nd?

14   A.  Prior to the incident ending they were -- they were still

15   in the process of investigating this number and pursuing

16   this -- I would categorize that as they were still pursuing

17   this investigative lead.

18   Q.  All right.  And if we could go to the last page of this

19   transcription.  And do you see at the top, Agent Anderson --

20   does that reflect that there was a break in recording there

21   between the conversation, sir, between 2:30 a.m. and

22   7:54 a.m.?

23   A.  Yes, sir.

24   Q.  All right.  And is there discussion in this portion about

25   contact with the number that was provided or attempts to

———— W. D. Anderson - Direct ————

1   contact?

2   A.   I'm sorry.  Could you restate the question?

3   Q.   Why don't you just go ahead and read, starting with the

4   first UM, sir.

5   A.   Unidentified male:  "Peace be upon you."

6           Abdullahi:  "Peace be upon you."

7           There was a pause.

8           Unidentified male:  "Peace be upon you.  Abdullahi?

9   Can you hear me, Abdullahi?"

10          Pause.

11          I would characterize this as the interpreter haling

12   the vessel, trying to get Abdullahi on the radio.

13   Q.   All right.

14   A.   Abdullahi responds with:  "Hello?"

15          Unidentified male:  "Okay.  I want to tell you

16   something so, Brother, listen to me, all right?"

17          Abdullahi:  "Yes, yes."

18          Unidentified male:  "First, I did not have contact

19   with that man Mohammad, whose name you gave us and who was

20   from Galkayo" -- unintelligible -- "he is nowhere to be

21   found.  We did not get an answer on the telephone yet, so if

22   you have gotten information about him like other telephone

23   numbers can you give us?"

24          Abdullahi:  "No, my friend.  I am not in contact

25   with him and have not a telephone number, so I could not call

—————— W. D. Anderson - Direct ——————

1   him" -- unintelligible -- "but he will answer."

2   Q.  Agent Anderson, this was on February 21st.  Is that

3   right, sir?

4   A.  Yes, sir.

5   Q.  All right.  And I'd like to go to the next day, February

6   22nd.  On this day, on February 22nd, was there a different

7   pirate that was now involved in the dialogue with the United

8   States Navy?

9   A.  Yes, sir.

10  Q.  And what was his name, if you recall?

11  A.  I would have to refer to my notes to be completely

12  accurate, sir.

13  Q.  Okay.  But it was not Abdullahi?

14  A.  It was not Abdullahi.

15  Q.  Up to this point, now, on February 22nd was there any

16  deviation from the pirates' position that they wanted to go

17  to Somalia before negotiations would begin?

18  A.  No, sir.  They were consistent throughout.

19  Q.  And on February 22nd what timing issues were you dealing

20  with on that day, sir?

21  A.  Well, the timing issues we were dealing with on the 22nd

22  was instead of having until the 23rd to -- which would take

23  us to locations further south along the Somali coast, it

24  appeared that the Quest was making a direct -- they were on a

25  direct path to Somalia, which would put them in Somali waters

———————— W. D. Anderson - Direct ————————

1    on the 22nd.  So I effectively lost a day of negotiation

2    time.

3    Q.  What was the Navy's response to the pirates getting

4    closer and approaching Somalia in a more rapid fashion?

5    A.  As had been relayed to the pirates throughout, they were

6    not going to be allowed to -- they were not going to be

7    allowed to reach Somalia.  We informed them that we were

8    going to peacefully alter their course and doing this by

9    placing the USS Sterett between the Quest and Somali waters.

10   Q.  What was the pirate response to that, to being told that

11   their course would be peacefully altered and that they would

12   not be allowed to reach Somalia?

13   A.  They said they were not going to talk to us anymore.

14   They ceased communications, but right before ceasing

15   communications they said, "We will eat them like meat."

16   Q.  Okay.  And what did you view that to mean, sir?

17   A.  An obvious threat to the safety of them.

18   Q.  Did the Navy begin taking some actions to peacefully

19   alter the course of the Quest?

