```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                      Norfolk Division

3

4   - - - - - - - - - - - - - - - - - -
    UNITED STATES OF AMERICA,        )
5                                    )
            Plaintiff,               )
6                                    )        CRIMINAL CASE NO.
    v.                               )            2:11cr33
7                                    )
    MOHAMMAD SAAILI SHIBIN,          )
8   a/k/a "Khalif Ahmed Shibin,"     )
    a/k/a "Mohammad Ali,"            )
9   a/k/a "Ali Jama,"                )
                                     )
10          Defendant.               )
    - - - - - - - - - - - - - - - - - -
11

12

13                  TRANSCRIPT OF PROCEEDINGS
                 (Testimony of Robert D'Amico)

14                    Norfolk, Virginia
                      April 25, 2012
15

16

    BEFORE:   THE HONORABLE ROBERT G. DOUMAR,
17            United States District Judge, and a jury

18

19  APPEARANCES:

20            UNITED STATES ATTORNEY'S OFFICE
              By:  Joseph E. DePadilla, Esquire
21                 Benjamin L. Hatch, Esquire
                   Brian J. Samuels, Esquire
22                 Paul Casey, Esquire
                   Assistant United States Attorneys
23                 Counsel for the United States

24            ZOBY & BROCCOLETTI, P.C.
              By:  James O. Broccoletti, Esquire
25                 Counsel for the Defendant
```

```
 1                    I N D E X

 2

 3  ON BEHALF OF THE GOVERNMENT:     Direct   Cross    Red.    Rec.

 4  R. C. D'Amico                      3       54      --      --

 5

 6                  E X H I B I T S

 7  No.                                              Page

 8  Government Exhibit No. 2-6 A                      17

 9  Government Exhibit No. 2-6 B                      17

10  Government Exhibit No. 2-7 A through X            25

11  Government Exhibit No. 2-8 A through N            25

12  Government Exhibit No. 2-7 Y                      29

13  Government Exhibit No. 2-6 D                      36

14  Government Exhibit No. 2-6 E                      40

15  Government Exhibit No. 2-6 F                      41

16  Government Exhibit No. 2-6 G through J            45

17  Government Exhibit No. 2-11 B                     56

18  Government Exhibit No. 2-11 C                     58

19  Government Exhibit No. 2-11 D                     60

20  Government Exhibit No. 2-11 E                     60

21  Defense Exhibit No. 9                             64

22

23

24

25
```

Heidi L. Jeffreys, Official Court Reporter

————————————— R. D'Amico - Direct —————————————

```
 1                    *****      *****      *****

 2

 3          THE COURT:  Who is your next witness, Mr. Hatch?

 4          MR. HATCH:  Your Honor, the United States calls

 5   Robert D'Amico.

 6              (The witness was sworn by the clerk.)

 7          ROBERT CHARLES D'AMICO, called as a witness, having

 8   been first duly sworn, testified as follows:

 9                        DIRECT EXAMINATION

10   BY MR. HATCH:

11   Q.  Good morning, sir.

12   A.  Good morning.

13   Q.  Would you please state your name.

14   A.  Robert Charles D'Amico.

15   Q.  Do you go by "Rob"?

16   A.  Yes, I do.

17   Q.  Where do you work?

18   A.  The Federal Bureau of Investigation.

19   Q.  And how long have you worked for the FBI?

20   A.  Since 1995, about 17 years.

21   Q.  Okay.  And did you have any prior government service

22   before you came to the FBI?

23   A.  Yes, I did.  I was in the Marine Corps.

24   Q.  Now, what's your current role at the FBI?

25   A.  I'm a supervisory special agent with the FBI's Hostage
```

R. D'Amico - Direct

1  Rescue Team.  My specific job is the East Coast Liaison to

2  the Department of Defense.

3  Q.  And where are you stationed for that job?

4  A.  I live in North Carolina, and I go between bases here in

5  Virginia and North Carolina.

6  Q.  Okay.  Now, were you involved in response to the Quest

7  hijacking event?

8  A.  Yes, sir, I was.

9  Q.  And did you actually go out to the scene yourself?

10  A.  Yes, sir, I did.

11  Q.  And when did you arrive?

12  A.  Approximately, February 21st, the evening of.

13  Q.  And where did you first go when you got there on the

14  scene?

15  A.  On the scene I had made my way to the Enterprise and then

16  flew over to the USS Sterett.

17  Q.  Now, when you arrived there at the Sterett there were

18  some other FBI personnel there as well?

19  A.  There was one -- there were two, actually; SA Dale

20  Anderson and the interpreter.

21  Q.  Okay.  And over the course of these events did other FBI

22  agents come onto the Sterett as well?

23  A.  Yes, two others were with me, Brian Maliszewski and

24  Robert Henley.

25  Q.  But were you the senior FBI agent on scene?

R. D'Amico - Direct

1  A.  Yes, sir.

2  Q.  As the senior FBI agent, tell the jury generally what was

3  your job there as these events unfolded?

4  A.  I was to advise the SEAL commander of different issues

5  that had law enforcement implications and also to control the

6  other agents, their placement and where they were best

7  utilized.

8  Q.  Let me take you to the morning of February 22nd, as the

9  Sterett was approaching the Quest.  Where were you that

10  morning?

11  A.  Sir, I was on the wing, outside the bridge, on the port

12  side, the left side of the ship.

13  Q.  Was that the wing that was toward the Quest?

14  A.  Yes, sir, it was.

15  Q.  And as the Sterett was approaching the Quest what, if

16  anything, did you observe coming from the Quest?

17  A.  Coming from the Quest, the first thing we observed was an

18  RPG rocket.

19  Q.  And where did that go?

20  A.  It went directly over our heads, off to our left, and

21  over the Sterett.

22  Q.  And what were the people around you doing when that RPG

23  came at you?

24  A.  Most of them were on the ground.  There was a few of us

25  that were still looking over the side.

—————————————— R. D'Amico - Direct ——————————————

1   Q.   Did you also hear some gunfire that morning on the Quest?

2   A.   Yes, sir, we did.

3   Q.   After that RPG and the gunfire, did the SEAL boats go and

4   board the Quest?

5   A.   Yes, sir, they did.

6   Q.   And did they take control of it?

7   A.   Yes, sir, they did.

8   Q.   Now, after the SEALs had secured the Quest what was done

9   with the Americans that had been on board?

10   A.   The Americans were being handled medically and taken off

11   the Quest and flown over to the Enterprise.

12   Q.   At that point what did you consider the Quest to be?

13   A.   A crime scene.

14   Q.   So what did you do to try to preserve that crime scene?

15   A.   I had actually, before I deployed, agreed with the SEAL

16   commander that it was, in fact, an FBI crime scene and that

17   we would have an agent from the Hostage Rescue Team with his

18   forces to assume control.

19       It didn't go as planned, but as soon as they started

20   making their approach on it I tasked Special Agent Brian

21   Maliszewski to get his gear on, his safety gear, and make his

22   way down to get on the small boat in order to get on the

23   Quest and assume the custody of the crime scene.

24   Q.   And did he do that?

25   A.   He did, in fact.

R. D'Amico - Direct

1   Q.  And what were your instructions to Agent Maliszewski

2   about how to preserve that scene?

3   A.  I told him to leave everything in place unless he thought

4   that it was in jeopardy of, say, falling overboard just due

5   to the seas and the conditions, and not to disturb anything

6   but just to photograph it, take his notes, and then we would

7   try to get it to a position where other evidence people could

8   come in.

9   Q.  And speaking of going overboard, before the SEALs got to

10  the Quest did you see any items get thrown overboard?

11  A.  Yes, sir.  When several of them came from below deck up

12  top, as they turned to go to the front of the Quest they

13  would throw their rifles in the water and then make their way

14  up and put their hands up.

15  Q.  Now, tell the jury how the Quest was ultimately able to

16  be brought back to a port.

17  A.  It was fairly significant to try to tow a sailing vessel.

18  I'm not a sailor, but I take the advice of the people who in

19  fact were.  But we talked about trying to tow it back to

20  Djibouti.  We knew that was the nearest port we could

21  actually get an FBI team in.

22        So they had the chief boatswain mate come out, and

23  he looked at the Quest, and he thought he had come up with a

24  solution to rig it for tow, but he did, in fact, tell us he

25  didn't think it would hold that long but that we would give

——————— R. D'Amico - Direct ———————

1   it the best shot we could.

2   Q.   And did that tow ultimately fail?

3   A.   No.  We got it under tow approximately 8:00 p.m. that

4   evening, and we started towing it.  We were back up in the

5   ward room talking to the ship's captain about trying to get

6   it back, and we were informed that, in fact, the tow line did

7   break.

8   Q.   So after the tow broke off, what was your solution to

9   that problem?

10  A.   In consultation with the captain of the Sterett, I wanted

11  to put Agent Maliszewski back on the Sterett to again control

12  it as a crime scene, and the captain said he had about four

13  sailors that he thought he could get down there and try to

14  fix it.  Due to the damage during the actual incident, it

15  wasn't under its own power, so he thought about four sailors

16  could get down and assess that and get it under its own

17  power, which they, in fact, did.

18  Q.   Okay.  And how long did it take Agent Maliszewski and

19  those sailors to get the Quest back to port?

20  A.   I think it was about four and a half days straight

21  sailing.

22  Q.   And were they able to sleep when they were on that ship?

23  A.   I'm sure they nodded off here and there, but it's

24  basically four days.  In order to preserve, again, the crime

25  scene and everything -- they didn't want to molest it -- they

R. D'Amico - Direct

1    slept on top of the wheelhouse.  There's maybe a 10 x 12
2    area; there was four of them.  So I'm sure they might have
3    slept some, but it probably wasn't a lot.
4    Q.  And then when the Quest was brought back to Djibouti
5    ultimately did the ERT Team come to process it?
6    A.  Yes, sir.
7    Q.  Now, after you got back -- you went back on the Sterett
8    to Djibouti with the Quest.  Is that right?
9    A.  Yes, sir.
10   Q.  After you got back to Djibouti did you become involved in
11   the ongoing efforts to apprehend Mohammad Shibin?
12   A.  Yes, sir, I did.
13   Q.  And did you receive anything in your investigation of him
14   that was -- came from his phone?
15   A.  Yes, sir, I did.  I received a disk that had pictures of
16   Mr. Shibin's phone from another government employee.
17   Q.  And tell the jury what did you do after you got that
18   disk?
19   A.  We started looking at all the pictures.  There were
20   several hundred of them on there.  Some were in English, some
21   were in Somali.  In consultation with Kevin Coughlin, who is
22   the case agent out on the Sterett that was doing the
23   interviews, we were just trying to piece together which
24   messages that were pictured on the phone showed a connection
25   to the actual operation of the Quest.

——————— R. D'Amico - Direct ———————

1   Q.  And, so, did you find materials that you thought showed

2   that connection?

3   A.  We did.  We had some that were in English that were very

4   obvious.  Some we tried to have translated into Somali that

5   we thought -- and then based on some of Kevin's input from

6   names he was hearing we tried to match messages or contacts

7   from the phone pictures to what we knew was involvement.

8   Q.  So these materials that you were finding on the phone,

9   did you do anything to collect them?

10   A.  At that point we were still looking for Mr. Shibin,

11   trying to actually come across him so we could talk to him.

12   So we did know the fact that that phone might not be present,

13   so we took some of the photos that showed what I thought was

14   the most involvement, and we put them on a PowerPoint.  So

15   each page had maybe six or so photos of screen shots of the

16   phones, and we kind of just tried to prioritize which ones we

17   felt showed the most involvement.

18   Q.  Now, at some point -- speaking now in the March, 2011

19   time frame as you're going through that process, at some

20   point were you notified that an arrest warrant had issued for

21   Mr. Shibin from the United States?

22   A.  Yes, sir, I was.

23   Q.  So then did you become involved in the efforts to

24   actually effect that arrest warrant?

