```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - -
      UNITED STATES OF AMERICA,          )
 5                                        )
              Plaintiff,                  )
 6                                        )       CRIMINAL CASE NO.
      v.                                  )            2:11cr33
 7                                        )
      MOHAMMAD SAAILI SHIBIN,             )
 8    a/k/a "Khalif Ahmed Shibin,"        )
      a/k/a "Mohammad Ali,"               )
 9    a/k/a "Ali Jama,"                   )
                                          )
10            Defendant.                  )
      - - - - - - - - - - - - - - - - - -
11

12

13                    TRANSCRIPT OF PROCEEDINGS
                   (Testimony of Sascha Krausse)

14                      Norfolk, Virginia
                    April 19, 20 and 23, 2012
15

16

     BEFORE:   THE HONORABLE ROBERT G. DOUMAR,
17             United States District Judge, and a jury

18

19   APPEARANCES:

20             UNITED STATES ATTORNEY'S OFFICE
               By:  Joseph E. DePadilla, Esquire
21                  Benjamin L. Hatch, Esquire
                    Brian J. Samuels, Esquire
22                  Paul Casey, Esquire
                    Assistant United States Attorneys
23                  Counsel for the United States

24             ZOBY & BROCCOLETTI, P.C.
               By:  James O. Broccoletti, Esquire
25                  Counsel for the Defendant
```

```
 1                        I N D E X

 2

 3   ON BEHALF OF THE GOVERNMENT:     Direct   Cross   Red.   Rec.

 4   S. Krausse                          6       48     --     --
                                        54       77     --     --
 5                                       87      101     --     --
                                        107      --     --     --
 6                                      115      132     --     --

 7                        E X H I B I T S

 8   No.                                                      Page

 9   Government's Exhibit No. 1-3                              11

10   Government's Exhibit No. 1-4 A                            15

11   Government's Exhibit No. 1-5 A                            15

12   Government's Exhibit No. 1-6 A                            15

13   Government's Exhibit No. 1-7 A                            15

14   Government's Exhibit No. 1-13 A                           15

15   Government's Exhibit No. 1-14 A                           15

16   Government's Exhibit No. 1-15 A                           15

17   Government's Exhibit No. 1-16 A                           15

18   Government's Exhibit No. 1-18 A                           15

19   Government's Exhibit No. 1-20 A                           15

20   Government's Exhibit No. 1-21 A                           15

21   Government's Exhibit No. 1-22 A                           15

22   Government's Exhibit No. 1-23 A                           15

23   Government's Exhibit No. 1-28 A                           15

24   Government's Exhibit No. 1-30 A                           15

25   Government's Exhibit No. 1-33 A                           15
```

Heidi L. Jeffreys, Official Court Reporter

| 1 | E X H I B I T S (Cont'g.) | |
|---|---|---|
| 2 | No. | Page |
| 3 | Government's Exhibit No. 1-34 A | 15 |
| 4 | Government's Exhibit No. 1-35 A | 15 |
| 5 | Government's Exhibit No. 1-36 A | 15 |
| 6 | Government's Exhibit No. 1-37 A | 15 |
| 7 | Government's Exhibit No. 1-38 A | 15 |
| 8 | Government's Exhibit No. 1-40 A | 15 |
| 9 | Government's Exhibit No. 1-42 A | 15 |
| 10 | Government's Exhibit No. 1-43 A | 15 |
| 11 | Government's Exhibit No. 1-44 A | 15 |
| 12 | Government's Exhibit No. 1-45 A | 15 |
| 13 | Government's Exhibit No. 1-46 A | 15 |
| 14 | Government's Exhibit No. 1-47 A | 15 |
| 15 | Government's Exhibit No. 1-49 A | 15 |
| 16 | Government's Exhibit No. 1-50 A | 15 |
| 17 | Government's Exhibit No. 1-51 A | 15 |
| 18 | Government's Exhibit No. 1-52 A | 15 |
| 19 | Government's Exhibit No. 1-53 A | 15 |
| 20 | Government's Exhibit No. 1-54 A | 15 |
| 21 | Government's Exhibit No. 1-55 A | 15 |
| 22 | Government's Exhibit No. 1-56 A | 15 |
| 23 | Government's Exhibit No. 1-58 A | 15 |
| 24 | Government's Exhibit No. 1-59 A | 15 |
| 25 | Government's Exhibit No. 1-60 A | 15 |

| | E X H I B I T S (Cont'g.) | |
|---|---|---|
| 1 | | |
| 2 | No. | Page |
| 3 | Government's Exhibit No. 1-61 A | 15 |
| 4 | Government's Exhibit No. 1-62 A | 15 |
| 5 | Government's Exhibit No. 1-63 A | 15 |
| 6 | Government's Exhibit No. 1-64 A | 15 |
| 7 | Government's Exhibit No. 1-65 A | 15 |
| 8 | Government's Exhibit No. 1-66 A | 15 |
| 9 | Government's Exhibit No. 1-67 A | 15 |
| 10 | Government's Exhibit No. 1-69 A | 15 |
| 11 | Government's Exhibit No. 1-71 A | 15 |
| 12 | Government's Exhibit No. 1-72 A | 15 |
| 13 | Government's Exhibit No. 1-73 A | 15 |
| 14 | Government's Exhibit No. 1-78 A | 15 |
| 15 | Government's Exhibit No. 1-79 A | 15 |
| 16 | Government's Exhibit No. 1-80 A | 15 |
| 17 | Government's Exhibit No. 1-81 A | 15 |
| 18 | Government's Exhibit No. 1-8 | 15 |
| 19 | Government's Exhibit No. 1-9 | 15 |
| 20 | Government's Exhibit No. 1-10 | 15 |
| 21 | Government's Exhibit No. 1-11 | 15 |
| 22 | Government's Exhibit No. 1-12 | 15 |
| 23 | Government's Exhibit No. 1-17 | 15 |
| 24 | Government's Exhibit No. 1-19 | 15 |
| 25 | Government's Exhibit No. 1-24 | 15 |

```
1                     E X H I B I T S  (Cont'g.)

2    No.                                              Page

3    Government's Exhibit No. 1-25                      15

4    Government's Exhibit No. 1-26                      15

5    Government's Exhibit No. 1-27                      15

6    Government's Exhibit No. 1-31                      15

7    Government's Exhibit No. 1-32                      15

8    Government's Exhibit No. 1-39                      15

9    Government's Exhibit No. 1-41                      15

10   Government's Exhibit No. 1-57                      15

11   Government's Exhibit No. 1-67                      15

12   Government's Exhibit No. 1-70                      15

13   Government's Exhibit No. 1-71                      15

14   Government's Exhibit No. 1-74                      15

15   Government's Exhibit No. 1-75                      15

16   Government's Exhibit No. 1-76                      15

17   Government's Exhibit No. 1-77                      15

18   Government's Exhibit No. 1-1 O                     64

19   Government's Exhibit No. 1-1 P                     64

20   Government's Exhibit No. 1-1 Q                     64

21   Government's Exhibit No. 1-82 A                    83

22   Government's Exhibit No. 1-82 B                    83

23

24   Defendant's Exhibit No. 11                        136

25
```

───────── S. Krausse - Direct ─────────

1                  *****      *****      *****

2

3          THE COURT:  Who is your next witness?

4          MR. DEPADILLA:  Your Honor, Detective Sashca Krausse

5    with the LKA.

6          SASHCA KRAUSSE, called as a witness, having been

7    first duly sworn, testified as follows:

8                         DIRECT EXAMINATION

9    BY MR. DEPADILLA:

10   Q.  Sir, could you please state your name for the record?

11   A.  My name is Sashca Krausse.

12   Q.  And what country are you from, sir?

13   A.  I'm a German citizen.

14   Q.  What is your native language?

15   A.  German.

16   Q.  So you speak German as your native language.  Do you also

17   speak English?

18   A.  Yes, sir.

19   Q.  How are you employed, sir?

20   A.  I'm a police detective.

21   Q.  And tell the jury how long have you been in the police in

22   Germany?

23   A.  I've been in the police since 2004.

24   Q.  Describe your career.

25   A.  I started in 2004 and studied until 2007.  When I was

S. Krausse - Direct

1    finished with my studies I was assigned to a drug squad in

2    the northern part of Germany, and in 2009 I was assigned to

3    the central organized crime unit of the crime police of Lower

4    Saxony in Hanover.

5    Q.   And what does the organized crime unit in Lower Hanover

6    investigate?

7    A.   Usually we are investigating organized crime like drug

8    crimes, human smuggling and weapon crimes, but we also do

9    piracy.

10   Q.   And when did your squad begin to do piracy, Detective

11   Krausse?

12   A.   The first case of piracy in our state was the case of the

13   Victoria in 2009, and in 2010 with the Marida Marguerite we

14   started our first investigations in the field of maritime

15   piracy.

16   Q.   Give the jury an idea.  In an average year how many

17   German ships get hijacked off the coast of Somalia?

18   A.   In the high frequency years of 2008 to 2011 it has been

19   three to four ships a year.

20   Q.   Does your squad investigate every ship?

21   A.   No, sir.

22   Q.   Which ships does your squad investigate?

23   A.   We investigated all the ships which companies were

24   settled in our state but no German citizens were on board.

25   Q.   And when a German citizen is on board which area of the

S. Krausse - Direct

1  German police investigates that?

2  A.  The federal office would do that.

3  Q.  Once a ship is hijacked what do the owners commonly do in

4  regards to communication so they can record the calls?

5  A.  They will build a team, assign a negotiator, and then

6  they will create one telephone line which is wholly intended

7  for communication with the pirates.

8  Q.  And who does the company designate to talk with the

9  pirates?

10  A.  A company employee.

11  Q.  Okay.  And whose interest does that employee represent in

12  the negotiations?

13  A.  The interests of the company.

14  Q.  And what is the purpose of that employee?

15  A.  To act as a middleman between the owners and the pirates.

16  Q.  In your time as a piracy investigator have you evaluated

17  many of these taped conversations of various hijackings?

18  A.  Yes, sir, I did that in three hijackings.

19  Q.  And, in your experience, who does the company negotiator

20  usually speak to on the other end of the line?

21  A.  Usually he speaks to the negotiator on behalf of the

22  pirates, his counterpart.

23  Q.  And sometimes the other pirates beyond the negotiator,

24  depending on the situation?

25  A.  Yes, sir.

S. Krausse - Direct

1    Q.  Have you also studied in your investigations how pirate

2    attacks unfold --

3    A.  Yes.

4    Q.  -- how they happen?

5         So what are some of the roles of Somali pirates in a

6    piracy organization?

7    A.  There are several roles.  It starts with the attack

8    squad, who is on the high sea and attacks and hijacks the

9    ship, and when the ship is at the coast of Somalia they have

10   several guards on board who are responsible for the security

11   on board, and behind the negotiator they are the commanders

12   who are the decision makers of the pirates.

13   Q.  Did you evaluate and take phone calls during the ransom

14   negotiations with the Marida Marguerite, Detective Krausse?

15   A.  Yes, sir.

16   Q.  Give the jury an idea.  How many intercepts did you look

17   at?

18   A.  It has been around 1100.

19   Q.  Does the German police's equipment record data even when

20   nobody picks up the phone on the other end?

21   A.  Yes.

22   Q.  Can you tell the jury what data is recorded if no one

23   picks up?

24   A.  The involved numbers will be recorded and also the date

25   and the time of the call.

S. Krausse - Direct

1   Q.  As part of the investigation did your team also recover

2   faxes that were sent from the Marida Marguerite?

3   A.  Yes.

4   Q.  And also did they recover text messages?

5   A.  Right.

6   Q.  And what is a text message commonly called in Germany?

7   A.  It's called SMS, for Short Message Service.

8   Q.  Okay.  Thank you.  Now I'm clear.

9       I'd like to show you what's been previously marked as

10  Government's Exhibit 1-3?  Detective Krausse, you reviewed

11  Government's Exhibit 1-3 before?

12  A.  Yes, sir.

13  Q.  And what is 1-3?

14  A.  1-3 is a chart in which the negotiation calls and faxes

15  and SMSs of the Marida Marguerite are listed in.

16  Q.  Okay.  And is it a fair and accurate summary of the

17  calls, the faxes and SMSs that we intend to offer as evidence

18  in this trial?

19  A.  Yes, sir.

20  Q.  And what information is tracked in that chart?

21  A.  That information is tracked on the exhibit number on the

22  left, the incoming telephone number, what kind of

23  communication was in the phone -- or if it was a call, a fax,

24  or an SMS and also the date of that call or message and the

25  time.

S. Krausse - Direct

1          MR. DEPADILLA:  Your Honor, we would offer
2    Government's Exhibit 1-3 at this time.
3          THE COURT:  Received in evidence.  It may be
4    published, if you desire to.
5          MR. DEPADILLA:  Thank you, Your Honor.  I'd like it
6    published.
7          (The exhibit was admitted into evidence.)
8    BY MR. DEPADILLA:
9    Q.  All right.  Let's take a look at this chart.
10         Before you were describing the column all the way on
11   the left.  What is going to be tracked in that?
12   A.  The exhibit number.
13   Q.  Okay.  And in the next column, which is labeled "Incoming
14   Line," explain that to the jury.  What is the incoming line?
15   A.  The incoming line is the line who was wiretapped.
16   Q.  All right.  Then we have a type, and it says, "Call."
17   What are the three kinds of types we're going to have in this
18   case?
19   A.  It will be call, fax and SMS.
20   Q.  So where I'm highlighting now, those would be faxes?
21   A.  Right.
22   Q.  And, to give you another example, what is Government's
23   Exhibit 1-29 going to be?
24   A.  An SMS.
25   Q.  Okay.  I'm now going to ask the court security officer to

S. Krausse - Direct

1  hand you the next exhibit, the disk.

2        Do you recognize that, Detective Krausse?

3  A.  Yes, sir.

4  Q.  And what is contained on that disk you are holding?

5  A.  On this disk are stored the negotiation calls in the case

6  of the Marida Marguerite between the company and the pirates.

7  Q.  And are those specifically a subset of the negotiation

8  calls that are reflected in chart 1-3?

9  A.  Yes.

10  Q.  Have you reviewed all those calls before coming to trial?

11  A.  Yes, sir.

12  Q.  Okay.  And as part of your review process were

13  transcripts of those calls made?

14  A.  Yes.

15  Q.  Can you explain to the jury what the transportation

16  process was?

17  A.  Yes.  The transcripts were made by the public

18  prosecutor's office of Norfolk, and when they were finished

19  they were forwarded to my person.  And we checked them and

20  listened to the calls, and if there was anything to change or

21  to add I tried to do that, and then I passed the transcripts

22  back to the public prosecutor's office.

23  Q.  Okay.  Were there instances in those calls where you

24  could not make out what the parties were saying?

25  A.  Yes.

─────────────── S. Krausse - Direct ───────────────

1   Q.   And how is that noted in the transcript?

2   A.   It was noted with the mark IA, "Indian," "Arthur."

3   Q.   And were there instances where speakers used a foreign

4   language that you did not know?

5   A.   Yes.

6   Q.   How was that noted in the transcripts?

7   A.   With a mark "foreign language."

8   Q.   All right.  Are those transcripts that correspond to the

9   disk of calls that are in Government's 1-3 fair and accurate,

10  to the best of your ability?

11  A.   Yes.

12        MR. DEPADILLA:  Your Honor, at this time we have a

13  stipulation.

14        THE COURT:  All right, read it.

15        MR. DEPADILLA:  "United States Exhibits 1-4 to 1-81

16  are true and accurate recordings and transcripts, as

17  appropriate, of telephone calls, faxes or text messages

18  communicated in the course of ransom negotiations for the

19  Marida Marguerite from in or about May 17th, 2010, to in or

20  about December 27th, 2010.  The parties agree that the

21  recordings and transcripts of the conversations presented in

22  United States Exhibits 1-4 to 1-81 are authentic and

23  accurately recorded and transcribed.  United States

24  Exhibit 1-3 is a summary chart of those telephone calls,

25  faxes and text messages indicating the date, time and phone

S. Krausse - Direct

line of the call; specifically, United States Exhibits 1-4 A,
1-5 A, 1-6 A, 1-7 A, 1-13 A, 1-14 A, 1-15 A, 1-16 A, 1-18 A,
1-20 A, 1-21 A, 1-22 A, 1-23 A, 1-28 A, 1-30 A, 1-33 A,
1-34 A, 1-35 A, 1-36 A, 1-37 A, 1-38 A, 1-40 A, 1-42 A,
1-43 A, 1-44 A, 1-45 A, 1-46 A, 1-47 A, 1-49 A, 1-50 A,
1-51 A, 1-52 A, 1-53 A, 1-54 A, 1-55 A, 1-56 A, 1-58 A,
1-59 A, 1-60 A, 1-61 A, 1-62 A, 1-63 A, 1-64 A, 1-65 A,
1-66 A, 1-67 A, 1-69 A, 1-71 A, 1-72 A, 1-73 A, 1-78 A,
1-79 A, 1-80 A and 1-81 A are true and accurate recordings of
phone calls recorded by the Lower Saxony police during ransom
negotiations.  The corresponding 1-number B exhibits are
accurate transcripts of those phone calls.  United States
Exhibits 1-8, 1-9, 1-10, 1-11, 1-12, 1-17, 1-19, 1-24, 1-25,
1-26, 1-27, 1-31, 1-32, 1-39, 1-41, 1-57, 1-67, 1-70, 1-71,
1-74, 1-75, 1-76 and 1-77 are true and accurate copies of
facsimile data transmission collected by the Lower Saxony
police during ransom negotiations.  United States Exhibits
1-29 and 1-48 are true and accurate copies of Short Mail
Service (SMS) data transmissions, commonly known as text
messages, which were collected by the Lower Saxony police
during ransom negotiations."

          At this time, Your Honor, we're offering all of
those calls, all of those faxes and the short mail messages
that I've designated.

          THE COURT:  May I ask how you propose to publish

———— S. Krausse - Direct ————

1  these?

2        MR. DEPADILLA:  Yes, Your Honor.  All of the

3  transcripts have been loaded in the computer, so when we play

4  a clip of a portion of the call it will come up on the screen

5  for the jury.

6        All of the faxes and short mail messages have also

7  been digitally scanned, so when we're referring to them both

8  the Court and the jury can view them.

9        THE COURT:  All right.  They're received in

10  evidence.

11        I assume that's satisfactory with you,

12  Mr. Broccoletti.

13        MR. BROCCOLETTI:  It is, Your Honor.

14        THE COURT:  All right.

15        (The exhibits were admitted into evidence.)

16        MR. DEPADILLA:  Can we "Escape," Mr. Samuels?  Thank

17  you.

18  BY MR. DEPADILLA:

19  Q.  Let's talk about the voices on those recordings.

20  A.  Yeah.

21  Q.  Who were the primary voices?  Tell the jury.

22  A.  The primary voices were the negotiators on behalf of the

23  company, Rajesh Chava and Mike and the negotiators of the

24  pirates, Ali Jama and his second negotiator called Leon.

25  Q.  Were there sometimes other pirates who would come on the

S. Krausse - Direct

1    line?

2    A.   Yes, sir.

3    Q.   And you mentioned that the second negotiator for the

4    company had a name of Mike.  Does he have another name that

5    you know him by?

6    A.   Yes.  Mike was his nickname for the negotiations.  His

7    real name is Stefan Nitsche.

8    Q.   Okay.  And besides the parties you identified, were there

9    from time to time other members of the crew that also would

10   appear on these tapes?

