```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
     UNITED STATES OF AMERICA,        )
 5                                    )
             Plaintiff,               )
 6                                    )       CRIMINAL CASE NO.
     v.                               )            2:11cr33
 7                                    )
     MOHAMMAD SAAILI SHIBIN,          )
 8   a/k/a "Khalif Ahmed Shibin,"     )
     a/k/a "Mohammad Ali,"            )
 9   a/k/a "Ali Jama,"                )
                                      )
10           Defendant.               )
     - - - - - - - - - - - - - - - - - -
11

12

13                 TRANSCRIPT OF PROCEEDINGS
               (Testimony of Robert R. Henley)

14                    Norfolk, Virginia
                       April 24, 2012
15

16

     BEFORE:   THE HONORABLE ROBERT G. DOUMAR,
17             United States District Judge, and a jury

18

19   APPEARANCES:

20             UNITED STATES ATTORNEY'S OFFICE
               By:  Joseph E. DePadilla, Esquire
21                  Benjamin L. Hatch, Esquire
                    Brian J. Samuels, Esquire
22                  Paul Casey, Esquire
                    Assistant United States Attorneys
23                  Counsel for the United States

24             ZOBY & BROCCOLETTI, P.C.
               By:  James O. Broccoletti, Esquire
25                  Counsel for the Defendant
```

```
 1                        I N D E X

 2

 3    ON BEHALF OF THE GOVERNMENT:    Direct   Cross   Red.   Rec.

 4    R. Henley                         3       18      --     --

 5

 6                       E X H I B I T S

 7    No.                                               Page

 8    Government's Exhibit No. 2-3 A                       8

 9    Government's Exhibit No. 2-3 B                       8

10    Government's Exhibit No. 2-3 C                       8

11    Government's Exhibit No. 2-3 D                       8

12    Government's Exhibit No. 2-3 E                       8

13    Government's Exhibit No. 2-3 F                       8

14    Government's Exhibit No. 2-3 G                       8

15    Government's Exhibit No. 2-3 H                       8

16    Government's Exhibit No. 2-3 J                      14

17    Government's Exhibit No. 2-3 K                      14

18    Government's Exhibit No. 2-3 L                      14

19    Government's Exhibit No. 2-3 N                      17

20

21

22

23

24

25
```

──────────── R. Henley - Direct ────────────

1              *****     *****     *****

2

3          THE COURT:  Who is your next witness?

4          MR. HATCH:  Robert Henley, Your Honor.

5          (The witness was sworn by the clerk.)

6          ROBERT R. HENLEY, called as a witness, having been

7    first duly sworn, testified as follows:

8                        DIRECT EXAMINATION

9    BY MR. HATCH:

10   Q.  Good morning, sir.  Could you please state your name for

11   the record?

12   A.  Good morning.  My name is Robert R. Henley.

13   Q.  And how are you employed?

14   A.  I'm employed with the Federal Bureau of Investigation.

15   Q.  And how long have you been with the FBI?

16   A.  I've been with the FBI for five years.

17   Q.  What is your title?

18   A.  Special Agent.

19   Q.  And directing your attention to the February, 2011, time

20   frame, what unit were you working in with the FBI at that

21   time?

22   A.  At that time I was working with the Counterterrorism

23   Division with the Fly Team.

24   Q.  Can you just give the jury an idea as a Fly Team member

25   kind of what are your duties?

R. Henley - Direct

1   A.  Our duties with the Fly Team were based in certain areas

2   of the world to help.  For instance, we'd collect evidence

3   for the FBI or conduct interviews for the FBI, but a lot of

4   times we're staged in different regions of the world so that

5   way we can quickly react to whatever we are requested to

6   respond to.

7   Q.  Okay.  Is part of that reaction flying places a lot?

8   A.  That is true.  That's why we get the name the Fly Team,

9   is that's usually how we get there, is by flying.

10  Q.  Again sticking with that February 2011 time frame, where

11  were you physically stationed at that time?

