IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

- - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

Plaintiff,

v.

MOHAMMAD SAAILI SHIBIN,
a/k/a "Khalif Ahmed Shibin,"
a/k/a "Mohammad Ali,"
a/k/a "Ali Jama,"

Defendant.

- - - - - - - - - - - - - - - - - - - -

CRIMINAL CASE NO. 2:11cr33

TRANSCRIPT OF PROCEEDINGS
**(Testimony of Kimberly Whittle)**

Norfolk, Virginia
April 24, 2012

BEFORE: THE HONORABLE ROBERT G. DOUMAR,
United States District Judge, and a jury

APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE
By: Joseph E. DePadilla, Esquire
Benjamin L. Hatch, Esquire
Brian J. Samuels, Esquire
Paul Casey, Esquire
Assistant United States Attorneys
Counsel for the United States

ZOBY & BROCCOLETTI, P.C.
By: James O. Broccoletti, Esquire
Counsel for the Defendant

I N D E X

| ON BEHALF OF THE GOVERNMENT: | Direct | Cross | Red. | Rec. |
| --- | --- | --- | --- | --- |
| K. Whittle | 4 | 35 | -- | -- |

E X H I B I T S

| No. | Page |
| --- | --- |
| Government's Exhibit No. 2-4 C | 13 |
| Government's Exhibit No. 2-4 D | 13 |
| Government's Exhibit No. 2-4 E | 13 |
| Government's Exhibit No. 2-4 F | 14 |
| Government's Exhibit No. 2-4 G | 14 |
| Government's Exhibit No. 2-4 H | 17 |
| Government's Exhibit No. 2-4 I | 17 |
| Government's Exhibit No. 2-4 J | 17 |
| Government's Exhibit No. 2-4 K | 17 |
| Government's Exhibit No. 2-4 L | 17 |
| Government's Exhibit No. 2-4 M | 17 |
| Government's Exhibit No. 2-4 N | 17 |
| Government's Exhibit No. 2-4 O | 17 |
| Government's Exhibit No. 2-4 P | 17 |
| Government's Exhibit No. 2-4 Q | 17 |
| Government's Exhibit No. 2-4 R | 17 |
| Government's Exhibit No. 2-4 S | 17 |
| Government's Exhibit No. 2-4 T | 17 |
| Government's Exhibit No. 2-4 U | 21 |

E X H I B I T S (Continuing)


| No. | Page |
|---|---|
| Government's Exhibit No. 2-4 V | 21 |
| Government's Exhibit No. 2-4 X | 22 |
| Government's Exhibit No. 2-4 Y | 22 |
| Government's Exhibit No. 2-4 Z | 22 |
| Government's Exhibit No. 2-4 DD | 24 |
| Government's Exhibit No. 2-4 LL | 25 |
| Government's Exhibit No. 2-4 MM | 31 |
| Government's Exhibit No. 2-4 NN | 31 |
| Government's Exhibit No. 2-4 OO | 31 |
| Government's Exhibit No. 2-4 PP | 32 |
| Government's Exhibit No. 2-4 QQ | 32 |
| Government's Exhibit No. 2-4 RR | 33 |
| Government's Exhibit No. 2-4 SS | 34 |
| Government's Exhibit No. 2-4 TT | 34 |

***** ***** *****

THE COURT: Your next witness?

MR. SAMUELS: Judge, the United States calls Kim Whittle.

(The witness was sworn by the clerk.)

KIMBERLY WHITTLE, called as a witness, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SAMUELS:

Q. Good morning, ma'am.

A. Good morning.

Q. Would you tell us your name, please?

A. My name is Kimberly Whittle.

Q. And, Ms. Whittle, where do you work?

A. I'm a special agent at the FBI office in New York City.

Q. And what unit are you assigned to at the FBI in New York?

A. I'm assigned to the Counterterrorism Division as my primary responsibility, and then my secondary responsibility is part of the Evidence Response Team.

Q. What are your duties as part of the Evidence Response Team?

A. I'm a team leader for the Evidence Response Team, and I'm in charge of a team of approximately eight special agents. We go to various crime scenes as required, both in New York

and also internationally, to process the crime scenes for forensic evidence and any other evidence that needs to be collected as part of the investigation.

Q. Now, you mentioned internationally. Does your particular unit at the FBI in New York have an international coverage?

A. Yes. The international realm is divided up according to the various field offices, and New York has primary responsibility for crimes against American citizens that occur in Africa.

Q. How long have you been a special agent with the FBI?

A. I've been a special agent for just over 14 years.

Q. And how long have you been part of the Evidence Recovery Team?

A. I've been on the team since 2005.

Q. Is there additional training that you have to undergo to learn how to process and collect evidence?

A. Yes. Initially, we go through an 80-hour training. Then we also have several specialty schools that we go to that can range from a week to two weeks, several one-day schools for things like post-blast fingerprinting, bullet trajectory, the blooded evidence, trace evidence, those types of things.

Q. And as part of your experience -- and is it called the ERT Team? Is that --

A. Yes, that's the acronym we use.

Q. -- the acronym for it?

As part of your experience for the ERT team have you deployed internationally in other instances to process crime scenes?