20   A.  Yes.  The Navy vessels positioned to where the USS

21   Sterett could do what they called a shouldering operation,

22   which is they were going to pull alongside and then in front

23   of the Quest and place the USS Sterett between Somalia --

24   place the Sterett between Somalia and the Quest.

25   Q.  Agent Anderson, as the Navy began this maneuver what did

---
W. D. Anderson - Direct
---

1   the pirates do, sir?

2   A.  As the Sterett was approaching -- as the Sterett was

3   getting closer to the Quest, the pirates on board the Quest

4   fired an RPG at the USS Sterett.

5           THE COURT:  Mr. Samuels, we'll take a break at this

6   time.

7           MR. SAMUELS:  Yes, sir.

8           THE COURT:  Everybody please rise while the jury

9   retires.  We'll take 15 minutes, ladies and gentlemen.

10          (The jury withdrew from the courtroom.)

11          THE COURT:  A 15-minute recess.

12          (A recess was taken.)

13          THE COURT:  Please remain standing.  Bring in the

14  jury, please, Mr. Pierce.

15          (The jury entered the courtroom.)

16          THE COURT:  Let the record reflect that the entire

17  jury has returned.

18          You may be seated.

19          You're reminded, sir, you're still under oath,

20  Mr. Anderson.

21          THE WITNESS:  Yes, Your Honor.

22  BY MR. SAMUELS:

23  Q.  Agent Anderson, before we took our break we were talking

24  about this extraordinary maneuver that the Navy was

25  attempting, and as we get more into that was the Navy

─────────── W. D. Anderson - Direct ───────────

1    following the Quest for the entire time period from

2    February 20th up through the 22nd?

3    A.   Yes.

4    Q.   Okay.  And was it those vessels that you mentioned; the

5    Sterett, the Enterprise, and then one or two other vessels?

6    A.   The Sterett, the other vessel of similar size -- I can't

7    remember the name of that second vessel -- and then the

8    Enterprise came and went from view throughout that period.

9    Q.   Okay.  But the Sterett had eyes on the Quest for that

10   entire time period?

11   A.   Yes, sir.

12   Q.   And as we broke you were talking about what the pirate

13   response was when the Navy started making its approach to

14   peacefully alter their course.  What was that, sir?

15   A.   Yes, as the USS Sterett was gaining ground on the Quest

16   the pirates on the Quest fired an RPG, a rocket-propelled

17   grenade, on the USS Sterett.

18   Q.   Okay.  And, again, what is an RPG?

19   A.   It's a rocket-propelled grenade.  It's a shoulder-fired

20   anti-tank weapon.

21   Q.   How do you know this was fired, sir?

22   A.   It's got a -- while I was not -- I was one person back

23   from the edge of the bridge wing, so I did not have direct --

24   a direct view of the RPG being fired at the time, but the

25   naval personnel in front of me identified it as an RPG.

─────────────── W. D. Anderson - Direct ───────────────

1   There had been observations.  They had an RPG out, so we were

2   all aware that an RPG was visible on the Quest.  Shortly

3   after that I heard the "whoosh."  It's a distinctive sound of

4   an RPG being fired.

5   Q.  And what is that distinctive sound, sir?

6   A.  It's a "whoosh."

7   Q.  All right.  Have you reviewed a video of this event

8   showing the RPG being fired?

9   A.  Yes, and there you can see the distinctive puff of smoke

10  that's indicative of an RPG being fired.

11  Q.  And where was the RPG fired from, Agent Anderson?

12  A.  From the rear, from the stern of the USS -- I mean, from

13  the rear portion of the sailing vessel Quest.

14  Q.  And what direction was it fired towards?

15  A.  It was fired at the USS Sterett.  It went above the USS

16  Sterett.

17  Q.  All right.  Let me show you Government's Exhibit 2-2 I,

18  sir, and ask you if you recognize this.

19  A.  Yes, sir.

20  Q.  And what is 2-2 I, Agent Anderson?

21  A.  This is a video recording of the Quest at the time in

22  question.