25   A.  Yes, sir, I did.

Heidi L. Jeffreys, Official Court Reporter

———————— R. D'Amico - Direct ————————

1   Q.   Did you know -- let me ask you, at some point also in

2   that investigation did you receive information from German

3   law enforcement authorities?

4   A.   Yes, sir, we did.

5   Q.   And what was that?

6   A.   That Mr. Shibin might have been involved in the hijacking

7   of the Marida Marguerite.

8   Q.   And did you get any pictures from them?

9   A.   They did supply one photo of what we believed to be

10  Mr. Shibin on the Marida Marguerite.

11  Q.   Now, at some point were you notified that Mr. Shibin had

12  been captured?

13  A.   Yes, sir, I was.

14  Q.   And tell the jury when that was.

15  A.   That was April 4th, 2011.

16  Q.   And where was he at that time?

17  A.   He was in Bossasso, Puntland, which is an area of -- a

18  semi-autonomic area of Somali.

19  Q.   Okay.  And who had custody of him, according to the

20  information you received?

21  A.   The Host Nation Defense Forces.

22  Q.   Now, to your knowledge, had those Host Nation Defense

23  Forces taken him into custody in cooperation with the FBI's

24  efforts to apprehend him?

25  A.   Yes, sir, they did.

R. D'Amico - Direct

1   Q.   And I'd like to show you 2-6 C, which I believe is

2   already in evidence.

3        Agent D'Amico, do you recognize this as a map of

4   Somalia?

5   A.   Yes, sir.

6   Q.   Okay.  Now -- and the surrounding areas, I should say.

7   That first red arrow I've put on there, where is that

8   pointing to?

9   A.   Djibouti.

10  Q.   Okay.  And is that where you were when you got this

11  information that he had been captured?

12  A.   Yes, sir.  We were working out of there at the time.

13  Q.   Okay.  Now, the second red arrow, what is that pointing

14  to?

15  A.   That's pointing to Bossasso.

16  Q.   Okay.  So after you were notified that he was in Bossasso

17  what did you do?

18  A.   We immediately made travel arrangements, myself and Brian

19  Maliszewski, to go to Bossasso.

20  Q.   And were you able to get there?

21  A.   We were.  I think he was apprehended in the afternoon,

22  and we made it within a few hours, four or five hours, maybe.

23  Q.   When you arrived in Bossasso did you locate Mr. Shibin?

24  A.   Yes, sir, we did.

25  Q.   And where was he?

R. D'Amico - Direct

1   A.   When we first got there the Host Nation Defense Forces

2   had a compound that was on the water, and he was outside

3   the -- there were several buildings, and then he was in one

4   of the outside areas sitting on a carpeted area.

5   Q.   Okay.  And is this compound -- is it a walled compound?

6   A.   Both walls and fences.

7   Q.   But he was in an open area there?

8   A.   Yes, sir.

9   Q.   And who was he with?

10  A.   He was with several members of the Host Nation Defense

11  Forces.

12  Q.   Was he in any restraints when you observed him that first

13  time?

14  A.   No, sir, he was not.

15  Q.   Now, do you see Mr. Shibin in court today?

16  A.   Yes, sir, I do.

17  Q.   Can you indicate where he is?

18  A.   Yes, sir.  He's right there.

19          THE COURT:  Let the record so reflect he's

20  identified the defendant.

21          MR. HATCH:  Thank you, Your Honor.

22  BY MR. HATCH:

23  Q.   Now, while Mr. Shibin was detained at this facility were

24  you and Agent Maliszewski able to monitor his treatment?

25  A.   Yes, sir, we were, with some input from the Host Nation

R. D'Amico - Direct

1   Defense Commander.  We actually had him moved from that

2   outside area to a classroom.

3   Q.  Okay.  And tell the jury -- this classroom, is that where

4   he stayed for the next several days?

5   A.  Yes, sir, it is.

6   Q.  And what accommodations were there in that classroom?

7   A.  The classroom itself had some desks, a TV.  They made

8   kind of like a bed for him on the ground.  It had lights.

9   And then around the corner was a restroom.

10  Q.  Okay.  Throughout the time of Mr. Shibin's custody by the

11  Host Nation Defense Forces did you ever observe him to be

12  mistreated?

13  A.  No, sir, I did not.

14  Q.  To your observations, was he fed adequately?

15  A.  Yes, sir, he was.

16  Q.  Was he allowed adequate rest?

17  A.  Yes, sir.

18  Q.  And adequate space to move about?

19  A.  Yes, sir.

20  Q.  And let me ask you, did you become aware at some point

21  that he had been provided with khat?

22  A.  Yes, sir, we were.

23  Q.  Okay.  And when did you become aware of that?

24  A.  April 5th.  It was the second day -- the first night we

25  were there on the 4th, and then the second day in that

R. D'Amico - Direct

1   afternoon we were made aware during our -- we'd do frequent

2   trips down to where he was, and during one of those we saw

3   that he had been provided khat.

4   Q.  Now, did that cause you any concern as an investigative

5   agent that this gentleman was given khat?

6   A.  Yes, sir.  We didn't want to influence him, like you

7   don't want to influence someone on alcohol or drugs, so we

8   took it the same; that we would not talk to him during the

9   time we thought he was under the influence.

10  Q.  Now, speaking about talking to him, that first day you

11  arrived, April 4th, did you have an opportunity to talk to

12  Mr. Shibin that day?

13  A.  Yes, sir, I did.

14  Q.  And he was still in the Host Nation custody at this time?

15  A.  Yes, sir.

16  Q.  Where did the interview physically occur?

17  A.  The classroom he was in, there was a smaller classroom

18  right to the right of it separated by a concrete wall, and we

19  did the interview in there.

20  Q.  During this interview what, if any, physical restraints

21  was Mr. Shibin in?

22  A.  He was not.

23  Q.  And what were you wearing during this interview?

24  A.  I don't remember specifically, but I had the same clothes

25  for four days, so it was probably a pair of like cargo pants,

—————————— R. D'Amico - Direct ——————————

1   a T-shirt, and then a long buttoned-up like collared shirt,

2   one of the lightweight material ones.

3   Q.  Did you have any visible weapons on you during this

4   interview?

5   A.  Not visible.

6   Q.  And how about Agent Maliszewski?

7   A.  He did not, either.

8   Q.  Now, before this interview did you perform a physical

9   search of Mr. Shibin?

10  A.  Yes, sir, we did.

11  Q.  And what did you find on him?

12  A.  Some, I believe, pocket litter, cigarettes, passport type

13  things.

14  Q.  Did you find any United States currency on him?

15  A.  No, I did not.

16  Q.  Now, at the outset of this interview what rights did you

17  advise Mr. Shibin of?

18  A.  We advised him of his Miranda warnings.

19  Q.  Okay.

20          MR. HATCH:  With the assistance of Mr. Pierce, if I

21  could hand up Government's Exhibits 2-6 A and 2-6 B.

22  BY MR. HATCH:

23  Q.  Agent D'Amico, do you recognize those two exhibits?

24  A.  Yes, sir.  They're the Bureau's Miranda warning form,

25  FD-395s.

────────────── R. D'Amico - Direct ──────────────

1          MR. HATCH:  Your Honor, I would move in Government's

2    Exhibits 2-6 A and 2-6 B.

3          THE COURT:  2-6 A and 2-6 B, Miranda warnings, are

4    received in evidence.

5          (The exhibits were admitted into evidence.)

6          MR. HATCH:  And if I may publish 2-6 A, please.

7          THE COURT:  Yes, you may.

8    BY MR. HATCH:

9    Q.  Now, Agent D'Amico, these are the Miranda warnings you

10   were describing a minute ago?

11   A.  Yes, sir.

12   Q.  Now, what language are these Miranda warnings in?

13   A.  One is in English, and one is in Somali.

14   Q.  Okay.  So specifically on your screen -- if you look on

15   your screen there that might be easier, so you're seeing the

16   same thing I am.

17   A.  Oh, okay.

18   Q.  So 2-6 A, what language is that in?

19   A.  That's the English version.

20   Q.  Okay.  Did you review the Miranda warnings with

21   Mr. Shibin in English?

22   A.  Yes, sir, we did.

23   Q.  Okay.  Did he have any difficulty understanding them?

24   A.  No.  We actually had him also read them out to us in

25   English.

R. D'Amico - Direct

1    Q.   Now, if I could quickly go to 2-6 B, what is 2-6 B,
2    Agent D'Amico?
3    A.   That is the Somali version.
4    Q.   Okay.  So these are the Miranda warnings translated into
5    Somali?
6    A.   Yes, sir.
7    Q.   Did you offer him the Somali version of the Miranda
8    warnings?
9    A.   Yes, sir, we did.
10   Q.   And what did Mr. Shibin say?
11   A.   He said he did not need them; that he understood the
12   English.
13           MR. HATCH:  Okay.  If I could go back to 2-6 A,
14   please.
15   BY MR. HATCH:
16   Q.   Now, do you see that box I've blown up?  Where does that
17   indicate the interview took place?
18   A.   Bossasso, Puntland.
19   Q.   And on April 4th.  Is that right?
20   A.   Yes, sir.
21   Q.   Okay.  Now, after you reviewed these warnings with
22   Mr. Shibin what did you ask him to do?
23   A.   We asked him to sign them.
24   Q.   If you wanted -- if he understood them?
25   A.   If he understood them, yes.

——————————— R. D'Amico - Direct ———————————

1   Q.   And did he in fact sign them?

2   A.   He in fact did.

3   Q.   And is that his signature there on the right by "sign"?

4   A.   It is.

5   Q.   And how about in the witness blocks?  Whose are those

6   signatures?

7   A.   Myself on the second one down, and Agent Maliszewski is

8   the first one.

9   Q.   Now, there's a couple of notations under each of those

10  about the 5th of April, 6th of April.  Do you see those?

11  A.   Yes, sir, I do.

12  Q.   Tell the jury what those denote.

13  A.   Every time we spoke to him on other dates we had him

14  review this whole document and then in fact state that he

15  understood it and sign it again, and then both of us

16  initialed that he in fact did that again.  So every time we

17  talked to him after we had him redo that.

18  Q.   What, if anything, did you do --

19        MR. HATCH:  Actually, you can take that down.

20  BY MR. HATCH:

21  Q.   -- to assess Mr. Shibin's health before you interviewed

22  him?

23  A.   When we initially started to talk to him we asked him,

24  and then we had him have a physical.

25  Q.   Okay.  And were there any health problems?

R. D'Amico - Direct

1    A.   No.  He did mention that his left side hurt from a prior

2    injury, but nothing more specific than that.  He did say he

3    had diabetes that he wasn't taking anything for.  The

4    physical revealed a blood sugar of about 330, which was

5    elevated but not dangerous.

6    Q.   Okay.  Now, did you ask Mr. Shibin about his treatment?

7    A.   Yes, sir, we did.

8    Q.   What did he tell you?

9    A.   We asked him specifically if he was treated well by the

10   Host Nation Defense Forces, if they had done anything to him

11   that constituted something other than good treatment, and he

12   said he had not been.

13   Q.   He had not been mistreated?

14   A.   Had not been mistreated.

15   Q.   Okay.  In this first interview you had with Mr. Shibin

16   who did you tell him you were?

17   A.   Told him we were agents with the U.S. Government.

18   Q.   And did you tell him why you wanted to talk to him?

19   A.   No.

20   Q.   Now, why did you do that?

21   A.   At the time we were going in we had the arrest warrant

22   for him, but we did not know at the time if the government of

23   Puntland would actually, in fact, turn him over to us.  So

24   there was some contention there; that we didn't want to just

25   lay out to everyone exactly why we were there.

R. D'Amico - Direct

1   Q.   Now, during this first interview on April 4 -- so did you

2   ask him anything about piracy in this April 4 interview?