11   A.   Yes.

12   Q.   Okay.  Give the jury an idea.  How long did you spend

13   with these recordings, Detective Krausse?

14   A.   I spent with these records around seven to twelve working

15   days.

16   Q.   Okay.  And did that also include when you were evaluating

17   the case back when it was in Germany, before you even met the

18   American investigators?

19   A.   No, that would be at the time.

20   Q.   So to give the jury an idea, when it was your case back

21   in Germany how much were you listening to these calls?

22   A.   The same time.

23   Q.   Okay.  Did you become familiar with the voice of a man on

24   the tape who identified himself as Ali Jama?

25   A.   Yes, sir.

——————— S. Krausse - Direct ———————

1   Q.  Do you see the person whose voice you recognize as Ali

2   Jama in the courtroom today?

3   A.  Yes.

4   Q.  Can you describe what he is wearing?

5          MR. BROCCOLETTI:  Stipulate it's the defendant,

6   Judge.

7          THE COURT:  Okay.

8          MR. DEPADILLA:  Okay.

9          THE COURT:  It's the defendant.  It's been

10  stipulated that Ali Jama is the defendant.

11         MR. DEPADILLA:  Thank you, Your Honor.

12  BY MR. DEPADILLA:

13  Q.  And when you were -- oh.

14         Did you travel to Oman when the Marida Marguerite was

15  released?

16  A.  Yes.

17  Q.  And at that time did you review any photographs on the

18  boat?

19  A.  Yes, sir, I did.

20  Q.  All right.  I'd ask you to look at the screen.

21         Are you familiar with that picture, sir?

22  A.  Yes, sir.

23  Q.  Tell the jury, when is the first time you saw that

24  picture?

25  A.  I saw this picture first on January 13, 2011.

—— S. Krausse - Direct ——

1    Q.   Okay.  And when you were on that ship doing your job did
2    you walk around and look at everything?
3    A.   Yes, sir.
4    Q.   Do you recognize the background in that picture?
5    A.   Yes, sir, I do.
6    Q.   And what do you recognize the background of that picture
7    to be?
8    A.   The background of this picture is the cabin of the chief
9    officer of the Marida Marguerite.
10   Q.   Okay.  Now I want to go to the very first recording in
11   evidence.
12           MR. DEPADILLA:  For the record, this is Exhibit
13   1-4 A, which was recorded on May 17th, 2010.
14   BY MR. DEPADILLA:
15   Q.   Before we play a portion of this call, Detective Krausse,
16   what is significant about this first call?
17   A.   This first call was the first contact between the pirates
18   and the company.
19   Q.   And how long was that after the ship was taken?
20   A.   It was nine days later.
21   Q.   All right, Detective Krausse.  I'm going to play a
22   portion of 1-4 A.
23           (An audio recording was played.)
24   BY MR. DEPADILLA:
25   Q.   What is the name the defendant gives in that clip as his

S. Krausse - Direct

1   name?

2   A.   Ali Jama.

3   Q.   And what name do you know him by?

4   A.   I know him as Mohammad Saaili Shibin.

5   Q.   Have you recovered any evidence in your investigation

6   that gives him the name Ali Jama officially?

7   A.   No, sir.

8   Q.   Did that become significant to your investigation?

9   A.   Yes.

10  Q.   All right.  Based on other evidence in your investigation

11  from the calls, is there anything inconsistent with the

12  defendant giving his name as Ali Jama when he first meets the

13  company?

14  A.   Yeah.  The defendant will represent himself as an NGO

15  member, a nongovernmental organization, who is on board to

16  take care of the crew and translate between the pirates and

17  the crew.  It was inconsistent that someone who is taking

18  care of the crew has to cover his name for the negotiation

19  calls.

20  Q.   Now I want to talk, based on your experience, about the

21  terms associated with negotiating the ransom of a hijacked

22  ship.

23  A.   Right.

24  Q.   Can you tell the jury what is the demand?

25  A.   The demand is the amount of money that the pirates are

S. Krausse - Direct

1   asking for for the release of the vessel and the crew.

2   Q.  What is the offer?

3   A.  The offer is the amount of money the company is offering

4   for the release of the crew and the ship.

5   Q.  And where does the negotiation take place?

6   A.  Between these two numbers.

7   Q.  What is the pirates' goal, based on the calls?

8   A.  To get as much money as possible for the release of the

9   crew and the ship.

10  Q.  What is the company's goal?

11  A.  The company's goal is to get the crew back safely and

12  fast and pay as least money as possible for that.

13  Q.  What are some of the negotiation strategies from the

14  defendant you reviewed from the calls?

15  A.  There were some.  First of all, the defendant will

16  disassociate himself from the pirates during the time of the

17  negotiations, and he will say that he's not a pirate.  He

18  will also present himself as a friend of the company and the

19  crew, and he will tell his sympathies about the crew members.

20         He will also put crew members on the line to forward

21  messages and threats to the company, and he will let the crew

22  members confirm that he's the negotiator on behalf of the

23  pirates and that the company should only talk to him.

24         He will also threaten the company with the

25  well-being of the ship, the cargo and the crew, and he will

S. Krausse - Direct

1   also use inside knowledge within the negotiations.

2   Q.  Do these strategies repeat themselves over the course of

3   the eight months that you reviewed from this hijacking?

4   A.  Yes, sir.

5   Q.  I would now like to play another portion of that call,

6   Government's Exhibit 1-4 A.

7          (The audio recording was played.)

8   BY MR. DEPADILLA:

9   Q.  Who is this new voice we're listening to?

10  A.  It's the captain of the Marida Marguerite, Mahadeo

11  Makane.

12  Q.  And where is Mahadeo Makane from?

13  A.  He's from India.

14  Q.  Let's go to the next section of the call -- or another

15  section of the call.

16         (The audio recording was played.)

17  BY MR. DEPADILLA:

18  Q.  In the calls that we're going to review going forward how

19  does the defendant use the crew to negotiate with the

20  company?

21  A.  He will threaten the company that the life and the

22  healthy of the crew is in danger.

23  Q.  Let's continue and go to another part of the call.

24         (The audio recording was played.)

25  BY MR. DEPADILLA:

S. Krausse - Direct

```
1   Q.  Does the defendant ever give more information about the
2   supposed NGO that he's a part of?
3   A.  No, sir.
4   Q.  And can you explain to the jury what is an NGO?
5   A.  An NGO is a nongovernmental organization who most of the
6   time has the target or the purpose to do good things in a
7   special area and support the citizens and things like that.
8   Q.  Will we see the company negotiator ask the defendant for
9   more information about that NGO?
10  A.  Yes, he'll do that in call 37.
11  Q.  Does the defendant give him any information about that?
12  A.  No.
13  Q.  Okay.  Let's play further on in the recording.
14          (The audio recording was played.)
15  BY MR. DEPADILLA:
16  Q.  In the beginning of the hostage negotiation how does the
17  defendant refer to the pirates?
18  A.  He calls them "bone heads," so he disassociates himself
19  from them and says they're ignorant and only interested in
20  money.
21  Q.  We'll continue in the call.
22          (The audio recording was played.)
23  BY MR. DEPADILLA:
24  Q.  When you evaluated this wiretap and the defendant gave
25  details of a specific incident that happened to a specific
```

—— S. Krausse - Direct ——

1   crew member on a specific day, what did your team attempt to

2   do when you got to interview the crew?

3   A.  We tried to find out if these incidents which were

4   mentioned on the phone actually happened at these times.

5   Q.  And this call was on May 17th of 2010.  Did you interview

6   Captain Makane about what's being described there?

7   A.  Yes, sir.

8   Q.  And was Makane's statement to you consistent or

9   inconsistent with what's being played there?

10          MR. BROCCOLETTI:  Objection.  That calls for

11  hearsay, and, plus, he's going to be here to testify about

12  it, anyway.

13          THE COURT:  Approach the bench.

14          (The following was heard at the sidebar out the

15  hearing of the jury:)

16          THE COURT:  Does it make any difference what the

17  truth of the statement is?

18          MR. BROCCOLETTI:  I think it does.  The point of

19  what he's saying is the defendant is trying to create an

20  environment where he's deceptive and disassociating himself

21  and threatening the company.  I think it makes a difference.

22          MR. DEPADILLA:  I disagree.  It's not whether the

23  statement was true or not, only if it's consistent or

24  inconsistent with the crew members.  One of them will be

25  true, and one of them will be false.  I'm not characterizing

Heidi L. Jeffreys, Official Court Reporter

———— S. Krausse - Direct ————

1   which one is which, I'm just saying one is inconsistent.

2           MR. BROCCOLETTI:  There's no basis to introduce them

3   if they're not inconsistent.  That's the point.  They have no

4   relevance.

5           MR. DEPADILLA:  I believe there's a great relevance

6   that they're inconsistent.  He's making a specific threat

7   that supposedly happened to Makane on that day.  He had an

8   opportunity to interview Makane, and his representation was

9   inconsistent.  Mr. Broccoletti can argue his client's

10  recitation was true.  I'm sure Mr. Shibin will say that

11  happened.  But certainly the detective is allowed to do an

12  investigation and find out if it's inconsistent with what

13  he's getting.

14          MR. BROCCOLETTI:  But the basis of --

15          THE COURT:  I'll allow you to ask him if your

16  investigation revealed that the statement was true.  That's

17  all you can do.

18          MR. DEPADILLA:  Okay.

19          THE COURT:  You can't ask him what somebody else

20  said, you can ask him what his investigation was.  You can

21  also ask him who he investigated, who he interviewed, all of

22  that, but you can't go into a specific question.

23          MR. DEPADILLA:  That was not my intention.

24          THE COURT:  Okay.

25          (The proceedings resumed in open court as follows:)

S. Krausse - Direct

1   BY MR. DEPADILLA:

2   Q.  Detective Krausse, when you -- I don't want to get into

3   what Captain Makane may have said to you, but what I want to

4   ask you is based on your investigation in talking to Captain

5   Makane, was this incident described in call 1-4 A true?

6   A.  No.

7   Q.  All right.  Let's continue on.

8          (The audio recording was played.)

9   BY MR. DEPADILLA:

10  Q.  Now, after you got a chance to talk to the crew -- again,

11  I don't want you to say what they said, but the statement

12  that the defendant made that he was protecting them from the

13  pirates, was that true?

14         MR. BROCCOLETTI:  Again, the Court would note our

15  continuing objection to this line of questioning.

16         THE COURT:  Tell me what your objection is,

17  Mr. Broccoletti.  Come up here.

18         (The following was heard at the sidebar out the

19  hearing of the jury:)

20         MR. BROCCOLETTI:  The objection is that the only

21  basis for his knowledge is what he was told, so, therefore,

22  his investigations, response and his answer to the question

23  is purely based upon hearsay, and he's reciting what someone

24  else has told him as a result of his investigation.  That's

25  the only way he can respond to the question.  He hasn't any

——————————— S. Krausse - Direct ———————————

1    knowledge of his own.

2          THE COURT:  How about that?

3          MR. DEPADILLA:  I'm content to just ask if it's

4    consistent or inconsistent.  He's evaluating two pieces of

5    evidence that are inconsistent.  He can do that, and the jury

6    can draw their own conclusion of which is true and which is

7    false.

8          THE COURT:  I'll allow you to show what's consistent

9    or inconsistent.  He can't say what's true.

10          MR. DEPADILLA:  Thank you, Your Honor.

11          (The proceedings resumed in open court as follows:)

12    BY MR. DEPADILLA:

13    Q.  Detective Krausse, let me rephrase my question.

14          When you talked to the crew, the information that you

15    got from them -- was it consistent or inconsistent with the

16    defendant's claim that he was the protector of the crew?

17    A.  It was inconsistent, sir.

18    Q.  Okay.  I'd now like to move on to another call.  It's

19    1-5 A, which is call 23, made on May 18th, 2010.

20          (The audio recording was played.)

21    BY MR. DEPADILLA:

22    Q.  Now, based on that terminology you testified about

23    before, what is Rajesh Chava asking for?

24    A.  He's asking for the opening amount.

25    Q.  And let's go further in the call.

———————— S. Krausse - Direct ————————

1          (The audio regarding was played.)

2    BY MR. DEPADILLA:

3    Q.   Detective Krausse, who was the commander?

4    A.   The commander is the pirate which the defendant had to

5    ask for decisions regarding the negotiations.

6    Q.   And how does the defendant refer to the commander over

7    the course of these negotiations?

8    A.   He distanced himself from him and said that he's an

9    ignorant man who is only interested in money.

10   Q.   Let's now go to call 1-6 A, which is call 24, made on

11   May 18th.

12          (The audio recording was played.)

13   BY MR. DEPADILLA:

14   Q.   Based on your analysis, is the $15 million initial demand

15   what the company will pay in the end?

16   A.   No, sir.

17   Q.   Okay.  Will it lower over time as we view the wire?

18   A.   Yes.

19   Q.   Let's go further in the call.

20          (The audio recording was played.)

21   BY MR. DEPADILLA:

22   Q.   How does this part of the call fit in with the pattern of

23   negotiation done by the defendant over the next couple of

24   months?

25   A.   He's doing two things here.  First, he is threatening the

Heidi L. Jeffreys, Official Court Reporter

——— S. Krausse - Direct ———

1  company with the well-being of the ship and the crew.  And in

2  the second part he's also disassociating himself from the

3  pirates.  He says it's not his language.

4         MR. BROCCOLETTI:  Can we have a side bar?

5         THE COURT:  Yes.

6         (The following was heard at the sidebar out the

7  hearing of the jury:)

8         MR. BROCCOLETTI:  Judge, the tapes speak for

9  themselves.  The language speaks for itself.  The words speak

10 for themselves.  Counsel is certainly able to argue what the

11 meaning, strategy, intent, deception, whatever he may want to

12 characterize it as, at the time of closing argument, but to

13 allow this detective to editorialize as we go through the

14 tape and to refer to this and that based upon analysis is

15 purely commenting upon the evidence, which is not a witness's

16 foray.  It's up to Counsel to do that at closing, not when

17 the witness testifies.

18        MR. DEPADILLA:  I believe because the jury is

19 unfamiliar with the hostage negotiation situation for pirate

20 ransom the detective is qualified to interpret it.

21        I mean, we're not going to go into this heavily,

22 Your Honor -- this is only the second call -- but just to get

23 the jury used to the idea that these concepts are going to

24 occur across the water --

25        THE COURT:  We're going to take a break now, and

S. Krausse - Direct

1    we'll discuss it once the jury is out.

2            MR. DEPADILLA:  Yes, sir.

3            (The proceedings resumed in open court as follows:)

4            THE COURT:  Ladies and gentlemen, we'll take a

5    15-minute break now so I can discuss some matters with

6    counsel.

7            Everyone please rise while the jury retires.

8            (The jury withdrew from the courtroom.)

9            THE COURT:  You may be seated.

10           If the witness is familiar with the method of

11   negotiations in as much as they occur frequently, it wouldn't

12   be any different than the utilization of detectives who

13   discuss the meanings that are accorded to words and the words

14   on tapes dealing with drugs.

15           What is the difference, Mr. Broccoletti?

16           MR. BROCCOLETTI:  The difference, Your Honor, is

17   that the words related to drugs and other things the jurors

18   may not be familiar with are clearly words that are

19   reflective of guilty knowledge.

20           The words and the language that is used here is

21   susceptible of two different interpretations.  You could take

22   the interpretation that the words used are meant in truth by

23   the defendant that he's not associated with the pirates, or

24   you could take the interpretation that the detective is

25   offering, that the words connote a sinister and guilty

—— S. Krausse - Direct ——

1    knowledge.  And his editorializing about those words takes

2    them out of the context of letting the jury make the

3    determination as to which interpretation is correct.  Because

4    it could be that the defendant is absolutely accurate and

5    that he's not working for the pirates, that he is a mediator

6    and he's trying to assist, or it could be that the words are

7    as the detective says; they are indicative of deception and

8    strategy to raise the amount.

9         That's for the jury to decide, not for the witness

10   to testify to, and that's the difference.  The words that are

11   used in drug language and drug cases are words that are

12   unfamiliar with jurors that really have one interpretation.

13   Here it's varying interpretations, and it's the credibility

14   of the witness for the jury to determine.

15        THE COURT:  What do you have to say about that?

16        MR. DEPADILLA:  Your Honor, I would disagree,

17   because the defense opened on the fact that this is just some

18   neutral third-party media.  This is going to be one of the

19   issues in the case.

20        Certainly, our evidence should be allowed to rebut

21   it.  It's not only the words in the call, Your Honor, but the

22   frequency and how he uses those words to manipulate the

23   negotiations.  Mr. Broccoletti is just as free to argue in

24   his summation --

25        THE COURT:  Well, what Mr. Broccoletti is arguing is

S. Krausse - Direct

 1  not that you can't present all of this information, he's

 2  arguing that what we're obtaining is the opinion of the

 3  witness as to what this is.  I will allow this witness to

 4  testify concerning the fact that this is a usual course of

 5  conduct, if it is.  I don't know that it is or isn't.  But to

 6  indicate that it isn't true is a different question.

 7          Mr. Broccoletti is quite correct, I think, that

 8  otherwise we're getting the opinion of the witness.  Unless

 9  the witness qualifies as an expert we don't -- we're not

10  entitled to his opinion.

11          MR. DEPADILLA:  I understand that, Your Honor.  And

12  I didn't ask him whether or not it was true, only how the

13  negotiating strategy was being used.

14          THE COURT:  I'll allow you to use "negotiating

15  strategy," okay?  Does a person who is negotiating generally

16  try to make himself out as an independent individual?  You

17  can ask questions like that, and then you can go through the

18  testimony.  But the way you phrase the question is how it

19  will be allowed or not allowed.  Do you understand that?

20          MR. DEPADILLA:  Yes, Your Honor.  Thank you.

21          THE COURT:  Okay.  We'll take a 15-minute break.

22          (A recess was taken.)

23          THE COURT:  Bring in the jury, please, Mr. Pierce.

24          (The jury entered the courtroom.)

25          THE COURT:  You can resume the witness stand, sir.

S. Krausse - Direct

1          Let the record reflect the entire jury has returned.

2          You may be seated.

3          You're reminded you're still under oath, sir.

4          You may proceed.

5          MR. DEPADILLA:  Thank you, Your Honor.

6    BY MR. DEPADILLA:

7    Q.  Let's continue in call 24, which is 1-6 A.

8          (The audio recording was played.)

9    BY MR. DEPADILLA:

10   Q.  Based on the evidence you evaluated, Detective Krausse,

11   did the defendant let the crew use the phone from time to

12   time?

13   A.  Yes, sir.

14   Q.  Okay.  And what was the result on the company?

15   A.  It put pressure on the company.

16   Q.  How so?

17   A.  How so?  The crew members were allowed to call --

18          MR. BROCCOLETTI:  Judge, again, I object.  He can't

19   testify about pressure being put on the company and the

20   results of pressure being put on the company.  That's

21   certainly not within his domain as a witness.  He's now

22   interpreting phone calls.