12  A.  At that time I was out of the LEGAT office, the Legal

13  Attache Office, at the American Embassy in Nairobi, Kenya.

14  Q.  Now, did you become involved in the response to the Quest

15  hijacking incident?

16  A.  Yes, I did.

17  Q.  And approximately -- did you fly?

18  A.  Yes, I did.

19  Q.  And when did you get out there to that scene?

20  A.  I arrived at -- on February 21st of 2011 I arrived on the

21  USS Sterett.

22  Q.  Okay.  Did you go immediately to the Sterett, or did you

23  go somewhere else first?

24  A.  Actually, just -- I left from Nairobi, Kenya, flew into

25  Djibouti, then went from Djibouti to Oman, the country, then

R. Henley - Direct

1   went from Oman and flew onto the United States -- or the USS

2   Enterprise, and then flew from the USS Enterprise over to the

3   destroyer, the USS Sterett.

4   Q.   Okay.  And what did you take to get from the Enterprise

5   to the Sterett?

6   A.   A helicopter.

7   Q.   Now, as you arrived there on the Sterett on the 21st what

8   was your role in the ongoing operation?

9   A.   My role when I first arrived was to conduct some

10  interviews on some of the suspected pirates that they had

11  taken into custody the day before the incident.

12  Q.   Now, were these two individuals who had come over?

13  A.   Yes, they were.

14  Q.   Now, were these two individuals -- they weren't

15  cooperating at that point.  Is that correct?

16  A.   That is correct, they were not cooperating.

17  Q.   All right.  Now, let me take you to the next morning,

18  February 22nd.  What were you doing that morning?

19  A.   On February 22nd I was continuing with interviews on the

20  subjects from the day before that were not cooperating.

21  Q.   And did there come a time when your interview was

22  interrupted?

23  A.   That is correct, there was a time.

24  Q.   And what interrupted it?

25  A.   Somebody aboard the vessel that I was on, the Sterett,

———— R. Henley - Direct ————

1  told me -- I believe it was one of the U.S. Navy SEALS --

2  said that a rocket-propelled grenade, an RPG, was going to be

3  fired at the vessel.

4  Q.  Okay.  So what did you do then?

5  A.  At that time we ceased the interview, because the area

6  that we were in was in proximity of possibly being hit by the

7  RPG, so we stopped the interview.

8  Q.  Okay.  And where did you go after that?

9  A.  At that time I went up to the area that's known as the

10  bridge of the ship.

11  Q.  When you arrived at the bridge what was the situation out

12  on the sea where the Quest was?

13  A.  At that time the United States Navy SEALS had already

14  made their boarding of the Quest.

15  Q.  Were you called upon to take some actions with respect to

16  the Quest that day?

17  A.  Yes, I was.

18  Q.  And what were they?

19  A.  They were to board the Quest as well and to preserve

20  evidence.

21  Q.  So can you give the jury a sense of how long after the

22  SEALs had taken control of the Quest -- about how long was it

23  after that that you yourself went on board the Quest?

24  A.  I would say around 30 minutes after the time that they

25  had -- 15 to 30 minutes from the time that they had boarded

R. Henley - Direct

1   until when I boarded the vessel.

2   Q.  And how did you get over there?

3   A.  By what they call a RHIB, a rigid-hull inflatable boat,

4   from the Sterett over to the Quest.

5   Q.  Now, can you tell the jury, what steps did you generally

6   take in your effort to preserve that crime scene?

7   A.  Generally, I looked for any items of evidence that may be

8   damaged or that would not be able to make it back to port and

9   took some photographs.

10  Q.  Okay.  Let me hand up to you, if I could, at this time

11  two government's exhibits in series 2-3 A through 2-3 H.

12  And, if you could, just look through those and then look up

13  when you're done.

14          (There was a pause in the proceedings.)