A. Yes, I have. I went to Ethiopia to process a bombing scene in 2008, and in 2009 -- no, 2010 -- I went to Uganda to process a scene where several bombs had detonated during the last game of the World Cup soccer match.

Q. Ms. Whittle, were you involved in the evidence collection and the processing of the scene with respect to the sailing vessel Quest in February of 2011?

A. Yes, I was.

Q. And where was that done, ma'am?

A. That was in the port of Djibouti.

Q. And what was your role in processing that scene, and how did you conduct that?

A. There was a small team initially. It was three ERT members that were initially dispatched to Djibouti to process the sailing vessel Quest, and that became a team of two individuals, as one of the people who went with us was called to another location.

So there were two team members that were processing the Quest, and we broke down the duties as much as they could be but a lot of our duties overlapped. I went with a special agent named Kate Kelly, who took on the role as the team leader because she's one of the full-time coordinators in New

York. So her responsibility was keeping the logs and taking the photographs. My responsibility was sketching and evidence control, packaging, taking custody of the various items of evidence that we found.

And both of us had responsibility, you know, for searching. We worked pretty much hand-in-hand. We were on a very small vessel, in tight quarters, so we were always talking to each other, going back and forth. So we worked in tandem at all times.

Q. And, Agent Whittle, where was the Quest physically in Djibouti when you went over there to process it?

A. It was in the Port of Djibouti, attached to the USS Sterett. It was on the ocean side of the USS Sterett.

Q. Okay. Was it still in the water, or had it been moved to some dry dock?

A. No, it was still in the water.

Q. Did that pose any particular challenges when processing the scene?

A. Yes, it posed some very unique challenges. The first one was the fact that the only means of access to the crime scene was from the USS Sterett via a rope ladder. We had to lower all of our equipment as well as ourselves from one moving vessel that was bobbing in the ocean to another vessel that was bobbing in the ocean with the waves.

It also was a problem because of the wake and the

waves had everything moving all of the time. There were vessels coming in and out of the Port of Djibouti that were creating wake, and when the wake would wash over the ship it would move quite a bit.

Q. And do you recall when you arrived in Djibouti to begin this processing?

A. We arrived on Saturday, March 24th -- I'm sorry, February 24th.

Q. February 24th?

A. Uh-huh.

Q. So, two days after the murders had occurred on the Quest on February 22nd?

A. Yes.

Q. What steps, generally, did you and your team take to preserve and gather the evidence on board the Quest?

A. I'm sorry. I believe I misspoke. It would have been the 26th. It would have been Saturday, so four days later.

Q. Four days later?

A. Uh-huh.

Q. All right. And getting back to my question, what steps did you and your team take, generally, to preserve and process the scene on board the Quest?

A. The first thing we did to preserve the scene was take photographs. That's the first thing that ERT always does when we get to a scene, is we try to completely photograph

the scene intact as much as possible before we do any searching for items of evidence at the scene.

Q. Did you see some physical items of evidence?

A. Yes. When we were going through photographing and beginning the initial sketch there were items of evidence which were obvious and out in the open that we noted initially.

Q. Did you take any samples or swabs for further forensic use down the road?

A. No, there were no forensic swabs that were taken because of the fact that we believed, in talking with our colleagues at headquarters and upon examination of the boat, that because the boat had been out in the open ocean and because so many items had been moved through the DNA matter that their use would be minimal.

Q. Okay.

MR. SAMUELS: Judge, at this time I'd like to read two stipulations, if I could, sir.

I'd like to read two stipulations, Your Honor.

THE COURT: All right.

MR. SAMUELS: This is stipulation No. 6:

"United States Exhibits numbered in series 2-4 are physical items or pictures of physical items that were collected or made by members of the FBI's Evidence Response Team (ERT) during a physical search of the S/V Quest

conducted over the course of February 26-28, 2011. Prior to search of the Quest by ERT, the Quest had been in the continuous custody of the United States government since its seizure by the U.S. Navy on February 22, 2011. During the period the Quest was transported from its place of seizure to the place of ERT search, the Quest was in the custody of FBI Special Agent Brian Maliszewski. FBI Special Agent Maliszewski and the ERT took steps to ensure that the Quest and the evidence on board was not tampered with by any person. United States Exhibits numbered in series 2-4 were subsequently transferred by the ERT to the Federal Bureau of Investigation in Norfolk, Virginia, where the evidence was secured and properly stored and maintained as evidence by the FBI. United States Exhibits numbered in series 2-4 have therefore been properly authenticated and are admissible in evidence with no further showing by the government."

And then Stipulation No. 7 reads:

"United States Exhibits 2-4 A through 2-4 LL are pictures taken by the FBI ERT during their search of the Quest on February 26-28, 2011. United States Exhibits 2-4 A through 2-4 LL fairly and accurately portray the Quest and its contents as encountered by the ERT during its search and processing of the Quest. United States Exhibits 2-4 A through 2-4 LL have therefore been properly authenticated and are admissible in evidence with no further showing by the

government."

Thank you, Judge.

BY MR. SAMUELS:

Q. Ms. Whittle, how long did it take you and your team to process the Quest?

A. We were given a total of three days to process the Quest.

Q. Okay. And did you work long hours in doing so?

A. Yes, we did. We worked from early in the morning until as long as the lighting conditions would allow. On at least one night we had lights brought in from the USS Sterett so we could work late into the evening to try to get as much done as possible.