23  Q.  All right.  Does it show the RPG being fired?

24  A.  Yes, sir.

25  Q.  And, Agent Anderson, have you viewed that video in 2-2 I?

W. D. Anderson - Direct

1  A.  Yes, sir.

2  Q.  Are your initials on it, sir?

3  A.  Yes, sir.

4       MR. SAMUELS:  Your Honor, I would offer Government's

5  Exhibit 2-2 I.

6       THE COURT:  2-2 I is received in evidence.

7       (The exhibit was admitted into evidence.)

8  BY MR. SAMUELS:

9  Q.  And, Agent Anderson, before we pull 2-2 I up and play it

10 for the jury, is there audio associated with it, sir; do you

11 recall?

12 A.  I'd have to --

13 Q.  Okay, we'll play it.

14      Is there a physical -- what is the physical hallmark

15 of an RPG being fired, sir?

16 A.  A distinctive puff of smoke.

17 Q.  All right.  And do we see that in this video?

18 A.  Yes, sir.

19      (The video recording was played.)

20 BY MR. SAMUELS:

21 Q.  Agent Anderson, was that what we just saw there -- could

22 you see that on your screen?

23 A.  Yes, sir.

24 Q.  Did that depict the RPG being fired?

25 A.  Yes, sir.

W. D. Anderson - Direct

1   Q.  And what happened once the RPG was fired, sir?

2   A.  Almost immediately following the RPG being fired there

3   were shots fired on the Quest.  And at this point, again, I

4   wasn't at the bridge -- I was on the bridge wing, but I

5   wasn't at the railing when the RPG was fired.  I recognized

6   it by sound.  I recognize it on the video by the puff of

7   smoke.

8           After the RPG round went over us I moved to the

9   bridge wing, where I could see.  I could also hear multiple

10  gun shots being fired on the Quest.  It sounded to me as

11  multiple fully automatic weapons being fired.

12  Q.  And what's a fully automatic weapon, Agent Anderson?

13  A.  Fully automatic -- you depress the trigger one time, and

14  the weapon continues to fire until you release the trigger.

15  Q.  And did this occur directly after the RPG had been fired?

16  A.  Yes.  And, again, I stepped to the edge of the bridge

17  wing.  I'm looking at the Quest.  It appeared to me that all

18  the fire appeared to be contained within the Quest.  I didn't

19  hear any rounds -- I didn't hear the crack of any rounds

20  coming at the Sterett.  It appeared to be confined to the

21  Quest.

22  Q.  All right.  Let's finish this video, Agent Anderson.

23  A.  Yes, sir.

24          (The video recording was played.)

25  BY MR. SAMUELS:

Heidi L. Jeffreys, Official Court Reporter

—————— W. D. Anderson - Direct ——————

1   Q.  Agent Anderson, after the RPG had been fired what was the

2   response of the Navy to that, sir?

3   A.  The immediate response was we continued getting closer to

4   the Sterett -- continued getting closer to the Quest.

5   Throughout this -- we're first on the bridge-to-bridge radio

6   continuing to say, "We are not attacking, we are peacefully

7   altering your course, do not fire, do not" -- "We are not

8   attacking, we're just keeping it between you and Somalia."

9        We were doing that via the bridge-to-bridge,

10  recognizing they may not be listening to the bridge, and as

11  we got closer we transitioned from using the radio to a

12  public address system, and again we continued to say, "We are

13  not attacking, we're just getting between you and peacefully

14  altering your course."

15       We also began, in law enforcement terms, what we

16  would call a call-out -- you know, "Come out with your hands

17  up" type verbiage -- asking them to surrender.  You'll see

18  there were a couple individuals in that video that were

19  surrendering.  We were telling any of the pirates that wanted

20  to surrender all they had to do was jump in the water, and we

21  would recover them, we would pick them up.  They were

22  indicating nonverbally that they couldn't swim, but we were

23  again asking people to come out with their hands up;

24  basically, essentially, to surrender.

25       At this point Navy small boats were coming up behind

W. D. Anderson - Direct

1   the Quest, so they were visible.  The pirates would have seen

2   that, had they jumped in the water to surrender, there would

3   have been Navy small boats behind the Quest.

4   Q.  And, Agent Anderson, was there some period of time

5   between when the RPG was fired and the gunfire occurred and

6   the Navy personnel in the small boats coming up to the Quest?