3   A.   No, sir.

4   Q.   What name did he give for himself?

5   A.   Mohamed Salah Ali Shibin.

6   Q.   What did he tell you about what clan he was in?

7   A.   Osman Mohamud.

8   Q.   And did he tell you about when and where he was born?

9   A.   1960, in December -- he didn't have an exact date -- in

10  Mogadishu, Somalia.

11  Q.   Did he tell you where he was currently residing?

12  A.   He said he was currently residing with a nephew in Lanta

13  Hoaba, which is a village right on the outskirts of Bossasso.

14  Q.   Now, what did he tell you about any recent travel he had

15  taken from Somalia to Zambia?

16  A.   He told us that he had left Galkayo, Somalia, went up to

17  Bossasso, over to Djibouti, down to Ababa in Ethiopia, and

18  then on to Lusaka, Zambia.

19  Q.   Okay.  When did he say he left from Galkayo and did that

20  trip?

21  A.   March 1st was the approximate --

22  Q.   What did he tell you he was doing in Zambia?

23  A.   Visiting his sister, Hudan.

24  Q.   And did he also talk about his travel back from Zambia to

25  Somalia?

Heidi L. Jeffreys, Official Court Reporter

R. D'Amico - Direct

1   A.  He did.  And it was basically the same path, but, he'd --

2   like in Addis Ababa he missed his connecting flight and

3   stayed overnight.  When he got to Djibouti he got a three-day

4   visa and stayed at the hotel in Djibouti City and then took a

5   car over to Hargeisa that broke down, he stayed there a

6   couple of days, and then finally made it onward to Bossasso.

7   Q.  What did he tell you about his past employment?

8   A.  He said he used to work for the African Oil Corporation

9   but he had gotten laid off approximately 18 months ago.

10  Q.  Did he tell you about what skills he had brought to that

11  job for African Oil Corporation?

12  A.  He did.  He told us he was a dispatcher and a translator,

13  and when we asked him to explain it he basically picked

14  people up at the airport, took them to where they needed to

15  go, translated and just facilitated their movement.  And he

16  said he spoke good English, some Italian and good Arabic, and

17  that allowed him to do interface with a lot of different

18  folks.

19  Q.  All right.  Now, let me take you to the next day, April

20  5th.  Still in Bossasso?

21  A.  Yes, sir.

22  Q.  He's still under Host Nation custody?

23  A.  Yes, sir.

24  Q.  Did you have occasion to interview him on that day?

25  A.  Yes, sir, we did.

R. D'Amico - Direct

1  Q.  And were the circumstances of that interview, regarding
2  the place where it was conducted and the lack of restraints,
3  the same?
4  A.  Everything was the same, sir.
5  Q.  Okay.  And, similarly, you advised him of his Miranda
6  rights again?
7  A.  Yes, sir, again noted we had him read all through them,
8  asked him if he understood and if he still wanted to talk to
9  us.
10  Q.  And did you again ask him about his treatment?
11  A.  Yes, sir, we did.
12  Q.  And what did he say?
13  A.  He said he was treated fine.
14  Q.  About how long was this April 5th interview relative to
15  the one you had done on the 4th?
16  A.  It was actually very short.
17  Q.  And what was your purpose in going in to talk to him that
18  day?
19  A.  We knew he had had some luggage, and we wanted to go get
20  that luggage, so we asked him to tell us where it was and
21  asked him his consent to go get it and actually search it.
22  Q.  And did he give you consent?
23  A.  He did.
24  Q.  Did you find that luggage?
25  A.  We did.

---- R. D'Amico - Direct ----

1   Q.  We'll talk about that in a minute.

2          Did you ask Mr. Shibin about any cell phones he

3   possessed?

4   A.  Yes, sir, we did.  He said he had two previous cell

5   phones and he had lost one in a taxi in Zambia several weeks

6   earlier.  But he did -- he said that he was using two SIM

7   cards, and the numbers on the SIM cards were 761385 and then

8   228675.

9   Q.  And did he say was it those two numbers with the SIM

10  cards in the phone that he had lost in the taxi?

11  A.  Yes, he did.  He said those were the numbers that were

12  lost in the taxi.

13  Q.  Now, after that conversation with Mr. Shibin did you go

14  out and try to get that luggage?

15  A.  Yes, sir, we did.

16  Q.  And you found it?

17  A.  Yes, sir, we did.

18  Q.  Did you -- what did you then do with it?

19  A.  We brought it back to the classroom, where we talked to

20  Mr. Shibin and asked him, in fact, if that was his luggage.

21  And he said, yes.  And we asked him if we could search it,

22  and he did give us consent.

23  Q.  And did you search that luggage?

24  A.  We did, sir.

25  Q.  Can you describe for the jury -- I mean, what was the

––––––––––––––––––––––– R. D'Amico - Direct –––––––––––––––––––––––

1    luggage that you found?

2    A.   One was a big like cart, rolling-type Samsonite, and

3    another one was just a plastic bag that had different things

4    in it.  So one was just a big hard piece of luggage, and then

5    the other was a small bag.

6              MR. HATCH:  Your Honor, at this time if I may read a

7    stipulation the parties have entered into.

8              THE COURT:  Proceed.

9              MR. HATCH:  "United States Exhibits 2-7 A to 2-7 X

10   and 2-8 A to 2-8 N are documents and items seized from the

11   defendant Mohammad Salah Shibin or his personal effects in

12   Somalia.  United States Exhibits 2-7 A to 2-7 X and 2-8 A to

13   2-8 N were seized by FBI agents in Somalia and were

14   ultimately transferred to the custody of the FBI in Norfolk,

15   Virginia.  United States Exhibits 2-7 A to 2-7 X and 2-8 A to

16   2-8 N have therefore been properly authenticated and are

17   admissible in evidence with no further showing by the

18   government."

19             Your Honor, at this time I would move in evidence

20   2-7 A to 2-7 X and 2-8 A to 2-8 N, although I would note we

21   did not end up doing a 2-8 B, so there would be a gap there.

22   There's no 2-8 B.

23             THE COURT:  2-7 A through X, 2-8 A and N are

24   admitted in evidence.

25             (The exhibits were admitted into evidence.)

Heidi L. Jeffreys, Official Court Reporter

—————————— R. D'Amico - Direct ——————————

1          MR. HATCH:  If I may publish 2-7 A.

2     BY MR. HATCH:

3     Q.  Agent D'Amico, can you first tell the jury generally

4     about what types of bank records that you found in

5     Mr. Shibin's belongings?

6     A.  They all looked like this.  They were all usually

7     single-page documents from the bank, Amal Bank in the Galkayo

8     office.

9     Q.  Okay.  Did you find a large series of these bank records?

10    A.  Yes, sir.  Some were stapled together, but they were all

11    kind of in a stack.

12    Q.  Now in whose name -- particularly, we're now on 2-7 A.

13    In whose name is this bank record?

14    A.  Mr. Shibin's.

15    Q.  And then what's the telephone number under his name?

16    A.  It's that 228675 number.

17    Q.  Is that the same one he gave you?

18    A.  Yes, sir, it is.

19          MR. HATCH:  Now, if I could have --

20    BY MR. HATCH:

21    Q.  And this is dated on what date?

22    A.  That's January 8, 2011.

23          MR. HATCH:  If I could have 2-7 B, please.

24    BY MR. HATCH:

25    Q.  Now, is this another one of the records that you found,

──────────────────── R. D'Amico - Direct ────────────────────

1    Agent D'Amico?

2    A.   Yes, sir, it is.

3    Q.   What type of record is this one?

4    A.   It appears -- it's handwritten for a new account.

5    Q.   And does this record indicate how the account was opened?

6    A.   Yes, sir.  It's a cash deposit, new account.

7    Q.   And what's the date on the handwritten record?

8    A.   January 6, 2011.

9    Q.   Now, does this record also indicate what the opening

10   deposit was for this account?

11   A.   Yes.  It was $37,000, consisting of 370 $100 bills.

12   Q.   And then do you know what type of currency that deposit

13   was made of?

14   A.   U.S. dollars.

15   Q.   Okay.  And is that the third arrow I drew there on the

16   right?

17   A.   Yes, it is.

18        MR. HATCH:  If I may have 2-7 C.

19   BY MR. HATCH:

20   Q.   Agent D'Amico, is this another bank record that you

21   found?

22   A.   Yes, sir, it is.

23   Q.   And is this one associated with that record we were just

24   reviewing?

25   A.   Yes.  It's the typed or computer-printed version of the

R. D'Amico - Direct

1   deposit of receipt.

2   Q.   And what amount is indicated on that receipt?

3   A.   37,000 U.S. dollars.

4   Q.   And what is the date?

5   A.   January 8, 2011.

6   Q.   Did you review all of the bank records that you found

7   during your search of Mr. Shibin's belongings in Somalia?

8   A.   Yes, sir, I did.

9   Q.   Has the information from those -- they were fairly

10  voluminous.  Is that accurate?

11  A.   Yes, sir.

12  Q.   Has the information from those records regarding the date

13  and the type of transaction been entered into a spreadsheet?

14  A.   Yes, sir, it has.

15          MR. HATCH:  If I may unpublish.

16          Do you have 2-7 Y?

17          (There was a pause in the proceedings.)

18          MR. HATCH:  If I could hand it up, please, 2-7 Y.

19  BY MR. HATCH:

20  Q.   Agent D'Amico, do you recognize Government's Exhibit

21  2-7 Y?

22  A.   I do.

23  Q.   And what is that?

24  A.   That is the summary of the deposit and withdrawal slips

25  that we got from his luggage.

———————————— R. D'Amico - Direct ————————————

1   Q.   And is it fair and accurate?

2   A.   Yes, sir, it is.

3          MR. HATCH:  Your Honor, at this time I move in

4   Exhibit 2-7 Y.

5          THE COURT:  2-7 Y is received in evidence.

6          (The exhibit was admitted into evidence.)

7          MR. HATCH:  May I publish?

8          THE COURT:  Yes, you may.

9   BY MR. HATCH:

10  Q.   Now, Agent D'Amico, I've blown up a part of that.  What

11  are the three columns that are in this spreadsheet?

12  A.   The date, deposits and withdrawals.

13  Q.   And is the date the date of the transaction noted in the

14  records?

15  A.   It is.

16  Q.   What was the first dated transaction that you found?

17  A.   The January -- January 8th was the formalized one.  The

18  one that was in handwriting was the 6th.

19  Q.   Correct.  Okay.  And the deposit amount, again?

20  A.   $37,000.

21  Q.   Now, how many deposits were there in the entire period --

22  well, let me ask you first what was the date of the last

23  record that you found?

24  A.   March 1st, 2011.

25  Q.   How many deposits were there in that entire date range

R. D'Amico - Direct

1    that you had records?

2    A.   Two, sir.

3    Q.   And what was the total amount of deposits in that date

4    range?

5    A.   $30,700.

6    Q.   Now, with regard to the withdrawals, how many total

7    withdrawals were indicated in the bank records for the period

8    from January 10th to March 1st, 2011?

9    A.   20, sir.

10   Q.   And what was the total amount of those withdrawals?

11   A.   The total amount was $19,952.

12   Q.   Now, did you also find in the luggage and in the personal

13   belongings a lot of travel-related documents?

14   A.   Yes, sir, we did.

15   Q.   Flight records, passenger tickets, that sort of thing?

16   A.   Yes, sir.

17   Q.   And is that in the government's series 2-8?

18   A.   It is.

19        MR. HATCH:  I'd like to publish what's been

20   previously admitted as Government's Exhibit 2-8 M, page 2,

21   please.

22   BY MR. HATCH:

23   Q.   Agent D'Amico, can you tell the jury what is the 2-8 M

24   exhibit itself?