23          MR. DEPADILLA:  I can rephrase, Your Honor.

24          THE COURT:  Stop a minute.

25          I'm going to allow the witness to testify to

Heidi L. Jeffreys, Official Court Reporter

S. Krausse - Direct

1   material that concerns negotiating.  Generally, everybody
2   buys or sells something during their lifetime.  And everybody
3   is somewhat familiar with negotiating, unfortunately, and it
4   is up to the jury to make their decision as to what is
5   happening with the negotiations and why people say certain
6   things during negotiations.  It's not our decision, it's
7   their decision.
8            Consequently, you can ask him what is ordinary,
9   what's happening, you can ask him what he's checked out, but
10  you can't ask him if someone has made a statement contrary to
11  the statement he makes, okay?
12           MR. DEPADILLA:  Yes, Your Honor.
13           THE COURT:  All right.  Let's move along.
14  BY MR. DEPADILLA:
15  Q.  How often -- based on your review of the wire calls, how
16  often was the shipping company trying to have contact with
17  the Marida Marguerite?
18  A.  Very often.  It was almost every day.
19  Q.  And how often were they successful in making contact with
20  the Marida Marguerite when the defendant was the negotiator
21  on the ship?
22  A.  There were time periods when the company was not able to
23  reach the negotiator for days and sometimes more than a week.
24  Q.  Okay.  Let's continue with the call.
25           (The audio recording was played.)

S. Krausse - Direct

1   BY MR. DEPADILLA:

2   Q.  In a later call we review will the defendant refer to a

3   death that happens in the vicinity of the ship?

4   A.  Yes, sir.

5   Q.  All right.  Now I want to go on to -- well, no, I want to

6   do one last part of that call.

7           (The audio recording was played.)

8   BY MR. DEPADILLA:

9   Q.  Based on your analysis of the calls and how frequently

10  they were picked up, did the defendant ever keep regular

11  calls with the company?

12  A.  No, sir.

13  Q.  All right.  I now want to play Government's Exhibit

14  1-7 A, which is a call on May 20th, 2010.

15          (The audio recording was played.)

16  BY MR. DEPADILLA:

17  Q.  Does the defendant's position that he states there about

18  money change over the course of the negotiation?

19  A.  Yes, sir.

20  Q.  And when in the wiretap does the defendant take a

21  different position on money?

22  A.  At the very end -- it's going to be call 967 -- the

23  defendant will ask for a special bonus from the company for

24  his services on board.

25          (The audio recording was played.)

S. Krausse - Direct

1    BY MR. DEPADILLA:

2    Q.  As part of your job, Detective Krausse, have you

3    researched Somalia?

4    A.  Yes, sir.

5    Q.  And are you aware of any NGOs the defendant described

6    that are in Somalia to help reduce the number of piracies by

7    providing vocational training or education?

8    A.  As far as I know, no, sir.

9    Q.  Does the defendant ever go on to name -- give a specific

10   name for any of these NGOs?

11   A.  No.

12   Q.  Did the German police process the Marida Marguerite after

13   it was released?

14   A.  Yes, sir.

15   Q.  And was there any evidence of an NGO of this type

16   recovered from the ship?

17   A.  No, sir.

18   Q.  Were there any C.A.R.E. packages for the crew?

19   A.  No.

20   Q.  Any promotional materials or information materials from

21   an NGO recovered?

22   A.  Nothing, sir.

23            (The audio recording was played.)

24   BY MR. DEPADILLA:

25   Q.  And based on your research on Somalia, what was the

S. Krausse - Direct

1   number one business in Somalia at this time?

2   A.  I would say it's the piracy.

3   Q.  Now, you've testified that other than calls you also

4   recovered faxes and SMSs.

5   A.  That's right.

6   Q.  Can you explain to the jury over the process of

7   negotiations what were the faxes generally used for?

8   A.  When there was a new offer or a new demand the company or

9   the pirates sent a fax and confirmed it so that the other

10  side has something written in its hands.

11  Q.  So let's go to Government's Exhibit 1-8.

12      The first thing I want to talk about is this number

13  here in the right corner.  Can you explain to the jury what

14  that number is?

15  A.  This is a tracking number for our file so that we can

16  follow the pages in it and refer to it later.

17  Q.  So that was added by your team at a later time?

18  A.  Right.

19  Q.  Okay.  Other than adding a tracking number, is this the

20  same as you recovered it?

21  A.  Yes.

22  Q.  Okay.  And what is the purpose of this first fax?

23  A.  This is the opening demand of the pirates.

24  Q.  So let's go on to Government's Exhibit 1-9.

25      MR. DEPADILLA:  And first, for the record, 1-8 was a

Heidi L. Jeffreys, Official Court Reporter

S. Krausse - Direct

1    fax on May 20th of 2010, and 1-9 is a fax on May 21st, 2010.

2    BY MR. DEPADILLA:

3    Q.   And who is this fax from?

4    A.   This fax is from Rajesh Chava.

5    Q.   And it's in response to the original fax asking for

6    $15 million?

7    A.   Yes.

8    Q.   Did the defendant send a response back to this fax?

9    A.   Yes, he did.

10   Q.   All right.  I'd like you to read into the record this

11   part of the fax.

12   A.   Okay.  "I'm sorry about the commander spit in my face

13   right after I finished translation of your last fax.  He's

14   not happy with the wording of your message.  Perhaps Rajesh

15   is not taking our demands seriously, he said, and we will not

16   tolerate that."  He continues.

17   Q.   Read that part.

18   A.   "If Rajesh fails to come up with a reasonable statement

19   and offer, I myself, I'm in jeopardy, Mr. Rajesh, and I hope

20   you understand that.  And I'm dealing with young men armed

21   and who have never experienced law and order.  I really

22   expect the unexpected from them at any moment.  Ali Jama."

23   Q.   Now let's move on to 1-11, which was a fax on May 23rd,

24   2010.  Who is this fax from?

25   A.   This fax is from Rajesh Chava again.

S. Krausse - Direct

1   Q.   Is that in response to the defendant's last fax?

2   A.   Yes.

3   Q.   At this time has the company made a counteroffer?

4   A.   No, not so far.

5   Q.   And let's go to 1-12, which is a fax on May 24th, 2010.

6   Please read this part of the fax into the record.

7   A.   "Mr. Rajesh, the notion of your last fax of May 23rd,

8   2010, is exactly the same as previous one.  Despite being

9   very well articulated, in light of the lesson I have learned

10  from the previous one I did not convey it to the concerned.

11  They asked for certain amount of money, and they expect an

12  offer from the other side.  Only when your offer is here then

13  your wording like 'reasonable, realistic,' will be discussed

14  over.  For you to come up with reasonable offer please go

15  through the amount of money paid to the latest freed hijacked

16  ships.  Regards."

17  Q.   All right.  The first thing I want to talk about is that

18  early on he says that, "I've not conveyed it to those

19  concerned."  Did you review all the calls or faxes with

20  another person on the wire that made this exact same

21  statement or a similar statement to it?

22  A.   Yes.  The second pirate negotiator, Leon, will use the

23  same words.

24  Q.   And was it in the same context where if it was bad news

25  they were not going to pass it on?

————— S. Krausse - Direct —————

1   A.   Yes.

2   Q.   Now, here at the bottom it says for you "...to come up

3   with a reasonable offer, please go through the amount of

4   money paid the latest freed hijacked ships."

5        How does that become significant to your

6   investigation, Detective Krausse?

7   A.   During the time period the Marida Marguerite was hijacked

8   there were several other ships hijacked during the same time

9   period and at the same anchorage near the city Garaad.

10  Q.   In the calls that we review will the defendant refer to

11  those ships?

12  A.   Yeah, he will do that more than once.

13  Q.   Will he have information about those ships in these calls

14  that we will review?

15  A.   Yes.

16  Q.   Let's go on to 1-13 A on May 25th of 2010.

17       (The audio recording was played.)

18  BY MR. DEPADILLA:

19  Q.   Sir, based on your evaluation of the calls, were you able

20  to get an idea of how often the defendant was on the Marida

21  Marguerite?

22  A.   Yes, sir.

23  Q.   And, generally, how often was he on the ship?

24  A.   He was on the ship -- yeah -- almost all the time.  He

25  just left the ship a couple of times.

S. Krausse - Direct

1   Q.   Okay.  And between what time period?

2   A.   Between May and December, 2010.

3   Q.   And were you able to isolate a time he did leave the

4   ship?

5   A.   Yes, sir.

6   Q.   Okay.  And how did you do that?

7   A.   The defendant will say that in the telephone calls with

8   the company.

9   Q.   Let's play another part of that call.

10          (The audio recording was played.)

11  BY MR. DEPADILLA:

12  Q.   By this time in the negotiations had the company given

13  its initial offer?

14  A.   No, sir.

15  Q.   Was the defendant successful in obtaining that first

16  offer in this call?

17  A.   Yes.

18  Q.   Let's continue in the call.

19          (The audio recording was played.)

20  BY MR. DEPADILLA:

21  Q.   How much less is the company's opening offer than the

22  pirates' demand at this point?

23  A.   It's $40,187,500.

24  Q.   Let's continue in that call.

25          (The audio recording was played.)

───── S. Krausse - Direct ─────

1    BY MR. DEPADILLA:

2    Q.  In that part the defendant indicated he did not have a

3    cell phone.  Would this change during the course of the

4    investigation?

5    A.  Yes.

6    Q.  And would he provide a cell phone?

7    A.  Yes, several times.

8           (The audio recording was played.)

9    BY MR. DEPADILLA:

10   Q.  In that last part of the call what was significant to

11   your investigation?

12   A.  It was significant that he just told that he left the

13   ship sometimes.

14   Q.  Were there times the defendant indicated he could not

15   speak to the company negotiator for various reasons in the

16   calls?

17   A.  Yes, sir.

18   Q.  Let's go to 1-14 A, which is a call on May 29th of 2010.

19          (The audio recording was played.)

20   BY MR. DEPADILLA:

21   Q.  Now let's move on to 1-15 A, which is also on May 29th,

22   2010.

23          (The audio recording was played.)

24   BY MR. DEPADILLA:

25   Q.  Let's continue in the call.

S. Krausse - Direct

1           (The audio recording was played.)

2    BY MR. DEPADILLA:

3    Q.  As the negotiations stretch on into the year, based on

4    the calls, what is the defendant's major concern?

5    A.  That he's the one who finish the negotiation with the

6    company and that he gets paid for it.

7    Q.  And over the course of the wire, based on the defendant's

8    negotiations, does the company have to offer more money to

9    get their ship back?

10   A.  Yes.

11   Q.  Let's continue in the call.

12           (The audio recording was played.)

13   BY MR. DEPADILLA:

14   Q.  Earlier you described the roles of the pirates.  Which

15   type of pirates is the defendant describing here with courage

16   to go down into the sea?

17   A.  He's describing the attack squad, so the pirates who

18   actually hijack the ships.

19           (The audio recording was played.)

20   BY MR. DEPADILLA:

21   Q.  Does the company ever make a similar argument that

22   they're caught between two different people as well?

23   A.  Yes.

24   Q.  And who did the company use for negotiations, like the

25   defendant says he's between the pirates and the company?

—————— S. Krausse - Direct ——————

1   A.   The company negotiator at this time, Rajesh Chava.

2   Q.   And who does he place himself in between?

3   A.   Between the pirates and the owners.

4   Q.   And, based on the evidence that you adduced in your case,

5   who paid the company's negotiators?

6   A.   The company paid them.

7   Q.   And, based on your evidence, who paid the defendant?

8   A.   The pirates paid him.

9           (The audio recording was played.)

10  BY MR. DEPADILLA:

11  Q.   The defendant indicated in that call that he would put

12  some of the crew on the phone to get feedback about how he

13  was doing.  Did he ever do that in the calls that we're going

14  to review over the next couple of days?

15  A.   Yes, sir.

16  Q.   And was there a similar circumstance that was in those

17  calls where he put the crew on?

18  A.   The crew members were always introduced by the defendant,

19  so the defendant was every time around when the call was

20  made.

21  Q.   Did that ever change?

22  A.   Yes, sir.

23  Q.   And do you remember which call that was?

24  A.   That was call 975, at the very end of the negotiations.

25  Q.   Let's move on.

S. Krausse - Direct

1              (The audio recording was played.)

2     BY MR. DEPADILLA:

3     Q.   What expenses is the defendant referring to here at the

4     seven to eight hundred dollars a day?

5     A.   He's talking about the expenses the pirates have on

6     board.  That means they have to spend money every day for

7     food, for drinks and also for the chewing drug, khat.

8              (The audio recording was played.)

9     BY MR. DEPADILLA:

10    Q.   Now, a few calls ago we reviewed where the company made a

11    counteroffer of $812,000.  Has the defendant come back with a

12    counter demand back from the pirates yet?

13    A.   No, sir.

14             (The audio recording was played.)

15    BY MR. DEPADILLA:

16    Q.   Based on your investigation, was the Asian Glory being

17    held in that region at that time, as the defendant says?

18    A.   That's right, yeah.

19             (The audio recording was played.)

20    BY MR. DEPADILLA:

21    Q.   Which mediators are called heroes?

22    A.   Mediators who get more money than others.

23             (The audio recording was played.)

24    BY MR. DEPADILLA:

25    Q.   And over the course of the next couple of months what

---

S. Krausse - Direct

1   does the defendant try and get the company to do?

2   A.   To pay more money.

3   Q.   Let's move on to 1-16 A, which is on May 30th of 2010.

4        How long has the crew been held at this point, in the

5   May 30th time frame?

6   A.   Three weeks.

7            (The audio recording was played.)

8   BY MR. DEPADILLA:

9   Q.   By the time of May 30th had the defendant made his

10  counteroffer yet?

11  A.   No.

12           (The audio recording was played.)

13  BY MR. DEPADILLA:

14  Q.   In that call the defendant suggests that he will talk to

15  other negotiators and pirates to come up with a reasonable

16  amount of ransom.  How does he transmit his findings to the

17  company?

18  A.   He will send a fax afterwards.

19  Q.   All right.  Let's go on to 1-17, which is a fax on May 31

20  of 2010.  Please read that part into the record, Detective

21  Krausse.

22  A.   "Mr. Rajesh, regarding your request in our last telephone

23  conversation, the result in the study I have randomly

24  conducted shows two-thirds of the pirates would have demanded

25  more than the ransom money the commander asked for, should

---

—— S. Krausse - Direct ——

1    they be in this position.  However, among the two-thirds only

2    a very few of them say they will not accept less than

3    $11 million..."

4    Q.  Please continue.

5    A.  "...$11 million if for some reason their expectations

6    becomes unobtainable.  The other remaining pirates said it is

7    not their job to make deals, it is the commander who should

8    take care of that.  Please note they are tenacious in getting

9    their demands.  They are financially okay, for some of them

10   receive big cash from some of recently released ships.

11   Anyway, if you present an acceptable amount of money it will

12   probably strengthen my ability to bringing their dream down

13   to a level where both sides could reconcile.  Regards."

14           MR. DEPADILLA:  Your Honor, at this time, in

15   agreement with the defense, rather than playing through all

16   the calls, with the Court's permission, we'll call Detective

17   Krausse multiple times to break it down into smaller bits and

18   intersperse him with other witnesses, so I would like to

19   tender him to Mr. Broccoletti for these calls.

20           THE COURT:  You-all approach the bench.

21           (The following was heard at the sidebar out the

22   hearing of the jury:)

23           THE COURT:  What is it you want to do, now?

24           MR. DEPADILLA:  Otherwise, Mr. Broccoletti will be

25   forced to cross-examine this witness when he's testified for

———— S. Krausse - Direct ————

1    a day or two over 51 calls.  I thought it would be more fair

2    to Mr. Broccoletti if we split it into logical --

3              THE COURT:  You're beginning to sound like Ali Jama.

4              MR. DEPADILLA:  Maybe he's inspired me.  I just

5    think it would make more sense to the jury --

6              THE COURT:  What is your position?

7              MR. BROCCOLETTI:  It's fine.  We have talked about

8    this.  That's up to the Court, obviously.  I don't mind doing

9    it, as long as you agree.  It's not going to be much.

10             MR. DEPADILLA:  We tried to negotiate, Your Honor.

11             (The proceedings resumed in open court as follows:)

12             THE COURT:  Ladies and gentlemen, what we'll do

13   is -- these are a lot of calls, and so what we're going to do

14   is this witness will be called back on various calls.

15   Mr. Broccoletti is going to cross-examine him on the calls

16   that he's discussed so far so that we don't get lost over

17   time with all of these calls, and then from time to time he

18   may recall this witness.

19             MR. DEPADILLA:  Thank you, Your Honor.

20             THE COURT:  They both have agreed to this procedure

21   so that we can -- and you will have a better understanding of

22   what the cross-examination entails about the calls that have

23   been testified to up to this time, and it will keep us all

24   from trying to fall asleep.

25             MR. BROCCOLETTI:  I wish I could interest you more,

Heidi L. Jeffreys, Official Court Reporter

—————— S. Krausse - Cross ——————

```
 1    Judge, to keep you more awake, but I'll do my best.
 2                        CROSS-EXAMINATION
 3    BY MR. BROCCOLETTI:
 4    Q.  Detective, with respect to the first thing -- or one of
 5    the first things that Counsel asked you about, which was the
 6    name of Ali Jama -- do you recall testifying about that?
 7    A.  I'm sorry?
 8    Q.  About the name Ali Jama and that your investigation had
 9    not revealed a source of that name.
10    A.  Right.
11    Q.  Are you familiar with the other names listed on the
12    indictment, Khalif Ahmed Shibin and Mohammad Ali?
13    A.  Yes.
14    Q.  Has your investigation revealed the source of Khalif
15    Ahmed Shibin?
16    A.  Khalif Ahmed Shibin?  From the phone calls we were just
17    aware of the name Shibin, so Khalif Ahmed Shibin wasn't
18    mentioned.
19    Q.  How about Mohammad Ali?
20    A.  Mohammad Ali was mentioned, yes.
21    Q.  So your source of information that you're talking about
22    in terms of investigating the name Ali Jama comes solely from
23    phone calls.
24    A.  At the time the phone calls happened, yes.
25    Q.  Correct.  So in terms of the Somalian culture, in terms
```

S. Krausse - Cross

1    of his family, and in terms of his history, you're not

2    familiar with that background, are you?

3    A.   I'm not familiar with his background.

4    Q.   So if there's some name or cultural aspect of naming

5    that's in his background, that's not something that you could

6    tell us about today.

7    A.   No.

8    Q.   All right.  Secondly, with respect to -- you had talked

9    about the purposes of certain things, and we see that the

10   first offer comes by way of fax, correct?

11       And what is the purpose of the fax if they're talking

12   over the telephone?

13   A.   The purpose of the fax was as they agreed on the phone to

14   have the confirmation written.

15   Q.   All right.  Could it be that the purpose of the fax is

16   for the defendant to be able to take that to the commander

17   and translate that to the commander?

18   A.   Yes, sir.

19   Q.   Likewise, the purpose of the return fax, coming back from

20   the company in terms of what the offer may be -- could the

21   purpose of that return fax be for the defendant to take that

22   to the commander to translate it to him?

23   A.   It's possible, yes.

24   Q.   Now, you had talked about the negotiators and that the

25   company pays for its negotiator and the pirate pays for its

S. Krausse - Cross

1    negotiator, correct?

2    A.   Right.

3    Q.   We had testimony earlier that the company also, in terms

4    of its insurance team, hires a specific -- or, excuse me.

5    The insurance company provides a specific negotiation team.

6    Are you familiar with that?

7    A.   Yes.

8    Q.   And that the insurance company's negotiation team is

9    designed to, I guess, successfully terminate or conclude the

10   negotiations --

11   A.   Yes.

12   Q.   -- advise the negotiator for the company about, maybe,

13   what to say, what attitude to take, what amounts to offer,

14   things of that nature, right?

15   A.   That's right, yeah.

16   Q.   And that insurance company negotiating team is not paid

17   for by the company, is it?

18   A.   The team is not paid by the company.

19   Q.   Right.

20   A.   But the negotiator at this time was a company employee,

21   he was not a part of the paid team from the insurance.