15          THE WITNESS:  Yes, sir.

16  BY MR. HATCH:

17  Q.  Agent Henley, do you recognize all those exhibits?

18  A.  Yes, I do recognize them.

19  Q.  And what are they, generally?

20  A.  These are, generally, pictures taken aboard the Quest.

21  Q.  And who took them?

22  A.  The majority of these photographs were taken by myself.

23  I notice that a couple of these photographs were taken by the

24  person who assists me in taking the photographs.

25  Q.  And what was the name of that individual?

R. Henley - Direct

1   A.   That was Brian Maliszewski.

2   Q.   Is he also with the FBI?

3   A.   He is.

4   Q.   Now, whenever Brian Maliszewski was taking a picture were

5   you also present for that?

6   A.   Yes.  He was actually doing the photo log for me while I

7   was taking the photos.

8   Q.   Are the pictures in Government's Exhibits 2-3 A through

9   2-3 H fair and accurate pictures of what you saw on that

10  morning of February 22nd on the Quest?

11  A.   Yes, they are.

12          MR. HATCH:  Your Honor, I'd move in Government's

13  Exhibits 2-3 A through 2-3 H.

14          THE COURT:  2-3 A through 2-3 H are admitted into

15  evidence.

16          (The exhibits were admitted into evidence.)

17          MR. HATCH:  If I may publish, Your Honor.

18          THE COURT:  You may.

19  BY MR. HATCH:

20  Q.   Let's start with 2-3 A.  And, Agent Henley, if you would

21  like, you should have a screen there as well.  Either one you

22  can use.

23          Can you tell the jury what is 2-3 A showing?

24  A.   This is the suspected pirates that had been detained, and

25  they're on top of the Quest in the bow area.

Heidi L. Jeffreys, Official Court Reporter

R. Henley - Direct

1   Q.   And are they secured at this point?

2   A.   Yes.

3   Q.   Now, that day were the suspected pirates taken off the

4   Quest at some point?

5   A.   Yes, they were.

6   Q.   And where were they moved to after that?

7   A.   At that time -- the next time that I saw the pirates they

8   were aboard the Enterprise, so I'm not sure exactly, you

9   know, how they got to the Enterprise.  But at some point they

10  made it to the Enterprise.

11  Q.   And were all of the suspected pirates secured when you

12  arrived on the ship?

13  A.   Yes, they were.

14  Q.   Okay.  Now I'm showing you 2-3 B.  Can you tell the jury

15  what this bag contains?

16  A.   It's rocket-propelled grenades, the actual projectiles.

17  Q.   Do you recall how many of them, approximately, you saw?

18  A.   No, I don't.

19  Q.   Now, were those rocket-propelled grenades in the bag when

20  you arrived?

21  A.   Yes, they were.

22  Q.   2-3 C.  Agent Henley, can you tell the jury what this

23  item I'm indicating with the red arrow there is in the center

24  of the screen?

25  A.   That is the actual launcher or the launching tube of the

R. Henley - Direct

1    rocket-propelled grenade, so that's what the actual grenade
2    would go onto.
3    Q.   And what portion of the ship was this grenade launcher
4    located in?
5    A.   This was the rear portion or the aft portion of the
6    vessel.
7    Q.   Okay.  Now I'm showing you 2-3 D.  Agent Henley, can you
8    tell the jury which portion of the ship are we looking at
9    now?
10   A.   You are looking in the wheelhouse area, if you're looking
11   towards the rear of the vessel.
12   Q.   Okay.  And let me ask you, by the time you came onto the
13   Quest were any of the American hostages still there?
14   A.   There -- yes.
15   Q.   Okay.  But when you took these pictures were they still
16   present?
17   A.   No, they were not.
18   Q.   And what happened to the hostages that were there when
19   you came on board?
20   A.   They were in the -- when I was coming on board the Quest
21   they were in the process of rendering medical treatment to
22   them and air-lifting them off of the -- so there were
23   still -- a few of them had been taken off, and I believe
24   there was at least one that was still on the rear of the
25   Quest when I first got onto the vessel.