Q. All right. Ms. Whittle, I'm going to show you Exhibits 2-4 A and 2-4 B, which have already been received in evidence. Do you recognize that, ma'am?

A. Yes. That's a picture of the sailing vessel Quest as it was alongside the USS Sterett, and visible in that picture you can also see the rope ladder that I was referring to that was our only means of ingress and egress into the crime scene.

Q. And is that how you moved your equipment down to the Quest as well, with that rope ladder?

A. Yes. Later on we rigged up a rope system to lower things down in a bag on a pulley, but initially that rope ladder was the only means of getting things down to the vessel.

Q. Let me show you 2-4 B as well. Is that just the rear side of it, ma'am?
A. Yes, that's the rear view of the Quest as it was attached to the USS Sterett.
Q. Okay. Ms. Whittle, I'm going to hand you a binder that has a number of exhibits in it.
A. Okay.

MR. SAMUELS: We'll do this in one trip for Mr. Pierce.

THE WITNESS: Thank you, sir.

BY MR. SAMUELS:
Q. And I'll ask you to look first at Exhibits 2-4 C through 2-4 E and for you to tell us if you recognize those and what they are.
A. Yes, I recognize those as pictures that Kate Kelly took of communications equipment, satellite equipment, that was on the rear of the sailing vessel Quest on the stern side.
Q. All three pictures depict that communications equipment?
A. Yes. ERT takes pictures from long range, medium and close up, and that's exactly what was done here. The pictures were taken from long range, the first one, 2-4 C, and then medium range, 2-4 D, and a close-up on 2-4 E, showing that the cable had been cut and that the equipment had been disabled.

MR. SAMUELS: Your Honor, I would offer Government's

Exhibits 2-4 C, D and E, sir.

THE COURT: 2-4 C, D and E are received in evidence, being pictures of the communication equipment.

(The exhibits were admitted into evidence.)

BY MR. SAMUELS:

Q. And, Agent Kelly (sic), 2-4 C -- what are we looking at here, ma'am?

A. 2-4 C is the long-range picture of Tracfone equipment. That appears to be some sort of satellite communication device that was aboard the vessel.

Q. And excuse me, Agent Whittle. If we look down here does it appear that a line has been cut or severed there?

A. Yes, you can see that the line appears to have been cut from the long range.

Q. Let's go to the closer range, 2-4 D. And is that showing the same line as part of the communications equipment?

A. Yes, that shows that line in a little bit more detail.

Q. And, finally, 2-4 E.

A. Yes, that's the same line that was visible in the previous two pictures, a close-up of the damage where it had been cut and the communication equipment disabled.

Q. All right. Do you have 2-4 F and 2-4 G? Are those the next photos you have in your book there, ma'am?

A. Yes, 2-4 F and 2-4 G are the next two photos.

Q. And what do they depict?

A. 2-4 F depicts the steering gallery of the sailing vessel Quest, which was on the top side stern area of the boat and which had seating benches in approximately a U shape, and --

Q. I'm sorry. This is how it appeared when you processed the scene, ma'am?

A. Yes, it did.

Q. And then 2-4 G -- is that also a photo relating to the steering area of the Quest?

A. Yes. It's a close-up of the front area. There was a shelf right below the windshield glass where some items were located.

MR. SAMUELS: Your Honor, I'd offer 2-4 F and 2-4 G.

THE COURT: 2-4 F and G are received in evidence.

(The exhibits were admitted into evidence.)

BY MR. SAMUELS:

Q. Agent Whittle, is this how this horseshoe or cockpit area that you described was presented when you first started processing the scene, ma'am?

A. Yes, it was. This was one of our entry photos, so that would have been taken before we conducted any search or disturbed any of the items from where we found them.

Q. Okay. Agent Whittle, these stains over here -- what is that, ma'am?

A. Those appear to be blood stains.

Q. And were there bullet holes that were found in this area,

ma'am?

A. Yes. There were several bullet holes that were found in the glass, in the fiberglass structure, and in various items that were located in the steering gallery.

Q. All right. And can you see these items over here where I'm putting this arrow, ma'am?

A. Yes.

Q. What are those?

A. Those were firearms that were found in the steering gallery.

Q. Let's go to 2-4 G. And what does this show, Agent Whittle? That's just a closer-up of that area?

A. Yes, that's a close-up of the area under the windshield, and that's a jacket and an electronic device that was found in place there.

Q. Agent Whittle, in the course of your processing of the Quest did you find any ordinance?

A. Yes, we did.

Q. All right. Did you find any RPG rounds?

A. Yes. We found three RPG rounds that were in a bag that had been tied to the railing on the stern of the boat, the back end of the boat.

Q. What did you do with them?

A. Well, at that point, when we came across the rounds, they were photographed in place, and then everyone who was on

board the Quest was immediately evacuated because we had safety concerns over these grenades being on the boat.

Q. And, so, what was done with the grenades on the boat?

A. Navy EOD, the ordinance disposal team, was called in after we had confirmed with our headquarters and with the U.S. Attorney's Office that these items could be disposed with so that we could safely continue our search of the vessel.