7   A.  Right.  I want to say approximately five minutes or so,

8   and then there was -- there was an RPG and an almost

9   immediate barrage of gunfire.  Some minutes elapse, no more

10  than approximately five or so, there's a second volley of

11  gunfire.  This gunfire is directed at the Sterett.  Shortly

12  after that the two small Navy boats made contact with the

13  Quest and go on board.  There's another exchange of gunfire.

14  I hear the distinct reports of two different weapons, and

15  then they're calling "All clear" on the Quest and requesting

16  immediate medevac.

17  Q.  Agent Anderson, after the RPG had been fired were you in

18  a position to be able to see the Quest then, sir?

19  A.  After the RPG was fired I moved forward where I could see

20  the Quest.  I then immediately moved back to my FBI linguist,

21  to be with -- the way that -- on the bridge wing it was large

22  enough that I would have to step to the edge of the bridge

23  wing to see the Quest.  I would have to step back to the

24  bulkhead where my interpreter was with the bridge-to-bridge

25  radio.  So instead of watching the Quest I immediately went

W. D. Anderson - Direct

1    back to the interpreter to keep coaching him with the -- to

2    keep advising him to keep broadcasting, "We're not

3    attacking," then transitioning to the callout.  And then we

4    moved to the -- toward the left side of the bridge wing to

5    get -- to transition to that microphone that gave us access

6    to the public address system.

7    Q.  And when you had transitioned to the left side of the

8    bridge wing could you then see the Quest again?

9    A.  Then I could see the Quest again, and by now there were

10   more pirates on board with their hands up.

11   Q.  Agent Anderson, I'd like to hand you three final photos,

12   2-2 F, 2-2 G and 2-2 H, and ask if you can recognize these,

13   sir?

14   A.  Yes.  2-2 F -- that would be the view I would have --

15   once I moved to the port, the left side of the bridge wing,

16   by the public address system, that's the view I would have

17   had of the Quest.

18        I take -- actually, that's -- I was still a little

19   further to the rear of the Quest, versus directly alongside,

20   but that's the view I saw on the Quest when I moved to the PA

21   system; although, they would have been slightly ahead of us

22   at that time.

23        The 2-2 G is probably more representative of what I

24   saw when I made that move to the left-hand side of the bridge

25   wing.

Heidi L. Jeffreys, Official Court Reporter

---- W. D. Anderson - Direct ----

1    Q.   Does 2-2 H also show the ending of this scenario, Agent

2    Anderson?

3    A.   2-2 H -- without a time stamp, I would say that this

4    represents the position of the vessels after that last --

5    after the very last gunfire that happened when the U.S. Navy

6    personnel boarded the Quest.

7    Q.   Are there small boats, small Navy boats, adjacent to the

8    Quest, sir?

9    A.   Right, those are the two -- those are the two small Navy

10   boats I said made contact and boarded the Quest.  And given

11   their position, how they kind of moved back away from it, I

12   would say that this is during the time frame we are -- we,

13   the U.S. Government, they, the U.S. Navy -- are conducting

14   the medevac procedures.

15         MR. SAMUELS:  Your Honor, I would offer 2-2 F, 2-2 G

16   and 2-2 H.

17         THE COURT:  F, G and H of 2-2 are received in

18   evidence.

19         (The exhibits were admitted into evidence.)

20   BY MR. SAMUELS:

21   Q.   Agent Anderson, does this depict the scenario after the

22   gunfire and the RPG where some individuals had come up on the

23   bridge with their hands in the air?

24   A.   Yes, sir.

25   Q.   And, Agent Anderson, as we look at the Quest here, sir,

W. D. Anderson - Direct

1  during the course of the discussions did you determine where

2  the Americans had been sitting?

3  A.   Yes.   On that morning we had a conversation -- brief

4  conversation with Captain Adams, and in that conversation we

5  specifically asked him where he and the other hostages were

6  located.   They were sitting in the four corners of that

7  exterior cockpit.