25   A.   Mr. Shibin's passport.

———————————————— R. D'Amico - Direct ————————————————

1   Q.   Somali passport?

2   A.   Yes, sir.

3   Q.   And what name does it list for Mr. Shibin?

4   A.   Mohamed Salah Ali.

5   Q.   And what occupation does it give for him?

6   A.   Teacher.

7   Q.   Okay.

8           MR. HATCH:  You can take that down.

9           MR. BROCCOLETTI:  I'm sorry.  What's the number?

10          MR. HATCH:  2-8 M, page 2.

11  BY MR. HATCH:

12  Q.   All right.  Now I want to go to the next day, April 6th.

13          Did you have the opportunity to interview Mr. Shibin

14  again on that day?

15  A.   We did.

16  Q.   Now, what were the circumstances of this interview, and,

17  particularly, were there some time constraints, and what was

18  going on with this custody?

19  A.   There were -- there were -- we were informed again -- I

20  told you when we first got there we weren't sure if the

21  turn-over was going to go as planned.  It did not for a

22  couple of days, and a high-level thing was worked out that

23  the Host Nation Defense Forces were going to turn Mr. Shibin

24  over to the Bossasso Police Department, who would then turn

25  him back over to us to be flown out of Bossasso.

Heidi L. Jeffreys, Official Court Reporter

R. D'Amico - Direct

1   Q.  And so were there -- what time constraints did that

2   impose on your interview with Mr. Shibin?

3   A.  We were told this approximately an hour, hour and a half

4   before we had to turn him over.

5   Q.  Okay.  At the outset of the interview, again, were the

6   circumstances the same as the ones on the 4th and the 5th

7   that we've already talked about?

8   A.  Yes, sir.  We went through his treatment questions again,

9   and he did not indicate he was mistreated.  And then we again

10  asked him to review his advice of rights, which he, in fact,

11  did and signed again.

12  Q.  Now in this April 6 interview what did you decide you

13  were going to ask Mr. Shibin about?

14  A.  We decided to ask him about piracy, since it was already

15  deemed that they were going to turn him over to us.  But we

16  did -- we always thought there was a possibility we might not

17  see him again, so we wanted to go ahead and ask him direct

18  questions about piracy.

19  Q.  So what was the first thing you asked him about?

20  A.  What he knew about piracy.

21  Q.  And what did he say?

22  A.  He first said he didn't know anything about piracy.

23  Q.  All right.  After that initial statement did he say

24  anything more he knew about piracy?

25  A.  He started saying that he was -- he started translating

R. D'Amico - Direct

1    for these people.  And then we asked him to elaborate about
2    who are "these people," and he said, "The pirates."
3    Q.   Now, what period did he initially state that he worked
4    for the pirates?
5    A.   May and June of 2010.
6    Q.   And in what capacity did he say he worked for the
7    pirates?
8    A.   As a pirate negotiator.
9    Q.   Now, were those his words, or is that some summaries you
10   are giving of what he said?
11   A.   No, those were his words.
12   Q.   Did Shibin tell you how he came to be involved as a
13   pirate negotiator?
14   A.   He was approached by a friend to participate in the crime
15   of piracy, and then he said that he did some research after
16   being approached to see if he wanted to get into it.
17   Q.   And let me just ask you again.  Were those his words,
18   "crimes of piracy"?
19   A.   Yes, sir.
20   Q.   And did you ask him who this friend was who had
21   approached him?
22   A.   We did.
23   Q.   And who did he tell you it was?
24   A.   He could not give a name.
25   Q.   Now, you said he indicated he had researched the

R. D'Amico - Direct

1   possibility of getting involved.  Did he say how he went
2   about researching this?
3   A.  He spoke to some friends and associates.
4   Q.  All right.  Did you ask him who those friends and
5   associates were?
6   A.  We did, and again he couldn't name any of them.
7   Q.  All right.  What did he say that his interviews with
8   these -- or research with these unnamed people had revealed
9   to him about piracy?
10  A.  He told us that his friends and associates told him that
11  if he was a negotiator he could make money and he wouldn't be
12  considered a criminal.  And then he said that he believed,
13  after talking to them, that he could act as a negotiator, and
14  as long as he didn't hijack the vessel he wouldn't be
15  considered a criminal.
16  Q.  Did Shibin say whether he had ever had any encounters
17  with the authorities regarding piracy before?
18  A.  He did.  He said he was arrested and detained for matters
19  related to piracy, but he didn't elaborate on that comment.
20  Q.  Now, in this interview did Shibin tell you about an
21  individual he referred to as Looyan or Leon?
22  A.  Yes, sir, he did.
23  Q.  And what did Shibin tell you about Leon's involvement in
24  the vessel the Marida Marguerite?
25  A.  He first stated that Leon was a pirate commander, an

——————————— R. D'Amico - Direct ———————————

1    investor and a negotiator, and then he went on to say that

2    Leon had taken his place on the Marida Marguerite.

3    Q.  And did he say that this replacement of him by Leon --

4    whether that had had any effect on the timeline of those

5    negotiations?

6    A.  Yes.  He said that was -- Leon was the reason that it

7    took longer.

8    Q.  Now, at that point did Shibin say anything about his own

9    involvement specifically in the Marida Marguerite?

10   A.  He did.  He said that he had operated as the pirate

11   negotiator that one time and that he had earned $30,000 for

12   his participation in the hijacking.

13   Q.  Now, did you decide to show Mr. Shibin something at this

14   point in the interview?

15   A.  Yes, sir, we did.

16        MR. HATCH:  With Mr. Pierce's assistance I'm handing

17   up Government's Exhibit 2-6 D.

18   BY MR. HATCH:

19   Q.  Do you recognize that, Agent D'Amico?

20   A.  I do.

21   Q.  And what is Government's Exhibit 2-6 D?

22   A.  That is the photo that the German authorities had given

23   us of Mr. Shibin on the Marida Marguerite.

24        MR. HATCH:  Your Honor, I move into evidence 2-6 D

25   and ask to publish it.

R. D'Amico - Direct

1           THE COURT:  2-6 D is received in evidence.

2           (The exhibit was admitted into evidence.)

3    BY MR. HATCH:

4    Q.  Okay.  So is this the picture -- what did you do with

5    this picture in the interview?

6    A.  We basically put it across the table and let him take a

7    look at it.

8    Q.  And what's this notation on the upper left-hand corner,

9    "#16"?

10   A.  That was how we numbered -- I told you we put together a

11   series of documents to show him, if we got the chance, and

12   that was the number we put on there.

13   Q.  Now, what did Shibin tell you about this picture when you

14   showed it to him?

15   A.  He said that was him on the Marida Marguerite.  That was

16   his words, "That's me on the Marida Marguerite."

17   Q.  Did Shibin provide any additional information at that

18   time about how he came to be involved in the Marida

19   Marguerite?

20   A.  He said he was called directly by the pirates to come out

21   and act as the translator for them, for the pirate crew.

22   Q.  And did he say who it was who had actually made that call

23   to him?

24   A.  He told us that an individual by the name of Farah or

25   Manxhe had called him directly.

R. D'Amico - Direct

1   Q.  Okay.  And if I spell Farah F-A-R-A-H and Manxhe

2   M-A-N-X-H-E would that be about right?

3   A.  Yes, sir.

4   Q.  Okay.  And did you ask him if he had any phone numbers

5   for this Farah?

6   A.  We did.  He didn't have any.

7   Q.  And, again, what did he say Farah had asked him?

8   A.  Asked him to act as the translator for the pirate crew.

9   Q.  Now, did Shibin tell you how he thought that this Farah

10  individual had gotten his phone number to call him?

11  A.  He believes that he got it from a gentleman by the name

12  of Liban, L-I-B-A-N.

13  Q.  And did you ask him if he had any contact information for

14  Liban?

15  A.  We did.

16  Q.  And what did he say?

17  A.  He did not have any.

18  Q.  Did Shibin say why he thought Liban would have passed his

19  number to Farah as the guy to contact?

20  A.  He believed that he told -- Liban told Farah that

21  Mr. Shibin spoke good English and, therefore, could act as a

22  translator.  He also believed that Liban did this because he

23  knew that Mr. Shibin was unemployed and needed the money.

24  Q.  What, if anything, did Mr. Shibin tell you about the

25  actual conditions on the Marida Marguerite?

—————————— R. D'Amico - Direct ——————————

1   A.   He described them as horrible.

2   Q.   And what did he tell you about the hostages?

3   A.   He said that all the hostages were kept in a small

4   wheelhouse, and there was 22 of them so the area was very

5   small.

6   Q.   Now, let me ask you, after you showed this picture,

7   2-6 D, to Mr. Shibin and he identified it as himself, did you

8   ask him to do anything to confirm that?

9   A.   We did.   We asked him if he, in fact -- if he thought

10   that was him on the Marida Marguerite to go ahead and sign

11   that document.

12   Q.   And did he do that?

13   A.   He did.

14   Q.   Now, Agent D'Amico, it doesn't appear to be on the

15   scanned copy we're showing, so could you hold up the hard

16   copy up there and just turn it around and show the jury where

17   his signature appears on that document?

18          (There was a pause in the proceedings.)

19   BY MR. HATCH:

20   Q.   Did it not get on that copy, either?

21   A.   It didn't get on this copy.

22   Q.   Okay.   We'll move on.

23          MR. HATCH:   You can take that down.

24   BY MR. HATCH:

25   Q.   What did Mr. Shibin tell you about his relationship with

—————————————— R. D'Amico - Direct ——————————————

1    the persons holding the hostages?

2    A.  Initially he said that the other pirates had respected

3    him, but then they came to believe that he was being too

4    lenient on the hostages.  He had mentioned that he would let

5    them use his cell phone to call their families during

6    bathroom breaks.

7    Q.  And when did Shibin say that he left the Marida

8    Marguerite?

9    A.  December, 2010.

10   Q.  After you had this discussion about the Marida Marguerite

11   did you try to turn the interview to the Quest piracy

12   incident?

13   A.  Yes, sir, we did.

14   Q.  And how did you begin questioning him pertinent to the

15   Quest?

16   A.  We handed him a photo and asked him to ID that if that,

17   in fact, was his phone.

18          MR. HATCH:  At this time, if I could, Mr. Pierce --

19   thank you -- I'm handing up 2-6 E and 2-6 F.

20   BY MR. HATCH:

21   Q.  Do you recognize 2-6 E?  First I'll start with that one.

22   A.  I do, sir.

23   Q.  And what is 2-6 E?

24   A.  It is a picture of his phone.

25          MR. HATCH:  Your Honor, I move into evidence 2-6 E.

———————————— R. D'Amico - Direct ————————————

1           THE COURT:  2-6 E is received in evidence, a picture

2      of a phone.

3               (The exhibit was admitted into evidence.)

4           MR. HATCH:  Please publish.

5      BY MR. HATCH:

6      Q.   Agent D'Amico, in the upper left-hand corner again

7      there's a notation of "A."  What does that reflect?

8      A.   That is, again, how we labeled it so we could track it.

9      Q.   Okay.  Now, how did you use this slide in your interview

10     with Mr. Shibin?

11     A.   Again, we just -- we were across the table, and we just

12     handed it over to him and asked him to look at the photo and

13     asked him if, in fact, that was his phone in the photo.

14     Q.   And what did Shibin say?

15     A.   He said, "That definitely looks like my phone."

16     Q.   And did he say anything about what had happened to that

17     phone?

18     A.   He said that was the one that he lost in the taxi.

19     Q.   What did you ask Mr. Shibin to do with that slide at that

20     point?

21     A.   We asked him to look at it carefully, review it, and if

22     he in fact thought it was his phone to go ahead and sign that

23     document.

24     Q.   Okay.  And did he do that?

25     A.   He did.

R. D'Amico - Direct

1    Q.   And is that his signature on the upper right-hand corner?

2    A.   Yes, sir, it is.

3    Q.   And then, turning to 2-6 F, do you recognize that

4    document, Agent D'Amico?

5    A.   I do.

6    Q.   And what is that?

7    A.   That's one of the slides that -- we talked about putting

8    pictures of his phone with messages on it.  That's one of the

9    first ones that we had done.