22   Q.   Fair enough.  I understand that.

23        But the point of my question is that he is being

24   advised by an insurance team that is not being paid for by

25   the company, true?

S. Krausse - Cross

1   A.   That's right, yes.

2   Q.   Okay.  We've talked about khat.

3   A.   Yeah.

4   Q.   Khat is -- we've seen pictures of it in bags.  It's a

5   leafy substance, right?

6   A.   Right.

7   Q.   And it's flown into the country almost every day --

8   A.   Yes.

9   Q.   -- to be distributed among the citizens.

10   A.   Yes.

11   Q.   It's almost as popular as Starbucks, isn't it?

12   A.   Yeah, it's very common.

13   Q.   I mean, almost all the citizens chew it.

14   A.   Yes.

15   Q.   And it's legal in Somalia.

16   A.   It is legal down there, yeah.

17   Q.   And you've also talked in terms of Counsel's questions

18   about the words that are used, strategies and things of that

19   particular nature about the defendant.  Do you remember that?

20   A.   Right.

21   Q.   About him distancing himself from the pirates, do you

22   remember talking about that?

23   A.   Right.

24   Q.   In terms of trying to align himself with the crew, do you

25   recall that?

——————— S. Krausse - Cross ———————

1   A.   (The witness nodded head.)

2   Q.   You've also had other telephone calls that Counsel

3   referred to from the second man, Looyan or Leon?

4   A.   That's right.

5   Q.   And you've listened to those?

6   A.   Yes, sir.

7   Q.   And in the context of those phone calls none of that

8   appears?

9           THE COURT:  Were any of those calls taken up yet?

10          MR. DEPADILLA:  Not yet, Your Honor, but they will

11  be.  It's okay.  We're not objecting.

12          THE COURT:  All I'm trying to do is to keep things

13  in context.

14          MR. BROCCOLETTI:  Yes, sir.

15          THE COURT:  We're now going beyond what was on

16  examination, is what --

17          MR. BROCCOLETTI:  Not really, Judge, because he

18  asked him about the words and the language and issues that

19  the defendant brought up.

20          THE COURT:  You're now discussing what Leon did.  I

21  understand Leon is a negotiator that comes in between there

22  for a couple of months, or thereabouts; however, we haven't

23  heard anything from this witness about Leon yet, have we?

24          MR. BROCCOLETTI:  Well, we've heard him refer to

25  Leon, we've heard him refer to the calls that were made, him

1    stepping in, so I think in that regard --

2            THE COURT:  All right.  As long as Mr. DePadilla

3    doesn't object, go ahead, Mr. Broccoletti.

4            MR. BROCCOLETTI:  Yes, sir.

5    BY MR. BROCCOLETTI:

6    Q.  The point is that in the context of the phone calls from

7    Leon none of that language appears, does it?

8    A.  None of it appears?

9    Q.  Yeah.  I mean, Leon is strictly business.

10   A.  Yeah.

11   Q.  He just gets straight to the point:  "This is what we

12   want, this is what you've offered, this is what we can do."

13   A.  That's right.

14   Q.  He doesn't talk about distancing himself, aligning

15   himself with the pirates.  He takes a different tack and a

16   different approach.

17   A.  Yes.

18   Q.  All right.

19           MR. BROCCOLETTI:  Thank you, Judge.

20           MR. DEPADILLA:  No redirect, we just ask that he

21   stay sworn and be ready for the next time we call him.

22           THE COURT:  All right.  By agreement of counsel I'm

23   going to allow him to come back during the direct

24   presentation.

25           You're instructed, however, not to discuss your

S. Krausse - Direct

```
1    testimony with anyone until you return to the witness stand.

2              THE WITNESS:  Yes, sir, I understand.

3              THE COURT:  All right.  You may be excused at this

4    time.

5

6                   *****     *****     *****

7

8              THE COURT:  Who is the next witness?

9              MR. DEPADILLA:  We're calling Detective Krausse

10   again for his second...

11             THE COURT:  You're reminded, sir, you're still under

12   oath.

13             SASHCA KRAUSSE, recalled as a witness, having been

14   previously duly sworn, testified further as follows:

15                  DIRECT EXAMINATION (Continuing)

16   BY MR. DEPADILLA:

17   Q.  Detective Krausse, I want to take up with Government's

18   Exhibit 1-18 A, which is a call on June 1st of 2010.  Please

19   look at the screen.

20             (The audio recording was played.)

21   BY MR. DEPADILLA:

22   Q.  From your analysis of the call, Detective Krausse, how

23   easy was it for the company negotiator to talk with the

24   Marida Marguerite when the defendant did not come on the

25   line?
```

S. Krausse - Direct

1    A.   It was almost impossible.

2    Q.   All right.  What was the level of English that any of the

3    pirates, excepting Leon, was able to speak in calls that you

4    reviewed?

5    A.   It was very bad.  They wouldn't be able to communicate

6    with each other.

7    Q.   And in this June 1st time frame has the company's offer

8    changed from that original $812,000?

9    A.   No, sir.

10   Q.   How does the defendant change tactics at this point?

11   A.   He will use inside information about the value of the

12   ship and the company and bring that into the negotiations.

13   Q.   I'd like to show you now what has been entered into

14   evidence as Government's Exhibit 1-19, which is a fax on

15   June 2nd, 2010.  Please read that into the record, sir.

16   A.   "Received your fax, and I do understand its contents.

17   Even though it has been receiving lately, it is true that the

18   world had experienced severe economic crisis, but what is

19   untrue is that the company owns only one ship.  The commander

20   is very well aware that the company owns about 15 ships, nine

21   of which are tankers, all named after flowers.  The

22   reasonable amount of money you are going to offer should be

23   reasonably based on 15 ships owner capacity and not on one

24   ship owner capacity.  If your offer is good enough I will be

25   encouraged to reduce them to a reasonable demand.  Above all,

———— S. Krausse - Direct ————

1    I am more concerned in saving human lives than the amount

2    of" -- I'm sorry, I have trouble with the handwriting.

3    Q.  Thank you, Detective Krausse.  Now I'm going to show you

4    Defendant's Exhibit 1-1 A.

5          Who is that man in the striped shirt?

6    A.  This is the second mate of the Marida Marguerite,

7    Mr. Sunsue Pandey.

8    Q.  All right.  I'd now like to go to call 1-20 A, which was

9    on June 4, 2010.

10          (The audio recording was played.)

11   BY MR. DEPADILLA:

12   Q.  How often would the defendant put either the captain or

13   the chief engineer on to talk to the company to convey

14   threats?

15   A.  He did that often during the time of the capture.

16   Q.  Now, in the majority of these calls that we reviewed

17   where is the defendant calling from?

18   A.  He's calling from the ship's satellite phone.

19   Q.  And does he ever give the company negotiator another

20   phone number?

21   A.  Yes.  He will give his cell phone number to the company.

22   Q.  So let's go to call 1-21 A on June 4th of 2010.

23          (The audio recording was played.)

24   BY MR. DEPADILLA:

25   Q.  Was the defendant consistent in giving a cell phone

S. Krausse - Direct

1    number that ended with the last four digits of 8675?

2    A.   Yes, sir.

3    Q.   Okay.  Let's move on to 1-22 A, which was also a call on

4    June 4th of 2010.

5            By the time of this call, sir, has the defendant been

6    successful in getting a higher offer from the company?

7    A.   Not so far, no.

8            (The audio recording was played.)

9    BY MR. DEPADILLA:

10   Q.   As part of your investigation did you try to become

11   knowledgeable about the Somali clan system?

12   A.   Yes.

13   Q.   And can you explain that a little to the jury?

14   A.   Yeah.  In Somalia there are a lot of big clans, and these

15   big clans are related to certain areas.  And when the clan is

16   on the top there are several subclans under it, so...

17   Q.   Thank you.

18           (The audio recording was played.)

19   BY MR. DEPADILLA:

20   Q.   Now, several times in that transcript it had an

21   indication of a foreign language.  What language are we

22   hearing there?

23   A.   It's Somalian.

24   Q.   Okay.  And at the end of the call the defendant suggests

25   that sometimes the commander is not on the ship.

————————— S. Krausse - Direct —————————

1          When you were researching these wiretap calls at the
2     time of the investigation were you able to tell when the
3     commander was on the ship?
4     A.  The defendant said when the commander was on board and
5     when he wasn't on board, but of course we haven't been on
6     board and so we never were sure if the commander was on board
7     or not.
8     Q.  Were there times that the other negotiator, Leon, said
9     that he was with the commander?
10    A.  Yes, sir.
11    Q.  And what would the defendant be saying about the
12    commander at that time?
13    A.  That he was also with the commander.
14    Q.  Let's continue in that call.
15          (The audio recording was played.)
16    BY MR. DEPADILLA:
17    Q.  Does there come a time on the wire calls that someone
18    does come to replace him?
19    A.  Yes, sir, Leon will come.
20    Q.  What does the defendant do after Leon comes to replace
21    him?
22    A.  He will stay on board all the time, and he will try to
23    get his job back then.
24    Q.  Let's continue in that call.
25          (The audio recording was played.)

Heidi L. Jeffreys, Official Court Reporter

S. Krausse - Direct

 1  BY MR. DEPADILLA:

 2  Q.  When the ship was freed did you talk to the crew about

 3  the defendant?

 4  A.  Yes, sir.

 5  Q.  And did that include Oleg Dereglazov and Captain Makane?

 6  A.  Yes, sir.

 7  Q.  Let's go on to call 123 A, which is on June 9th.

 8          (The audio recording was played.)

 9  BY MR. DEPADILLA:

10  Q.  Back in call 16 A what did the defendant indicate his

11  life and Rajesh's life was worth?

12  A.  More than a billion dollars, sir.

13  Q.  Let's continue the call.

14          (The audio recording was played.)

15  BY MR. DEPADILLA:

16  Q.  In that call the defendant references the fuel and the

17  resources on the ship.  Based on your analysis, what is the

18  other most frequent issue the defendant brings up as a

19  concern going forward?

20  A.  That he is possibly not the only one the company could

21  talk to.

22  Q.  Let's continue in the call.

23          (The audio recording was played.)

24          THE COURT:  Mr. DePadilla, how long do you expect

25  you'll be, sir?

S. Krausse - Direct

1              MR. DEPADILLA:  35 to 40 minutes, Your Honor.

2              THE COURT:  Did you want to ask him anything about

3     just what was on the tape?

4              MR. DEPADILLA:  No, I've made my point on that.

5              THE COURT:  This will be a good point to take a

6     mid-morning break.  We'll take a 15-minute break.  Everyone

7     please rise while the jury retires.

8              (The jury withdrew from the courtroom.)

9              THE COURT:  You're instructed, sir, not to discuss

10    your testimony during the break, sir.  Thank you.

11             THE WITNESS:  Yes, sir.

12             THE COURT:  We'll take a 15-minute recess.

13             (A recess was taken.)

14             THE COURT:  Please remain standing.

15             Bring in the jury, Mr. Pierce, if you would.

16             (The jury entered the courtroom.)

17             THE COURT:  Let the record reflect the entire jury

18    has returned.

19             You may proceed, Mr. DePadilla.

20             MR. DEPADILLA:  Thank you, Your Honor.

21    BY MR. DEPADILLA:

22    Q.  Detective Krausse, if you could look at the screen I'm

23    going to go to a fax, Exhibit 1-24, from June 20th.

24             THE COURT:  You're reminded, sir, you're still under

25    oath.

Heidi L. Jeffreys, Official Court Reporter

S. Krausse - Direct

```
 1          THE WITNESS:  Yeah.
 2    BY MR. DEPADILLA:
 3    Q.  I'd like you to look at the red arrow.  What is the
 4    company's second offer?
 5    A.  The second offer is $1.4 million.
 6    Q.  And has the defendant ever dropped the original demand of
 7    $15 million from the pirates at this point?
 8    A.  No, not at this point.
 9    Q.  Let's go on to 1-25, which is a fax on June 11th, 2010.
10    Please read that.
11    A.  "Be informed the leader of the pirates has instructed me
12    not to continue the dialogue regarding Marida Marguerite with
13    you anymore because you are found incomprehensible.  It is
14    absolutely imperative that you reconsider your attitude
15    towards the pirates and take their demand seriously.  I am
16    tired, and I am going to quit to get peace of mind.  Please
17    tell the owners to either contact with the pirates directly
18    or assign somebody else other than you.  The longer the time,
19    the worse the situation will be.  Regards, Ali."
20    Q.  Over the course of the entire hijacking, Detective
21    Krausse, did the defendant ever quit his post, quit his job?
22    A.  No.
23    Q.  Let's go to the next fax, 1-26, which was on June 20th of
24    2010.  Please read that.
25    A.  "As per our telephone conversation, the situation of the
```

S. Krausse - Direct

1   ship, the cargo and the crew will deteriorate in the very

2   weeks to come.  I am really very much concerned of the

3   well-being of the crew and company property, but,

4   unfortunately, I don't give orders here, I take them.  I feel

5   very much confident that I will somehow manage to convince

6   the pirates to reduce their demand if the owners present

7   acceptable money to pirate requirement.  I am not a pirate

8   and sure did my best to prevent the crew and the ship from

9   getting harmed.  If the owners" -- I cannot read this --

10  "this I will simply go ashore with clean and clear

11  conscience.  Regards, Ali."

12  Q.  Now, back in Exhibit 1-22 what did the defendant say he

13  was going to do for the crew?

14  A.  He's going to take care.

15  Q.  All right.  And how did he refer to the pirates at that

16  time?

17  A.  He said he will not leave them.

18  Q.  Okay.  Did this tactic of him saying he will simply walk

19  off the job and go ashore with a clear and clean conscience

20  result in a third increase from the company?

21  A.  No.

22  Q.  So let's go to 1-27, which is another fax on June 24th of

23  2010.  Please read that.

24  A.  "I have finally succeeded to convince the commander to be

25  flexible and accept your request for reduction of demanded

Heidi L. Jeffreys, Official Court Reporter

─────────── S. Krausse - Direct ───────────

1   ransom money.  He redacted $3 million from his initial

2   $15 million U.S. ransom demand.  Your contribution to this

3   unexpected break-through will most certainly enable me to

4   have him reduce more considerable amount of money.  Remember,

5   in 15 day the ship will be operational, but after that even

6   when released it will be required towing to be pulled to

7   efficient port.  I will do my very best to avoid this to

8   happen, but it only depends on your cooperation.  I hope for

9   the best.  Regards."

10  Q.  So, now what is the current positions of the parties?

11  What is the demand from the pirates?

12  A.  This is 12 million.

13  Q.  And the offer from the company?

14  A.  $1.4 million.

15  Q.  I'd now like to go to Exhibit 1-28 A, which is call 192

16  on June 29th.

17         (The audio recording was played.)

18  BY MR. DEPADILLA:

19  Q.  Back in Exhibit 1-13 A, which we went through in your

20  last session, how often did the defendant say he was leaving

21  the ship?

22  A.  Three times.

23  Q.  Okay.  Let's please go on to a little bit further in the

24  conversation.

25         (The audio recording was played.)

S. Krausse - Direct

1    BY MR. DEPADILLA:

2    Q.  Did you view some of the crews' faces on the Marida

3    Marguerite when you were in Salalah, Oman?

4    A.  Yes.

5              MR. DEPADILLA:  Could we unpublish, please, Madam

6    Clerk?

7    BY MR. DEPADILLA:

8    Q.  I'd like to show you what's been previously marked as

9    1-1 O, 1-1 P and 1-1 Q.

10             Do you recognize those photos, sir?

11   A.  Yes.

12   Q.  And what are those photos?

13   A.  These are photos of cabins of the Marida Marguerite after

14   it was released.

15             MR. DEPADILLA:  We would offer 1-1 O, 1-1 P and

16   1-1 Q, Your Honor.

17             THE COURT:  How long after the ship was released

18   were these taken?

19             THE WITNESS:  These pictures were taken during the

20   first two days when the ship was in Oman, so from the 3rd to

21   the 4th of January in 2011.

22             MR. DEPADILLA:  Thank you, Your Honor.

23             THE COURT:  You may publish them.  They're received

24   in evidence.

25             (The exhibits were admitted into evidence.)

Heidi L. Jeffreys, Official Court Reporter

S. Krausse - Direct

1    BY MR. DEPADILLA:

2    Q.  So let's just review them, 1-1 0, 1-1 P and 1-1 Q.

3           Did you also view the cabin where the defendant

4    stayed?

5    A.  Yes, sir.

6    Q.  And what was that cabin like?

7    A.  The cabin the defendant stayed in was the cabin of the

8    chief officer, so it was a big cabin which he had for

9    himself, with its own bathroom and everything.

10   Q.  All right.  Let's go back to call 192, where we were, and

11   continue.

12          (The audio recording was played.)

13   BY MR. DEPADILLA:

14   Q.  In your investigations of German piracy incidents is

15   there an option for a captured ship when the company cannot

16   pay the pirates to make?

17   A.  Yes.  Sometimes the pirates use the hijacked ship as a

18   mother ship to hijack other ships.

19   Q.  And can you explain to the jury that concept of a mother

20   ship, how that would work?

21   A.  Yeah.  They will take the actual hijacked ship and sail

22   onto the high seas.  So they will take skiffs with them, and

23   because they're covered as a normal merchant vessel they will

24   not be recognized as pirates by other vessels.  So they are

25   able to come close, and then they can attack with the skiffs

1   from the ship when they are already very close.  So it makes

2   it easier to hijack ships on the open seas.

3   Q.  Let's continue in this call.

4           (The audio recording was played.)

5   BY MR. DEPADILLA:

6   Q.  Detective Krausse, we've heard testimony about a second

7   officer, Sunsue Pandey.  Did your investigative team

8   investigate him as well, as well as other people?

9   A.  Yes.

10  Q.  And tell the jury, what did your team investigate Sunsue

11  Pandey for?

12  A.  We investigated him for the cooperation with the pirates,

13  because he gave inside information about the value of the

14  ship and the financial possibilities to the defendant, and we

15  also investigated against him because of turning his crew

16  against his own captain.

17  Q.  And, from your observations, what languages did

18  Mr. Pandey speak?

19  A.  English and Hindi, sir.

20  Q.  Did it appear he spoke Somali at all?

21  A.  No.

22          (The audio recording was played.)

23  BY MR. DEPADILLA:

24  Q.  And we'll continue.

25          (The audio recording was played.)

———— S. Krausse - Direct ————

1   BY MR. DEPADILLA:

2   Q.  Now, in that part of the call the defendant references

3   hanging crew members from a crane.  Did your forensic team

4   process the entire Marida Marguerite?

5   A.  Yes.

6   Q.  Did you find any ropes hanging from cranes on the ship?

7   A.  No, not from cranes, sir.

8   Q.  Did you find any ropes that were attached to parts of the

9   ship that appeared that they had been used for hanging?

10  A.  Yes, sir.

11  Q.  And where were those located, generally?

12  A.  Those ropes were hanging from pipes on the ceiling.

13          (The audio recording was played.)

14  BY MR. DEPADILLA:

15  Q.  At the end of this call the defendant says he wishes he

16  could have the crew one by one come and tell the company how

17  he was defending them.

18          Does that ever happen in the communications with the

19  company from this point forward?

20  A.  He will never put the crew one by one on the phone, he

21  will just let the chief engineer and the captain on the

22  phone.

23  Q.  We'll continue in this call.

24          (The audio recording was played.)

25  BY MR. DEPADILLA:

S. Krausse - Direct

1   Q.   Over the course of this investigation were you ever able

2   to get an undercover German officer on the boat?