R. Henley - Direct

1   Q.   Now, what's this item again with the red arrow here in
2   the center of the screen?
3   A.   It's an AK-47, a rifle.
4   Q.   I'm showing you 2-3 E.  What portion of the ship are we
5   in now?
6   A.   You're still in the same area.  You're in the wheelhouse,
7   but you're looking down from -- as if you're above the
8   wheelhouse.
9   Q.   Okay.  Now, what's this item I've just indicated with the
10  first red arrow?
11  A.   That is another AK-47.
12  Q.   Now, I'm indicating with the second arrow -- there
13  appears to be an individual in the lower left-hand corner.
14  Is that correct?
15  A.   That is correct.
16  Q.   Now, were there suspected pirates who were deceased when
17  you came onto the Quest?
18  A.   Yes, there were.
19  Q.   And do you recall how many of them there were?
20  A.   There were four.
21  Q.   And is this one of those individuals?
22  A.   That is correct.
23  Q.   I'm showing you 2-3 F.  Now, what portion of the Quest
24  are we in now?
25  A.   This is below -- the below area of the Quest, so it's the

R. Henley - Direct

1   next level down from the deck.

2   Q.  Now, this one is a little bit blurry.  Were there some

3   difficulties you encountered taking pictures that day?

4   A.  That is correct.

5   Q.  And what caused the difficulty?

6   A.  The difficulty is the lighting conditions.  When you move

7   from the natural light above down below in the Quest you need

8   to either provide more light for the -- so that way your

9   shutter stays open longer or faster, or you -- basically, you

10  don't have as much light, so you have to hold the camera

11  still.  And then with the -- we had the heavy sea state that

12  day.  The boat was rocking considerably, so it was hard to

13  get a good, steady photo with the lighting conditions and the

14  sea state.

15  Q.  Okay.  I put a red arrow there toward the center of

16  2-3 F.  What's that arrow pointing to?

17  A.  That's an AK-47.

18  Q.  I'm showing you 2-3 G.  Now, what area of the ship are we

19  in now?

20  A.  We're in the same area.

21  Q.  And what's the perspective of this picture?  Are you

22  looking down to the floor or to the side?

23  A.  You're looking down toward the floor, and this is the

24  wall that you see in the -- basically, where the arrow is

25  drawn, the red arrow, that's the wall.

R. Henley - Direct

1   Q.   And what is the arrow pointing to?

2   A.   That is another AK-47.

3   Q.   Okay.  And does there appear to be an individual I've

4   indicated with the second arrow?

5   A.   That is one of the deceased suspected pirates.

6   Q.   And is this -- this is a different individual from the

7   one that we saw earlier in Government's Exhibit 2-3 E,

8   correct?

9   A.   That is correct.

10  Q.   Now I'm showing you Government's Exhibit 2-3 H.  Agent

11  Henley, tell the jury what this picture is showing.

12  A.   It is again showing the level below the deck, the second

13  level down, and it's showing approximately three AK-47s on

14  the floor.

15  Q.   And are the red arrows that I've put in there pointing to

16  the three AK-47s?

17  A.   That is correct.

18  Q.   Now I'd like to hand up, if I could, 2-3 J, K and L.

19  Agent Henley, do you recognize those photographs?

20  A.   Yes, I do.

21  Q.   And who took those photographs?

22  A.   I took these photographs.

23  Q.   And what are they of, generally?

24  A.   These are generally of the Quest, of the outside of the

25  Quest.

1        MR. HATCH:  Your Honor, at this time I would move in

2   Government's Exhibits 2-3 J, K and L.

3        THE COURT:  2-3 J, K and L, the outside of the Quest

4   photographs, are admitted into evidence.

5        (The exhibits were admitted into evidence.)

6        MR. HATCH:  And, Your Honor, I'll also show the

7   witness 2-3 I, which was previously admitted as well.

8        THE COURT:  2-3 I?  He hasn't identified 2-3 I, has

9   he?