Q. Did you also locate and find some firearms on board?

A. Yes, we found several firearms on board.

Q. I'd like to show you -- and they should be in the book in front of you -- 2-4 H going all the way down to 2-4 T and ask you if you have those photos, ma'am. So that would be 2-4 H, I, J, K, L, M, N, O, P, Q, R, S, T.

Do you have those, ma'am?

A. Yes, I do.

Q. All right. And, just generally, what does that series of photos show?

A. That series of photos depicts the various firearms that were found on the vessel.

Q. All right. And you were present when those photos were taken?

A. Yes.

MR. SAMUELS: Your Honor, I would offer 2-4 H going all the way down to 2-4 T, the photos of the firearms.

THE COURT: 2-4 H through 2-4 T are received in evidence, being pictures of the firearms.

(The exhibits were admitted into evidence.)

BY MR. SAMUELS:

Q. Agent Whittle, I'm going to bring up a number of these.

If we go to 2-4 H first, where does this area show, Agent Whittle?

A. This area is a hallway that led from what was the dining and desk area down to a stateroom on the left. And a bathroom storage area was straight ahead, and there were three pantry closets on the right right before the storage area, and you can see clearly in the picture on the right also a desk area.

Q. Now, was each firearm collected and then photographed separately, ma'am?

A. Yes, they were.

Q. Let me show you 2-4 J. What is that, ma'am?

A. 2-4 J is the individual photograph of one of the automatic weapons that was pictured on the floor of the hallway in the previous photograph. That's an up-close photograph of one of those weapons that was found on the floor.

Q. All right. Now, that's 2-4 J. Let me show you 2-4 K. Is that the same weapon, ma'am?

A. It is the same weapon.

Q. Okay. And is that -- that's a photograph of a ruler. Why is that done, ma'am?

A. We take a scale photo -- we take a photo without scale and with scale so that if our laboratory needs to examine anything further they can use the photographs and they will have a scale reference in the photograph to conduct any type of examination they may need to do.

Q. Okay. So in this series that we've just talked about, 2-4 H to 2-4 T, we'll see photos without the ruler and then photos with the ruler. It's the same gun when we see that, it's not multiple firearms, correct?

A. There were multiple firearms, but the pictures you're talking about are of the same gun taken multiple times.

Q. All right. Let's go on to 2-4 L. Is that a different firearm, Agent Whittle?

A. Yes, that is a different firearm. It was also found on the floor of the hallway.

Q. 2-4 M?

A. 2-4 M is a picture of the same firearm as 2-4 L that was found on the floor in the hallway. That is the picture with the scale.

Q. I'm sorry, ma'am. This is 2-4 N that I've showed you. I've skipped over the picture with the scale.

A. Oh, I'm sorry. 2-4 N is a picture of a different firearm.

Q. And where was that found?

A. That was also found on the floor in the hallway.

Q. 2-4 Q?

A. 2-4 Q is another one of the firearms that was found on the floor in the hallway.

Q. And skipping ahead to 2-4 S.

A. 2-4 S is a firearm that was found in the master stateroom.

Q. And where is that being photographed from?

A. That's photographed in place in the master stateroom. I believe that photograph was taken on top of the master bed.

Q. And, lastly, 2-4 T. What does this photo show, ma'am?

A. 2-4 T shows two automatic weapons that were found in the steering gallery on the seating.

Q. Agent Whittle, could you just describe for us when you entered down into the interior of the Quest what is the layout in terms of the different rooms?

A. The layout -- as you entered down into the Quest you went down a few steps from the steering gallery and you were in the dining area. The dining table was to your left, and to the right was a desk and also an indoor navigational area. As you continued down that hall you went down a couple more steps, and you were into the hallway where the guns were recovered. And then to the left down that hallway was an additional stateroom, a smaller stateroom. The next door was

a bathroom. And directly in front of the hall was a storage area. To the right there was a pantry area. And then there was a desk area. And then if you turned all the way around when you went immediately down the steps and to your right you could be in the kitchen area. The master stateroom led off of the kitchen area, and off of the master stateroom there was also a bathroom area.

Q. And just so I'm clear, the firearms that we just discussed were found in one of a number of places, correct?

A. Yes, there were several locations where firearms were located.

Q. And where were those locations that you located these firearms?

A. One was located down the steps. You would go down the steps and through a dining area, and they were on the floor in that hallway as it was leading to the second stateroom toward the bow of the boat. One firearm was recovered in the master stateroom in the bed area, and then the other firearms were recovered up top in the steering gallery on the benches.

Q. As this picture depicts here?

A. Yes.

Q. All right. Did you also find some magazines and some ammunition?

A. Yes, we did.

Q. Would you look at 2-4 U and 2-4 V, which should also be

in your book there, ma'am.

A. Okay.

Q. And what are those?

A. Those depict the magazines and ammunition after they had been separated before being photographed. When we found them the bullets were in magazines.

MR. SAMUELS: Your Honor, I would offer 2-4 U and 2-4 V into evidence.

THE COURT: 2-4 U and 2-4 G (sic) are received in evidence.

MR. SAMUELS: I'm sorry, Judge. 2-4 U and 2-4 V.

THE COURT: I'm sorry, I said "G." I should say "2-4 V" -- are received in evidence.

(The exhibits were admitted into evidence.)