8  Q.   Would that be this area, sir, where I've drawn the arrow?

9  A.   Yes, sir.

10  Q.   And looking at the video and then looking at this photo

11  of the Quest, where was the RPG fired from, Agent Anderson?

12  A.   The RPG was fired from the rear of the Quest.   It would

13  be to the left-hand side of the boat on this picture.

14  Q.   Here?

15  A.   Yes, sir.

16  Q.   Okay.

17  A.   Probably a little bit forward of that, but that general

18  area, sir.

19  Q.   And, again, does this depict the number of individuals

20  who had come out with their hands in the air after the

21  callout that you describe occurred?

22  A.   At that point in time.   They continued to slowly

23  surrender one by one, onesies and twosies.

24  Q.   And, finally, 2-2 H.   Agent Anderson, does this depict

25  the small Navy vessels that interceded and traveled to the

─────────────── W. D. Anderson - Direct ───────────────

1    Quest?

2    A.   Yes.

3    Q.   You mentioned medical treatment.  Did you observe medical

4    treatment being administered, Agent Anderson?

5    A.   Yes.  One of the very first radio calls from the Navy

6    personnel on the Quest was a call for immediate medevac.  You

7    could see back boards being passed from the small Navy boats

8    to the Quest.  You could see individuals being placed on the

9    back boards.  You could see medical personnel treating

10   individuals.  I couldn't tell which individual was which

11   victim, but you saw individuals being treated.  You could see

12   the helicopters come in and individually lift those

13   individuals off, because they were -- you could hear the

14   radio traffic where they were prioritizing the victims.

15   Q.   Do you know whether the medical treatment was able to

16   stabilize any of the hostages?

17   A.   I do know that two hostages still had vital signs when

18   they left the Quest.

19   Q.   Okay.

20   A.   That's the extent of my medical knowledge of that

21   scenario.

22   Q.   Agent Anderson, I'd just like to take you back briefly to

23   the discussions that you and your team had with the pirates

24   on board, the bridge-to-bridge and the translation that we

25   discussed.  Although the pirates indicated that they wanted

W. D. Anderson - Direct

```
 1   to proceed to Somalia, were there discussions about obtaining
 2   a ransom through a negotiator once they got to Somalia?
 3   A.   They clearly defined their roles, and Abdullahi
 4   maintained that he simply goes out and gets vessels.  He's
 5   simply the pirate that seizes the ship cargo, hostages,
 6   whatever; that there was an individual who had the role of
 7   negotiator who spoke English and who would conduct
 8   substantive negotiations.
 9   Q.   And would that negotiator --
10   A.   -- with the Americans, be it the victims' family, be it
11   the U.S. Government, whoever.
12   Q.   Would that involve the release of the hostages in
13   exchange for a ransom?
14   A.   That would involve substantive negotiations where there
15   would be some sort of demand, ransom demand, counteroffers
16   and that involved substantive demands, a quid pro quo
17   release.
18   Q.   And in that discussion that we looked at at the end of
19   the transcript where the unidentified male, the
20   representative of the Navy, indicated that they were not able
21   to contact this negotiator, had there been effort to contact
22   the negotiator at that time, to actually reach out on the
23   telephone?
24   A.   By the hostage-takers or by the U.S. Navy?
25   Q.   By the U.S. Navy, sir.
```

———— W. D. Anderson - Direct ————

1   A.  It was my understanding that they were still in the

2   process of trying to locate him.  And, again, simply coming

3   back to me was they were continuing to work the -- they were

4   continuing to work the issue.  I was not -- I think my

5   notes -- I made a reference to, "The negotiator on land

6   hasn't panned out yet" -- or "hasn't panned out."  It

7   shouldn't have read that "it hasn't panned out yet" because

8   they were still attempting to locate and contact this

9   individual.

10  Q.  So when it's represented in that transcript that they had

11  tried to telephone him and hadn't been able to reach him, to

12  your understanding no telephone call had been attempted?

13  A.  No.  That was merely a delaying tactic to the pirate --

14  the best way to represent that is we're letting them know

15  that we're still continuing to attempt to contact their

16  negotiator on land, but it hasn't happened yet, and we made

17  up an excuse for why it hasn't; we hadn't been able to reach

18  him yet.  Is that more clear, sir?