10   Q.   Now, let me ask you, did you create just one slide, or

11   did you have a lot that had pictures from the phone?

12   A.   No, we had quite a few because there were so many photos,

13   but we prioritized them.

14   Q.   Okay.  Given the limited time you had?

15   A.   Yes, sir.

16   Q.   And is 2-6 F the one that you showed him?

17   A.   It is.

18              MR. HATCH:  Your Honor, I would move in 2-6 F.

19              THE COURT:  2-6 F is received in evidence.

20              (The exhibit was admitted into evidence.)

21   BY MR. HATCH:

22   Q.   Now, Agent D'Amico, tell the jury a little bit about how

23   you went about selecting these recent contact photos that

24   appear in this exhibit.

25   A.   Through my conversations with Kevin Coughlin, the case

Heidi L. Jeffreys, Official Court Reporter

R. D'Amico - Direct

```
 1   agent, when he was on the Enterprise and when he was actually
 2   back in New York, we went through the photos that we found of
 3   his phone, and based on the interviews of the other pirates
 4   we figured out who were in his contacts that might have had
 5   some involvement with the Quest.  So those are the contacts
 6   that we put in that first page.
 7   Q.  So you were getting information fed through other
 8   interviews that were happening?
 9   A.  Yes, sir, I was.
10   Q.  Now, how did you go about deciding which of these text
11   searches to include?
12   A.  We basically went with the ones that were in English and
13   that we felt showed the most obvious connection to the
14   operation on the Quest.
15   Q.  All right.  Now, again, what did you do with the slide in
16   your interview with Mr. Shibin?
17   A.  We handed it over the table and let him see that and look
18   at all those pictures.
19   Q.  And what did Mr. Shibin say about where these pictures
20   had come from?
21   A.  He identified it as being pictures of his phone.
22   Q.  And what did you ask him to do then?
23   A.  We asked him to go ahead and if he would review it, and
24   if he thought that they were his to go ahead and sign it
25   again.
```

R. D'Amico - Direct

1    Q.   Okay.  And did he do that?

2    A.   He did.

3    Q.   Now, what did you ask him about the actual pictures that

4    are contained on this slide?

5    A.   We asked him, actually, if he had, in fact, searched

6    those topics; the hijacked Quest value, Jean and Scott Adams,

7    and other ones in there.  We asked him if he in fact searched

8    those with his phones.

9    Q.   And what was his response?

10   A.   He said he in fact did using the 111 feature.

11   Q.   And had he explained to you what this 111 feature was at

12   that time?

13   A.   He did.  It was just a search means on his phone that

14   they did from Somalia, how to search the Internet.

15   Q.   Now, did he also tell you about a separate auto alert

16   feature he had set up on his phone?

17   A.   Yes, he did.  He told us unsolicited that he had an auto

18   alert feature that sent messages about hijackings in and

19   around Somali waters directly to his phone.

20   Q.   Did you ask him why he would have a feature like that?

21   A.   We did.  He said, "You have to know the number of people

22   and the value of the boat."

23   Q.   Were those his own specific words?

24   A.   Yes, sir, they were.

25   Q.   When he told you that what did you say in response?

R. D'Amico - Direct

1   A.  We asked him, "Why would someone need that information?"

2   Q.  And what did he say?

3   A.  He said, "Curiosity."

4   Q.  And what did you ask him then?

5   A.  At that point I said, you know, "I'm a curious person,

6   but when I look at news stories I don't research how to get

7   ahold of victims and the value of certain things and the

8   details that showed this.  So again I asked him, "Why would

9   you search in that much detail on how to get ahold of

10  victims?"

11  Q.  And what did he say?

12  A.  He just repeated, "Curiosity."

13  Q.  Now, did you decide in your interview to show Mr. Shibin

14  some more slides at this point?

15  A.  Yes, sir, I did.

16  Q.  I'm handing up 2-6 G to 2-6 J.  Agent D'Amico, do you

17  recognize those four exhibits?

18  A.  I do.

19  Q.  And what are those?

20  A.  Those are pictures of the pirates that were on the Quest

21  that were flown back to the United States.

22  Q.  Okay.  Now, were those all the pirates or just some of

23  them?

24  A.  No, sir, just some of them.

25  Q.  And where did you get those pictures from?

———————————— R. D'Amico - Direct ————————————

1  A.  The case agent, Kevin Coughlin.

2          MR. HATCH:  Your Honor, at this time I'd move in

3  2-6 G to 2-6 J.

4          THE COURT:  2-6 G and J are received in evidence.

5          MR. HATCH:  And it's G, H, I and J, if I may, Your

6  Honor.

7          THE COURT:  All right.  G is what?

8          MR. HATCH:  These are --

9  BY MR. HATCH:

10  Q.  What is 2-6 G?

11          These are the four pictures, is that right, that you

12  showed him?

13          THE WITNESS:  Yes, sir.

14          MR. HATCH:  I can pull it up on your screen, if you

15  would like, Your Honor.

16          THE COURT:  2-6 G are four pictures of what?

17          MR. HATCH:  I'm sorry.  2-6 G is one picture of one

18  individual, H is another picture of another individual, so

19  on, for I and J.

20          THE COURT:  Okay.  They are received in evidence.

21          (The exhibits were admitted into evidence.)

22  BY MR. HATCH:

23  Q.  Now, did you show all four of those pictures to

24  Mr. Shibin?

25  A.  Yes, sir, we did.

Heidi L. Jeffreys, Official Court Reporter

R. D'Amico - Direct

1   Q.  And who, if anyone, in those four pictures did he say

2   that he recognized?

3   A.  He said he could only identify No. 6.

4         MR. HATCH:  Now, if I may publish 2-6 G.

5   BY MR. HATCH:

6   Q.  Is this the individual that he said he recognized?

7   A.  Yes, sir, it is.

8   Q.  And who did he say that person was?

9   A.  Juguf.

10  Q.  Did he say when the last time he had spoken to Juguf was?

11  A.  Late December of 2010, after he left the Marida

12  Marguerite.

13  Q.  Where did Mr. Shibin describe that conversation between

14  himself and Juguf occurring?

15  A.  Galkayo, Somalia.

16  Q.  Did he say if Juguf had told him anything about what he

17  was up to at that time?

18  A.  He said Juguf was going back over to Garaad to meet up

19  with some other pirates.

20  Q.  And then did he also say if he subsequently learned that

21  Juguf was involved in piracy?

22  A.  He did.  He said he learned from Liban that Juguf had

23  joined the pirate crew.

24  Q.  Did you ask Mr. Shibin if Juguf had spoken to him via

25  phone after that meeting in December?

R. D'Amico - Direct

1   A.  Yes, sir, we did, and he said he had not.

2   Q.  Now, did Mr. Shibin say whether he recognized any of the

3   other individuals that you showed him?

4   A.  He said he did not.

5   Q.  Okay.  If I may publish 2-6 H.

6        Is this another individual you showed him?

7   A.  Yes.

8   Q.  2-6 I?

9   A.  Yes, sir.

10  Q.  You showed Mr. Shibin this picture?

11  A.  Yes, sir.

12  Q.  And then 2-6 J?

13  A.  Yes, sir.

14  Q.  And he said he didn't recognize any of those other --

15  those three individuals?

16  A.  That is correct.

17  Q.  Now --

18        MR. HATCH:  Thank you.  You can take that down.

19  BY MR. HATCH:

20  Q.  Did Mr. Shibin bring the conversation back to the Quest

21  hijacking at that point?

22  A.  He did.

23  Q.  And what did he tell you about his searches that he

24  conducted?

25  A.  He said that -- he said he did not hijack the U.S. Quest

R. D'Amico - Direct

1   and that the searches were out of personal curiosity.

2   Q.  And did he say anything about whether he had agreed to

3   help them with the Quest?

4   A.  He said he did not agree to help them with the Quest.

5   Q.  Did he say what he meant by that statement?

6   A.  No, he didn't elaborate.

7   Q.  Did he say whether he had any knowledge of the Quest

8   hijacking?

9   A.  He said he did know about the hijacking of the Quest but

10  he never had an interest in negotiating for its release or

11  its return.

12  Q.  Okay.  I'd asked you before about that picture of him on

13  the German ship, and we didn't have the signature on that.

14  Are you sure whether he signed that one or not?

15  A.  Yes, sir, we asked him to identify and sign those photos.

16  Q.  Okay.  Now, in this interview on April 6 did Mr. Shibin

17  ever say to you that he had been a member of a

18  non-governmental organization?

19  A.  No, sir, he had not.

20  Q.  Did he ever say to you that he was a reporter or a

21  journalist?

22  A.  No, sir, he had not.

23  Q.  Did he ever say that he had participated in the Marida

24  Marguerite piracy on behalf of the hostages?

25  A.  No, sir, he did not.

Heidi L. Jeffreys, Official Court Reporter

R. D'Amico - Direct

```
1   Q.  And did he ever say he had been forced to engage in the
2   Marida Marguerite?
3   A.  No, sir, he did not.
4   Q.  And did he ever say that he had decided not to
5   participate in the Quest piracy because he had vacation plans
6   to Zambia?
7   A.  No, sir, he had not.
8   Q.  Now, after that interview came to an end what happened to
9   Mr. Shibin?
10  A.  He was released over to the custody of the Bossasso
11  Police Department and then turned back over to us.
12  Q.  So, when was the next time that you personally saw
13  Mr. Shibin?
14  A.  It was probably around midnight on the airfield.
15  Q.  In Bossasso?
16  A.  Yes, sir.
17  Q.  Did you place him under arrest at that time?
18  A.  I did.
19  Q.  And did you tell him what charges he was under arrest
20  for?
21  A.  I did.
22  Q.  And were all those charges related to the Quest piracy
23  incident?
24  A.  Yes, sir, they were.
25  Q.  Did you search him at that time?
```

——————————————— R. D'Amico - Direct ———————————————

1   A.  I did, sir.

2   Q.  And what, if anything, did you find on him?

3   A.  We found -- at that time we found money.  We found U.S.

4   currency on him.

5           MR. HATCH:  If I may, Mr. Pierce.

6   BY MR. HATCH:

7   Q.  I'm handing up Government's Exhibit 2-8 N.

8           Agent D'Amico, do you recognize Exhibit 2-8 N?

9   A.  Yes, sir.

10  Q.  And what is that?

11  A.  That is the money we found on Mr. Shibin.

12  Q.  And how much money is that?

13  A.  It's $1,620.

14  Q.  Now, is it a surprise to you that Mr. Shibin had $1,620

15  on him at that point?

16  A.  It was a very big surprise.

17  Q.  And why was that a surprise to you?

18  A.  Because, again, when we searched him when we first got to

19  Bossasso he had no money on him.  He was in the watchful eye

20  of the Host Nation Defense Forces that entire time.  And then

21  he was turned over to the police department and then brought

22  back to us, and he showed up with $1,600 -- over $1,600.

23  Q.  Now, did you ultimately travel back with Mr. Shibin all

24  the way back to the United States?

25  A.  I did.

—————— R. D'Amico - Direct ——————

1   Q.  And where was it that you -- you took a plane, I take it,

2   for most of that journey?

3   A.  Yes, sir.

4   Q.  Where was it that you first touched down --

5          THE COURT:  Mr. Hatch, how long are you going to be

6   with this witness?

7          MR. HATCH:  Almost done, Your Honor.  I've got two

8   more questions.

9          THE COURT:  Oh, okay.  Go ahead.

10  BY MR. HATCH:

11  Q.  Where was it that you first touched down in the United

12  States?

13  A.  In the United States it was at Oceana Naval Air Station.

14  Q.  And is that here in the Eastern District of Virginia?

15  A.  It is.

16  Q.  And from the point that you took Shibin into custody

17  until that point when you touched down in Oceana in Virginia

18  Beach was he ever in another part of the United States?

19  A.  No, sir, he was not.

20  Q.  So that was where he was first brought?

21  A.  Yes, sir.

22         MR. HATCH:  The Court's indulgence.

23         (There was a pause in the proceedings.)