3   A.   No, sir.

4   Q.   Were you ever able to get any cameras or wiretaps onto

5   the boat?

6   A.   No, sir.

7   Q.   So were you ever able to tell if what the defendant was

8   saying on the phone was true?

9   A.   No.

10   Q.   Let's continue and finish this call.

11          (The audio recording was played.)

12   BY MR. DEPADILLA:

13   Q.   At the end of that call he says he wants the negotiations

14   to finish as quickly as possible.  What is his next move?

15   A.   He will leave the ship.

16   Q.   Now, earlier we talked about SMS or text messages.

17   A.   Right.

18   Q.   You recovered these as well as part of your

19   investigation?

20   A.   Yes.

21   Q.   So let's look at 1-29.  I first want to go to the yellow

22   box on the screen.  What is the partner number?

23   A.   The partner number is the German word for the number of

24   the partner who sent the SMS, so...

25   Q.   All right.  And is the cell phone number ending in 8675

——————— S. Krausse - Direct ———————

1  familiar to you from your investigation?

2  A.  Yes.  This is the number of the defendant.

3  Q.  And now let's go to another part.  What is -- let me draw

4  an arrow.  What is "beginnen" in German?

5  A.  It's the start.  In that case it means when the message

6  was sent.

7  Q.  Okay.  And can you please interpret the numbers that I'm

8  highlighting here?

9  A.  It was sent on June 30th in 2010 at 4:37 p.m.

10  Q.  And can you please read the message?

11  A.  "Dear Rajesh.  I left the ship this morning, and I don't

12  know if I will go back.  Anytime you need my help, just call

13  me.  Regards."

14  Q.  How many times had the defendant previously suggested

15  that he was not free to leave?

16  A.  At least three times.

17  Q.  Did your team recover any other evidence on the Marida

18  Marguerite related to this text message?

19  A.  Yes.

20  Q.  And what was recovered?

21  A.  We recovered requests for vacation of the defendant.

22  Q.  Did the defendant return after a period of time?

23  A.  Yes, sir.

24  Q.  And tell the jury how did you know the defendant came

25  back to the ship?

S. Krausse - Direct

1   A.  The defendant will call the company and explain that he's

2   back.

3   Q.  I'll now go to call Exhibit 1-30 A, call 210, on

4   June 9th.

5           (The audio recording was played.)

6   BY MR. DEPADILLA:

7   Q.  What kind of ships was the Marida Marguerite supplying

8   water to?

9   A.  They were supplying water to other hijacked ships.

10          (The audio recording was played.)

11  BY MR. DEPADILLA:

12  Q.  Let's continue in the call.

13          (The audio recording was played.)

14  BY MR. DEPADILLA:

15  Q.  Detective Krausse, you just reviewed that clip.  Is there

16  anywhere in that clip where the defendant says he is going

17  for medical treatment?

18  A.  No, sir.

19  Q.  And where was the Marida Marguerite located most of the

20  time when you were getting these wire calls in Germany?

21  A.  Most of the time the Marida Marguerite was anchored near

22  the city Garaad, at the Somalian coast, in the northeast.

23  Q.  And let's continue on.

24          (The audio recording was played.)

25  BY MR. DEPADILLA:

S. Krausse - Direct

1   Q.  Is this the first call where the defendant begins to give

2   unofficial estimates of what the ransom will be?

3   A.  Yes, sir.

4   Q.  And in there he suggests if he gave it to them officially

5   the commander may kill him.  When is this call in relation to

6   when the defendant came back on the ship?

7   A.  This is his first day back on board.

8          (The audio recording was played.)

9   BY MR. DEPADILLA:

10  Q.  How frequently did the company have to make multiple

11  counteroffers before the defendant would reduce the demand?

12  A.  Twice.

13  Q.  Okay.  And how often would the company try and find out

14  about the well-being of their crew?

15  A.  Very often; almost in every call.

16  Q.  And what were the common methods that the company would

17  ask the defendant for to try and find out about their crew?

18  A.  The common opportunity is to ask for so-called proof of

19  lives that are questions which were asked by the company and

20  were questions which could only be answered by the crew

21  members.

22  Q.  Let's go to 1-26, which is a fax on June 20th.  Please

23  read that.

24  A.  "As per our telephone conversation, the situation of the

25  ship, the cargo and the crew will deteriorate in the very

S. Krausse - Direct

1   weeks to come.  I am really very much concerned of the
2   well-being of the crew and the company property, but
3   unfortunately I don't give orders here, I take them.  I feel
4   very much confident that I will somehow manage to convince
5   the pirates to reduce their demand if the owners present
6   acceptable money to pirates' requirement.  I am not a pirate
7   and sure did my best to prevent the crew and the ship from
8   getting harmed.  If the owners get" -- again, I'm sorry --
9   "this I will simply go ashore with clean and clear
10  conscience.  Regards."
11  Q.  Other than when the ransom was finished, did the
12  defendant ever answer proof-of-life questions?
13  A.  No, sir.
14  Q.  Okay.  So now I'd like you to look at 1-27, which is a
15  part of a fax on June 24th.
16      MR. DEPADILLA:  I'll skip that, Your Honor.  The
17  wrong thing is coming up.  We can move on.
18  BY MR. DEPADILLA:
19  Q.  Let's go to call 213, which is on July 10th of 2010.
20      (The audio recording was played.)
21  BY MR. DEPADILLA:
22  Q.  Now I'd like to show you 1-1 C.  Can you tell the jury
23  when the first time was you saw this photograph?
24  A.  I saw this photograph first time on January 3rd in 2011.
25  Q.  And what were the circumstances of you seeing that

S. Krausse - Direct

1    photograph?

2    A.   I saw that photograph on the laptop from one of the crew

3    members.   He showed us.   He showed it to me.

4    Q.   And at that time did you recover it for the German

5    police?

6    A.   Yes, sir.

7    Q.   Let's continue in call 213.

8         (The audio recording was played.)

9    BY MR. DEPADILLA:

10   Q.   Is the $3 million he's referring to the one time the

11   pirates have dropped their offer?

12   A.   Yes, sir.

13   Q.   And how many times has the company had to come up to get

14   one reduction of $3 million?

15   A.   Three times.

16   Q.   Later in the wire is a similar argument made by someone

17   else besides the defendant?

18   A.   The second negotiator of the pirates, Leon, will use the

19   same argument, yes, sir.

20        (The audio recording was played.)

21   BY MR. DEPADILLA:

22   Q.   And let's go to the end of that call.

23        (The audio recording was played.)

24   BY MR. DEPADILLA:

25   Q.   Based on your investigation, does the defendant

S. Krausse - Direct

```
 1   ultimately benefit personally from the ransom negotiations?
 2   A.  He will be paid by the pirates after the ransom money was
 3   delivered, so, yes.
 4   Q.  Let's move on to call 132 A, which is call 244 on
 5   July 29.
 6            (The audio recording was played.)
 7   BY MR. DEPADILLA:
 8   Q.  In that call the defendant references traveling on the
 9   Indian Ocean.  What was happening with the Marida Marguerite
10   at this time?
11   A.  At this time the Marida Marguerite was sailing to the
12   City of Hobyo for the first time.
13   Q.  And what is the significance of Hobyo, based on your
14   investigation?
15   A.  Hobyo is a city in Somalia which is under control of the
16   terrorist organization al-Shabaab.
17   Q.  Continue in that call.
18            (The audio recording was played.)
19   BY MR. DEPADILLA:
20   Q.  Tell the jury what is the Frigia?
21   A.  The Frigia is a Turkish-owned ship which was also
22   hijacked during this same time period.  The Marida Marguerite
23   was also held in the area of Garaad.
24   Q.  And was it released about June 29, 2010, as the defendant
25   says?
```

S. Krausse - Direct

1   A.   That's right, yeah.

2         (The audio recording was played.)

3   BY MR. DEPADILLA:

4   Q.   And let's finish the call.

5         (The audio recording was played.)

6   BY MR. DEPADILLA:

7   Q.   Let's finish this part of your testimony with call 247,

8   on July 30th of 2010.

9         (The audio recording was played.)

10  BY MR. DEPADILLA:

11  Q.   Did the company receive faxes from the defendant that

12  were written by the captain or the chief engineer saying that

13  the resources were running out?

14  A.   Yes.

15  Q.   Was there any way for the company to tell whether or not

16  those statements were true or the circumstances they were

17  written under?

18  A.   No, sir.

19        (The audio recording was played.)

20  BY MR. DEPADILLA:

21  Q.   What is the defendant referring to here with the

22  expenses?

23  A.   Like I mentioned in my last testimony, he's talking about

24  the daily costs the pirates have on board for fuel, water,

25  food and khat.

S. Krausse - Direct

1   Q.  Did your investigation recover any evidence off the ship

2   that corroborated the pirates' expenses while they were

3   operating the ship?

4   A.  Yes.

5   Q.  And in that corroborating evidence was the defendant's

6   name present?

7   A.  Yes, sir.

8           (The audio recording was played.)

9   BY MR. DEPADILLA:

10  Q.  What is the defendant referring to about the operation

11  ability of the Marida Marguerite?

12  A.  He's talking about what the Marida Marguerite could --

13  what the company could earn with the Marida Marguerite every

14  day it wouldn't be in the hands of the pirates.

15          (The audio recording was played.)

16  BY MR. DEPADILLA:

17  Q.  Does there come a time when a person other than the

18  defendant calls in to the company as part of the

19  negotiation -- or affects the negotiations?

20  A.  Yes, sir.

21  Q.  Let's finish this call.

22          (The audio recording was played.)

23  BY MR. DEPADILLA:

24  Q.  In future calls would the defendant's position change

25  concerning anyone else who wants to talk from the pirates to

S. Krausse - Cross

1    the company?

2    A.   Yes, sir.

3    Q.   How significant an issue will this become over time?

4    A.   He will be very concerned about the issue that the

5    company could speak to a second negotiator or a third party.

6    Especially during that time period when the very serious

7    tortures against the crew members started it was a main

8    issue.

9    Q.   Thank you.

10         MR. DEPADILLA:  Your Honor, I tender the witness to

11   Mr. Broccoletti for this.  Again, we're going to call

12   Detective Krausse again.  Thank you.

13                    CROSS-EXAMINATION

14   BY MR. BROCCOLETTI:

15   Q.   Detective, with respect to Government's Exhibit 1-3,

16   which was the summary chart of the telephone calls that we

17   had talked about yesterday --

18   A.   Yes.

19   Q.   -- you had listed on the right-hand side the time of the

20   calls.  Is that time in Somali time?

21   A.   No, that's in German time.

22   Q.   And do you know what the time difference is?

23   A.   It should be -- I'm not sure -- one or two hours ahead in

24   Somalia.

25   Q.   So, for example, do you have that chart in front of you?

S. Krausse - Cross

1   A.   No.

2           MR. BROCCOLETTI:   Could we bring that up?

3           MR. DEPADILLA:   Oh, sure.

4           MR. BROCCOLETTI:   1-3.

5           (There was a pause in the proceedings.)

6   BY MR. BROCCOLETTI:

7   Q.   On the right-hand side would be the German time.   So the

8   first time entry is 12-26, which is about 12:30 in the

9   afternoon.

10  A.   Right.

11  Q.   And it would be an hour or two ahead of time in Somali

12  time, so that obviously is the afternoon.

13  A.   This is in the afternoon.

14  Q.   And most of the calls seem to be in the afternoon.   Would

15  that be accurate?

16  A.   That's accurate, yes.

17  Q.   Okay.   All right.   Thank you.

18           Now, with respect to --

19           THE COURT:   Can't we establish the differentiation

20  in time?   I'm not sure where we are in the international date

21  line or anything of that nature, Mr. Broccoletti.

22           MR. BROCCOLETTI:   The witness believes it's one or

23  two hours, Your Honor.

24  BY MR. BROCCOLETTI:

25  Q.   Are you sure of a particular one or a two?   Do you know?

Heidi L. Jeffreys, Official Court Reporter

--- S. Krausse - Cross ---

1   A.  No, I don't know if it's one or two, but I'm a hundred

2   percent sure that it's not more or less.

3   Q.  All right.  With respect to Government's Exhibit 1-19,

4   which was the fax that was sent talking about the company

5   owning more than one ship -- do you recall that fax?

6   A.  Yeah, I know.

7   Q.  All right.  And you've already testified about and have

8   pointed out an individual by the name of Pandey.

9   A.  Yes.

10  Q.  And Pandey was under investigation by you for providing

11  information to the pirates.

12  A.  That's right, sir.

13  Q.  And part of that information would have been information

14  about the ownership of other ships or the wealth of the

15  company.

16  A.  Right.

17  Q.  And, so, this fax could accurately reflect information

18  that Pandey could have been providing.

19  A.  Yes, sir.

20  Q.  You also talked today about the clans -- I'm sorry?

21          THE COURT:  Just because we can establish the

22  differentiation in time -- it's a fixed differentiation, as

23  long as we know the city in Germany we're speaking from and

24  the city in Somalia which we're speaking from.

25  BY MR. BROCCOLETTI:

S. Krausse - Cross

1  Q.  Yes, sir.  The city in German that you're speaking from

2  is...

3  A.  The name is Harem.  It's H-A-R-E-M.

4  Q.  And the town in Somalia is Garaad?

5  A.  Garaad, yes.

6      MR. BROCCOLETTI:  So, perhaps, Your Honor, at the

7  lunch break we can come back with an accurate number for Your

8  Honor.

9      THE COURT:  I'll take notice of it.

10     MR. BROCCOLETTI:  Yes, sir.

11  BY MR. BROCCOLETTI:

12  Q.  With respect to one of the defendant's telephone calls

13  you talked about the clans and aggression between the clans.

14  Did your investigation into Somalian culture determine that

15  there was such aggression between clans?

16  A.  No, sir.

17  Q.  There is not.  So the clans are compatible with each

18  other?

19  A.  No, I wouldn't say that.  I just said that we didn't

20  investigate in that.

21  Q.  Oh, I'm sorry.  You did not investigate in that?

22  A.  No, we did investigate, or we had to get an overview

23  about the clan structure, but, of course, I'm not able to say

24  which clan is in a fight with another clan.  But I can

25  imagine that there are fights between the clans, yes.

—— S. Krausse - Cross ——

1   Q.   Counsel asked you about the ship being anchored off the

2   coast.  Did your investigation reveal how far off the coast

3   it would have been?

4   A.   The Marida Marguerite?

5   Q.   Yes, sir.

6   A.   Yes.  It has been between two and three kilometers.

7   Q.   And what is the method of transportation between ship to

8   shore?

9   A.   The pirates are using skiffs, and they're traveling in

10  the skiffs from the shore to the ship and back.

11  Q.   And at some point the defendants refer to that as "speed

12  boats"?  Would that also be another name for it?

13  A.   Yeah.

14  Q.   During some of the conversations that we listened to

15  today the defendant talks about allowing the crew to call

16  home.  Did your investigation reveal that that was

17  consistent?

18  A.   Yes, that was consistent.

19  Q.   Now, with respect to the time that the defendant left the

20  ship, Counsel asked you about a piece of paper that you had

21  located on the Marguerite after it was released.

22  A.   Right.

23  Q.   On that particular piece of paper -- obviously, it was in

24  Somalian.

25  A.   It was in Somalian.

—————— S. Krausse - Cross ——————

1   Q.  And that piece of paper had three names on it.  Is that

2   correct?

3   A.  I have to see the paper.  I don't know.  I don't remember

4   if there are several names on it.

5   Q.  And I'm handing you also the English translation.

6   A.  Thank you, sir.

7           (There was a pause in the proceedings.)

8           THE WITNESS:  Yes.

9   BY MR. BROCCOLETTI:

10  Q.  And there are three names that are listed on that, and

11  you've also translated that into English?

12  A.  Yes.

13          THE COURT:  He's merely repeating what's on the

14  paper.  Is the paper going into evidence?

15          MR. BROCCOLETTI:  Yes, sir, eventually.  We can put

16  it in now.

17          MR. DEPADILLA:  Your Honor, we were going to offer

18  it from a later witness, but we have no objection if

19  Mr. Broccoletti wants to offer it.

20          THE COURT:  I don't have any objection to any of it,

21  but I do want to make sure it's evidence when somebody is

22  reading from something.

23          Okay.  It's admitted in evidence.  What exhibit

24  number are you going to use?  That way we won't have it

25  confused later on.

S. Krausse - Cross

1          MR. DEPADILLA:  Yes, Your Honor.

2          THE COURT:  This is just for the record, ladies and

3  gentlemen.  I'm just getting some things straight.

4          (There was a pause in the proceedings.)

5          MR. DEPADILLA:  Your Honor, for the record, 1-82 is

6  the original Somali, and 1-82 A and 1-82 B is the

7  translation.

8          THE COURT:  Do you want to introduce them?

9          MR. BROCCOLETTI:  We do, Your Honor.

10          THE COURT:  All right.  1-82 and 1-82 A (sic) are

11  introduced in evidence, and this defendant can read from them

12  all.

13          MR. BROCCOLETTI:  This witness?

14          THE COURT:  Yes, sir.

15          (The exhibits were admitted into evidence.)

16          MR. BROCCOLETTI:  They've been introduced.  Could we

17  publish them to the jury, please?

18          THE COURT:  Sure.

19  BY MR. BROCCOLETTI:

20  Q.  All right.  Now, this is Government's 1-82, and this is

21  what you're looking at as well, right?

22  A.  Yes.

23  Q.  And, obviously, this is Somalia --

24  A.  Yes.

25  Q.  -- and it has a date of -- they operate on a European

Heidi L. Jeffreys, Official Court Reporter

————— S. Krausse - Cross —————

1   system where the date is the day first, the month, and then

2   the year?

3   A.   That's correct.

4   Q.   And, so, the top line would be June 28th?

5   A.   Yeah, that's correct.

6   Q.   And then the bottom line would be June 30th.

7   A.   That's right.

8   Q.   And -- I'm sorry.

9         MR. BROCCOLETTI:   1-82 A is the translation.  Do we

10  have that, Madam Clerk?

11  BY MR. BROCCOLETTI:

12  Q.   And it reflects that all three of these individuals left

13  the ship on the 30th of June.

14  A.   That's right.

15  Q.   And that's consistent with the fax that the defendant had

16  sent to the company that he was leaving the ship -- with the

17  SMS.

18  A.   With the text, yes.

19  Q.   I'm sorry.  And the defendant was gone for how long a

20  period of time?

21  A.   He came back after eight days.

22  Q.   So, therefore, for the first week of July of 2010 the

23  defendant, according to both this particular government's

24  exhibit as well as the analysis of the phone records that you

25  received -- the defendant was not on board.

S. Krausse - Cross

1    A.  Right.

2    Q.  And you're aware that the captain, through your

3    investigation, has said that he was tortured during that

4    first week of July of 2010, correct?

5    A.  That's correct.

6    Q.  All right.  Thank you.

7         Government's Exhibit 1-C, which was the photo of the

8    defendant in the chief officer's cabin -- did that have a

9    date on it?

10   A.  No.

11   Q.  So we don't know what date that was taken?

12   A.  No.

13   Q.  Because there appears to be a calendar in the back, but

14   we couldn't verify what date it was?

15   A.  No.

16   Q.  Okay.  And, lastly, with respect to Counsel's questions

17   to you about the faxes that the crew was sending, the captain

18   and the chief engineer, about the status of the ship and its

19   fuel and supplies and things of that nature -- do you

20   remember that?

21   A.  Yes.

22   Q.  And you had said that there was no way for the ship to --

23   excuse me -- for the owners to be able to corroborate that or

24   confirm that, right?