10        MR. HATCH:  Well, it was already admitted, and I'll

11   ask him about it now, Your Honor.  It was admitted during

12   Ms. Sem's testimony.

13        THE COURT:  All right.  Let's move along.

14   BY MR. HATCH:

15   Q.  Agent Henley, for the benefit of the Court and the jury,

16   can you tell them what Exhibit 2-3 I, that you see on your

17   screen there, is?

18   A.  That's the outside of the Quest.

19   Q.  And is this one of the pictures that you yourself took

20   that day?

21   A.  That is one of the pictures, as well, that I took that

22   day.

23   Q.  And when did you take the pictures of the outside of the

24   Quest in relation to these other pictures we've already seen?

25   A.  This was at the very end of the day, approximately

——————————R. Henley - Direct——————————

1    6:00 p.m.

2    Q.   And, so, did you take these as you were leaving the

3    Quest?

4    A.   Yes, I did.

5    Q.   I'm showing you 2-3 J.  What's 2-3 J?

6    A.   That is the rear portion of the Quest.

7    Q.   And then what's this other ship that's in the right-hand

8    side of that picture?

9    A.   That is the USS Sterett.

10   Q.   Now, was there a plan to try to get the Quest back to an

11   area where it could be completely processed for evidence?

12   A.   Yes, there was.

13   Q.   What are your limitations on processing for evidence as

14   they existed out on the high seas?

15   A.   That limited me to whatever I could carry aboard, which

16   was -- and then also the stability of the ship limited me as

17   far as processing it.

18   Q.   So what was the initial plan on how the Quest would be

19   taken back to port?

20   A.   The initial plan was for them to secure the Quest at the

21   back of the Sterett, so basically it would be towed back to

22   port in Djibouti.

23   Q.   And did that towing process ultimately work?

24   A.   It did not work.  It worked for a few hours, but then it

25   failed to work.

R. Henley - Direct

1   Q.   And then what -- do you know what happened after that to

2   get it back?

3   A.   From the time after that my photo assistant that I

4   discussed, Brian Maliszewski, he, along with other sailors,

5   ended up sailing the Quest back to Djibouti.

6   Q.   And then let me show you 2-3 K quickly.   Is this another

7   picture of the Quest and the Sterett?

8   A.   Yes, it is.

9   Q.   And 2-3 L?

10  A.   Yes, it is.

11  Q.   And I'm going to apply a red arrow here.   Is that line

12  part of that attempted towing process you just described?

13  A.   Yes, it is.

14  Q.   Now, based on your work on the Quest on the 22nd, what

15  did you do to try to preserve the physical -- did you take

16  physical items of evidence that didn't appear to be related

17  to the military off the Quest?

18  A.   Nothing that didn't appear to be related to the military.

19  Q.   To the U.S. military, right?

20  A.   Correct.

21  Q.   So for the physical evidence that you saw on the Quest

22  what steps did you take to try to preserve it?

23  A.   Basically, moved any items that were -- that appeared to

24  be -- that would fall off the vessel, move them away from the

25  side of the vessel into a secure area.

R. Henley - Direct

1   Q.  And did you do anything with the firearms that you found

2   to secure those?

3   A.  Basically, unloaded the firearms, took the ammunition

4   that was in the chamber out of the chambers to make them safe

5   for other people that were working around the firearms from

6   that day on.

7   Q.  Now, let me ask you, that morning of the 22nd when you

8   were on the Quest did you do anything to try to confirm what

9   position you were in on the Quest?

10  A.  Yes, I did.

11  Q.  And by "position" I mean relative to the seas to Somalia.

12  A.  Sure.

13  Q.  And, so, did you obtain information about the GPS or the

14  longitude and latitude of the ship that morning?

15  A.  Yes, I did.

16  Q.  Handing you Government's Exhibit 2-3 N, can you tell the

17  Court and jury what Government's Exhibit 2-3 N is showing?

18  A.  2-3 N is depicting the location that the Quest was in

19  when I got the lat/longitude coordinates for our location, so

20  it's basically that location has been plotted onto the map.