BY MR. SAMUELS:

Q. Agent Whittle, 2-4 U -- does this show the ammunition taken out of the magazine, ma'am?

A. Yes.

Q. And when it was found was it contained in the magazine?

A. Yes, it was inside the magazine when we found it. We actually were the ones who downloaded it from the magazine so that we could photograph it and show exactly how many rounds were in the magazine.

Q. Okay. And 2-4 V?

A. Same situation. The bullets were inside the magazine

when we found them, and they were downloaded so that we could photograph them with the magazine to show exactly how many bullets were in the magazine.

Q. Were these magazines loose, or were they attached to the guns that you described?

A. At the time they were loose. We understood that the magazines had been cleared from the guns at a time prior to our arriving at the ship.

Q. Agent Whittle, did you also find some identification documents of some individuals on board the Quest?

A. Yes, we did.

Q. All right. I'd like to have you look at -- I believe you've got 2-4 X, 2-4 Y and 2-4 Z in your book there, ma'am.

(There was a pause in the proceedings.)

THE WITNESS: Yes, I have 2-4 X, Y and Z.

BY MR. SAMUELS:

Q. Okay. And are those some of the identification documents that you found, ma'am?

A. Yes, they are.

MR. SAMUELS: And, Your Honor, at this time I would offer 2-4 X, Y and Z into evidence.

THE COURT: Received in evidence, 2-4 X, Y and Z.

(The exhibits were admitted into evidence.)

BY MR. SAMUELS:

Q. Agent Whittle, let me show you 2-4 W first, which has

already been received into evidence.

Whose identification did you find on board the Quest, ma'am?

A. That is the identification for Scott Adam, including his U.S. passport. And our understanding was that he was one of the owners of the Quest.

Q. All right. 2-4 X. What does this show?

A. 2-4 X is the identification documents we found, including the U.S. passport, in the name of Jean Adam, who we were also advised was one of the owners of the boat.

Q. 2-4 Y?

A. 2-4 Y is identification documents for Robert Riggle, including his U.S. passport.

Q. And, finally, 2-4 Z?

A. And 2-4 Z are identification documents for Phyllis Macay, including her United States passport.

Q. And when you found these documents were they pieced together in this way? Did you spread them out to take the photographs of them?

A. We put them on a surface so that we could photograph them. They were found in various locations throughout the boat.

Q. Agent Whittle, do you have 2-4 DD up there, ma'am?

A. Yes, I do.

Q. Okay. And do you recognize was that is?

A. That is a GPS device that we found aboard the sailing vessel Quest.

Q. A photograph of the device?

A. Yes.

MR. SAMUELS: Your Honor, I would offer 2-4 DD.

THE COURT: 2-4 DD is received in evidence, being a...

(The exhibit was admitted into evidence.)

BY MR. SAMUELS:

Q. Agent Whittle, where did you find this device on board the Quest?

A. We found that on the shelf under the windshield in the steering gallery. It was near a jacket that had previously been depicted in one of the photos you showed me.

Q. Okay. Did you also find a chart with some position markers on it, ma'am?

A. Yes, we did. We found that on the dining table.

Q. I'm going to show you 2-4 KK, which has already been received into evidence.

Is that the chart you found, ma'am?

A. Yes, that's a photograph depicting the chart where we found it.

Q. And where was this located? It was right on the table there?

A. Yes, it was right on the dining table.

Q. All right. Agent Whittle, do you also have 2-4 LL up there, ma'am?
A. Yes, I do.
Q. And what is that?
A. That is a piece of lined paper with -- or a photograph of a piece of lined paper with handwriting on it.
Q. Was that found on board the Quest?
A. That was found aboard the Quest. It was in a jacket that was found in the dining area on one of the benches beside the dining table.

MR. SAMUELS: Your Honor, I would offer 2-4 LL into evidence.

THE COURT: 2-4 LL is received in evidence.

(The exhibit was admitted into evidence.)

BY MR. SAMUELS:
Q. Agent Whittle, can you make out a date on the top of that paper, ma'am?
A. I'm not sure whether the date is 9-2 or February 9th, 2011, because the European way of writing the date is to put the day before the month. So it could be either 9/2/2011 -- but I don't think it would be, because that date had not occurred yet.
Q. At the time you processed the scene in February of 2011?
A. Yes, uh-huh.
Q. Agent Whittle, we showed you the photographs of a number

of firearms. Once those firearms were photographed what was done with them, ma'am?

A. They were once again checked to be rendered safe so that they could be packaged and shipped back with the evidence.

Q. All right. And where were they shipped back to; do you know?

A. They came back to the FBI office in Norfolk.

MR. SAMUELS: Judge, at this time I would like to read two additional stipulations into evidence.

THE COURT: Proceed.

MR. SAMUELS: Thank you, sir.

Stipulation No. 8:

"United States Exhibits 2-4 NN through 2-4 TT are firearms that were recovered from the Quest by the FBI ERT during its search of the Quest from February 26-28, 2011. Each of United States Exhibits 2-4 NN through 2-4 TT is a 'machine gun' within the meaning of Title 18, United States Code, Section 921(a)(23). United States Exhibits 2-4 NN through 2-4 TT were each tested by the FBI laboratory in Quantico, Virginia. Each of United States Exhibits 2-4 NN through 2-4 TT were found by the FBI laboratory to be firearms that functioned as designed in both the automatic and semi-automatic modes. United States Exhibits 2-4 NN through 2-4 TT were then returned from the FBI laboratory in Quantico to the FBI Norfolk and have been properly stored and

maintained as evidence by the FBI. United States Exhibits 2-4 NN through 2-4 TT have therefore been properly authenticated and are admissible in evidence with no further showing by the government."