19  Q.  It is.  And, finally, in the recording we listened to

20  there were some English voices that you could hear, sir.

21  Were there some personnel -- Navy personnel voices that were

22  captured on that recording in addition to the Somali going

23  back and forth?

24  A.  Yes, because this is -- you've got a small digital

25  recorder sitting up on top of the radio, and then you've got

———— W. D. Anderson - Direct ————

1   other personnel around.  You know, you've got the

2   interpreter, you've got the naval commander who is

3   responsible for negotiations, you've got me, you've got other

4   bridge personnel who are in the process of physically driving

5   the boat, so you're going to have other individuals whose

6   voices are going to be captured on that recording.

7   Q.   Thank you, Agent Anderson.

8           MR. SAMUELS:   Just one moment, Your Honor.

9           (There was a pause in the proceedings.)

10  BY MR. SAMUELS:

11  Q.   Agent Anderson, in the course of the discussions with the

12  pirates, did two pirates travel over to the Sterett to talk

13  with the Navy personnel on the evening of February 21st?

14  A.   Yes.  It was the evening of -- it was the afternoon into

15  the early evening hours of the 21st.

16  Q.   And was that part of the ongoing discussions with the

17  pirates in order to try and obtain some sort of resolution of

18  this situation?

19  A.   Yes, sir.

20  Q.   And was there any change in the position of those two

21  pirates, to your knowledge, when they came over to the

22  Sterett as to whether or not they would negotiate before

23  reaching Somalia?

24  A.   No, they were intransient -- intran -- they were not

25  moving from their position.

W. D. Anderson - Cross

1    Q.  Thank you, Agent Anderson.

2         MR. SAMUELS:  Thank you, Judge.  That's all I have.

3                      CROSS-EXAMINATION

4    BY MR. BROCCOLETTI:

5    Q.  Agent, just to be clear, no attempt was made to help make

6    that phone call to the Somali phone number that was given to

7    you, correct?

8    A.  Not -- not up until the time I've testified to the events

9    of the 22nd.

10   Q.  That's because you were saying the continued

11   investigation was on going into that particular phone

12   number --

13   A.  Yes, sir.

14   Q.  -- rather than just picking up the phone and calling it.

15   A.  Right.  We would not just have cold-called that number.

16   It could have driven the individual underground.  We would be

17   making attempts to locate him first.

18   Q.  But you did have two Somalis on board.

19   A.  Yes, sir.

20   Q.  Do you remember their names?

21   A.  We had a naval interpreter -- he went by the name of

22   Mohammad -- and then we had the Bureau linguist.

23   Q.  In addition to that, as Counsel just indicated, towards

24   the afternoon or early evening of the 21st you actually had

25   two of the Somali pirates on board.

———————— W. D. Anderson - Cross ————————

1   A.   Yes, we had two of the Somali pirates on board on the

2   21st.

3   Q.   Was any attempt made to have those two pirates call his

4   252 number in Somalia?

5   A.   No, sir.

6   Q.   Now, I'm going to try to work this, so bear with me.

7   A.   Okay.

8          (There was a pause in the proceedings.)

9   BY MR. BROCCOLETTI:

10  Q.   This is Government's Exhibit 2-1 B.  Do you see that?

11  A.   Yes, sir.

12         THE COURT:  2-1 B?

13         MR. BROCCOLETTI:  Yes, sir.

14  BY MR. BROCCOLETTI:

15  Q.   And in this particular exhibit can you tell us where the

16  pirates planned to go to?

17  A.   Abdullahi states, "He is from Puntland.  He will come and

18  can be contacted.  We will all contact him.  We will talk to

19  that man when we arrive to a place where we think we are in

20  Puntland near Hafun."

21  Q.   All right.  So, from this, the pirates plan to be in

22  Puntland near a place called Hafun.

23  A.   Yes, sir.

24  Q.   And they indicate that the person is in Galkayo?

25  A.   Yes, "He is from Puntland.  He is in Galkayo now."

–––––– W. D. Anderson - Cross ––––––

 1   Q.   If I can show you -- this is Government's Exhibit 2-6 C.

 2          And is that arrow pointing at Hafun?

 3   A.   If you could blow it up, sir -- I don't have my reading

 4   glasses, but it does appear to be Hafun.