24         MR. HATCH:  No further questions, Your Honor.  Thank

25  you.

Heidi L. Jeffreys, Official Court Reporter

—— R. D'Amico - Direct ——

1          THE COURT:  Did you remember what the dates of the
2    curiosity research on the Quest and the Adams (sic)
3    individuals were, what that date was?
4          THE WITNESS:  I could actually look at the pictures
5    of the phone, because each of them have a date and time.
6          THE COURT:  Would you publish that, please.  It's
7    2-6 F, I believe.  2-6 F?
8          MR. HATCH:  Correct, Your Honor.
9          If I may assist, Your Honor, just to make these big
10   enough to see.
11         (There was a pause in the proceedings.)
12   BY MR. HATCH:
13   Q.  Starting in the upper right-hand corner, Agent D'Amico,
14   if you could just read the text of the search and then the
15   date on which it occurred.
16   A.  "Hijacked S/V Quest value, 20/02/2011, 04:10:21 p.m."
17         THE COURT:  That would mean it was on February
18   the 20th?
19         THE WITNESS:  That would be February 20th, sir.
20         THE COURT:  February the 20th.  At what time?
21         THE WITNESS:  That one was 4:10 p.m.
22         THE COURT:  Just keep going with all of them.
23   BY MR. HATCH:
24   Q.  Okay.  Let's start on the left, Agent D'Amico, on the
25   second row now.

—————— R. D'Amico - Direct ——————

1   A.   "Jean and Scott Adam's profile, February 20, 2011,

2   2:56 p.m."  I assume I can eliminate the seconds.

3           The next one is, "Jean and Scott Adam's profile"

4   again, is "February 20, 2011, 2:39 p.m."

5           The next one is "Address of hijacked S/V Quest

6   owner."  That's "February 19, 2011, 3:52 p.m."

7   Q.   Starting on the left again -- do I need to make it

8   bigger?

9   A.   A little bit.

10          (There was a pause in the proceedings.)

11          THE WITNESS:  "Address of the hijacked sailing

12   vessel Quest owner, February 19, 2011, 3:43 p.m."

13          The next one, "Jean and Scott Adam's telephone

14   number, February 19, 2011, 3:36 p.m."

15          "Hijacked sailing vessel Quest by Somali pirates,

16   February 19, 2011, 2:53 p.m."

17          "Hijacked sailing vessel Quest by Somali pirates,

18   February 19th, 2011, 2:47 p.m."

19          THE COURT:  I'm satisfied.  You don't have to answer

20   any more.

21          (There was a pause in the proceedings.)

22          THE COURT:  Have I raised any questions for any of

23   you?

24          MR. BROCCOLETTI:  Judge, I've not conducted

25   cross-examination yet.

Heidi L. Jeffreys, Official Court Reporter

─────────────── R. D'Amico - Cross ───────────────

1           THE COURT:  All right.

2           MR. BROCCOLETTI:  Would you like to do that now --

3     it will take some time -- or --

4           THE COURT:  No, I think we ought to take a luncheon

5     break, Mr. Broccoletti.

6           MR. BROCCOLETTI:  Yes, sir.

7           THE COURT:  We'll take a luncheon break until 1:30.

8           (The jury withdrew from the courtroom.)

9           THE COURT:  We will take a luncheon break until

10    1:30.

11          (A luncheon recess was taken.)

12          THE COURT:  Please remain standing.  Bring in the

13    jury, please, Mr. Pierce.

14          (The jury entered the courtroom.)

15          THE COURT:  You may be seated.

16          Let the record reflect the entire jury has returned.

17          Cross-examination.  Mr. D'Amico, you're reminded

18    you're still under oath, sir.

19          THE WITNESS:  Yes, sir.

20                      CROSS-EXAMINATION

21    BY MR. BROCCOLETTI:

22    Q.  Good afternoon, sir.  If we could bring up 2-13 D,

23    please.

24          All right.  Sir, are you familiar with Exhibit 2-13 D

25    as being a text that was seen on the defendant's phone?

──────────────── R. D'Amico - Cross ────────────────

1    A.   Yes, sir.

2    Q.   And that's a screen shot and one of the screen shots that

3    you had talked about, correct?

4    A.   Yes, sir.

5    Q.   And, again, I want to just, if I could -- does it reflect

6    that that message was received on the 19th of February, 2011,

7    approximately 6 p.m. in the afternoon?

8    A.   Yes, sir, it does.

9         MR. BROCCOLETTI:   Now, if we could bring up 2-11 B,

10   please.

11        THE CLERK:   2-11 D?

12        MR. BROCCOLETTI:   B, B as in "bravo."

13        THE CLERK:   I don't have that as admitted.

14        MR. DEPADILLA:   They were all moved in as part of

15   the stipulation.   We're just now showing them.

16        MR. BROCCOLETTI:   Okay.

17        THE COURT:   What's the problem?

18        THE CLERK:   I don't have it shown as being admitted.

19   I have nothing in the 2-11 series in.

20        MR. BROCCOLETTI:   I'm sorry.   I thought they were,

21   because I thought the Court was questioning him about that.

22        THE CLERK:   That's okay.

23        MR. BROCCOLETTI:   Mr. Pierce, if I could show the

24   witness Government's Exhibit 2-11 B, 11 C, 11 D, 11 E --

25        THE COURT:   2-11 B, C, D and E?

——————————— R. D'Amico - Cross ———————————

1          MR. BROCCOLETTI:  And F, Your Honor.

2          I'm sorry.  Too many 2-11s running around.

3     BY MR. BROCCOLETTI:

4     Q.  Sir, could you tell us what those exhibits, 2-11 A, B,

5     C --

6          THE COURT:  Do it one at a time.

7          MR. BROCCOLETTI:  Yes, sir.

8     BY MR. BROCCOLETTI:

9     Q.  2-11 B.

10    A.  It is a screen shot with the words "Four Americans

11    hijacked by Somali pirates," dated February 19, 2011, at

12    2:33 p.m.

13    Q.  All right.

14         MR. BROCCOLETTI:  I move to admit 2-11 B, Your

15    Honor.

16         THE COURT:  Wait a minute.  February 19, 2:33 p.m.?

17         MR. BROCCOLETTI:  Yes, sir.

18         THE COURT:  Go ahead.

19         MR. BROCCOLETTI:  Move to admit 2-11 B, Your Honor.

20         THE COURT:  2-11 B is admitted in evidence.

21         (The exhibit was admitted into evidence.)

22    BY MR. BROCCOLETTI:

23    Q.  The next exhibit, sir?

24    A.  Is 2-11 C, as in Charlie.  Web search --

25         THE COURT:  Wait a minute.  It's agreed that all of

Heidi L. Jeffreys, Official Court Reporter

R. D'Amico - Cross

1   these came from the telephone of Mr. Shibin?

2          MR. BROCCOLETTI:  Yes, sir, it's part of the

3   stipulation.

4          THE COURT:  That's all.  I just want to make sure --

5   I'm just cleaning up the record, Mr. Broccoletti.

6          MR. BROCCOLETTI:  I understand.

7          THE COURT:  2-11 C you were on.

8          THE WITNESS:  It is a screen shot that says,

9   "Received SIM 1, Web search, Somali pirates seize yacht with

10  four Americans.  Description, CNN:  Somali pirates hijacked a

11  yacht with four Americans on board in the Indian" -- and

12  that's all it says.

13         THE COURT:  Does it say where it came from?

14         THE WITNESS:  The only indication is it's a 111

15  search received on SIM Card 1 out of the two on the phone.

16         MR. HATCH:  If I may, it's a multi-page exhibit,

17  Your Honor, so if the witness wanted to take it out of the

18  plastic he could read the whole thing.

19         THE WITNESS:  So, "On board in the Indian Ocean,

20  U.S. military officials said Saturday.  Identities of the

21  Americans were" -- and then it says "... News search:  Somali

22  pirates seize yacht with four Americans on board in the

23  Indian Ocean, U.S. military" -- again, "Ocean, U.S. military

24  officials said Saturday.  The identities of the Americans

25  were not immediately known, but the yacht, the sailing vessel

—————————————— R. D'Amico - Cross ——————————————

1    Quest, is owned by Jean and Scott Adams..."  And then,

2    "Received SIM 1:  Jean and Scott Adams, source CNN, news

3    date/time," and that's 7-2-2012, 10:15 a.m.

4    BY MR. BROCCOLETTI:

5    Q.  Well, that's obviously a --

6    A.  That's, again, from the actual search, so something

7    coming in at -- the date and time stamp on that, though, from

8    the phone is February 19, 2011, 2:35 p.m.

9    Q.  All right.  Go to Exhibit --

10            THE COURT:  What is 7-2-2012 at 10:15 a.m.?

11            THE WITNESS:  Again, that's something that came in

12   from the source, from the 111, so it could be something in

13   error on the news.  But that came in with the news feed, not

14   an actual date/time of the message.

15   BY MR. BROCCOLETTI:

16   Q.  And is there a date and time that the message is received

17   by --

18   A.  It is.  It's February 19, 2011, 2:35 p.m.

19            MR. BROCCOLETTI:  We would move to admit 2-11 C,

20   Your Honor.

21            THE COURT:  2-11 C is admitted in evidence.

22            (The exhibit was admitted into evidence.)

23   BY MR. BROCCOLETTI:

24   Q.  And what is 2-11 D, sir?

25   A.  2-11 D is another multi-page screen shot, "Received

R. D'Amico - Cross

1    SIM 1, Web search, Somali pirates seize yacht with four

2    Americans, description CNN, Somali pirates hijack a yacht

3    with four Americans on board in the Indian Ocean, U.S.

4    military officials said Saturday.  The identities of the

5    Americans were... news search:  Somali pirates seize yacht

6    with four Americans" -- "with four Americans on board,

7    military says.  Description:  CNN Somali pirates hijacked a

8    yacht with four Americans on board in the Indian Ocean, U.S.

9    military officials said Saturday.  The identities of the

10   Americans were not immediately known, but the yacht, the

11   sailing vessel Quest, is owned by Jean and Scott Adam --

12   sailing vessel Quest is owned by Jean and Scott Adam...

13   source, CNN," again, "news date/time" and has that same

14   7-2-2012, 10:15 a.m. stamp, but the official -- the date/time

15   stamp from the phone is February 19, 2011, 2:36 p.m.

16        MR. BROCCOLETTI:  Move to introduce 2-11 D, Your

17   Honor.

18        THE COURT:  February 16, 12:35 p.m.?

19        THE WITNESS:  February 19th, sir.

20        THE COURT:  Okay.  It was February 19th?

21        THE WITNESS:  Yes, sir.

22        THE COURT:  12:35 p.m.?

23        THE WITNESS:  2:36 p.m., sir.

24        THE COURT:  This is 2-11 D, and it says, "2:36 p.m."

25   Is that correct?

——————————— R. D'Amico - Cross ———————————

1          THE WITNESS:  Yes, sir, it is.

2          THE COURT:  And what does that other date with the 7

3    have to do with?

4          THE WITNESS:  I do not know.  Again, it's coming in

5    from the Internet, so I don't have -- I assume that it's

6    something that's tied to the story, but, obviously, it's --

7          THE COURT:  2-11 D is admitted in evidence.  Let's

8    move along.

9          (The exhibit was admitted in evidence.)

10   BY MR. BROCCOLETTI:

11   Q.  2-11 E?

12   A.  It is another screen shot of the phone.  This one has,

13   "Hijacked sailing vessel Quest by Somali pirates."  The date

14   is February 19th, 2011, 2:47 p.m.

15         MR. BROCCOLETTI:  Move to admit 2-11 E, Your Honor.

16         THE COURT:  2-11 E -- does it also have this 7 stuff

17   on it?