25   A.  I said that they were not able to give information on the

S. Krausse - Cross

1    circumstances of writing.

2    Q.  All right.  Now, the owners know how much fuel, water,

3    et cetera, would be on board at the beginning of the vessel,

4    would they not?

5    A.  Yes.

6    Q.  And the owners would be able to compute, by virtue of the

7    amount of travel, how much fuel or water would have been used

8    during the course of that.

9          MR. DEPADILLA:  Objection, Your Honor.

10          THE COURT:  Excuse me.  I thought the water was

11   being manufactured on the ship.

12          MR. BROCCOLETTI:  I'm sorry, Judge.  I'll keep it to

13   the fuel.

14          THE COURT:  It was the desalinization that was

15   testified to, so I'm curious as to where you're going now,

16   Mr. Broccoletti.

17          MR. BROCCOLETTI:  Yes, sir.  I'll just focus on the

18   fuel, Your Honor.

19          THE COURT:  All right.

20   BY MR. BROCCOLETTI:

21   Q.  The owners would be able to calculate the amount of fuel

22   that was used based upon the distance the ship had traveled.

23   A.  I first want to make sure you know I'm not an expert in

24   the shipping business, but I can imagine that it depends on

25   the machines which are running on the vessel, and I think if

——————— S. Krausse - Direct ———————

1   there's not a permanent report to the company that they will

2   not be able to calculate that.

3   Q.  And the company also knew how long the ship was off the

4   shore of Somalia.

5   A.  Yes.

6   Q.  Thank you very much.

7   A.  You're welcome.

8           MR. DEPADILLA:  No redirect, Your Honor.  We would

9   ask that we be allowed to call him again at a later time.

10          THE COURT:  Do not discuss your testimony in the

11  interim.  You may step outside.

12          THE WITNESS:  Yes, sir.

13

14                  *****     *****     *****

15

16          THE COURT:  Who is your next witness?

17          MR. DEPADILLA:  Detective Krausse, Your Honor.

18          THE COURT:  You are reminded you're still under

19  oath.

20          THE WITNESS:  Yes, sir.

21          SASHCA KRAUSSE, recalled as a witness, having been

22  previously duly sworn, testified further as follows:

23                  DIRECT EXAMINATION (Continuing)

24  BY MR. DEPADILLA:

25  Q.  Okay.  Detective Krausse, when we last left off it was


Heidi L. Jeffreys, Official Court Reporter

—————————— S. Krausse - Direct ——————————

1   with call 247 with the introduction of Mohammad to the

2   defendant.  I'd now like to go to 1-36 A on August 2nd, 2010,

3   which is call 249.

4            (The audio recording was played.)

5            THE COURT:  Stop.  Is it on the screen?

6            THE CLERK:  Yes, sir.

7            THE COURT:  Okay.  It's up now.

8            MR. DEPADILLA:  I'll start it over, Your Honor, so

9   you can see it again.

10           THE COURT:  Please.

11           (The audio recording was played.)

12  BY MR. DEPADILLA:

13  Q.  How long is this call after call 247, the last one we

14  reviewed?

15  A.  It has been three days, sir.

16  Q.  And in the earlier call what did the defendant say

17  Mohammad might do for the deal?

18  A.  He said he might give ideas and clues and help to

19  finalize the deal.

20  Q.  Let's go to another part of the call.

21           (The audio recording was played.)

22  BY MR. DEPADILLA:

23  Q.  And continuing in the call...

24           (The audio recording was played.)

25  BY MR. DEPADILLA:

S. Krausse - Direct

1   Q.   In that call the defendant says he's concerned about the

2   demands of the hijackers.  Will there be any other parties on

3   the phone that we listen to that will make a similar

4   statement?

5   A.   Leon will do a similar statement, sir.

6   Q.   We'll continue in that call.

7           (The audio recording was played.)

8   BY MR. DEPADILLA:

9   Q.   What is significant about that part of the call from your

10  investigation, Detective?

11  A.   In this part of the call the defendant confirmed his

12  number again, his mobile number.

13  Q.   How does that mobile number become important in the

14  future?

15  A.   This will be the mobile numbers, as far as I was

16  informed, which were given by the pirates who were

17  responsible for the hijack of the Quest through the U.S. Navy

18  and the pirates told the Navy talked to Ali Shibin.

19  Q.   What is the next move to talk to Mohammad?

20  A.   He will put the captain on the line.

21  Q.   Let's go to Exhibit 1-37 A on August 2nd, 2010, which is

22  call 250.

23          (The audio recording was played.)

24  BY MR. DEPADILLA:

25  Q.   And now let's go on to 1-38 A, which is call 253, on

S. Krausse - Direct

1   August 5th.

2           (The audio recording was played.)

3   BY MR. DEPADILLA:

4   Q.   Detective Krausse, in that call the captain says that Ali

5   has been detained and had his mobile taken away.

6           How long is it before the company hears from Ali

7   again?

8   A.   Three days.

9   Q.   And was the Marguerite ever turned over to al-Shabaab?

10  A.   No, sir.

11  Q.   Did this tactic work to increase the company's offer?

12  A.   No, sir.

13  Q.   So who reduced next?

14  A.   The defendant will reduce next.

15  Q.   Let's go to 1-39, which is a fax on August 8th of 2010.

16  Please read that into the record, sir.

17  A.   "The pirates agreed to reduce 1.3 million U.S. dollars,

18  but he writes 1,700,000 from the previous demand.  They are

19  now asking for $10,300,000.  Please send me a fax when you

20  receive this message.  Regards, Ali."

21  Q.   And this fax was three days after the pirates said Ali

22  was under arrest?

23  A.   Yes, sir.

24  Q.   Now I'd like to go on to call 1-40 A, which is call 259,

25  on August 9th.

S. Krausse - Direct

```
 1              (The audio recording was played.)
 2      BY MR. DEPADILLA:
 3      Q.  And let's continue in the call.
 4              (The audio recording was played.)
 5      BY MR. DEPADILLA:
 6      Q.  What is he referring to; that they moved the ship from
 7      that area to this area now?  Which trip?
 8      A.  He's referring to the trip to Hobyo.
 9      Q.  And what is the factor that he's telling?
10      A.  That if the company would open a second dialogue or
11      continue this, this is a factor that could motivate the
12      pirates doing trips like that.
13      Q.  And this is four days after the call with Osman and the
14      captain where they say the defendant was under arrest.  Did
15      you review any call where the defendant explained how -- if
16      he was under arrest or anything?
17      A.  No.
18      Q.  Okay.  Let's go on to a fax which is Government's
19      Exhibit 1-41, dated August 11, 2010.  Please read that.
20      A.  "Getting straight to the point, I did my very best to
21      convince the commander to reduce ransom demand to a
22      reasonable and a lower amount, but he refused.  He justifies
23      his refusal on the basis that the amount of money he has
24      reduced so far is more than twice as much as has been offered
25      by you.  Frankly, it seems that both of you are complicating
```

————— S. Krausse - Direct —————

1    the concerned dialogue (overestimated demand versus

2    underestimated offer.)  As a mediator, I would suggest you to

3    make your offer reasonably more attractive this time to

4    harness him to demand for logically less money.  Please note

5    I am in a difficult situation.  In one hand I'm acting as a

6    watchdog on board the ship, taking care of the safety of the

7    crew and the ship, and on the other hand it is you making

8    contact with a third who have nothing to do with the ship --

9    to prove -- ask them to call you from the ship's telephone.

10   They simply cannot therefore do.  Please not waste time on

11   them.  Besides, I have tipped you off from the reconciliatory

12   point of rendezvous.  Straighten your offer up to resolve the

13   situation quickly.  And as far as prospective investor is

14   concerned, the commander is too ignorant to perceive."

15   Q.  And how does the defendant refer to himself?

16   A.  He refers to himself as a mediator.

17   Q.  And how many days is this fax after the company got a

18   call that the defendant was under arrest?

19   A.  Could you help me with the date, please?

20   Q.  Sure.  The date of this fax is August 11th, 2010.

21   A.  It's a couple of days.

22   Q.  All right.  Thank you.

23       I'd now like to go to call 264, which is 1-42 A, on

24   August 11.

25       (The audio recording was played.)

S. Krausse - Direct

1  BY MR. DEPADILLA:

2  Q.  And we'll continue.

3          (The audio recording was played.)

4  BY MR. DEPADILLA:

5  Q.  After the company offers $2,535,000 what is the next

6  change in the negotiations?

7  A.  The next change is that the company will change the

8  negotiator.

9  Q.  And who is going to be the new negotiator for the

10 company?

11 A.  Mr. Stefan Nitsche, who calls himself "Mike" within the

12 negotiations.

13 Q.  And have you reviewed calls that Mike makes over the

14 course of the next couple of months?

15 A.  Yes, sir.

16 Q.  How is his style different than Rajesh's?

17 A.  I would call him a hard-liner in the negotiations.

18 Q.  Let's go to call 143 A, which is call 292, on

19 August 19th.

20         (The audio recording was played.)

21 BY MR. DEPADILLA:

22 Q.  And let's continue in the call.

23         (The audio recording was played.)

24 BY MR. DEPADILLA:

25 Q.  Did the defendant have a response to this new tactic?

S. Krausse - Direct

1    A.   Yes.

2    Q.   And what was it?

3    A.   He would put the chief engineer of the Marida Marguerite

4    on the line.

5    Q.   All right.  Let's go to call 937, which is 1-44 A.

6              (The audio recording was played.)

7    BY MR. DEPADILLA:

8    Q.   Now let's move on to 1-45 A, which is call 317.

9              (The audio recording was played.)

10   BY MR. DEPADILLA:

11   Q.   Has the defendant ever explained why the chief engineer

12   called and said the captain was dead?

13   A.   No, never.

14   Q.   What is Mike's response in the negotiations?

15   A.   He said that threats like this won't help with the

16   negotiations.

17   Q.   Let's continue in the call.

18             (The audio recording was played.)

19   BY MR. DEPADILLA:

20   Q.   I now want to move on to call 335, which is 1-46 A, on

21   September 8, 2010.  What was the significance of this first

22   week of September to your investigation?

23   A.   This was the time when the pirates used the most serious

24   torture against the crew.

25   Q.   And I'll play the first clip.

—— S. Krausse - Direct ——

1           (The audio recording was played.)

2   BY MR. DEPADILLA:

3   Q.   How does the company first find out that their crew is

4   being tortured?

5   A.   The defendant will call the company and tell about it.

6   Q.   All right.  Let's go on to 147 A, which is call 343, on

7   September 13th, 2010.

8           (There was a pause in the proceedings.)

9           MR. DEPADILLA:  Sorry, Mr. Samuels, it's being

10  cranky.  Could you go to 343?  There should only be one clip.

11          (There was a pause in the proceedings.)

12          (The audio recording was played.)

13  BY MR. DEPADILLA:

14  Q.   And how is the next way the defendant communicated to the

15  crew?

16  A.   He will send a short message to the company.

17  Q.   Let's look at 148.

18          Do you recognize the partner number, the PA -- what

19  is the PA?

20  A.   The PA is, yeah, the partner number, and this is the

21  number that the defendant answered, 8675.

22  Q.   And the date of the SMS?

23  A.   It's September 13th, 2010.  It's 5:20 p.m.

24  Q.   And that's the same date as the call 343 we just listened

25  to?

—— S. Krausse - Direct ——

1   A.  Yes.

2   Q.  And what does the defendant say?

3   A.  "Mike, either pay the pirates or initiate rescue

4   operation, and I will cooperate without reservation."

5   Q.  Is this the first time the defendant has ever mentioned

6   helping the ship with a rescue operation?

7   A.  Yes.

8   Q.  Does he ever revisit that topic?

9   A.  No.

10  Q.  And what is the next significant event in the negotiation

11  process?

12  A.  The defendant will be replaced by another negotiator,

13  Leon.

14  Q.  So now let's play 149 A, call 348, on September 14th,

15  2010.

16          (The audio recording was played.)

17  BY MR. DEPADILLA:

18  Q.  Give us an idea, Detective Krausse, how big is the Asian

19  Glory that the defendant is saying they should be looking to

20  for a ransom amount?

21  A.  The Asian Glory was a very huge car carrier, so it

22  carried hundreds of vehicles.  So it is much, much bigger

23  than the Marida Marguerite.

24  Q.  And to give the jury an idea, the suggestion of the

25  company of the Frigia -- what was the Frigia like?

1   A.  The Frigia was a bar carrier which was around 17 to

2   18 meters longer than the Marida Marguerite.

3           (The audio recording was played.)

4   BY MR. DEPADILLA:

5   Q.  Detective Krausse, before we reviewed an SMS where the

6   defendant said to rescue the ship or pay the ransom.

7   A.  Right.

8   Q.  The call we just reviewed was after that, and have

9   negotiations continued on as if they've never changed?

10  A.  Yes, sir.

11  Q.  Okay.  Let's now go to call 50, on September 19th.  It's

12  Government's Exhibit 1-50 A.

13          THE COURT:  Before we get to this call just take a

14  seventh inning stretch.  Let's just stand for a second.  Take

15  a seventh inning stretch just for a second.

16          (There was a pause in the proceedings.)

17          MR. BROCCOLETTI:  May I have a word with Counsel?

18          THE COURT:  Yes, you may.

19          (There was a pause in the proceedings.)

20          THE COURT:  Okay.  We can sit back down now.

21          (There was a pause in the proceedings.)

22          MR. DEPADILLA:  Okay.

23          (The audio recording was played.)

24  BY MR. DEPADILLA:

25  Q.  What is significant about this part of the call,

—— S. Krausse - Direct ——

1    Detective Krausse?

2    A.   This will be the last call in the first period as a

3    negotiator from the defendant.

4    Q.   All right.  So let's continue in the call.

5           (The audio recording was played.)

6    BY MR. DEPADILLA:

7    Q.   How did the defendant phrase how he is losing his

8    assignment?

9    A.   He said he had to hand over his assignment.

10           (The audio recording was played.)

11   BY MR. DEPADILLA:

12   Q.   Who is the defendant saying that Mike must deal with

13   solely now?

14   A.   He said that Mike is only allowed to speak to Leon.

15           THE COURT:  How much longer are you going to do

16   this?

17           MR. DEPADILLA:  Your Honor, I'm on call 50, and then

18   I have call 394 and I'm done with this set.

19           THE COURT:  Oh, okay.

20           MR. DEPADILLA:  I'm going to need a minute to reset

21   it, though, Your Honor.  I apologize.  You've thrown me off.

22           THE COURT:  That's all right.  No apology.  Just

23   move along.

24           (There was a pause in the proceedings.)

25           (The audio recording was played.)

Heidi L. Jeffreys, Official Court Reporter

S. Krausse - Direct

1  BY MR. DEPADILLA:

2  Q.  Who else has made a similar argument during negotiations

3  that the pirates don't care about the company's problems?

4  A.  The defendant did.

5          (The audio recording was played.)

6  BY MR. DEPADILLA:

7  Q.  Who else has made an argument that the pirates really

8  have nothing to lose in this situation?

9  A.  The defendant did.

10  Q.  Let's finish call 50.

11          (The audio recording was played.)

12  BY MR. DEPADILLA:

13  Q.  In all the calls that we've reviewed so far does the

14  defendant ever think of both the offer and the demand at the

15  same time?

16  A.  I don't think so.

17  Q.  All right.  What does he primarily focus on?

18  A.  He was focused on the behalf of the pirates, on the

19  demand.

20  Q.  Let's go to the last call in the set, 1-51 A, call 394,

21  on September 21st.

22          (The audio recording was played.)

23  BY MR. DEPADILLA:

24  Q.  We'll continue.

25          (The audio recording was played.)

S. Krausse - Direct

1   BY MR. DEPADILLA:

2   Q.  Who else have we heard on the wire that has made the

3   argument that if the company does not come up the crew is

4   going to suffer?

5   A.  Again, the defendant.

6           (The audio recording was played.)

7   BY MR. DEPADILLA:

8   Q.  When the defendant was the negotiator for the pirates did

9   he ever tie a demand and offer together where both parties

10  start moving towards the middle?

11  A.  No, sir.

12          (The audio recording was played.)

13          MR. DEPADILLA:  Your Honor, that's the end of this

14  set of calls, and I tender the witness to Mr. Broccoletti.

15          THE COURT:  We'll take a break now, a 15-minute

16  break.  Everyone please rise while the jury retires.

17          (The jury withdrew from the courtroom.)

18          THE COURT:  You're instructed, sir, not to discuss

19  your testimony during the break.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  We'll take a 15-minute recess.

22          (A recess was taken.)

23          THE COURT:  Please remain standing until the jury

24  comes in, please.

25          (The jury entered the courtroom.)

1          THE COURT:  You may be seated.

2          Let the record reflect the entire jury has returned.

3          You're reminded you're still under oath, sir.

4     THE WITNESS:  Yes.

5          THE COURT:  You may proceed, Mr. Broccoletti.

6     MR. BROCCOLETTI:  Thank you, Your Honor.

7                    CROSS-EXAMINATION

8  BY MR. BROCCOLETTI:

9  Q.  Detective, I wanted to begin with the phone call of

10 August the 5th, which is Government's Exhibit 1-38 A.  That's

11 the phone call where they discussed al-Shabaab.  Do you

12 recall that?

13 A.  Yeah.

14 Q.  Now, that phone call was dated April 5th.  During

15 anywhere in that phone call do you hear the defendant

16 speaking?

17 A.  April the 5th?

18 Q.  I'm sorry.  It's late on Friday afternoon.  I apologize.

19          August 5th.  Anywhere in that phone call do you hear

20 the defendant speaking?

21 A.  No.

22 Q.  Okay.  And, again, you had determined through your

23 analysis that the defendant had come back into the picture,

24 so to speak, on August the 8th of that year, correct?

25 A.  I'm not sure -- could you remind me, because I'm not sure

─────────── S. Krausse - Cross ───────────

1   about the dates right now.

2   Q.  Sure, that's fine.  There was a period of time when he

3   was absent --

4   A.  Yes.

5   Q.  -- from the calls and faxes and everything else.

6   A.  Right.

7   Q.  And that period of time was approximately August the 2nd

8   until August the 8th.  Does that sound accurate?

9   A.  Yes.

10  Q.  All right.  And during that six-day period of time was

11  when this August 5th phone call involving al-Shabaab

12  occurred.

13  A.  Right.

14          MR. BROCCOLETTI:  Judge, with Counsel's assistance,

15  I wanted to play two clips from that phone call.

16          THE COURT:  All right.

17          MR. DEPADILLA:  The first clip?

18          MR. BROCCOLETTI:  If you would, please.

19          (The audio recording was played.)

20  BY MR. BROCCOLETTI:

21  Q.  All right.  Now, this is the captain that was speaking --

22  A.  That's right.

23  Q.  -- continuing on with his concerns about the al-Shabaab.

24  A.  Right.

25  Q.  And again nowhere do we hear --

—————— S. Krausse - Cross ——————

1      THE COURT:  What is the question?

2      MR. BROCCOLETTI:  That the defendant, Your Honor,

3  was not --

4      THE COURT:  What is the question you're asking this

5  witness?

6      MR. BROCCOLETTI:  I'm asking it.

7      THE COURT:  What?

8      MR. BROCCOLETTI:  That the defendant was not present

9  during that conversation.

10      THE COURT:  That's obvious.  Let's move along.

11      MR. BROCCOLETTI:  All right.  Can we play the next

12  clip, then, Your Honor?

13      (The audio recording was played.)