21          MR. HATCH:  Your Honor, at this time I would offer

22  2-3 N into evidence.

23          THE COURT:  2-3 N is received in evidence, showing

24  the location of the Quest at the time.

25          (The exhibit was admitted into evidence.)

—— R. Henley - Cross ——

1   BY MR. HATCH:

2   Q.  And now I'm going to blow up a box for you there.  Could

3   you tell the jury what does that red dot indicate?

4   A.   The red dot basically indicates the location --

5   approximate location in reference to those latitude/longitude

6   coordinates that are basically on the map there.  That's the

7   approximate location of the Quest.

8   Q.  And, so, that was the location of the Quest that morning

9   of the 22nd?

10  A.  That is correct.

11  Q.  Now, can you tell the jury on the key of this map what

12  does this blue line that I'm indicating with an arrow that

13  runs all the way up and around the coast of Somalia -- what

14  does that denote?

15  A.   That denotes, basically, the 12-nautical-mile limit to

16  the coast.

17          MR. HATCH:  The Court's indulgence.

18          (There was a pause in the proceedings.)

19          MR. HATCH:  Nothing further, Your Honor.

20          THE COURT:  Mr. Broccoletti?

21                      CROSS-EXAMINATION

22  BY MR. BROCCOLETTI:

23  Q.  Sir, you had mentioned that you were in the process of

24  interviewing two pirates who were noncooperative with you

25  when you had received the information about the RPG.

                            ———— R. Henley - Cross ————

1   A.   That is the correct.

2   Q.   And what were the names of those two pirates?

3   A.   Actually, there was only one that was being interviewed

4   that day, and that was the -- one of them was the -- the one

5   that had driven the dingy or the small boat over to the

6   Sterett, but I don't remember his name.

7   Q.   Is that Abdula?

8   A.   I'm not sure what his -- what his...

9   Q.   Did you recover any cell phones from the Quest?

10  A.   I didn't take anything from the Quest, sir.

11  Q.   All right.

12          MR. BROCCOLETTI:  Thank you.

13          THE COURT:  Was there any attempt to locate the

14  mother ship from which the dingy left to go after the Quest?

15          THE WITNESS:  There was an attempt -- are you

16  talking about the -- the -- there was -- to answer your

17  question, yes, there was an attempt.

18          THE COURT:  Did they locate the mother ship?

19          THE WITNESS:  They did locate the vessel that the --

20  that was, I guess, what you could call the mother ship, and

21  there was some interviews that were conducted, but I -- I

22  don't -- I wasn't a part of those interviews.

23          THE COURT:  Did they capture the mother ship?

24          THE WITNESS:  I believe they did, sir, but I don't

25  know the details of that.

                    Heidi L. Jeffreys, Official Court Reporter

```
 1              THE COURT:  You didn't interview any of the people
 2    from the mother ship, then.
 3              THE WITNESS:  No, sir.
 4              THE COURT:  Have I raised any questions?
 5              MR. HATCH:  Not from the government, Your Honor.
 6              MR. BROCCOLETTI:  No, Your Honor.
 7              THE COURT:  Do you need this witness any further?
 8              MR. HATCH:  We'd ask he be released, Your Honor.
 9              MR. BROCCOLETTI:  No, sir.
10              THE COURT:  You may -- you're instructed not to
11    discuss your testimony with anyone until this case is
12    complete, at which time you're free to discuss it with anyone
13    you like.  You may be excused, and you are released.
14
15                  *****      *****      *****
16
17
18
19
20
21
22
23
24
25
```

```
 1                          CERTIFICATION

 2

 3        I certify that the foregoing is a correct transcript

 4  of an excerpt from the record of proceedings in the

 5  above-entitled matter.

 6

 7

 8

 9                              s/s

10                       Heidi L. Jeffreys

11

12                       July 31, 2012

13                            Date

14

15

16

17

18

19

20

21

22

23

24

25
```

Heidi L. Jeffreys, Official Court Reporter