And Stipulation No. 9 reads:

"United States Exhibit 2-4 MM is a rocket-propelled grenade launcher that was recovered from the Quest by the FBI ERT during its search of the Quest from February 26-28, 2011. United States Exhibit 2-4 MM is a 'destructive device' within the meaning of Title 18, United States Code, Section 921(a)(4), because it is a weapon which will expel a projectile by the action of an explosive or other propellant and which has a barrel with a bore of more than one-half inch in diameter. United States Exhibit 2-4 MM was tested by the FBI laboratory at Quantico, Virginia, and the FBI laboratory concluded that it was functional. United States Exhibit 2-4 MM was then returned from the FBI laboratory in Quantico to the FBI Norfolk and have been properly stored and maintained as evidence by the FBI. United States Exhibit 2-4 MM has therefore been properly authenticated and is admissible in evidence with no further showing by the government."

BY MR. SAMUELS:

Q. Ms. Whittle, I'm going to show you a number of exhibits from items that you've collected.

MR. SAMUELS: And, Judge, with the Court's indulgence, I'd like to have an agent come up and assist Ms. Whittle as she goes through these physical items.

THE COURT: What we're going to do is we're going to take a ten-minute recess at this time. We'll go to lunch at 1:00, ladies and gentlemen, not now.

Everyone please rise while the jury retires.

(The jury withdrew from the courtroom.)

THE COURT: We'll take a ten-minute recess at this time.

(A recess was taken.)

THE COURT: Please remain standing. Mr. Pierce, if you would bring in the jury.

(The jury entered the courtroom.)

THE COURT: Let the record reflect the entire jury has returned.

Ladies and gentlemen, the reason I have to take lunch at 1:00 is all the District Court judges are required to be at a meeting at 1:00, so I have to go to a meeting at 1:00. It's a very important meeting. It deals with replacing certain people. You may be seated.

All right. Proceed, Mr. Samuels.

BY MR. SAMUELS:

Q. Agent Whittle, I'm going to show you some physical items.

MR. SAMUELS: And, with the Court's indulgence, I'll

have Agent Kevin Coughlin assist in bringing these up to Agent Whittle.

THE COURT: I assume the safety is on all of these weapons, if they have a safety.

MR. SAMUELS: Yes, sir, checked and double-checked, Your Honor.

THE COURT: All right.

BY MR. SAMUELS:

Q. Agent Whittle, this should be 2-4 MM. Do you see that, ma'am?

A. Yes.

Q. And do you recognize what this is?

A. That is the rocket-propelled grenade launcher which was found aboard the sailing vessel Quest.

Q. Okay. Now, it's packaged up, ma'am. Is that how you packaged it?

A. Yes. I recognize my writing on the packaging.

Q. I see a rather large orange biohazard label on it, and the agent is wearing gloves as well. Why is there a biohazard label on it?

A. Because there was a significant amount of blood and other biological matter pretty much covering every surface in the Quest, including the weapons.

Q. All right. And, so, that's why the agent is wearing gloves in handling it, as well?

A. Yes.

Q. Okay. I'd like you next to look at 2-4 NN. And, Agent Whittle, while he's bringing that up, we had talked about the ammunition, 2-4 U and 2-4 V, that you had found. Did you find other ammunition other than those magazines I showed you?

A. Yes, we did. We found loose ammunition aboard the vessel, also.

Q. And were there other magazines you found?

A. Yes.

Q. So that was representative of what you found?

A. Yes. There was a significant amount of ammunition at various points throughout the boat.

Q. All right. What exhibit is that, ma'am? Is it 2-4 NN?

A. Yes, it's 2-4 NN.

Q. Okay. And do you recognize what's contained inside that box?

A. I recognize -- yes, I recognize that to be one of the automatic weapons that was found aboard the sailing vessel Quest.

Q. Okay. And you used the term "automatic." What do you mean by that, ma'am?

A. That it can fire more than one bullet in succession without having to have the trigger pulled.

Q. Do you know from your experience what type of weapon that

is, Agent Whittle?

A. No, I do not. I do not have specific training in various firearms.

Q. All right.

MR. SAMUELS: Thank you, Agent Coughlin. If we could go to 2-4 OO.

And, Your Honor, I would offer 2-4 MM and 2-4 NN while we're making the transfer here.

THE COURT: 2-4 MM, the rocket launcher, is received in evidence.

2-4 NN, the automatic weapon, is received in evidence.

(The exhibits were admitted into evidence.)

BY MR. SAMUELS:

Q. Do you have 2-4 OO there, Agent Whittle?

A. Yes, that is 2-4 OO.

Q. And what do you recognize that to be?

A. I recognize that to be another one of the firearms that we recovered aboard the sailing vessel Quest.

MR. SAMUELS: Okay. Your Honor, I would offer 2-4 OO.

THE COURT: The firearm, 2-4 OO, is received in evidence.

(The exhibit was admitted into evidence.)