 5          (There was a pause in the proceedings.)

 6          MR. DEPADILLA:  Do you mind, Your Honor?  I'll just

 7   help him.

 8          THE COURT:  Please help him.

 9          MR. BROCCOLETTI:  Please do.

10          (There was a pause in the proceedings.)

11   BY MR. BROCCOLETTI:

12   Q.   All right.  In this -- thanks to Mr. DePadilla, we do see

13   Hafun, correct?

14   A.   Yes, sir, that is Hafun.

15   Q.   All right.  And --

16          MR. BROCCOLETTI:  I'm sorry, Judge.

17          (There was a pause in the proceedings.)

18          THE WITNESS:  I can see clearly, and where you're

19   attempting to point to is Galkayo.

20          MR. BROCCOLETTI:  Could you --

21          MR. DEPADILLA:  No problem.

22          MR. BROCCOLETTI:  I apologize.

23   BY MR. BROCCOLETTI:

24   Q.   All right.  So, again thanks to Mr. DePadilla, we see

25   that Galkayo is on the left-hand side, correct?

—————— W. D. Anderson - Cross ——————

1   A.  Yes, sir.

2   Q.  And Hafun is up in the upper right-hand corner.

3   A.  Yes, sir.

4   Q.  Do you have any idea of the distance between those two

5   cities?

6   A.  No, sir, not --

7   Q.  Do you have any idea of the road conditions or the

8   ability to travel between those two cities?

9   A.  No, sir.

10  Q.  Are you at all familiar with the transportation system

11  within Somalia?

12  A.  No, I'm not familiar.

13  Q.  I'm sorry?

14  A.  No, sir.

15  Q.  Now, again going back to 2-1 B...

16          (There was a pause in the proceedings.)

17  BY MR. BROCCOLETTI:

18  Q.  This is 2-1 B 3, again, and in it -- I'm sorry.

19          There's a notation, "However, we have not had any

20  contact with him as of now because we have lost

21  communication."

22          Are you aware of any contact that's recorded in

23  anything from the satellite phones from the Quest to that 252

24  number?

25  A.  I'm not aware of any.

—— W. D. Anderson - Redirect ——

1   Q.  Are you aware of any cell phone records or any type of

2   records that would reflect contact from the Quest at the time

3   to that 252 number?

4   A.  No, sir.

5           (There was a pause in the proceedings.)

6           MR. BROCCOLETTI:  All right.  I believe that's all

7   the questions I'll have.

8           Thank you very much, Your Honor.

9           MR. SAMUELS:  I just have two questions, Judge.

10                  REDIRECT EXAMINATION

11  BY MR. SAMUELS:

12  Q.  Agent Anderson, Mr. Broccoletti asked you about the

13  pirates' course towards Somalia.  In the course of planning

14  for this were you aware of whether or not it appeared that

15  the pirates had changed their course from where they were

16  originally headed to where they ultimately ended up going?

17          MR. BROCCOLETTI:  Judge, I don't think I -- I'm

18  sorry.  I apologize.  I'll sit down.

19          THE WITNESS:  Not being able to see into the mind of

20  the pirates, not -- them not earlier stating -- I'm not aware

21  of them stating an original destination that they would have

22  changed to Hafun.  Our time/distance estimates -- my

23  time/distance estimates that were made when I first got on

24  board the Sterett when we were establishing -- when I'm

25  trying to establish how much time I have to work with, in

1  that time/distance math exercise where we determined midday

2  on the 23rd was based on an intelligence assessment, an

3  intelligence assumption, that they would try to move further

4  down the Somali coastline for a safe haven.  The

5  time/distance math problem puts them off the coast of

6  Puntland early morning hours of the 22nd.

7         Does that answer your question, sir?

8  BY MR. SAMUELS:

9  Q.  So the time period that you were working with got

10  shortened.  Is that right, sir?