18         THE WITNESS:  It does not.

19         THE COURT:  And this is February the 19th,

20   2:47 p.m., and it's 2-11 E, correct?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  All right.  It's received in evidence.

23         (The exhibit was admitted into evidence.)

24   BY MR. BROCCOLETTI:

25   Q.  And the times that were just reflected all precede the

--------- R. D'Amico - Cross ---------

1   text under 2-13 D that the "Sarindaaq captured Americans," is
2   that correct?
3   A.   I'm sorry.  Say that again, sir.
4   Q.   The times we just talked about, 2:36 in the afternoon,
5   all predate the time that the text was received under
6   Government's Exhibit 2-13 D saying that "Sarindaaq captured
7   Americans."  Do you recall that?
8   A.   I do -- can I see that text, sir?
9            MR. BROCCOLETTI:  May we see 2-13 again?
10           THE WITNESS:  What was the time on that?
11           MR. BROCCOLETTI:  We'll show you.
12           (There was a pause in the proceedings.)
13           THE WITNESS:  Yes, it does.  That's 5:54 p.m.
14   BY MR. BROCCOLETTI:
15   Q.   Now, you recovered --
16           THE COURT:  Does it reflect where these calls came
17   from?
18           THE WITNESS:  The 111 searches are coming from -- on
19   this screen shot it shows it's coming from SIM Card 1 because
20   it was a dual SIM card phone.  It had two SIM cards, so it
21   had two different numbers associated.  So it shows the search
22   was done by SIM Card 1 to that phone.
23           THE COURT:  I'm not that familiar with what SIM
24   Card 1 was.  What --
25           THE WITNESS:  Your phone has a SIM card that tells

—————— R. D'Amico - Cross ——————

1    the carrier the data information, and it has a phone number

2    associated with it.

3           The phone that was here -- in Europe they are more

4    popular, but they can have two SIM cards, so you can have two

5    numbers with the same phone.  You can place calls and receive

6    calls on two different numbers.

7           So the picture up front -- on top has a highlight

8    over 1 which indicates that that search or that phone call

9    was received using that first SIM card in that phone.  And

10   the first SIM card on this phone is associated with the

11   228675 number that we talked about.

12          MR. BROCCOLETTI:  Now, if I could ask Mr. Pierce --

13          THE COURT:  So two phones have the same number?

14          THE WITNESS:  No, one phone has two numbers.  It's

15   popular so that people can use a personal phone and like a

16   business phone and only carry one phone.  So they can make

17   calls and charges on different accounts.

18          MR. BROCCOLETTI:  Judge, may I ask Mr. Pierce to

19   show the witness Defendant's Exhibit Number 9?

20          And, Judge, we would move 2-11 E into evidence as

21   well.

22          (There was a pause in the proceedings.)

23          MR. BROCCOLETTI:  We would move 2-11 E into

24   evidence, Your Honor.

25          THE COURT:  It's been received in evidence.

—————————— R. D'Amico - Cross ——————————

1        MR. BROCCOLETTI:  Thank you, sir.

2   BY MR. BROCCOLETTI:

3   Q.  Sir, I've handed you what's been marked for

4   identification as Defendant's Exhibit 9.

5        Tell the jury, did you recover screen shots of other

6   news articles, ships, piracy incidents that were on the

7   defendant's phone?

8   A.  Yes, I believe there are other searches done on that

9   phone.

10  Q.  All right.  And, again, you had talked earlier about

11  prioritizing things that you had shown to the defendant.

12  A.  Yes, sir.

13  Q.  These are -- what's reflected in Defendant's Exhibit 9

14  are shots that you did not show to the defendant?

15  A.  We did not show these.

16  Q.  All right.  But they all accurately represent screen

17  shots that were taken from the defendant's phone.  Is that

18  true?

19  A.  If they came off the disks that I provided to the case

20  agent, they were.

21  Q.  They did?

22  A.  Okay.  Then they are.

23  Q.  All right.  And could you just --

24       MR. BROCCOLETTI:  Judge, at this point I would move

25  into evidence Defendant's Exhibit 9, please.

R. D'Amico - Cross

1          THE COURT:  What is Defendant's Exhibit 9?

2    BY MR. BROCCOLETTI:

3    Q.  All right.  Sir, could you describe to the Court what

4    Defense Exhibit 9 is, please?

5    A.  The first page has three pictures of messages received.

6    I'll read them in order.

7          "Received SIM 1" --

8          THE COURT:  Don't read anything yet.

9          THE WITNESS:  Okay.

10         THE COURT:  Just what are they?

11         THE WITNESS:  They're the same type of screen shots

12   of the pictures of his phone that messages were received.

13         THE COURT:  And, again, they're screen shots of

14   Mr. Shibin's phone, correct?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  All right.  Defense Exhibit 9 is

17   received in evidence.

18         (The exhibit was admitted into evidence.)

19         MR. BROCCOLETTI:  Thank you, sir.  And if I could

20   retrieve that from the witness and just be able to publish it

21   to the jury.  I'll put it up here on the Elmo.

22   BY MR. BROCCOLETTI:

23   Q.  All right.  Showing you the first page of what's

24   reflected in Defendant's Exhibit 9, again, this appears to be

25   a 111 search.

Heidi L. Jeffreys, Official Court Reporter

R. D'Amico - Cross

1    A.  Yes, sir, it does.

2    Q.  And it's talking about Israel shutting down four of its

3    embassies because of some terror attacks.

4    A.  Actually, the first one is something about

5    perezhilton.com.  The second one has Israelis, yes, sir.

6    Q.  And what is the date and time of the first one?

7    A.  February 19, 2011, 3:37 p.m.

8    Q.  All right.

9             THE COURT:  This is Exhibit 9?

10            MR. BROCCOLETTI:  It is, Your Honor.

11            THE COURT:  Now --

12            MR. BROCCOLETTI:  It is the first page of Exhibit 9.

13            THE COURT:  -- it has three phone calls on it?

14   BY MR. BROCCOLETTI:

15   Q.  Sir, could you describe this on Exhibit 9, please?

16   A.  It is pictures of three screen shots from his phone.

17            The first one is information received on SIM 1.

18            The second is also information received.  Can you

19   slide it up so I can see --

20            THE COURT:  All I'm trying to do is identify these

21   things, Mr. Broccoletti, because there are three different

22   things here.

23            MR. BROCCOLETTI:  Yes, sir.

24   BY MR. BROCCOLETTI:

25   Q.  And the three --

R. D'Amico - Cross

1    THE COURT:  You're saying the first one is this, but
2  I assume there's nothing to say 1, 2, 3, or whatever on here.
3    MR. BROCCOLETTI:  There are just three sequential
4  shots of the phone.
5  BY MR. BROCCOLETTI:
6  Q.  Is that correct?
7  A.  Yes, sir.
8  Q.  And, if I may --
9    THE COURT:  It's only one phone call.  Is that
10  correct?
11    THE WITNESS:  It would have been -- if you received
12  a message during a 111 search that didn't fit on one screen,
13  you would then scroll through the three screens that showed
14  the whole message.
15    So the first picture was the first screen, you
16  scrolled to the next one, another photograph, and then
17  finally the last one in that --
18    THE COURT:  All right.  Does any of this show from
19  whence the phone message comes?
20    THE WITNESS:  It came from the 111 search, which is
21  the generic --
22    THE COURT:  I understand it came from the 111
23  search.  I'm asking would it tell you who sent it?
24    THE WITNESS:  It doesn't, because -- I'm not sure in
25  Somalia how the 111 search is routed.  It would take the

R. D'Amico - Cross

1   phone operator to put a phrase in and then send it to 111,

2   and then it comes back with the information it finds.

3           THE COURT:  How does the message get on 111?

4           THE WITNESS:  I'm not sure.  It's a technical

5   question; that from what I know when it goes out to the

6   service provider they have some link with the Internet; that

7   then they would take that search, put it into the Internet,

8   get that message, and send it back out to the phone that sent

9   it.

10          So it's kind of like a Google for a phone, if people

11  know what Google is.  You're just Googling a search engine,

12  and they're coming back with information.

13          THE COURT:  How do you Google...

14          (There was a pause in the proceedings.)

15          THE COURT:  All right.  Let's take a little break.

16  I want to make sure I understand what's going on.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  We'll take a five-minute break, ladies

19  and gentlemen.

20          Everyone please rise while the jury retires.

21          (The jury withdrew from the courtroom.)

22          THE COURT:  All right.  We'll take a five-minute

23  break.

24          (A recess was taken.)

25          THE COURT:  You're reminded you're still under oath,

—————————— R. D'Amico - Cross ——————————

1   sir.

2          I'm sorry to have interrupted you, Mr. Broccoletti.

3   I just wanted to understand what we were doing.  I understand

4   that.

5          All right.  Bring in the jury.  Please remain

6   standing.

7          MR. BROCCOLETTI:  You can interrupt me anytime,

8   Judge.

9          THE COURT:  I beg your pardon?

10         MR. BROCCOLETTI:  That's fine.

11         (The jury entered the courtroom.)

12         THE COURT:  You may be seated.  Let the record

13   reflect the entire jury has returned.

14         Forgive me for doing this, ladies and gentlemen.  I

15   just want to understand a little bit about the Internet or

16   the -- whatever this is, this 111 situation.  Now I think

17   I've got some grasp of it.

18         Go ahead.

19         MR. BROCCOLETTI:  Thank you, Your Honor.

20   BY MR. BROCCOLETTI:

21   Q.  Sir, if you would, turn to the fourth page of the

22   exhibit.  Can you read this to the jury, please?

23   A.  "Hijacked British-owned ship by Somali pirates."

24   Q.  And the date and time of that?

25   A.  February 17th, 2011, 3:44 p.m.

R. D'Amico - Cross

1   Q.   And does that predate the seizure of the Quest?

2   A.   Yes, it does.

3   Q.   The Quest occurred on the 18th?

4   A.   Yes, sir.

5   Q.   All right.  The sixth page of the exhibit, could you read

6   that to the jury, please?

7   A.   "Hijacked Panamanian ship by Somali pirates," February

8   16, 2011, 3:29 p.m.

9   Q.   And, obviously, again predating the seizure of the Quest.

10  A.   Yes, sir.

11  Q.   Would it be fair to say that you found a number of these

12  type of searches within the defendant's phone?

13  A.   Yes, sir, we did.

14  Q.   All predating the Quest -- the seizure of the Quest?

15  A.   Some of them, yes, sir.

16         MR. BROCCOLETTI:  Madam Clerk, Defendant's 9 has

17  been admitted, correct?

18         THE CLERK:  Defendant's 9?

19         MR. BROCCOLETTI:  Yes, ma'am.

20         THE CLERK:  Yes, it has been admitted.

21         MR. BROCCOLETTI:  Do you have it?

22         THE CLERK:  It was admitted, yes, sir.

23         MR. BROCCOLETTI:  All right.

24  BY MR. BROCCOLETTI:

25  Q.   With respect to the luggage that you recovered from the

—————— R. D'Amico - Cross ——————

1   defendant, as I understand it, that luggage was not with him
2   at the Host Security Force compound.
3   A.  No, it was not.
4   Q.  All right.  That luggage was located where?
5   A.  He gave us directions to his nephew's house, and then we
6   went out in town and got it and brought it back to him.
7   Q.  And did you even know that he had luggage?
8   A.  Yes, sir, we did.  I mean, we figured he was traveling,
9   so we knew that he probably had some luggage, since it wasn't
10  on him.
11  Q.  All right.  Did you ask him specifically about the
12  luggage, or had he volunteered that, if you recall?
13  A.  I'm not sure if he volunteered it or we asked him.  I
14  believe we asked him at that point and asked him where it
15  was, and then he volunteered it was at his cousin's or his
16  nephew's.
17  Q.  And once you recovered the luggage you went through the
18  different bank statements and things with him?
19  A.  Not with him.  We brought him -- showed him the luggage,
20  asked him to ID that it was his, he in fact said it was, and
21  then we opened it and searched it.
22  Q.  Did you ever inquire of him as to the specific bank
23  deposits or withdrawals that you found or were reflected in
24  the luggage?
25  A.  We did not have time, sir.