14      THE COURT:  Stop.  What are we doing now?  Stop

15  the --

16      MR. DEPADILLA:  I'm stopping.

17      THE COURT:  Just a minute.  Stop.

18      The reason I'm asking is we went through this entire

19  tape once before.  We went through, and I understood that the

20  captain was allowed to be cross-examined.  Now what are we

21  doing, repeating the cross-examination that was made of the

22  captain?

23      MR. BROCCOLETTI:  No, sir.  This is a different part

24  of the tape that has not been played before.

25      THE COURT:  This part of the tape hasn't been played

––––––––––S. Krausse - Cross––––––––––

1   before?

2           MR. BROCCOLETTI:  No, sir, it has not.

3           THE COURT:  Okay.  I'll allow that.

4           MR. BROCCOLETTI:  Yes, sir.  Thank you.

5           MR. DEPADILLA:  Your Honor, I'll start from the

6   beginning of that clip.

7           THE COURT:  Yes, you can start at the beginning.

8           MR. DEPADILLA:  Thank you, Your Honor.

9           (The audio recording was played.)

10  BY MR. BROCCOLETTI:

11  Q.  All right.  And, again, the defendant wasn't present

12  during that conversation.

13  A.  I -- I cannot tell.  I can just tell that the captain

14  said he wasn't present.

15  Q.  Right.  You cannot hear him on the conversation.  You

16  cannot hear the defendant on that conversation.

17  A.  I hear a voice I cannot identify, but I couldn't tell

18  that it's the defendant.

19  Q.  That's fair.

20          All right.  Now, the text that was No. 344 that was

21  introduced as Government's Exhibit 1-48 where it says,

22  "Rescue the crew and I'll cooperate" --

23  A.  Yes, sir.

24  Q.  All right.  Counsel asked you about whether or not the

25  defendant had ever followed through with any type of

———— S. Krausse - Cross ————

1  suggestions as to how to cooperate, correct?

2  A.  That's right.

3  Q.  Did Mike ever respond to that text by saying, "We will

4  attack the ship, we will rescue the ship, how can you

5  cooperate"?

6  A.  No.

7  Q.  So there was no response from Mike; therefore, there was

8  no response from the defendant that's found.

9            THE COURT:  Objection -- excuse me.

10           MR. BROCCOLETTI:  Yes, sir.

11           THE COURT:  You can show there's no response.

12  You're testifying, Mr. Broccoletti, okay?

13           MR. BROCCOLETTI:  May I rephrase, Your Honor?

14           THE COURT:  Yes.

15  BY MR. BROCCOLETTI:

16  Q.  There was no response from Mike.

17  A.  No, sir.

18           THE COURT:  The question is, "Was there a response

19  from Mike?"  And I just -- I want to make sure that we are

20  questioning the witness.  I don't mean to be badgering.

21           MR. BROCCOLETTI:  Yes, sir.

22           THE COURT:  Just ask questions.

23           MR. BROCCOLETTI:  Yes, sir.

24  BY MR. BROCCOLETTI:

25  Q.  Was there any response from Mike?

S. Krausse - Cross

1   A.  No, sir.

2   Q.  Thank you.  We have seen already in the government's

3   exhibits a number of faxes between the defendant and the

4   company.  Are there any faxes between Mike and the company?

5   A.  Between Mike --

6   Q.  I'm sorry.  Again, it's Friday afternoon.  I apologize.

7        Any faxes between Leon and the company?

8   A.  No.

9   Q.  We heard at the end some discussions between Leon about

10  insurance paying part of the ransom.  Has the defendant ever

11  mentioned in his calls any part that insurance could play?

12  A.  No, sir.

13  Q.  All right.  Thank you.

14        MR. BROCCOLETTI:  Thank you, Your Honor.

15        MR. DEPADILLA:  No redirect, Your Honor.

16        THE COURT:  All right.  Who is your next -- you're

17  through with this witness at this time?

18        MR. DEPADILLA:  At this time, Your Honor.

19        THE COURT:  You may step down.  Don't discuss your

20  testimony with anyone until this matter is complete.

21        THE WITNESS:  Of course.

22

23             *****     *****     *****

24

25        THE COURT:  Who is your next witness?

Heidi L. Jeffreys, Official Court Reporter

--------------------- S. Krausse - Direct ---------------------

1          MR. DEPADILLA:  Detective Sashca Krausse, Your

2    Honor.

3          THE COURT:  You are reminded you're still under

4    oath, sir.

5          THE WITNESS:  Yes, sir.

6          SASHCA KRAUSSE, recalled as a witness, having been

7    previously duly sworn, testified further as follows:

8                DIRECT EXAMINATION (Continuing)

9    BY MR. DEPADILLA:

10   Q.  Detective Krausse, let's pick up with Exhibit 1-53 A,

11   which is call 435, on October 21st of 2010.

12          In your last session you reviewed call 50, where the

13   defendant had to hand over his job on September 19th, so how

14   much time has passed until October 21st?

15   A.  It's about a month.

16          (The audio recording was played.)

17   BY MR. DEPADILLA:

18   Q.  And what is the defendant going to be doing in the next

19   part of the call?

20   A.  He's trying to find out what the status is between Leon

21   and Mike.

22          (The audio recording was played.)

23   BY MR. DEPADILLA:

24   Q.  In that section, Detective Krausse, does the defendant

25   ever mention the commander?

S. Krausse - Direct

1   A.  No, sir.

2   Q.  Let's continue.

3           (The audio recording was played.)

4   BY MR. DEPADILLA:

5   Q.  Detective Krausse, does Leon call again?

6   A.  Yes, sir, he will.

7   Q.  Let's go to 1-54 A, which is call 437, also on

8   October 21st.

9           (The audio recording was played.)

10          MR. DEPADILLA:  Yes, Your Honor?

11          THE COURT:  We need to take this up.  We will take a

12  break.  Everyone please rise while the jury retires.

13          (The jury withdrew from the courtroom.)

14          THE COURT:  We'll take five minutes.

15          Don't go anywhere.  Have a seat.  We'll wait five

16  minutes.

17          You'll start from the beginning of this tape again,

18  Mr. DePadilla.

19          MR. DEPADILLA:  Yes, Your Honor.  I don't even have

20  the ability to start in the middle.

21          THE COURT:  And see if you can't adjust that.

22          MR. DEPADILLA:  You want it down, Your Honor?

23          THE COURT:  Down a little bit.  I think we could

24  understand it better.

25          MR. DEPADILLA:  Yes, sir, 8 percent down.

S. Krausse - Direct

1           (There was a pause in the proceedings.)

2           THE COURT:  Mr. Hughes, would you see if Mr. Pierce

3  is ready with the jury?

4           THE LAW CLERK:  Yes, sir.

5           (The jury entered to the courtroom.)

6           THE COURT:  You may be seated.  Let the record

7  reflect the entire jury has returned.

8           You may start at the beginning of the tape again.

9           MR. DEPADILLA:  Thank you, Your Honor.  I'll start

10  with Exhibit 1-54 A, which is call 437, also on October 21st.

11           THE COURT:  This is the second conversation they

12  had, correct?

13           MR. DEPADILLA:  Yes, sir.

14           (The audio recording was played.)

15  BY MR. DEPADILLA:

16  Q.  What is Leon trying to do in this part of the

17  conversation?

18  A.  Leon is giving Mike new numbers.  He's telling Mike how

19  they can proceed to finish the deal.  He's actually

20  negotiating.

21  Q.  And from the rest of the call does it appear that Leon

22  knows that the defendant has called Mike?

23  A.  Absolutely not.

24  Q.  Let's continue in the call.

25           (The audio recording was played.)

—————— S. Krausse - Direct ——————

1   BY MR. DEPADILLA:

2   Q.  Let's now go on to 1-55 A, which is call 455, on

3   October 27.

4          How long has passed since Leon said he had to go talk

5   to the commander?

6   A.  It has been six days.

7          (The audio recording was played.)

8   BY MR. DEPADILLA:

9   Q.  Where was this call placed to?

10  A.  It was made from the satellite ship phone.

11  Q.  All right.  Let's go on to 1-56 A, which is call 458, on

12  October 27th.

13         (The audio recording was played.)

14  BY MR. DEPADILLA:

15  Q.  And how does the defendant respond to Mike's offer at

16  2.8 million?

17  A.  He will send a fax.

18  Q.  Let's go on to Exhibit 1-57.  Please read this first

19  part.

20  A.  "Dear Mr. Mike:  The commander sees your last letter as

21  daunting as well as taunting.  He says, first, they will

22  reduce more money only when your offer is equivalent to the

23  amount of money they have reduced so far.  Second, they have

24  been keeping the ship alive for months for the safe and the

25  well-being of the crew, but now that you're found

––––––––––– S. Krausse - Direct –––––––––––

1    inconsiderate they will let the ship go dead and once it does

2    you know the consequences.  Third, they are tenaciously

3    determined to hold on the ship until they are offered certain

4    amount of money that meets their satisfaction, even if it

5    takes years.  Ali.  Regards."

6    Q.  All right.  Now I'd like to go on to Exhibit 1-59 A,

7    which is call 492, on October 29.

8             (The audio recording was played.)

9    BY MR. DEPADILLA:

10   Q.  How does the defendant phrase who is going to make the

11   decision about whether Leon comes back?

12   A.  He said that, "We will consider that."

13   Q.  Let's continue with the call.

14            (The audio recording was played.)

15   BY MR. DEPADILLA:

16   Q.  What is different about the defendant's suggestion at the

17   end of that call about who will be talking to Mike?

18   A.  Earlier in the calls, when he was -- when he was the

19   negotiator on behalf of the pirates he was really concerned

20   that the company will only speak to him, so he limited the

21   communication between the company negotiator and him.  And

22   when he introduced Leon for the first time he did the same,

23   he limited the communication between Mike and Leon, and he

24   said, "You will not talk to anyone else."  Now he's

25   introducing Leon again, but he's adding that Mike should keep

S. Krausse - Direct

1   dialogue open with him and talk about these clues and ideas

2   he has about the solution.

3   Q.   Okay.  Let's go on to 1-60 A, which is call 508, on

4   November 1st.

5          (The audio recording was played.)

6   BY MR. DEPADILLA:

7   Q.   Which negotiator has put Captain Makane on in the past to

8   say how bad things were on the ship?

9   A.   The defendant did that.

10  Q.   Let's continue in call 508.

11         (The audio recording was played.)

12  BY MR. DEPADILLA:

13  Q.   In that call Mike mentions "bunker."  What is "bunker"?

14  A.   Bunker means to refuel the ship, to give fuel oil to the

15  ship so that it can sail and that the generators can run.

16  Q.   And once the Marida Marguerite was back in Somalia who

17  was supplying bunker to it from time to time?

18  A.   The pirates.

19  Q.   How has Leon established his position as negotiator

20  again?

21  A.   He put the captain on the line and let him confirm that

22  he's the negotiator on behalf of the company.

23  Q.   And will that happen again in the wiretap?

24  A.   Yes.

25  Q.   And who will do it the next time?

─────────────── S. Krausse - Direct ───────────────

1    A.   The defendant will be next.

2    Q.   Let's continue in call 508.

3            (The audio recording was played.)

4    BY MR. DEPADILLA:

5    Q.   Explain this three-part call.  What is -- how is it that

6    they can communicate with Leon and the captain and Mike all

7    at the same time?

8    A.   Leon was actually using a good phone, so he opened a

9    conference call between his phone, the Marida Marguerite, and

10   the company.  So they were not together in one room, they

11   were -- Leon was on the shore; the captain was on the Marida

12   Marguerite.

13           (The audio recording was played.)

14   BY MR. DEPADILLA:

15   Q.   What is Leon's explanation for how Ali Jama became the

16   negotiator the second time?

17   A.   While Leon was on the shore the defendant was all the

18   time on the boat.  He was with the pirates.  He was still

19   working for the pirates as the mediator between the crew and

20   the pirates, and when the commander was not on board Ali Jama

21   called the company.

22           (The audio recording was played.)

23   BY MR. DEPADILLA:

24   Q.   Let's continue on now with Exhibit 1-61 A, which is

25   call 575, on November 18th.

——————————— S. Krausse - Direct ———————————

1          (The audio recording was played.)

2     BY MR. DEPADILLA:

3     Q.   And on November 18th what are the positions of the

4     pirates?

5     A.   The positions are 7.5 and 3.5 million.

6     Q.   Okay.  And where does Leon believe his negotiation is

7     going to end up?

8     A.   Between $5.0 million and $5.5 million.

9          (The audio recording was played.)

10    BY MR. DEPADILLA:

11    Q.   Let's continue in call 575.

12         (The audio recording was played.)

13    BY MR. DEPADILLA:

14    Q.   Does the ransom amount ever go up again beyond this range

15    of 5.0 million to 5.5 million?

16    A.   Yes, sir.

17    Q.   And who raises the demand up above the range that's being

18    discussed here?

19    A.   The defendant will raise the demand.

20    Q.   Now I'd like to go to 1-62 A, which is call 643, on

21    November 25th, 2010, and we'll play a portion of that call.

22         (The audio recording was played.)

23    BY MR. DEPADILLA:

24    Q.   And was November 25th, 2010, the next time they had a

25    contact from the defendant since Leon took the job back from

———— S. Krausse - Direct ————

1    him?

2    A.  Yes, sir.

3            MR. DEPADILLA:  I have no further questions at this

4    time, Your Honor.  We'll need to call Detective Krausse one

5    final time.

6            THE COURT:  All right.  Mr. Broccoletti?

7            MR. BROCCOLETTI:  No questions, Your Honor.

8            THE COURT:  You are instructed not to discuss your

9    testimony in the interim.  You may step outside.  Thank you,

10   sir.

11           THE WITNESS:  Yes, sir.  Thanks.

12

13                  *****     *****     *****

14

15           THE COURT:  Who is your next witness?

16           MR. DEPADILLA:  Your Honor, detective Sashca Krausse

17   for the last time.

18           THE COURT:  You're reminded, sir, you're still under

19   oath.

20           THE WITNESS:  Yes, sir.

21           THE COURT:  You may proceed, Mr. DePadilla.

22           MR. DEPADILLA:  Thank you, Your Honor.

23           SASHCA KRAUSSE, recalled as a witness, having been

24   previously duly sworn, testified further as follows:

25                   DIRECT EXAMINATION (Continuing)

———— S. Krausse - Direct ————

1  BY MR. DEPADILLA:

2  Q.  Detective Krausse, let's pick up with Exhibit 1-63 A,

3  which is call 783, on December 8th of 2010.

4          (The audio recording was played.)

5  BY MR. DEPADILLA:

6  Q.  What is the official demand from the pirates as of

7  December 8th, according to Leon?

8  A.  5.6 million.

9  Q.  Let's continue on to call 1-64 A, which is call 787, also

10  on December 8 of 2010.

11          (The audio recording was played.)

12  BY MR. DEPADILLA:

13  Q.  How does the defendant re-establish himself as the

14  negotiator for the pirates?

15  A.  He will put the captain on the line and let him confirm

16  that he is the negotiator on behalf of the pirates again.

17  Q.  Let's continue in call 787, on December 8.

18          (The audio recording was played.)

19  BY MR. DEPADILLA:

20  Q.  In that clip the captain references Christmas.  On

21  December 8, 2010, how long had the crew of the Marida

22  Marguerite been in the hands of the pirates?

23  A.  It has been seven months then, exactly.

24  Q.  Let's go further along in that call.

25          (The audio recording was played.)

S. Krausse - Direct

1   BY MR. DEPADILLA:

2   Q.  In call 783, which you just reviewed, Leon said the

3   demand was 5.6 million.  How much has the defendant increased

4   it to in this call?

5   A.  He increased $400,000.

6   Q.  And, so, what is the new demand, according to the

7   defendant?

8   A.  It's $6 million then.

9   Q.  Other than in call 787, over this six-month period has

10  the demand from the pirates ever gone up?

11  A.  No.

12  Q.  Let's continue in call 787.

13          (The audio recording was played.)

14  BY MR. DEPADILLA:

15  Q.  Back in call 57 what type of mediators did the defendant

16  tell the company were considered heroes by the pirates?

17  A.  He said in call 57 that mediators who were getting more

18  money out of the negotiations than other mediators are called

19  heroes.

20  Q.  Ultimately, does he get more than $5 million out of the

21  company?

22  A.  No, sir.

23  Q.  And who was the negotiator that first predicted that

24  5 million would probably be the end of it?

25  A.  It was Leon, on November 18th.

S. Krausse - Direct

1    Q.   Let's go to 1-65 A, which is call 793, on December 8.

2             (The audio recording was played.)

3    BY MR. DEPADILLA:

4    Q.   And now let's play 1-66 A, which is call 794, also on

5    December 8.

6             (The audio recording was played.)

7    BY MR. DEPADILLA:

8    Q.   In that call Leon references that this is something

9    that's going on in the ship.  Based on the calls, where was

10   the defendant located at that time?

11   A.   The defendant was on the ship.

12   Q.   Let's go to 1-67 A, which is call 796, on December 9th.

13            (The audio recording was played.)

14   BY MR. DEPADILLA:

15   Q.   According to the defendant, what is the scope of the

16   pirate negotiator job?

17   A.   To first negotiate with the company and stay on board and

18   translate between the crew and the pirates.

19   Q.   So, according to the defendant, who did more for the

20   pirates, Leon or the defendant?

21   A.   According to the defendant, the defendant did.

22   Q.   Let's continue on in 796, which is on December 9th.

23            (The audio recording was played.)

24   BY MR. DEPADILLA:

25   Q.   Based on the calls, where is the defendant at this time

S. Krausse - Direct

1    frame?

2    A.  On the ship.

3    Q.  And which phone is he using?

4    A.  He's using the satellite phone.

5            (The audio recording was played.)

6    BY MR. DEPADILLA:

7    Q.  Over the course of the past two months we've seen Leon

8    and Ali Jama switch places several times.

9    A.  Right.

10   Q.  What did that do to the overall length of time that the

11   hostages had to spend in Somalia?

12   A.  It slowed the negotiations down so that the hostages had

13   to stay longer in Somalia.

14   Q.  Let's continue on in call 796.

15           (The audio recording was played.)

16   BY MR. DEPADILLA:

17   Q.  What is the reason the defendant gives for why Leon is

18   not pleasing the commander?

19   A.  He said that Leon is busy jumping from ship to ship and

20   that he hasn't enough time to take care of the negotiations.

21   Q.  And based on the investigation, what does "jumping from

22   ship to ship" mean?

23   A.  That means that Leon was also in charge for other

24   hijacked ships of the pirates, and he was negotiating them

25   parallel.

——————— S. Krausse - Direct ———————

1    Q.  Let's continue on in 796.

2            (The audio recording was played.)

3    BY MR. DEPADILLA:

4    Q.  Did the defendant follow up with the official demand for

5    the pirates?

6    A.  Yes.

7    Q.  Let's go to 1-68.  That's .pdf 78, which was a fax sent

8    on December 9, 2010.  Please read that, Detective Krausse.

9    A.  "Dear Mr. Mike:  As I told you last night over the phone,

10   the commander's current demand is six million US dollars.

11   Regarding Leon, ask him to call you from the ship's sat.

12   phone to verify genuinity of his claim.  Remember, Mike, we

13   are in the last mile, and the last mile is the hardest

14   because at the end of the day it is the longest mile.  Let's

15   jump over the hurdles and get to final compromise.  Wishing

16   you a very happy, merry Christmas in advance.  Ali."

17   Q.  Now go on to 1-69 A, call 822, the next day, December

18   10th, 2010.

19           (The audio recording was played.)