BY MR. SAMUELS:

Q. Agent Whittle, all of these weapons we're looking at, are they automatic weapons?

A. Yes.

Q. Capable of firing multiple rounds with one trigger pull?

A. Yes.

Q. I'd next like to show you 2-4 PP. And what do you recognize 2-4 PP to be, Agent Whittle?

A. 2-4 PP is another one of the firearms, an automatic weapon, that we found aboard the Quest.

MR. SAMUELS: Your Honor, I would offer 2-4 PP.

THE COURT: 2-4 PP -- 2-4 OO and 2-4 PP are received in evidence, being the firearms.

(The exhibit was admitted into evidence.)

MR. SAMUELS: And if we could next bring up 2-4 QQ, Agent Coughlin.

BY MR. SAMUELS:

Q. Agent Whittle, what do you recognize 2-4 QQ to be?

A. 2-4 QQ is another one of the firearms that was found aboard the sailing vessel Quest.

THE COURT: Are all of these firearms automatic?

THE WITNESS: Yes, they are.

THE COURT: 2-4 QQ is received in evidence.

(The exhibit was admitted into evidence.)

BY MR. SAMUELS:

Q. And, Agent Whittle, those twist ties that are around

those -- the cable ties that are around those, that's the safety mechanism. Is that correct?

A. Yes. A cable tie is inserted through the gun to prevent it from being able to be fired, and cable ties were also used to hold them in place while they were packaged to prevent them from moving.

Q. And do you have 2-4 RR there now, Agent Whittle?

A. Yes, I do.

Q. All right. And what do you recognize it to be?

A. That's another one of the firearms, an automatic weapon, that was recovered from the sailing vessel Quest.

MR. SAMUELS: Your Honor, I would offer -- if I had -- 2-4 QQ as well as 2-4 RR.

THE COURT: 2-4 QQ and 2-4 RR are received in evidence, being automatic weapons.

(The exhibits were admitted into evidence.)

BY MR. SAMUELS:

Q. And just two more, Agent Whittle, 2-4 SS and 2-4 TT, as well.

Do you have 2-4 SS there, ma'am?

A. Yes.

Q. And what is that?

A. That is another one of the automatic firearms that we recovered from the sailing vessel Quest.

MR. SAMUELS: Your Honor, I would offer 2-4 SS.

THE COURT: It is received in evidence, being an automatic firearm.

(The exhibit was admitted into evidence.)

BY MR. SAMUELS:

Q. And, lastly, that should be 2-4 TT, Agent Whittle.

A. Yes, it is.

Q. And what do you recognize that to be, ma'am?

A. I recognize that to be another one of the automatic firearms that was recovered from the sailing vessel Quest.

Q. Is this one that was recovered from the stateroom?

A. Yes, it is.

MR. SAMUELS: Your Honor, I offer 2-4 TT.

THE COURT: 2-4 TT is received in evidence.

(The exhibit was admitted into evidence.)

BY MR. SAMUELS:

Q. Agent Whittle, all of these firearms that we've just seen and that Agent Coughlin has displayed are the same firearms that photos were introduced of. Is that correct, ma'am?

A. Yes, they are.

Q. And all of this physical evidence that you collected, from the firearms to the other things that we've seen pictures of, what was done with it after you collected it, ma'am?

A. After we collected it we brought it back to the NCIS facility at Camp Lemonnier, Djibouti, to finish packaging to

make sure that it was able to be safely transported back to the United States. It was then locked in an evidence storage locker in the NCIS office at the times when Kate Kelly or I were not actually present and working with the evidence. At the end of our trip we brought the evidence back with us to Norfolk.

Q. Okay. And, just to be clear, ma'am, there were other things that you collected as well in the course of the processing of the scene?

A. Yes, there were numerous other items of evidence that we collected.

MR. SAMUELS: The Court's indulgence, Your Honor.

(There was a pause in the proceedings.)

MR. SAMUELS: Thank you, Judge. That's all the questions I have.

THE COURT: Mr. Broccoletti.

CROSS-EXAMINATION

BY MR. BROCCOLETTI:

Q. Ma'am, Counsel asked you about some additional evidence that was collected. I want to go through that with you just briefly, if we could.

Do you have your key with you, or your --

A. No, I do not have my notes, and I would need that to be able to discuss the other evidence with you.

Q. Where are your notes?

A. My notes were given to the U.S. Attorneys. I believe you have a copy of the report that was --

MR. BROCCOLETTI: Judge, could we retrieve that and hand it to her so she can refresh her recollection?

MR. SAMUELS: No objection.

THE COURT: Yes.

BY MR. BROCCOLETTI:

Q. All right. Item No. 9 is one Golis SIM card. Do you recall that?

A. One moment, please. Let me find it on the --

(There was a pause in the proceedings.)

THE WITNESS: Yes, I see that listed as one of the items of evidence, Item No. 9, one Golis SIM card.

MR. BROCCOLETTI: I'm sorry, Your Honor?

THE COURT: I just wanted to know what kind of card it was.

MR. BROCCOLETTI: Yes, sir.

BY MR. BROCCOLETTI:

Q. And do you know what Golis is?

A. No, I do not.

Q. Do you know anything about the Somalian mobile phone system?

A. I know nothing about that.

Q. All right. What is a SIM card? Do you know that?

A. A SIM card is placed in a mobile telephone in order for

it to be able to place and receive calls, and my understanding is that data is also stored on the SIM card regarding numbers that have been called and other information.