11  A.  It decreased from the maximum to the first available

12  landfall on the -- it decreased from the maximum estimate of

13  midday on the 23rd to the first available landfall on the

14  22nd.

15  Q.  Which is where the pirates appeared to be headed on the

16  22nd.

17  A.  On the 22nd, yes, sir.

18  Q.  And with respect to the question about the cell phones,

19  was there -- is there an ability to be able to use -- not

20  talking about satellite phones, but just cell phones when you

21  were out at sea on the 20th and the 21st?

22  A.  No, sir, due to the distance.

23  Q.  Thank you, sir.

24         MR. SAMUELS:  Nothing further, Judge.

25         THE COURT:  In looking at the photographs that were

—— W. D. Anderson - Redirect ——

1    admitted initially, it appeared to be one of the pirates came

2    out with his hands up on the forward part of the Quest.  Was

3    he the first person to raise his hands up in the air?

4         THE WITNESS:  Your Honor, my recollection is fairly

5    early into the incident -- or fairly early into those events

6    there were two individual Somali pirates who surrendered

7    almost immediately.  If you look at the video again you'll

8    see one is standing up, hands raised, in very short order.

9    The second one, if you look closely, appears to be crawling

10   out of a hatch or somehow crawling across the front, and then

11   that's the second individual, Your Honor.

12        THE COURT:  At that time only one round of

13   ammunition had been fired?

14        THE WITNESS:  At that time only one -- my

15   recollection, from my perspective, Your Honor, that one RPG

16   round had been fired, followed almost immediately by the

17   barrage of automatic gun fire on the Quest.

18        When that -- I'm looking at the Quest while that

19   automatic gun fire is occurring.  I don't see anyone

20   surrendering.  I had to step back to give instructions to my

21   interpreter.  At my next look out over the bridge wing there

22   were the two individuals standing up surrendering.

23        THE COURT:  Now, when was the second round heard?

24        THE WITNESS:  Again, there's only the one RPG

25   round --

W. D. Anderson - Redirect

1        THE COURT:  Right.

2        THE WITNESS:  -- followed by a barrage of automatic

3   gun fire that appeared to me to be confined within the Quest.

4   Sometime within the next five minutes, approximately five

5   minutes later, there's a second volley of gunfire on the

6   Quest that I -- I --

7        THE COURT:  Was the second round of gunfire after or

8   before the two men that you indicated were surrendering?

9        THE WITNESS:  I believe -- I believe they were -- I

10  believe those two men were out there already surrendering,

11  and the -- they were on the exterior front portion of the

12  Quest.  The gunfire -- the second volley of gunfire was

13  coming from the cabin area, from the interior of the Quest,

14  and those two individuals were standing on the forward

15  portion of the Quest while the second volley of gunfire

16  occurred.

17        Did I answer your question, Your Honor?

18        THE COURT:  When you say they were standing on the

19  exterior of the Quest, was the man standing there with his

20  hands up at that time?

21        THE WITNESS:  Yes, those two individuals were.

22        THE COURT:  Okay.  Have I raised any questions for

23  you?

24        MR. SAMUELS:  No, sir, Your Honor.

25        MR. BROCCOLETTI:  No, Your Honor.

1          THE COURT:  Thank you.  You may -- you're

2     instructed, Mr. Anderson, not to discuss your testimony with

3     anyone until this case is complete, at which time you're free

4     to discuss it with anyone you like.  You may be excused.

5          Do you want to release him, or do you want to hold

6     him, Mr. Samuels?

7          MR. SAMUELS:  Judge, the government is fine to

8     release him.

9          THE COURT:  Do you want to release him,

10    Mr. Broccoletti?

11         MR. BROCCOLETTI:  I do, Your Honor.

12         THE COURT:  All right.  You may leave.  Thank you,

13    sir.

14

15                    *****     *****     *****

16

17                        CERTIFICATION

18

19         I certify that the foregoing is a correct transcript

20    of an excerpt from the record of proceedings in the

21    above-entitled matter.

22                          s/s

23                    Heidi L. Jeffreys

24                    _____

25                     June 5, 2012