Heidi L. Jeffreys, Official Court Reporter

─────────────────────── R. D'Amico - Cross ───────────────────────

1  Q.  With respect to the money that he had on him, the

2  approximate $1,600 or so --

3  A.  Yes, sir.

4  Q.  -- you are familiar with the fact that prior to the time

5  that the German authorities delivered the money -- or the

6  German shipping company delivered the money for the ransom

7  for the Marida Marguerite -- that they had recorded the

8  serial numbers of that money?

9  A.  Yes, sir, I am.

10  Q.  And you matched up the serial numbers of that money to

11  determine if any of the money that the defendant had on his

12  person was part of that?

13  A.  I did not.  I did not feel it was necessary at that

14  point, since there was deposits and withdrawals, so if you

15  deposit one set of money you don't necessarily get it back

16  out.  But I would assume that the case agent at a later time

17  had searched.  I didn't have the resources in Somalia.

18  Q.  All right.  It's never been brought to your attention,

19  however, that any of that money was reflected as marked

20  money?

21  A.  No, it has not.

22  Q.  Also during the course of -- did you ever recover the

23  cell phone?  Let me ask you that.

24  A.  No, sir, we did not.

25  Q.  So it wasn't in the luggage?

——————————— R. D'Amico - Cross ———————————

1    A.   No, it was not.

2    Q.   And not on his person?

3    A.   It was not.  He told us it was lost in a taxi, so --

4    Q.   I understand, but I'm just wondering.  You never found it

5    anyplace?

6    A.   No, we did not.

7             MR. BROCCOLETTI:   Could we bring up 2-8 E, please.

8             (There was a pause in the proceedings.)

9    BY MR. BROCCOLETTI:

10   Q.   All right.  Sir, looking at Exhibit 2-8 E, can you tell

11   the jury what this is, please?

12   A.   It's a visa application, but I would need to zoom in to

13   actually read specifics.

14   Q.   That's what I'm trying to do right now for you.

15            Can you describe that -- this is what you found in

16   the defendant's luggage?

17   A.   Yes, sir.

18   Q.   And can you tell us what it is?

19   A.   A visa application.  Name, Mohamed Salah Ali.  And it

20   gives a P.O. Box in Lusaka, which is Zambia.

21   Q.   And the defendant had told you that he went to Zambia to

22   visit his sister.

23   A.   Yes, sir, he did.

24   Q.   And up in the left-hand corner there seems to be an

25   immigration stamp.  Can you tell us what that is?

—————— R. D'Amico - Cross ——————

1   A.  It's an immigration -- I can't read it, but it's the date

2   of 24 February 2011.

3   Q.  And at the bottom can you tell us what that is?

4   A.  I can't read all of it.  I can read "Lusaka" and

5   "visiting family members."

6           MR. BROCCOLETTI:  Can we go to the next page,

7   please?

8   BY MR. BROCCOLETTI:

9   Q.  And, again, showing you -- this is the second page of

10  that exhibit?

11  A.  Yes, sir.

12  Q.  All right.  And --

13          MR. BROCCOLETTI:  No, I don't want to do that.

14          (There was a pause in the proceedings.)

15  BY MR. BROCCOLETTI:

16  Q.  Does it show the date the application was made?

17  A.  February, 2011.  I can't tell if that's an 18 or a 15.

18  Can you zoom in, or if I could actually see the document.

19          MR. BROCCOLETTI:  Mr. Pierce, if you would be kind

20  enough.

21          (There was a pause in the proceedings.)

22          THE WITNESS:  18 February 2011.

23  BY MR. BROCCOLETTI:

24  Q.  And do you recognize the signature as being that of the

25  defendant?

––––––––––––––––– R. D'Amico - Cross –––––––––––––––––

1   A.  Yes, sir.

2   Q.  All right.  Thank you.

3           In fact, you recovered plane tickets from the

4   defendant's luggage?

5   A.  Yes, sir, we did.

6   Q.  And what did the plane record or tickets reflect?

7   A.  His travels to Zambia.  I would have to see them to see

8   the exact dates and times.

9           MR. BROCCOLETTI:  Could we pull up 2-8 C, please.

10          THE COURT:  Is it in evidence?

11          THE CLERK:  Yes, sir.

12  BY MR. BROCCOLETTI:

13  Q.  All right.  Can you read this, or do you need me to blow

14  it up for you?

15  A.  If you could blow it up some.

16  Q.  Sure.

17          (There was a pause in the proceedings.)

18  BY MR. BROCCOLETTI:

19  Q.  All right.  Does it reflect the date of the booking?

20  A.  It does.  It's 28 February 2011.

21  Q.  And does it reflect his name?

22  A.  Yes, it does.

23          THE COURT:  It had the date of booking up there.

24          MR. BROCCOLETTI:  It did.

25          THE COURT:  What was that?

—————————— R. D'Amico - Cross ——————————

1           THE WITNESS:  28 February 2011.

2   BY MR. BROCCOLETTI:

3   Q.  And does it reflect the travel?

4   A.   It does.  It shows origin in Galkayo, on Wednesday,

5   2 March 2011, 7:20, arrival Wednesday, 2 March 2011, 8:50,

6   and then check-in form, and then it gives a flight number,

7   and then it has the Djibouti 2011, 2 March, Wednesday, then

8   again, arrival Wednesday, 2 March 2011, 10:00 a.m., and then

9   check-in form Wednesday, 2 March 2011, 6:30, and then a

10  flight number.

11  Q.  And do you recall whether there was a flight from

12  Djibouti that went further on to Zambia?

13  A.  His flight or --

14  Q.  Yes.

15  A.  Yes.

16          THE COURT:  Is this Zambia?

17          MR. BROCCOLETTI:  This is Djibouti.  No, sir.

18          THE COURT:  This isn't Zambia?

19          MR. BROCCOLETTI:  No, sir.  This is on the way to.

20          THE COURT:  This is a different flight entirely.

21          MR. BROCCOLETTI:  No, sir, it's the origin of the

22  flights.  You have to like hop and skip and jump.

23          THE WITNESS:  I believe from Djibouti it was to

24  Addis Ababa and then to Zambia.

25  BY MR. BROCCOLETTI:

Heidi L. Jeffreys, Official Court Reporter

R. D'Amico - Cross

1  Q.   And you saw those records?

2  A.   Yes, sir.

3  Q.   And you recovered them?

4  A.   Yes, sir.

5  Q.   And, likewise, was there a return flight from Zambia?

6  A.   There was.

7  Q.   And do you remember that, when that was?

8  A.   I believe starting March 27th, and it was almost in

9  reverse order.  Like I said, he flew out of Lusaka into Addis

10 Ababa, he missed his connector, stayed overnight, flew on to

11 Djibouti, he was there three days in the Dar Es Salam Hotel,

12 and then got a -- basically paid a car to drive him, a Land

13 Cruiser that broke down, stayed overnight in a village, got

14 to Hargeisa and was there three days before arriving in

15 Bossasso on 4 April.

16 Q.   And the defendant told you that, and you saw records in

17 his luggage which would --

18 A.   That would indicate -- yes, that was consistent with

19 that.

20 Q.   Now, with respect to the statements that you had taken

21 from the defendant, were any of these statements audio taped?

22 A.   No, sir.

23 Q.   Were any of these statements videotaped?

24 A.   No, sir.

25 Q.   Were any of the statements given to him to sign and to

R. D'Amico - Cross

1  review?

2  A.  No, sir.

3  Q.  The statements are summarized on forms that you have

4  provided.

5  A.  Yes, sir.

6  Q.  Did you take notes?

7  A.  Yes, sir.

8  Q.  And what happened to the notes that you took which

9  ultimately resulted in this summary?

10  A.  They're in 1-A envelopes, where we put our original

11  notes.

12  Q.  Okay.  So they're available?

13  A.  Yes, sir.

14  Q.  Now, when you first met the defendant you said that you

15  didn't tell him really why you were there.

16  A.  No, sir.

17  Q.  What did you tell him?

18  A.  We told him we were agents from the U.S. Government and

19  we wanted to talk to him about his recent travels, was the

20  first conversation.

21  Q.  Did he ask you why he was being held in custody by Host

22  Security -- Host Nation Forces?

23  A.  I don't remember the exact question -- him asking that.

24  Q.  Now, prior to this, sometime in -- I think it was the

25  22nd of February -- did Host Nation Forces take his cell

R. D'Amico - Cross

1   phone?

2   A.   Yes, sir.

3   Q.   And they kept it or you kept it for a couple of days?

4   The U.S. Government kept it for a couple of days?

5   A.   Yes, sir.

6   Q.   And that's when the screen shots were taken?

7   A.   Yes, sir.

8   Q.   And then the phone was given back to him.

9   A.   Yes, sir, it was.

10   Q.   So, presumably, he was aware of that prior to the time

11   that you spoke to him.

12   A.   Yes, sir.

13   Q.   Did he ever ask you, "What type of agency are you from"

14   or "What are you investigating?"

15   A.   He did not.

16   Q.   How long was that first conversation for?

17   A.   With the physical and all that it was probably an hour

18   and a half to -- with the admin time of having him checked

19   out and having talked with him I would say about an hour and

20   a half.

21   Q.   Did he ask you why you were performing a physical on him?

22   A.   No.

23   Q.   Did you tell him?

24   A.   Not specifically.

25   Q.   How about indirectly?

R. D'Amico - Cross

1   A.  We just wanted to make sure he was okay medically, so we

2   just told him that we're going to have the doc check him out

3   to make sure -- we asked him if he had any injuries that we

4   needed to be aware of, and that's when he told us about the

5   left side.

6   Q.  Generally speaking, when an FBI agent speaks to you you

7   display your credentials.

8   A.  Yes, sir, we do.

9   Q.  Did you do that in this case?

10  A.  No.

11  Q.  So he did not know you were from the FBI?

12  A.  He did not.

13  Q.  The second interview that took place -- did you identify

14  yourself at that point?

15  A.  No, sir, I did not, not -- I did not show him

16  credentials, just, again, "agents of the government."

17  Q.  You were present, Agent Coughlin was present?

18  A.  No, sir, it was myself and Agent Maliszewski.

19  Q.  Just the two of you?

20  A.  Yes, sir.

21  Q.  And did he ask you why you came back the second day?

22  A.  No, he did not.

23  Q.  Did you tell him why you came back the second day?

24  A.  We told him that we wanted to look at his luggage.

25  Q.  And that's when he consented to the search of his

```
 1   luggage.
 2   A.  Yes, sir, he did.
 3           MR. BROCCOLETTI:  All right.  Thank you very much,
 4   Your Honor -- give me one second, Judge.
 5           (There was a pause in the proceedings.)
 6           MR. BROCCOLETTI:  Thank you, sir.
 7           MR. HATCH:  No further questions, Your Honor.
 8           THE COURT:  Thank you very much.
 9           Can we excuse this witness, or are you going to keep
10   him?
11           MR. HATCH:  He may be excused, Your Honor.
12           THE COURT:  Do you need him any further, Mr. --
13           MR. BROCCOLETTI:  No, Your Honor.
14           THE COURT:  You can step outside.  Thank you very
15   much, Mr. D'Amico.
16
17                   *****     *****     *****
18
19
20
21
22
23
24
25
```

1                              CERTIFICATION

2

3          I certify that the foregoing is a correct transcript

4     of an excerpt from the record of proceedings in the

5     above-entitled matter.

6

7                              s/s

8                         Heidi L. Jeffreys

9

10                    _____

11                    June 5, 2012

12

13

14

15

16

17

18

19

20

21

22

23

24

25