20   BY MR. DEPADILLA:

21   Q.  According to the defendant, what is the most important

22   factor for knowing that the company is dealing with the right

23   pirate negotiator?

24   A.  To be on the ship and have the control of the sat com.

25   Q.  Detective Krausse, in your investigations into other

Heidi L. Jeffreys, Official Court Reporter

————— S. Krausse - Direct —————

1   piracy incidents throughout your career has the company ever

2   paid the wrong pirates?

3   A.  The wrong pirates?

4   Q.  Have they ever dropped ransom to a group that did not

5   control the ship?

6   A.  No, I don't think so.

7   Q.  Okay.  Let's go further in the call 822.

8           (The audio recording was played.)

9   BY MR. DEPADILLA:

10  Q.  Detective Krausse, please tell the jury what is the

11  Al-Nisr Al-Saudi?

12  A.  The Al-Nisr Al-Saudi was an Arabian ship which was also

13  hijacked during the same time period as the Marida Marguerite

14  and was anchored in the same area of Garaad.

15  Q.  And were you able to determine what is this Greek ship

16  the defendant is saying is getting released for 6 million to

17  LNV?

18  A.  I never found out which ship this was.

19           (The audio recording was played.)

20  BY MR. DEPADILLA:

21  Q.  And we just have one more section of call 822.

22           (The audio recording was played.)

23  BY MR. DEPADILLA:

24  Q.  Does the company follow up with a new offer by fax?

25  A.  Yes.

——— S. Krausse - Direct ———

1  Q.  Let's go to 1-70.  That's .pdf 79, a fax sent on

2  December 10th of 2010.  Please read that.

3  A.  "To Ali Jama and the commander from Mike:  This fax is

4  being sent in good faith and to show transparency and

5  honesty, as Ali Jama requested.  We hope that you will be

6  equally open and honest in your reply.  The situation is as

7  follows:  In recent weeks the company has made a large

8  increase in its offer from 3.560 million to 4.05 million.

9  This has only been possible after a huge effort from the

10 company.  To confirm, the company has 4.05 million ready for

11 delivery to the ship.  Our firm understanding is that the

12 commander's demand was 5 million.  If you really want to

13 finalize this matter and have your money soon, then it is now

14 up to you.  There is very little else the company can do.

15 Please take the time to consider this information.  We look

16 forward to a positive reply.  Mike."

17 Q.  Does the defendant reply to them?

18 A.  Yes.

19 Q.  Let's go to Government's Exhibit 1-71, .pdf 82, which is

20 a fax on the 12th of December, 2010.

21 A.  "To Mr. Mike:  The purpose of this fax is to confirm that

22 the commander will release the ship and the crew when you

23 have offered the 5 million USD.  He also confirms that he

24 will not seek anything else more, nor will he accept anything

25 less than 5 million.  Once payment of 5 million is made the

———— S. Krausse - Direct ————

1    ship and the crew will be freed without any condition

2    whatsoever.  For your information, we have supplied

3    235 metric tons of fuel oil and 70 tons of diesel oil to the

4    ship so far, and we will manage to refuel it to enable the

5    ship to recommence its voyage.  Regards.  Ali."

6    Q.  When did Leon predict that 5 million was going to

7    probably be the final number, Detective Krausse?

8    A.  On November 18th.

9    Q.  And how much is this $5 million final figure less than

10   the amount the defendant increased it to the last time?

11   A.  It's $1 million.

12   Q.  Okay.  Let's go on to Exhibit 172 A, which is call 837,

13   on December 13th of 2010.

14          (The audio recording was played.)

15   BY MR. DEPADILLA:

16   Q.  Let's continue in that call.

17          (The audio recording was played.)

18   BY MR. DEPADILLA:

19   Q.  Has the defendant ever supplied the names of those other

20   ships that are being held by the commander's friends?

21   A.  No, sir.

22   Q.  And based on the calls, when the defendant does supply

23   names of ships, actual ships, what is going on at that point

24   with those ships?

25   A.  He was mentioning other hijacked ships which were close

S. Krausse - Direct

1    to the release.

2    Q.  We'll continue in 837.

3            (The audio recording was played.)

4    BY MR. DEPADILLA:

5    Q.  What is the new issue that's arising in the deal-making

6    process between the defendant and the company?

7    A.  The issue is that the defendant promised that they will

8    re-bunker the ship.  Now maybe the company has the dilemma

9    theirself.  They need the bunker to sail away from the area

10   in Somalia once they're released.

11   Q.  And how easy is it to resupply a ship with oil off the

12   coast of Somalia at a moment's notice?

13   A.  It is very difficult.

14   Q.  Let's go on in the call 837.

15           (The audio recording was played.)

16   BY MR. DEPADILLA:

17   Q.  What does the defendant remind Mike about at the end of

18   that call?

19   A.  At the end of that call he says that, "We have never

20   asked you for any money for the expenses we had."

21   Q.  And what are some of the pirate expenses that they were

22   supplying at that point for the ship?

23   A.  It's fuel, it's food, it's water, it's khat.

24   Q.  Did the company have a choice at that point, when their

25   ship was held by the pirates?

───────── S. Krausse - Direct ─────────

1    A.  No, sir.

2    Q.  Let's finish up call 837.

3           (The audio recording was played.)

4    BY MR. DEPADILLA:

5    Q.  Ultimately, Detective Krausse, who has to re-bunker the

6    ship?

7    A.  The company does.

8    Q.  And what does that do to the overall release time for the

9    hostages?

10   A.  They will have to stay longer in Somalia because they

11   have to wait for the bunker boat.

12   Q.  Let's continue on to 1-73 A, that's call 863, on

13   December 16th.

14          (The audio recording was played.)

15   BY MR. DEPADILLA:

16   Q.  What are the final details to be worked out, Detective

17   Krausse, for the release of the ship?

18   A.  How to drop the money.

19   Q.  And what is the system for paying ransom commonly with

20   these type hijackings?

21   A.  Once the deal is closed the company has to collect the

22   money.  They will put it in an airplane, fly over the ship,

23   then the crew has to line up on the deck of the ship so that

24   they can make sure that everyone is alive and in good

25   condition, and when everything is fine -- they will drop the

S. Krausse - Direct

1   money and the pirates will get it out of the water, will

2   divide it on board, and when everything is fine they will

3   leave.

4   Q.  Besides the money, does the company often drop other

5   things for the crew?

6   A.  Yes, they will often drop spare parts for the ship.

7   Q.  Let's continue on 863.

8         (The audio recording was played.)

9   BY MR. DEPADILLA:

10  Q.  What is the defendant asking about here, Detective

11  Krausse?

12  A.  The defendant is asking Mike if it's possible that after

13  the money is released some of the pirates stay on board and

14  sail with the Marida Marguerite to an island in the northern

15  part of Somalia.  They wanted to use the Marida Marguerite as

16  a taxi afterwards.

17  Q.  Did the company agree to letting the defendant have

18  pirates stay on as a taxi to the northern islands of Somalia?

19  A.  Of course not.

20        (The audio recording was played.)

21  BY MR. DEPADILLA:

22  Q.  How does the defendant and the company work out most of

23  the final details over the course of the ransom?

24  A.  Via fax.

25  Q.  So let's go on to 174, which is .pdf 94, on

Heidi L. Jeffreys, Official Court Reporter

1    December 17th, 2010.  Please read that.

2    A.  "To Mr. Mike:  We hereby agree that we will leave (for

3    good) the vessel (Marida Marguerite) after the 5 million USD

4    payment has been made.  And we understand the delivery boat

5    will not supply re-bunker as long as the pirates are on board

6    the vessel.  Thank you.  Ali."

7    Q.  How does the defendant refer to himself?

8    A.  He said "we" several times.

9    Q.  Several times in conversations that you read previously

10   the defendant said that he did not want to get any money or

11   that he was a volunteer.  Does his position change?

12   A.  Yes.

13   Q.  Let's go to Government's Exhibit 1-75, which is .pdf 96,

14   on December 19th of 2010.  Please read that.

15   A.  "Please acknowledge receipt of my last fax.  Be reassured

16   that the pirates will vacate the ship soon after they receive

17   the money.  Those heading north have arranged other means of

18   transportation.  The ship is now at 700.3 north 049 degrees

19   25.24 east and is only 2.8 miles away from the shore.  Note

20   that remaining fuel is insufficient, meaning it will not be

21   possible to move the ship to a far-away location from shore

22   after being freed.  To prevent unexpected threats from

23   happening please alert allied war ships near the vicinity to

24   coordinate security during and after re-bunker.  About me:

25   As communication facilitator between you and the pirates,

S. Krausse - Direct

1    please kindly allocate for me some money for the service I

2    have rendered.  Best regards, Ali."

3    Q.  How else does the defendant transmit to the company that

4    he wants to be paid?

5    A.  He will also put the captain on the line and let the

6    captain say that the defendant did a lot for the crew and

7    that he deserves something, and at least he will ask by

8    himself.

9    Q.  And what is the last big issue they're going to work out

10   between the pirates?

11   A.  The proof of life.

12   Q.  Let's go to 1-76, which is .pdf 106, on December 24th of

13   2010.  Please read that.

14   A.  "To Mr. Mike:  We will sure proof crew members' life in

15   such a way that will meet your satisfaction if and only if

16   you reconfirm the time and the date you have promised you

17   will deliver the 5 million USD.  Once we receive your

18   reconfirmation we will prove crew members' life 24 hours

19   ahead of scheduled delivery date.  We hope this is a

20   reasonable justification.  Best regards, Ali."

21   Q.  Was that the only restriction Ali put on; that they had

22   to reconfirm the $5 million before they would get the

23   proof-of-life questions answered?

24   A.  I think so.

25   Q.  Okay.  Let's go on to 1-78 A, call 951, on December 26 of

S. Krausse - Direct

1    2010.

2            (The audio recording was played.)

3    BY MR. DEPADILLA:

4    Q.   Which crew member has the defendant first put on to say

5    that he deserves money in the deal?

6    A.   The captain.

7    Q.   Does the defendant ever raise this issue of being paid by

8    the company verbally on his own?

9    A.   He will call two times in the future and will ask for the

10   money for his service on board.

11   Q.   So let's go to 1-79 A, which is call 965, on

12   December 26th of 2010.

13           (The audio recording was played.)

14   BY MR. DEPADILLA:

15   Q.   And we'll continue in that call.

16           (The audio recording was played.)

17   BY MR. DEPADILLA:

18   Q.   Did the defendant ever supply the company an e-mail

19   address so they could talk to him in the future?

20   A.   No, sir.

21   Q.   Let's go on to call 1-80 A, 967, also on December 26 of

22   2010.

23           (The audio recording was played.)

24   BY MR. DEPADILLA:

25   Q.   Who worked out the majority of the technical details with

S. Krausse - Direct

```
 1   the company for the ransom drop?
 2   A.   The defendant did.
 3   Q.   And who did the rest of the details?
 4   A.   The captain.
 5           THE COURT:  Mr. DePadilla, this would be a good time
 6   to take an afternoon recess.
 7           Everyone please rise while the jury retires.  We'll
 8   take a 15-minute recess.
 9           (The jury withdrew from the courtroom.)
10           THE COURT:  You're instructed, sir, not to discuss
11   your testimony during the interim.  We'll take a 15-minute
12   recess.
13           (A recess was taken.)
14           THE COURT:  Please remain standing.
15           Bring in the jury.
16           (The jury entered the courtroom.)
17           THE COURT:  You may be seated.
18           Let the record reflect the entire jury has returned.
19           You may proceed, Mr. DePadilla.
20           You're reminded you're still under oath, sir.
21           THE WITNESS:  Yes, sir.
22           THE COURT:  Thank you.
23           MR. DEPADILLA:  Thank you, Your Honor.
24   BY MR. DEPADILLA:
25   Q.   Let's continue, Detective Krausse, with Exhibit 1-80 A,
```

Heidi L. Jeffreys, Official Court Reporter

—————— S. Krausse - Direct ——————

1    which is call 967, on December 26, 2010.

2         (The audio recording was played.)

3    BY MR. DEPADILLA:

4    Q.  And let's finish up 967.

5         (The audio recording was played.)

6    BY MR. DEPADILLA:

7    Q.  And what is the dropping batch?

8    A.  The dropping batch is the package with the money and the

9    spare parts that the company would drop next to the ship.

10   Q.  And give the jury an idea.  After the ransom money is

11   dropped approximately how many days is it until your

12   investigative team gets to talk to the crew members?

13   A.  It's around five days.

14        (The audio recording was played.)

15   BY MR. DEPADILLA:

16   Q.  According to the defendant, who was going to be the last

17   person off of the Marida Marguerite?

18   A.  The defendant will be.

19   Q.  Describe the issues the company was facing during this

20   transition period when the money was dropped and the pirates

21   were going to leave.

22   A.  When the pirates leave the vessel the ship has to come

23   out of this area very fast, because in Somalia we talked

24   about that it's clan-structured, and there might be another

25   pirate group who tries to re-hijack the ship when they're not

S. Krause - Cross

1   getting out of the 12-mile zone fast enough.

2   Q.  Was the company in contact with Captain Makane during

3   this process?

4   A.  Yes.

5   Q.  And for what purpose?

6   A.  To make sure that the crew is okay.

7   Q.  I'd now like to play from Government's Exhibit 1-81 A,

8   call 975, on December 27, 2010.

9            (The audio recording was played.)

10  BY MR. DEPADILLA:

11  Q.  Detective Krausse, how long was the crew of the Marida

12  Marguerite held?

13  A.  Seven months and three weeks.

14            MR. DEPADILLA:  No further questions for this

15  witness, Your Honor.

16            THE COURT:  Mr. Broccoletti.

17            MR. BROCCOLETTI:  Yes, sir.

18                       CROSS-EXAMINATION

19  BY MR. BROCCOLETTI:

20  Q.  Detective, early on you had told us that the "FL"

21  insignia on the transcript stands for foreign language.

22  A.  Yes.  Foreign language is the common mark, yeah.

23  Q.  And the foreign language, generally, in this particular

24  case would have been Somalian.

25  A.  Yes.

———————————— S. Krausse - Cross ————————————

1   Q.   Do you speak Somalian?

2   A.   I don't speak Somalia.

3   Q.   For example, on Government's Exhibit 1-64 A, when Counsel

4   was asking you about the last demands that Leon had made and

5   the demands that the defendant had made, and the defendant

6   said, "What is the demand Leon told you last time," and Mike

7   laughed and said, "I want to hear it from you," we're then

8   hearing a period of foreign language that's in the

9   background.  Do you recall that?

10  A.   Yes.

11  Q.   And were you able to translate that or understand that?

12  A.   We have a translator in Germany, yes.

13  Q.   Have you translated that section of it?

14  A.   Yes, but I cannot provide you right now what was said.

15  Q.   The defendant, however, obviously is on that tape.  Do we

16  know who else he's speaking to or who else is in the room

17  with him?

18  A.   I do not.

19  Q.   And then that's when the defendant comes back to say,

20  "The commander is with me now, and I have just asked him the

21  question."  Do you recall that?

22  A.   Yes.

23  Q.   Now, Counsel also asked you about whether or not the

24  defendant had ever provided his e-mail address.

25        First of all, did Mike ever give his e-mail address

S. Krausse - Cross

1   to the defendant?

2   A.  Not as far as I know, sir.

3   Q.  The defendant had, however, given his cell phone number.

4   A.  That's right.

5   Q.  And they were able to communicate using his mobile phone.

6   A.  That's right.

7   Q.  And, in fact, the cell phone number that the defendant

8   provided turned out to be very significant in the

9   investigation.

10  A.  That is true.

11  Q.  Counsel also asked you about the details of the

12  negotiations provided by the defendant.

13       Do you recall that a number of the faxes that were

14  sent from Mike to the Marguerite were very detailed in what

15  should happen during the last stages of the ransom payments?

16  A.  Right.

17  Q.  And, in fact, the faxes from Mike had specific positions

18  where the crew should be standing, correct?

19  A.  That is true.

20  Q.  How often the telephone calls should be made, the

21  distances the boats would be apart?

22  A.  Correct.

23  Q.  So Mike was, in effect, dictating where each person

24  should be, where the boat should be during the course of the

25  ransom payments.

—— S. Krausse - Cross ——

1   A.   He was, on the behalf of the company, the decision-maker

2   for the ransom payment, yes.

3   Q.   I understand.  And the details he provided were very

4   specific as to the circumstances and the sequence of events.

5   A.   Yes.

6   Q.   All right.  The last thing I wanted to ask you about was

7   that Counsel had also asked you about a particular fax where

8   the defendant had said that "we" would be doing things or

9   "we" would be changing things, and you had said that that was

10  a different language that he had used.  Do you recall that?

11  A.   Yes.

12          MR. DEPADILLA:  Judge, no objection.

13          MR. BROCCOLETTI:  Judge, could we show the witness

14  this, please?

15          THE COURT:  Mr. Pierce, if you would.

16          MR. BROCCOLETTI:  This is marked for identification

17  as Defendant's 11.  This is not in Your Honor's book; I'm

18  sorry.  This is something new.

19          THE COURT:  Just so you know, ladies and gentlemen,

20  in federal court we don't allow a lawyer to approach a

21  witness or the things you see on television with their

22  fingers in the witness's face.  That just doesn't happen.

23          MR. BROCCOLETTI:  I'll step back even further so

24  I --

25          THE COURT:  Oh, no, that's --

Heidi L. Jeffreys, Official Court Reporter

S. Krausse - Cross

1           (Laughter.)

2    BY MR. BROCCOLETTI:

3    Q.   Detective, do you recognize that, please?

4    A.   Yes.

5    Q.   And what is that?

6    A.   This is a fax sent from Ali to Mike on December 20 during

7    the nighttime.

8           MR. BROCCOLETTI:  Judge, we move to introduce this

9    as Defendant's Exhibit 11, please.

10          MR. DEPADILLA:  No objection, Your Honor.

11          THE COURT:  Defendant's Exhibit 11 is received in

12   evidence, being a fax.  I assume it's dated December the

13   20th, 2010.

14          (The exhibit was admitted into evidence.)

15   BY MR. BROCCOLETTI:

16   Q.   Could you read this for us, please?

17   A.   Sure.

18          "To Mr. Mike:  Here is commander's reply to your

19   last fax.  We will not the allow the crew to make calls to

20   their families because we do not understand their native

21   languages and we will not be able to verify if they are

22   calling their families or not.  To be on the safe side, let

23   them make the calls after they are released.  Since

24   December 13 you kept us guessing when you will drop the

25   money.  We are spending money each day that passes by.  To be

1    specific, drop the money by December 24 or we will reconsider

2    our agreement.  The earlier the better.  Regards, Ali."

3              MR. BROCCOLETTI:  Judge, if I could proffer this to

4    the clerk, please.

5              Thank you, very much.

6              THE WITNESS:  You're welcome.

7              MR. DEPADILLA:  No redirect, Your Honor.  We ask

8    that Detective Krausse be excused now.

9              THE COURT:  You are instructed not to discuss your

10   testimony with anyone until this case is complete, at which

11   time you're free to discuss it with anyone you like.  You may

12   be excused and released.

13             I assume he can be released.  I didn't ask

14   Mr. Broccoletti.  Is that correct, Mr. Broccoletti?

15             MR. BROCCOLETTI:  Yes, sir, Your Honor.

16             THE COURT:  All right.  You may be released.

17

18                  *****     *****     *****

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I certify that the foregoing is a correct transcript

4    of an excerpt from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                              s/s

10                        Heidi L. Jeffreys

11

12                        July 25, 2012

13                            Date

14

15

16

17

18

19

20

21

22

23

24

25