Q. And where is that recovered from?

A. It says it was recovered in Area G, which was the front or main stateroom.

Q. Was it just by itself?

A. According to the log, yes, it was just by itself.

Q. Do you know of any attempt to download the data that may have been contained on that SIM card?

A. I was not party to any attempt to download data from that SIM card.

Q. Item No. 10 is one AT&T SIM card found inside pocket of No. 52, which is a black -- excuse me. Found in pocket of Item 52, correct?

A. That is correct.

Q. And, again, do you know of any attempt to download the data --

THE COURT: Do you desire to have Item 9 received in evidence?

MR. BROCCOLETTI: Judge, I don't, no, sir. I just wanted to ask her about it.

THE COURT: All right.

BY MR. BROCCOLETTI:

Q. Likewise, do you know of any attempt to download the data from the AT&T SIM card?
A. I was not party to any download of data from that SIM card.
Q. And what is Item No. 52?
A. Item No. 52 is listed as a gray jacket.
Q. And where was that recovered from?
A. According to the legend, that was recovered from the office dining area.
Q. Was there anything within that jacket that would indicate to whom it belonged or an identification?
A. Not that we noted.
Q. Item No. 41 is a Motorola cell phone.
A. Yes, that is correct.
Q. Where was that recovered from?
A. That was recovered from Area E, which was the office dining area.
Q. Do you know of any attempt to download any data from that phone?
A. I'm not aware of any attempts that may have been made to download that. I was not a party to that.
Q. Do you know to whom that phone may have belonged?
A. No, I do not.
Q. Item No. 53 is a Nokia cell phone, again found in the same jacket pocket as No. 52. Likewise, any attempt that

you're aware of to download data?
A. I was not a party to any attempt to download the data, no.
Q. Item No. 71 is a Nokia cell phone with Muhdi, M-U-H-D-I. What does that mean?
A. That was a word or lettering that was on the phone when we found it.
Q. Literally transcribed on the phone?
A. Without seeing an actual photograph of that item, I can't tell you whether that was incised on the phone, whether it was a label on the phone, or whether that was something from the manufacturer. But with the photograph I would be able to tell you that.
Q. And that was found inside of jacket pocket, No. 70?
A. Yes.
Q. And what was No. 70?
A. No. 70 is a black jacket, and it had the word "Happy" on it.
Q. And where were those items located?
A. Those items were also in Area E, which was the office dining area.
Q. Item No. 76 -- what is that?
A. Item No. 76 is one SIM card and two SIM card holders.
Q. And where were they located?
A. They were also located in Area E, which was the office

dining area.

Q. Do you recall if they were by themselves or attached to something or in something?

A. They were by themselves; otherwise, we would have noted which other item they were found in. As you've noted, they say inside of jacket that was Item 70, et cetera.

Q. Item No. 87 -- what is that?

A. Item No. 87 is a Nokia cell phone which was found inside the pocket of Item No. 85.

Q. And was Item No. 88 found with that?

A. Yes, Item No. 88 was also found inside the pocket of Item No. 85.

Q. And Item 88 is --

A. Item 88 is a T Mobile air card.

Q. Was there anything in Item No. 85, a black bomber jacket, which indicated to whom it may have belonged?

A. There was nothing noted as far as ownership of that jacket.

Q. Item No. 90?

A. Item No. 90 was a Form cell phone.

Q. Where was that found?

A. That was found in Area F, which was the hallway.

Q. Do you know what a Form cell phone is?

A. I do not know various types of cell phones, no.

Q. Item No. 91.

A. 91 was an HTC Smart Phone.
Q. And where was that phone?
A. That was found in Area F, also, the hallway.
Q. And, again, do you know anything about what an HTC Smart Phone may be?
A. I'm aware that that's a brand of cellular phone that's sold in the United States.
Q. And then Item No. 93?
A. Item No. 93 is a Nokia cell phone which was found inside the pocket of Item No. 92.
Q. And 92 is a brown corduroy jacket?
A. Yes.
Q. Was there anything in that brown corduroy jacket that may have indicated to whom that may have belonged?
A. No, there was not.
Q. All right. Thank you, ma'am.

MR. SAMUELS: Judge, I have nothing further for Agent Whittle.

THE COURT: Do you need this witness any further?

MR. SAMUELS: No, Judge, the United States does not.

THE COURT: Do you need this witness any further, Mr. Broccoletti?

MR. BROCCOLETTI: No, Your Honor.

THE COURT: You are instructed, ma'am, not to discuss your testimony with anyone until this matter is

concluded, at which time you're free to discuss it with anyone you like.

You may be excused. And may she be released?

MR. SAMUELS: She may, Your Honor.

THE COURT: Mr. Broccoletti, may she be released?

MR. BROCCOLETTI: She may, Your Honor.

THE COURT: You're released. Thank you very much, ma'am.

THE WITNESS: Thank you.

***** ***** *****

CERTIFICATION

I certify that the foregoing is a correct transcript of an excerpt from the record of proceedings in the above-entitled matter.

s/s

Heidi L. Jeffreys

July 31, 2012

Date