**E X H I B I T S**

EXHIBIT 1 PG  1



U.S. Department of Justice

Federal Bureau of Prisons

---

*Office of the General Counsel*                    *Washington, DC 20534*

March 23, 2021

MEMORANDUM FOR T. SCARANTINO, COMPLEX WARDEN
               FEDERAL CORRECTIONAL COMPLEX
               BUTNER, NORTH CAROLINA

*James C Wills for*

FROM:          Ken Hyle
               Assistant Director/General Counsel

SUBJECT:       SHIBIN, Mohammad
               Federal Register No. 78207-083
               Request for Reduction in Sentence

Please be advised that Mr. Shibin's request for a reduction in
sentence (RIS) pursuant to section 3(a) of Program Statement
No. 5050.50, Compassionate Release/Reduction in Sentence:
Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and
4205(g) ("Terminal Medical Condition"), is denied.  We have
carefully reviewed the documentation accompanying this request
and have consulted with the BOP's Medical Director.

Section 3(a) of PS 5050.50 provides that RIS consideration may
be given to an inmate who has been diagnosed with a terminal,
incurable disease and whose life expectancy is 18 months or less
or who has a disease or condition with an end-of-life trajectory
under 18 U.S.C. § 3582(d)(1).  In addition, section 7 requires
in all RIS cases consideration of factors such as the nature and
circumstances of the inmate's offense and whether release would
minimize the severity of the offense or pose a danger to the
safety of any other person or to the community.

Mr. Shibin is 60 years old and has been diagnosed with stage IV
castrate-resistant prostate cancer with metastatic disease.  His

<u>EXHIBIT 1 PG 2</u>

prognosis is poor and his life expectancy is estimated to be less than 18 months.  Mr. Shibin therefore meets the criteria for a RIS under section 3(a).

However, due to the nature and circumstances of Mr. Shibin's offenses, his release at this time would minimize the severity of his offenses and pose a danger to the community. Accordingly, although he meets the criteria for a RIS under section 3(a), his RIS request is denied.

Please provide Mr. Shibin with a copy of this decision.


cc:  J. C. Petrucci, Regional Director, Mid-Atlantic Region

CM/ECF - vaed

**EXHIBIT 2 PG 1**

APPEAL, CLOSED, INTERPRETER

## U.S. District Court
### Eastern District of Virginia - (Norfolk)
### CRIMINAL DOCKET FOR CASE #: 2:11-cr-00033-RGD-DEM-1

Case title: USA v. Shibin

Date Filed: 03/08/2011
Date Terminated: 08/14/2012

Assigned to: District Judge Robert G.
Doumar
Referred to: Magistrate Judge Douglas
E. Miller
Appeals court case number: 12-4652
4CCA - Case Manager - Joy Hargett
Moore

**Defendant (1)**

**Mohammad Saaili Shibin**
*TERMINATED: 08/14/2012*
*also known as*
*"Khalif Ahmed Shibin"*
*TERMINATED: 08/14/2012*
*also known as*
Mohammad Ali
*TERMINATED: 08/14/2012*
*also known as*
Ali Jama
*TERMINATED: 08/14/2012*

represented by **James Orlando Broccoletti**
Zoby & Broccoletti
6663 Stoney Point S
Norfolk, VA 23502
(757) 466-0750
Fax: 757-466-5026
Email: james@zobybroccoletti.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Jason Eli Ohana**
Willcox & Savage PC
Wells Fargo Center
440 Monticello Ave
Suite 2200
Norfolk, VA 23510
(757) 628-5500
Fax: (757) 628-5566
Email: johana@wilsav.com
*ATTORNEY TO BE NOTICED*
*Designation: Pro Bono*

**Pending Counts**

T. 18, USC 1651, 3238, and 2 - Piracy
under the Law of Nations
(1s)

T. 18, USC 1203(a), 3238, and 2 -

**Disposition**

Imprisonment - LIFE; Supervised
Release - 5 years; Special Assessment -
$100.00; Restitution - $5,000,000.00

Imprisonment - LIFE, to be served
concurrently; Supervised Release - 5

CM/ECF - vaed                                                    EXHIBIT 2 PG 2

| | |
|---|---|
| Conspiracy to Commit Hostage Taking (2s) | years, to run concurrently; Special Assessment - $100.00 |
| T. 18, USC 1203(a), 3238, and 2 - Hostage Taking (3s) | Imprisonment - LIFE, to be served concurrently; Supervised Release - 5 years, to run concurrently; Special Assessment - $100.00 |
| T. 18, USC 2280(a)(1)(H), 2280(b)(1), and 3238 - Conspiracy to Commit Violence Against Maritime Navigation (4s) | Imprisonment - 240 months, to be served concurrently; Supervised Release -3 years, to run concurrently; Special Assessment - $100.00 |
| T. 18, USC 2280(a)(1)(A), 2280(b)(1), 3238, and 2 - Violence Against Maritime Navigation (5s) | Imprisonment - 240 months,to be served concurrently; Supervised Release - 3 years, to run concurrently; Special Assessment - $100.00 |
| T. 18, USC 924(c)(1)(A), 3238, and 2 - Use, Carry, Brandish, and Discharge of a Firearm During a Crime of Violence (6s) | Imprisonment - 120 months, to be served CONSECUTIVELY; Supervised Release - 5 years, to run concurrently; Special Assessment - $100.00 |
| T. 18, USC 1651, 3238, and 2 - Piracy under the Law of Nations (7s) | Imprisonment - LIFE, to be served concurrently; Supervised Release - 5 years, to run concurrently; Special Assessment - $100.00; Restitution - $408,646.48 |
| T. 18, USC 1203(a), 3238, and 2 - Conspiracy to Commit Hostage Taking (8s) | Imprisonment - LIFE, to be served concurrently; Supervised Release - 5 years, to run concurrently; Special Assessment - $100.00 |
| T. 18, USC 1203(a), 3238, and 2 - Hostage Taking (9s) | Imprisonment - LIFE, to be served concurrently; Supervised Release - 5 years, to run concurrently; Special Assessment - $100.00 |
| T. 18, USC 1201(c) and 3238 - Conspiracy to Commit Kidnapping (10s) | Imprisonment - LIFE, to be served concurrently; Supervised Release - 5 years, to run concurrently; Special Assessment - $100.00 |
| T. 18, USC 1201(a)(2), 3238, and 2 - Kidnapping (11s) | Imprisonment - LIFE, to be served concurrently; Supervised Release - 5 years, to run concurrently; Special Assessment - $100.00 |
| T. 18, USC 2280(a)(1)(H), 2280(b)(1), and 3238 - Conspiracy to Commit Violence Against Maritime Navigation (12s) | Imprisonment - LIFE, to be served concurrently; Supervised Release - 5 years, to run concurrently; Special Assessment - $100.00 |
| T. 18, USC 2280(a)(1)(A), 2280(b)(1), 3238, and 2 - Violence Against Maritime Navigation | Imprisonment - LIFE, to be served concurrently; Supervised Release - 5 years, to run concurrently; Special |

AO 245B (Rev. 12/03)(VAED rev. 2) Judgment in a Criminal Case
Sheet 3 – Supervised Release

EXHIBIT 2 PG 4

| | |
|---|---|
| Case Number: | 2:11CR00033-01 |
| Defendant's Name: | SHIBIN, MOHAMMAD SAAILI |

# SUPERVISED RELEASE

If ever released from imprisonment, the defendant shall be placed on supervised release for a term of FIVE (5) YEARS. This term consists of FIVE (5) YEARS on each of Counts 1, 2, 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15; and a term of THREE (3) YEARS on each of Counts 4 and 5, all to run concurrently.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of supervised release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and periodic drug tests thereafter, as determined by the court.

The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or restitution obligation, it is a condition of supervised release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

# STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court set forth below:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance or any paraphernalia related to such substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer for a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Case 2:11-cr-00033-RGD-DEM   Document 136   Filed 08/14/12   Page 5 of 8 PageID# 2144 Page 5 of 8

AO 245B (Rev. 12/03)(VAED rev. 2) Judgment in a Criminal Case
Sheet 3A – Supervised Release

| | |
|---|---|
| Case Number: | 2:11CR00033-01 |
| Defendant's Name: | SHIBIN, MOHAMMAD SAAILI |

EXHIBIT 2 PG 5

## SPECIAL CONDITIONS OF SUPERVISION

While on supervised release pursuant to this Judgment, the defendant shall also comply with the following additional special conditions:

1) As a condition of supervised release, upon completion of the term of imprisonment, the defendant is to be surrendered to a duly-authorized Immigration official of the Department of Homeland Security, United States Immigration and Customs Enforcement, for a deportation review in accordance with established procedures provided by the Immigration and Naturalization Act, 8 U.S.C. Section 1101, et seq.

2) As a further condition of supervised release, if ordered deported, the defendant shall remain outside of the United States.

**From:** Hinda Adan Ali

Bossaso, Puntland Somalia

Telephone: +252907726614

**EXHIBIT 4 PG 1**

4 April 2021

**To whom it may concern.**

**RE:** Mr. Mohammad S. Shibin **Case.** Reg. No.78207-083

I am writing on behalf of myself, the half sister of Mr. Mohamed, and my family. Mr. Mohamed has been in US prison for almost 10 years now. Since then his health has deteriorated rapidly. He has applied for compassionate release on the basis of his worsening health condition. His request was then rejected by the court due to the assumption he is still a risk to his country (Somalia), should he be released.

Before this peculiar incident, my bother remained proven fine and responsible character, a good man with a sense of humor who used to support his family and the community at large. He has never attended or been part of any armed conflict or combat in Somalia.

We, the family are feeling the pain that he still remains behind the bars for a crime we believe he was innocent of. We can confirm that he poses no threat or risks at all to the country or the community.

We, therefore, humbly request for reconsideration of his compassionate release request to enable him reestablish his life back home and recover from the terrible illnesses. The family hereby also confirm taking care of Mr. Mohamed and provide him every support he dearly requires

Sincerely,

Hinda Adan

EXHIBIT 5 PG 1

# DIPLOMA

## Commonwealth of Pennsylvania
## Department of Education

In recognition of having met the requirements for issuance of the Commonwealth Secondary School Diploma as set forth in Title 22, Section 4.72 of the Pennsylvania Code, this diploma is conferred upon

**MOHAMMAD S SHIBIN**

Date Issued: 3/21/2014

Given under the seal of the
Department of Education
Commonwealth of Pennsylvania
at Harrisburg



# State of Mississippi



## Mississippi Community College Board

# High School Equivalency Diploma

This is to certify that **MOHAMMAD SHIBIN** has taken the GED® Test provided through the GED® Testing Service of the American Council on Education with test scores comparable to those made by high school graduates and is hereby awarded this High School Equivalency Diploma, the legal equivalent of a high school diploma, as determined by the Mississippi State Board of Education.

February 04, 2014
*Date*

4551935
*Diploma Number*

*Executive Director*

*GED® Administrator*

EXHIBIT 5  PG 2

EXHIBIT 5 PG 3

# Certificate of Completion

## Mohammad Shibin



Has successfully completed all the necessary requirements at U.S.P. Canaan for the

## DRUG EDUCATION PROGRAM

*Congratulations on your completion of the Drug Education Class here at USP Canaan.*

Mr. R. Smedley,

D. T. S.

U.S.P. CANAAN DRUG PROGRAM

July 16, 2013



| | Individualized Needs Plan - Program Review   (Inmate Copy) | SEQUENCE: 01718700 |
|---|---|---|
| | Dept. of Justice / Federal Bureau of Prisons | Team Date: 03-23-2021 |
| | Plan is for inmate: SHIBIN, MOHAMMAD SAAILI  78207-083 | |

| | | | |
|---|---|---|---|
| Facility: | BUH  BUTNER FMC | Proj. Rel. Date: | UNKNOWN |
| Name: | SHIBIN, MOHAMMAD SAAILI | Proj. Rel. Mthd: | LIFE |
| Register No.: | 78207-083 | DNA Status: | CAA03332 / 09-06-2012 |
| Age: | 60 | | |
| Date of Birth: | 12-13-1960 | | |

**Detainers**

| Detaining Agency | Remarks |
|---|---|
| ICE | INVESTIGATION INTO THE REMOVAL FROM THE UNITED |

**Current Work Assignments**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BUH | UNASSIGNED | NO WORK ASSIGNMENT | 11-24-2020 |

**Current Education Information**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BUH | ESL HAS | ENGLISH PROFICIENT | 05-14-2013 |
| BUH | GED EARNED | GED EARNED IN BOP | 02-11-2014 |

**Education Courses**

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| BTF GP | C | ALTERNATIVE TO VIOLENCE | 06-01-2018 | 06-03-2018 |
| BTF GP | C | INTRODUCTION TO EDUCATION | 04-30-2018 | 05-15-2018 |
| BUH MS | C | WELLNESS ABDOMINALS CLASS | 01-03-2018 | 03-08-2018 |
| BUH MS | C | WELLNESS AEROBICS CLASS | 03-14-2017 | 06-09-2017 |
| BUH MS | C | ADVANCED WELL ABS CLASS | 05-21-2017 | 06-09-2017 |
| BUH MS | C | WELLNESS AEROBICS CLASS | 03-04-2017 | 03-04-2017 |
| BUH MS | C | WELLNESS AEROBICS CLASS | 03-04-2017 | 03-04-2017 |
| BUH MS | C | ADV WELLNESS SPIN CLASS | 11-04-2016 | 11-25-2016 |
| BUH MS | C | HEALTH FAIR | 11-10-2016 | 11-20-2016 |
| CAA CHG | C | RPP6 ANGER MANAGEMENT | 10-23-2015 | 12-21-2015 |
| CAA CHG | C | VOCATIONAL CULINARY PROGRAM. | 06-08-2015 | 09-17-2015 |
| CAA CHG | C | RPP6 COMMUNICATION SKILLS | 04-04-2014 | 04-04-2014 |
| CAA CHG | C | GED 114 12:45-3:20 PM | 12-18-2013 | 02-11-2014 |
| CAA CHG | C | RPP6 REVIEWING MY DRUG USE | 01-28-2014 | 01-28-2014 |
| CAA CHG | C | REMEDIAL ON ALL GED SUBJECTS. | 12-02-2013 | 01-28-2014 |
| CAA CHG | W | PRE-GED 114 10:10 - 12:10 | 05-14-2013 | 12-18-2013 |
| CAA | C | COMPUTER | 07-15-2013 | 11-02-2013 |
| CAA | C | LEATHER | 09-23-2013 | 11-13-2013 |
| CAA | C | PARENTING 2 | 08-17-2013 | 09-27-2013 |
| CAA | C | ADVANCED CONVERSATIONAL SPAN. | 07-16-2013 | 09-03-2013 |
| CAA | C | PARENTING CLASS | 06-20-2013 | 08-17-2013 |
| CAA | C | CONVERSATIONAL SPANISH CLASS | 05-06-2013 | 06-20-2013 |
| CAA | C | ESL 108 9:30-11:30AM | 04-09-2013 | 05-14-2013 |
| CAA | W | ENGLISH SECOND LANG 12:45-3:20 | 02-01-2013 | 04-09-2013 |
| CAA | W | COURSE ON SOLAR SYSTEM. | 01-16-2013 | 03-25-2013 |

**Discipline History (Last 6 months)**

| Hearing Date | Prohibited Acts |
|---|---|
| ** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ** | |

**Current Care Assignments**

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 09-17-2012 |
| CARE4 | MRC CARE REQUIRED | 08-26-2020 |

**Current Medical Duty Status Assignments**

| Assignment | Description | Start |
|---|---|---|
| NO PAPER | NO PAPER MEDICAL RECORD | 09-05-2012 |



# Certificate of Completion

This certifies that:

Mohammad Shibin (78207-083)
Completed the Non-Residential
Drug Abuse Program at the
**United States Penitentiary, Canaan, PA**



T.Cowen, Drug Treatment Specialist

January 28, 2014

EXHIBIT 5 PG 6



EXHIBIT 5 PG 7

*Certificate*

Workshops for Training in Nonviolence
Alternatives to Violence Project North Carolina

*Mohammad Shlibes*

has completed the BASIC Alternatives to Violence Project Workshop

Trainer

Trainer

Trainer

Trainer

Trainer

Trainer

Butner, North Carolina
Location

June 3, 2018
Date

EXHIBIT 5 PG 8

# THANK YOU!

This certificate of appreciation is presented to

## Mohammad Shibin

for

Dedication and service as a tutor for
USP Canaan's Education Department

Date

USP CANAAN

Signature

EXHIBIT 5 PG 9

# Tutors of Literacy in the Commonwealth

"Equipping Adult and Family Literacy Programs in Pennsylvania"

Awards this Certificate of Achievement to

Mohammad Shrin

In Recognition of Completion of

## Basic Tutor Training

Rosie Fry, Certified Trainer

July 15 and 16, 2014



EXHIBIT 5 PG 10

## USP CANAAN

THIS CERTIFIES THAT

## Mohammad Shibin

has successfully completed the Adult Continuing Education Class

## TYPING

August 2013

C.Ball, ACE Coordinator



EXHIBIT 5 PG 11

USP CANAAN

THIS CERTIFIES THAT

M. Shibin

has successfully completed the Adult Continuing Education course

PARENTING

August 2013

T. Salzaneda, Teacher



EXHIBIT 5 PG 12

USP CANAAN

THIS CERTIFIES THAT

M. Shibin

has successfully completed the Adult Continuing Education course

PARENTING II

August 2013

T. Salzameda, Teacher



EXHIBIT 5 PG 13

USP CANAAN

THIS CERTIFIES THAT

Mohammad Shibin

has successfully completed the Adult Continuing Education Class

SPANISH 2

August 2013

C.Ball, ACE Coordinator

EXHIBIT 5 PG 14

# ServSafe®
## CERTIFICATION

ServSafe
National Restaurant Association

## MOHAMMAD SHIBIN

for successfully completing the standards set forth for the ServSafe® Food Protection Manager Certification Examination, which is accredited by the American National Standards Institute (ANSI)–Conference for Food Protection (CFP).

5043

EXAM FORM NUMBER

7/20/2020

DATE OF EXPIRATION

12598113

NUMBER

7/20/2015

DATE OF E...

Local laws apply. Ch... ...gency for recertification requirements.

Sherm...

...lls logo are trademarks of the NRAEF.

#0855

ACCREDITED PROGRAM
American National Standards Institute
and the Conference for Food Protection

(ANSI)

In accordance with Maritime Labor...
©2015 National ...
Nat...

Contact us with questions at 175 W Jackson Blvd., Ste 1500, Chicago, IL 60604 or ServSafe@restaurant.org



EXHIBIT 5 PG 15

USP CANAAN

THIS CERTIFIES THAT

Mohammad Shibin

has successfully completed the Adult Continuing Education Class:

BASIC LITERACY

January 2014

C.Ball, ACE Coordinator



EXHIBIT 5 PG 16

# USP CANAAN

THIS CERTIFIES THAT

## M. Shibin

has successfully tutored the Adult Continuing Education course

## ULTIMATE NATURE

September, 2014

*T. Salzameda, Teacher*

10/24/2012

CM/ECF - vaed

| | |
|---|---|
| USA | represented by |
| **Plaintiff** | |

None

**Complaints**

**Highest Offense Level (Opening)**

Felony

| | |
|---|---|
| (1s) | |
| T. 18, USC 924(c)(1)(A), 3238, and 2 - Use, Carry, Brandish, and Discharge of a Firearm During a Crime of Violence | |
| (1s-1ss) | |

**Highest Offense Level (Terminated)**

Felony

**Terminated Counts**

| | |
|---|---|
| T. 18, USC 1651, 3238 and 2 - Piracy under the Law of Nations | Superseding Indictment filed 8/17/11 |
| (1) | |
| T. 18, USC 1201(c) and 3238 - Conspiracy to Commit Kidnapping | Superseding Indictment filed 8/17/11 |
| (2) | |
| T. 18, USC 924(c)(1)(A)(ii) and (B) (ii), 3238 and 2 - Possess, Use, Carry, Brandish and Discharge of a Firearm During a Crime of Violence | Superseding Indictment filed 8/17/11 |
| (3) | |

**Disposition**

**Highest Offense Level (Terminated)**

Felony

**Complaints**

None

**Disposition**

**Joseph E. DePadilla**
United States Attorney's Office
101 W Main St
Suite 8000
Norfolk, VA 23510
(757) 441-6331
Fax: (757) 441-6689
Email: joe.depadilla@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Lucas Hatch**
United States Attorney's Office -
Norfolk

Assessment - $100.00

Imprisonment - LIFE, to be served
CONSECUTIVELY; Supervised
Release - 5 years, to run concurrently;
Special Assessment - $100.00

EXHIBIT 2 PG 3



EXHIBIT 5 PG 17

# CERTIFICATE OF APPRECIATION

*this certificate is awarded to:*

## Mohammad Shibin

*in recognition of his performance as an Inmate Companion Program since*

*February 26, 2014*

March 7 2016

N, Coy, Psy.D., Staff Psychologist

EXHIBIT 5 PG 18

**ACHIEVEMENT**

# Mohammad Shibin
## Reg. No. 78207-083

This certifies that the above named inmate has
successfully completed the
**Living Free Program**
at the United States Penitentiary - Canaan

_Dr. G. Grimm, Chief_
_Psychologist_

_April 14, 2014_

_Date_

EXHIBIT 5 PG 19

# Certificate of Completion

## Mohammad Shibin

has completed the one hour Release Preparation Class

**Communication Skills 101**

conducted by the Psychology Services Department at USP Canaan.

Dr. G. Grimm, Chief Psychologist

EXHIBIT 6 PG 1

GROUND ONE Supporting Facts:

(i)  Movant was tried on 15 counts for the capture and piracy of a German vessel (Marida Marguerite) and an American sailing vessel (Quest), on the "High Seas."  See United States v. Shibin, 722 F.3d 233 (4th Cir. 2013).

The Movant was ultimately found guilty on all counts and sentenced to 12 Life terms of imprisonment; a consecutive 120-month term of imprisonment; and several concurrent 240-month terms.

(ii)  Before trial, Movant's attorney James Orlando Brocco-letti, conveyed the Government's oral plea offer to the Movant. This initial plea offer was made pursuant to the August 17, 2011, superseding indictment in this case.  The Movant has further filed for more information concerning the Government's plea offer, under the Freedom of Information Act/Privacy; the request is still pending (see Ex. 1, F.O.I.A.).

(iii)  Per Mr. Broccoletti, the Government offered the following plea: Because the Government estimated my remaining Life expectancy to be between 20 to 25 years, a deal for half my remaining life expectancy was extended.

(iv)  After being told the Government's offer, to the best of my knowledge and belief, the following conversation with Mr. Broccoletti occurred:

> Movant:  "Will there be a written agreement?"
>
> Mr. Broccoletti:  "No, you will be at the mercy of the judge."
>
> Movant:  "I would accept an agreement that is written, I will think about it, but try to get the agreement in writing."

---

**UNITED STATES OF AMERICA v. TYRONE TIDWELL**
**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**2020 U.S. Dist. LEXIS 139434**
**CRIMINAL ACTION NO. 94-353**
**August 5, 2020, Decided**
**August 5, 2020, Filed**

---

**Editorial Information: Prior History**

United States v. Tidwell, 1995 U.S. Dist. LEXIS 19153 (E.D. Pa., Dec. 22, 1995)

**Counsel**                    {2020 U.S. Dist. LEXIS 1}For USA, Plaintiff: EILEEN CASTILLA ZELEK, U.S. ATTORNEY OFFICE - EDPA, LEAD ATTORNEY, PHILADELPHIA, PA; LEAD ATTORNEY, SETH WEBER, QUAKERTOWN, PA; TOMIKA N.S. PATTERSON, UNITED STATES ATTORNEY'S OFFICE, PHILADELPHIA, PA.

**Judges:** CYNTHIA M. RUFE, J.

**CASE SUMMARY**Prisoner's motion to reduce sentence pursuant to the First Step Act was granted because extraordinary and compelling reasons existed to reduce sentence as it was established that Bureau of Prison cannot adequately protect prisoner from infection, especially in light of his vulnerability and presence of COVID-19 where prisoner serving his sentence.

**OVERVIEW: HOLDINGS: [1]**-Prisoner's motion to reduce sentence pursuant to the compassionate release provision of the First Step Act was granted because extraordinary and compelling reasons existed to reduce defendant's sentence as it was established that Bureau of Prison cannot adequately protect prisoner from infection, especially in light of his vulnerability and the presence of COVID-19 at the medical center where prisoner serving his sentence.

**OUTCOME: Motion granted.**

**LexisNexis Headnotes**

*Criminal Law & Procedure > Sentencing > Imposition > Factors*
*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions*

A court generally may not correct or modify a prison sentence once it has been imposed, unless permitted by statute or by Fed. R. Crim. P. 35. One statute that permits such modifications is 18 U.S.C.S. § 3582 (c)(1)(A)(i), which, as amended by the First Step Act of 2018, allows prisoners the right to file their own motions for a sentence reduction if they first exhaust the statute's procedures for initially making a request to the warden to file a motion on their behalf. Once a defendant's administrative remedies are exhausted, a court may grant compassionate release based upon: consideration of the factors set forth in 18 U.S.C.S. § 3553(a), a finding that extraordinary and compelling reasons warrant such a reduction; and a determination that the reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Court's Authority*

lyccases                                        I

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581080

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

In order to obtain relief, a defendant would petition the Bureau of Prisons to seek compassionate release on his or her behalf, and, if the Bureau of Prisons deemed the defendant's petition worthy, it would subsequently move the sentencing court for relief. Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for extraordinary and compelling reasons.

*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions*

The title of the First Step Act's provision that enacted the exhaustion regime is Increasing the Use and Transparency of Compassionate Release and under the new regime, the exhaustion requirement is met if the defendant establishes either (1) that the Bureau of Prisons denied his or her request that it bring a compassionate-release motion and he or she fully exhausted all administrative appeal rights with respect to that denial, or (2) that the warden of the facility took no action on his or her request for the filing of a compassionate-release motion within 30 days of receiving it. Significantly, Congress intended the 30-day exhaustion period to be an accelerant, not a barrier, to judicial review.

*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions*

A denial of a compassionate release request by the General Counsel of the Bureau of Prisons constitutes a final administrative decision and an inmate may not appeal the denial through the Administrative Remedy Procedure. 28 C.F.R. § 571.63(d).

*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions*

Congress delegated the authority to define extraordinary and compelling reasons to the United States Sentencing Commission. In accordance with this authority, the Sentencing Commission has issued a policy statement defining the term. The policy statement explains that, in two situations, the medical condition of the defendant provides extraordinary and compelling reasons. First, release may be warranted where the defendant is suffering from a terminal illness, i.e., a serious and advanced illness with an end of life trajectory. A specific prognosis of life expectancy, i.e., a probability of death within a specific time period, is not required. Second, release may also be warranted where the defendant is suffering from a serious physical or medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. The policy statement also provides a catch-all provision for situations where there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the other reasons described.

*Criminal Law & Procedure > Postconviction Proceedings > Imprisonment*

Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting.

*Criminal Law & Procedure > Sentencing > Imposition > Factors*

The applicable factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed--(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

lyccases                                    2

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

Although the government concedes that there are extraordinary and compelling reasons, the government argues that Tidwell is not entitled to relief based on these factors.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***

Any review of the 18 U.S.C.S. § 3553(a) factors must consider the most up-to-date picture of the defendant's history and characteristics, including evidence of rehabilitation.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***
***Civil Rights Law > Prisoner Rights > Medical Treatment***

Congress's primary goal in enacting The inquiry, however, is not whether the prison is able to manage the defendant's medical conditions, rather the Court must determine whether incarceration is needed to provide the defendant with necessary medical care. 18 U.S.C.S. § 3553(a)(6) was to promote national uniformity in sentencing. However, § 3553(a)(6) disallows unwarranted sentence disparities, not all sentence differences. Congress originally passed § 3582(c)(1)(A)(i) as a safety valve to reduce a sentence in the unusual case in which the defendant's circumstances are so changed that it would be inequitable to continue the confinement of the prisoner.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***

When a defendant demonstrates that extraordinary and compelling reasons warrant a sentence reduction, the ensuing sentence disparity has been authorized by Congress, and is therefore a warranted disparity.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***
***Criminal Law & Procedure > Bail > Dangerousness***
***Criminal Law & Procedure > Bail > Risk of Flight***

Sentencing Commission policy statements require the Court to determine that the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C.S. § 3142(g). U.S. Sentencing Guidelines Manual § 1B1.13(2). Pursuant to 18 U.S.C.S. § 3142(g), courts must consider a series of factors-weighing both the defendant's possible danger to the community and the defendant's likelihood to appear at trial-when deciding whether to release a defendant pre-trial. The factors that weigh danger to the community include the nature and circumstances of the offense charged, the history and characteristics of the person, including the person's character, physical and mental condition, family ties, community ties, past conduct, history relating to drug or alcohol abuse, and criminal history, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

**Opinion**

**Opinion by:**          CYNTHIA M. RUFE

**Opinion**

### MEMORANDUM OPINION
Rufe, J.

lyccases                                3

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

**Tyrone Tidwell**, a 62-year-old terminally ill defendant with a life expectancy of less than a year, who has served close to 26 years of a sentence of life imprisonment, has filed a motion to reduce sentence pursuant to the **compassionate release** provision of the First Step Act, 18 U.S.C. § 3582(c)(1)(A). Tidwell's motion is based on his illnesses--which include his metastatic (stage IV) prostate cancer, hepatitis C, and hypertension--the COVID-19 pandemic, and his significant rehabilitation in prison. The government opposes Tidwell's motion. Having carefully reviewed the parties' submissions, and the available record, the Court will grant Tidwell's motion.

## I. BACKGROUND

Between 1989 and 1991, Tidwell ran a drug distribution network in Philadelphia, Pennsylvania.1 On September 7, 1994, a federal grand jury returned a 23-count indictment that charged Tidwell with one count of conspiracy to distribute more than five kilograms of cocaine in{2020 U.S. Dist. LEXIS 2} violation of 21 U.S.C. § 846, one count of engaging in a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848, two counts of murder in furtherance of a CCE in violation of 21 U.S.C. § 848(e)(1)(A), six counts of possession with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1), three counts of tax evasion in violation of 26 U.S.C. § 7201, nine counts of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), and one count of criminal forfeiture pursuant to 21 U.S.C. § 853(a).2 Tidwell has been in custody since September 8, 1994.

On December 4, 1996, several days into his trial, Tidwell informed the District Court judge that he wished to change his plea to guilty.3 One year after his guilty plea, on December 4, 1997, the District Court judge "vacated the conspiracy conviction (Count 1) and sentenced Tidwell to life imprisonment on the continuing criminal enterprise charge (Count 2), life imprisonment without the possibility of parole on the murder charges (Counts 3 and 4), 40 years' incarceration on each of the possession with intent to distribute charges (Counts 5-10), five years' incarceration on each of the tax evasion charges (Counts 11-13), and ten years' incarceration on each of the charges of possession of a firearm{2020 U.S. Dist. LEXIS 3} by a convicted felon (Counts 14-22)," all to run concurrently.4

Much has changed in the last quarter-century. Tidwell is now 62 years old, he suffers from metastatic (stage IV) prostate cancer, hepatitis C, and hypertension, and he has less than a year to live. A pandemic is sweeping across the world, and it has infiltrated the Federal Medical Center, Butner ("FMC Butner")--where Tidwell is serving his sentence. Tidwell has also rehabilitated himself into a "model inmate" who no longer poses a danger to the community. Based on these changed circumstances, Tidwell seeks **compassionate release** from federal custody.

## II. LEGAL STANDARD

"A court generally may not correct or modify a prison sentence once it has been imposed, unless permitted by statute or by Federal Rule of Criminal Procedure 35."5 One statute that permits such modifications is 18 U.S.C. § 3582 (c)(1)(A)(i), which, as amended by the First Step Act of 2018, allows "prisoners the right to file their own motions for a sentence reduction if they first exhaust the statute's procedures for initially making a request to the warden to file a motion on their behalf."6 "Once a defendant's administrative remedies are exhausted, a court may grant **compassionate release** based upon: consideration of{2020 U.S. Dist. LEXIS 4} the factors set forth in 18 U.S.C. § 3553(a); a finding that 'extraordinary and compelling reasons warrant such a reduction'; and a determination that the reduction is 'consistent with applicable policy statements issued by the Sentencing Commission.'"7

## III. DISCUSSION

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

## A. Whether Tidwell has Satisfied the Exhaustion Requirement

"The **Compassionate Release** Statute was originally enacted as part of the Parole Reorganization Act of 1976" and, "as part of the Comprehensive Crime Control Act of 1984, [Congress] enacted the modern form of the **Compassionate Release** Statute contained in 18 U.S.C. § 3582."8 In both the 1976 and the 1984 **compassionate release** provisions, the Bureau of Prisons ("BOP") acted "as a gatekeeper for all **compassionate release** motions."9 In order to obtain relief, "[a] defendant would petition the BOP to seek **compassionate release** on his or her behalf, and, if the BOP deemed the defendant's petition worthy, it would subsequently move the sentencing court for relief."10 "[A]bsent such a motion, sentencing courts had no authority to modify a prisoner's sentence for extraordinary and compelling reasons."11

In 2018, recognizing the BOP's "grim history" of approving{2020 U.S. Dist. LEXIS 5} **compassionate release** requests,12 and "in an effort to expand the use of **compassionate release** sentence reductions,"13 Congress passed the First Step Act. "The title of the First Step Act's provision that enacted [the] exhaustion regime is 'Increasing the Use and Transparency of **Compassionate Release**'"14 and under the new regime, "[t]he exhaustion requirement is met if the defendant establishes either (1) that the Bureau of Prisons denied his or her request that it bring a **compassionate-release** motion and he or she fully exhausted all administrative appeal rights with respect to that denial, or (2) that the warden of the facility took no action on his or her request for the filing of a **compassionate-release** motion within 30 days of receiving it."15 Significantly, "Congress intended the 30-day exhaustion period to be an 'accelerant,' not a barrier, to judicial review."16

On December 18, 2019, Tidwell filed a request to the warden of FMC Butner for **compassionate release** based on his stage IV prostate cancer.17 The warden did not act on this request until February 27, 2020--71 days later--when he sent a letter to the BOP Assistant Director/General Counsel "recommending [that] consideration be given"{2020 U.S. Dist. LEXIS 6} to Tidwell's request.18 A month later, the request was denied.19 On May 12, 2020, Tidwell filed his Motion to Reduce Sentence in this Court.

Tidwell appears to have satisfied the exhaustion requirement--the warden took no action on his request within 30 days of receiving it *and*, in a final administrative decision, the BOP denied his request.20 Nonetheless, the government argues that Tidwell's request to the warden did not exhaust his administrative remedies because the request, which was filed before the COVID-19 pandemic, did not mention COVID-19. According to the government, the BOP should have the opportunity to reevaluate Tidwell's request in light of COVID-19.21

The Court rejects the government's argument for two reasons. First, Tidwell's request to the warden was predicated on his serious health conditions. He now seeks relief based on those same conditions; the only difference is that the COVID-19 pandemic has amplified the risk to his health.22 "Asking [Tidwell] to restart his process because of the COVID-19 pandemic would be tantamount to telling inmates that they must restart the process each time their condition deteriorates. That, clearly, is not the purpose of the statute."23

As explained above, Congress's unmistakable goal in passing the First Step Act was to "increase the use of **compassionate release**"24 and the way that "Congress chose to achieve this goal" was by "chang[ing] the process by which **compassionate release** could be obtained"25 with the intent for "the judiciary to take on the role that the BOP once held under the pre-First Step Act **Compassionate Release** Statute to be the essential adjudicator of **compassionate release** requests."26 Under the government's theory, every change in Tidwell's condition or in the extent of COVID-19 at Butner would require a new request so that the BOP could assess the exact risk at that

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

moment.27 The Court will not create additional barriers when the intent of the First Step Act was to reduce them.

Second, the BOP already had the opportunity to evaluate Tidwell's health conditions in light of the COVID-19 pandemic. By the time the warden forwarded Tidwell's request with the recommendation that it be given consideration, the COVID-19 pandemic was already a major concern, and the BOP surely was aware of it. As Tidwell points out, on the same day that his request was denied, Attorney General William Barr released a memo to the BOP with instructions to prioritize home confinement as an appropriate response to the COVID-19 pandemic.28 Under these circumstances, Tidwell has met the exhaustion requirement.

## B. Whether "Extraordinary or Compelling Reasons" Warrant Reducing Tidwell's Sentence

Congress delegated the authority to define "extraordinary and compelling reasons" to the United States Sentencing Commission.29 In accordance with this authority, the Sentencing Commission has issued a policy statement defining the term. Relevant to Tidwell's motion, the policy statement explains that, in two situations, the "medical condition of the defendant" provides{2020 U.S. Dist. LEXIS 9} "extraordinary and compelling reasons."30 First, release may be warranted where:

> The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), endstage organ disease, and advanced dementia.31

Second, release may also be warranted where "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."32 The policy statement also provides a catch-all provision for situations where "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the [other] reasons described."33

### 1. Tidwell's Terminal Illness

Tidwell suffers from metastatic prostate cancer—which the Sentencing Commission specifically cited as an example of a terminal illness constituting an extraordinary{2020 U.S. Dist. LEXIS 10} and compelling reason. Moreover, although "a specific prognosis of life expectancy" is not required, on Tidwell's February 3, 2020 "Reduction in Sentence / Compassionate Release Comprehensive Medical Summary," the section titled "Life Expectancy / Terminal Medical Condition" states that Tidwell "has been diagnosed with a terminal medical condition. Life expectancy is 18 months."34 Therefore, even without considering the COVID-19 pandemic, extraordinary and compelling reasons exist to justify reducing Tidwell's sentence.

### 2. The Impact of COVID-19 on Tidwell's Terminal Illness

Moreover, although the government disputes whether Tidwell's stage IV cancer qualifies as a terminal illness, the government concedes that his cancer, combined with the COVID-19 pandemic, renders him "less able to protect himself against an unfavorable outcome from the disease" and constitutes an extraordinary and compelling reason.35 As of August 2, 2020, there have been over 4.6 million confirmed cases of COVID-19 and over 154,000 deaths in the United States alone.36 "Not all Americans, however, are equally at risk."37 The Centers for Disease Control and Prevention ("CDC") has explained that "[p]eople with weakened{2020 U.S. Dist. LEXIS 11} immune systems are at higher risk of getting severely sick from SARS-CoV-2, the virus that causes COVID-19" and that "[t]hey may also remain infectious for a longer period of time than others with COVID-19."38 The

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

CDC has further explained that one condition that "can weaken a person's immune system" is "cancer."39 One study concluded that patients with stage IV cancer are 5.58 times more likely to die than cancer-free people if they contract COVID-19.40 The CDC has also explained that people with Hepatitis C and hypertension "might be at higher risk of severe illness from COVID-19."41

Because "[p]risons are ill-equipped to prevent the spread of COVID-19," Tidwell's risk increases again.42 "People residing in close living quarters are especially vulnerable to COVID-19"43 and "[j]ails and prisons represent unique and challenging environments in which to implement effective infection-control strategies"44 such as "social distancing, frequently disinfecting shared{2020 U.S. Dist. LEXIS 12} surfaces, and frequently washing hands or using hand sanitizer."45 As the CDC has further explained, "[c]orrectional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of [COVID-19] transmission among incarcerated/detained persons, staff, and visitors."46

This risk to Tidwell is not hypothetical. Although the rate of COVID-19 infections per 1,000 people in the United States is currently 13.55, in BOP facilities that rate is at least 74.13.47 At FMC Butner, at least 11 inmates and 15 staff members have tested positive.48 FMC Butner currently houses 886 inmates49 even{2020 U.S. Dist. LEXIS 13} though its maximum occupancy capacity for inmates is 743,50 and these crowded conditions increase again Tidwell's risk of transmission.51 Moreover, alarming infection rates have also appeared in other facilities on the same BOP complex: 650 inmates and 16 staff members at Butner Low FCI, 3 inmates and 2 staff members at Butner Medium II FCI, and 204 inmates and 32 staff members at Butner Medium I FCI have tested positive.52 Altogether, 24 inmates and one staff member at the Butner complex have died from the virus, a sobering fact.53 Therefore "[w]ithout a doubt, COVID-19 is present at Butner FMC and the larger Butner Federal Correctional Complex."54

In sum, "[t]he BOP cannot adequately protect [Tidwell] from infection, especially in light of his vulnerability and the presence of COVID-19" at FMC Butner.55 Therefore, because (as the government concedes) the combination of Tidwell's stage IV prostate cancer and the COVID-19 pandemic substantially diminishes Tidwell's ability to provide self-care at FMC Butner,{2020 U.S. Dist. LEXIS 14} "extraordinary and compelling reasons" exist to reduce Tidwell's sentence.

### C. Whether a Sentence Reduction is Consistent with the Section 3553(a) Factors

Having concluded that "extraordinary and compelling reasons" exist, the Court must still consider the relevant § 3553(a) sentencing factors and "assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting **compassionate release**."56 The applicable factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

. . . [and](6) the need to avoid unwarranted sentence disparities among defendants with similar

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

records who have been found guilty of similar conduct[.]57Although the government concedes that there are "extraordinary and compelling reasons," the{2020 U.S. Dist. LEXIS 15} government argues that Tidwell is not entitled to relief based on these factors.

*1. Nature and Circumstances of the Offense and History and Characteristics of the Defendant*

Based on "the extremely violent nature of [Tidwell's] crimes" and Tidwell's criminal history, the government argues that this factor weighs heavily against granting Tidwell's request for **compassionate** release.58 The Court agrees that the nature and circumstances of Tidwell's underlying offenses are extremely serious and, as the government points out, between 1978--when he was 19 years old--and 1994, Tidwell incurred six convictions for offenses including aggravated assault, knowing possession of a controlled substance, possession with intent to distribute, carrying a firearm without a license, and retail theft.59 However, the Court's evaluation of Tidwell's history and characteristics is not frozen in time--the Supreme Court has explained that any review of the § 3553(a) factors must consider the "most up-to-date picture" of the defendant's "history and characteristics," including evidence of rehabilitation.60

Tidwell has shown significant rehabilitation in prison. During his decades in prison, Tidwell has{2020 U.S. Dist. LEXIS 16} taken 34 educational courses61 and he has a "minimal, non-violent disciplinary record."62 Correctional Counselor T. Pike wrote in a memorandum included in Tidwell's request to the BOP for **compassionate release** that Tidwell "is a model inmate at this institution. His work performance is above average and is [reflected] in his work evaluations. His work ethics are a model for other inmates. Inmate Tidwell also helps newly incarcerated inmates adjust to prison life by giving them guidance and counseling. Inmate Tidwell also maintains a positive attitude with staff and peers."63 Tidwell's PATTERN64 score indicates that his "recidivism risk level" is "low."65 In light of Tidwell's rehabilitation and model behavior during his incarceration, this factor tilts in favor of reducing Tidwell's sentence.

*2. The Need for the Sentence Imposed*

"As to the Section 3553(a)(2) factor, the need for a sentence must be sufficient, but not greater than necessary, to serve the purpose of 'just punishment, deterrence, protection of the public, and rehabilitation.'"66 The government asserts that, based on Tidwell's status as a "violent drug offender[]," his continued incarceration is necessary.{2020 U.S. Dist. LEXIS 17}67 The Court disagrees.

Tidwell is a terminally ill man who has already served over 25 years in federal custody. This 25-year duration "has consumed a large part of his life and by any measure represents a very substantial punishment that reflects the seriousness of his offenses and the need for general or specific deterrence."68 This lengthy time "is also a period of time that promotes respect for the law and provides just punishment for his offenses," even where the defendant was originally sentenced to life imprisonment.69

The government also argues that Tidwell's "medical records belie" that he is too ill to engage in criminal activity.70 According to the government, because decades ago Tidwell ran a drug operation, "regardless of physical state, Tidwell is certainly functionally capable of engaging in the same conduct for which he is incarcerated."71 The government presents no evidence to support the theory that Tidwell would engage in similar conduct after **release** despite his record as a model inmate and while undergoing chemotherapy for stage IV prostate cancer. As almost any inmate, while alive, is at least theoretically capable of engaging in{2020 U.S. Dist. LEXIS 18} illegal conduct, the government's position would vitiate Congress's clear intent to allow terminally ill inmates to obtain **compassionate release**.

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

Moreover, Tidwell will be able to obtain needed medical care upon **release**. Tidwell has indicated that, if released, he will live with his daughter in Baltimore, Maryland. On Tidwell's Reduction in Sentence **Release** Plan Review, a social worker reported that Tidwell's daughter confirmed that he could live at her home, that she is aware of Tidwell's medical condition, and that she is prepared to provide support and care for him.72 Tidwell's counsel has stated that Tidwell will continue his cancer treatment at either the University of Maryland or Johns Hopkins University.73 Therefore, after considering the Section 3553(a)(2) factor, the Court concludes that prolonging Tidwell's incarceration under the current conditions would contravene § 3553(a)'s requirement to "impose a sentence sufficient, but not greater than necessary to comply with" the statutory purposes of punishment.74

*3. The Need to Avoid Unwarranted Sentencing Disparities*

"Congress's{2020 U.S. Dist. LEXIS 19} primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing."75 However, "§ 3553(a)(6) disallows '*unwarranted* sentence disparities,' not all sentence differences."76 Congress originally passed § 3582(c)(1)(A)(i) as a "safety valve" to reduce a sentence in "the unusual case in which the defendant's circumstances are so changed . . . that it would be inequitable to continue the confinement of the prisoner."77 As explained above, Congress's unmistakable goal in passing the First Step Act was to "increase the use of **compassionate release**."78 Therefore, when a defendant demonstrates that "extraordinary and compelling reasons" warrant a sentence reduction, the ensuing sentence disparity "has been authorized by Congress, and is therefore a 'warranted' disparity."79

Regardless, the "need to avoid unwarranted sentence disparities" is "just one factor (if relevant) that should be balanced against the others (again, if relevant)."80 Considering that Tidwell has already served close to 26 years in prison and has an estimated 12 months left to live, any sentencing disparity that would result from granting Tidwell's motion is outweighed by the factors that support Tidwell's **compassionate** release.81 In sum, the § 3553(a) sentencing{2020 U.S. Dist. LEXIS 20} factors do not outweigh the extraordinary and compelling reasons that justify granting Tidwell's request for **compassionate release**.

**D. Whether a Sentence Reduction is Consistent with the Applicable Sentencing Commission Policy Statements**

The relevant Sentencing Commission policy statements require the Court to determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."82 Pursuant to § 3142(g), courts must consider a series of factors--weighing both the defendant's possible danger to the community and the defendant's likelihood to appear at trial--when deciding whether to **release** a defendant pre-trial. "The factors that weigh danger to the community include 'the nature and circumstances of the offense charged,' 'the history and characteristics of the person,' including 'the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history,' and 'the nature and seriousness of the danger to any person or the community that would be posed by the person's **release**.'"83

As explained above, although Tidwell's offenses were extremely{2020 U.S. Dist. LEXIS 21} serious and he has an extensive criminal history, after careful consideration of the relevant factors, the Court holds that the strong evidence of rehabilitation and of seriously impaired health shows that Tidwell does not pose a danger to others. Tidwell is 62 years old with about 12 months left to live, and his health is deteriorating rapidly. Tidwell has built a record as a "model inmate," he has minimal disciplinary infractions over his many years in prison, and the BOP has designated him as a low risk to reoffend. Tidwell has strong family ties, including his two daughters and his brother.84 His family

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

is aware of his prognosis, are prepared to care for him, and he will be living with one of his daughters and her family.85 Any risk of harm to the community is further mitigated by the conditions the Court will impose on Tidwell's **compassionate release**—he will remain in home confinement and be subject to electronic monitoring by the United States Probation Office.86

## IV. CONCLUSION

Tidwell committed grave crimes and was accordingly sentenced to life imprisonment. However, Congress has recognized that changed circumstances, such as terminal illness or the totally unforeseeable{2020 U.S. Dist. LEXIS 22} COVID-19 pandemic, can justify **compassionate release**. Just two years ago, Congress passed the First Step Act with the intention of increasing the use of **compassionate release**. For the reasons explained at length above, Tidwell has shown that a case like his fits squarely within the statute and that **compassionate release** is warranted. An order will be entered.

## ORDER

**AND NOW**, this 5th day of August 2020, upon consideration of Tyrone Tidwell's Motion to Reduce Sentence [Doc. No. 544], the responses thereto, and all related filings, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that the Motion is **GRANTED** as follows:

1) Tidwell's prison sentence is **REDUCED** to time served;

2) The Warden of FMC Butner shall **RELEASE Tyrone Tidwell** (BOP inmate number: 48183-066) from custody.

3) There being a verified residence and an appropriate **release** plan in place, this order is **stayed for up to fourteen days** to make appropriate travel arrangements and to ensure the defendant's safe **release**. The defendant shall be released as soon as appropriate travel arrangements are made and it is safe for the defendant to travel. There shall be no delay in ensuring travel arrangements{2020 U.S. Dist. LEXIS 23} are made. If more than fourteen days are needed to make appropriate travel arrangements and ensure the defendant's safe **release**, then the parties shall immediately notify the court and show cause why the stay should be extended.

4) Upon his **release** from FMC Butner, Tidwell shall proceed immediately to his daughter's home in Baltimore, Maryland;

5) Upon **release** from custody, Tidwell shall immediately begin serving the **five-year term of supervised release** that was imposed at his sentencing;

6) While on supervised **release**, Tidwell shall be placed on home confinement with location monitoring; and

7) Within **72 hours** of **release**, Tidwell shall report to the U.S. Probation Office in Maryland by telephone and shall abide by all other conditions of supervised **release** imposed by the U.S. Probation Office.

It is so ORDERED.

BY THE COURT:

/s/ Cynthia M. Rufe

CYNTHIA M. RUFE, J.

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

**Footnotes**

1

Presentence Report at 2.

2

*See United States v. Tidwell*, No. 94-353, 2000 U.S. Dist. LEXIS 18759, 2000 WL 1886581, at *1 (E.D. Pa. Dec. 12, 2000), *aff'd*, 521 F.3d 236 (3d Cir. 2008).

3

*See United States v. Tidwell*, 521 F.3d 236, 238 (3d Cir. 2008).

4

*Tidwell*, 2000 U.S. Dist. LEXIS 18759, 2000 WL 1886581, at *1. On July 3, 2017, this case was reassigned to this Court. *See* Doc. No. 526.

5

*United States v. Van Sickle*, No. 18-250, 2020 U.S. Dist. LEXIS 80854, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020) (citing *United States v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003)).

6

*United States v. Hill*, 19-38, 2020 U.S. Dist. LEXIS 87751, 2020 WL 2542725, at *1 (D. Conn. May 19, 2020) (citing *United States v. Almontes*, 2020 U.S. Dist. LEXIS 62524, 2020 WL 1812713, at *1 (D. Conn. April 9, 2020)).

7

*United States v. Bogdanoff*, No. 12-0190-1, 2020 U.S. Dist. LEXIS 81278, 2020 WL 2307315, at *3 (E.D. Pa. May 8, 2020).

8

Shon Hopwood, *Second Looks & Second Chances*, 41 CARDOZO L. REV. 83, 100 (2019) (citation omitted); *see also United States v. Osorto*, No. 19-381, 2020 U.S. Dist. LEXIS 82661, 2020 WL 2323038, at *3 (N.D. Cal. May 11, 2020).

9

*United States v. Connell*, No. 18-281, 2020 U.S. Dist. LEXIS 81642, 2020 WL 2315858, at *2 (N.D. Cal. May 8, 2020).

10

2020 U.S. Dist. LEXIS 81642, [WL] at 1.

11

Hopwood, *supra* note 8, at 101.

12

*Osorto*, 2020 U.S. Dist. LEXIS 82661, 2020 WL 2323038, at *4.

13

Hopwood, *supra* note 8, at 106.

14

*United States v. Scparta*, No. 18-578, 2020 U.S. Dist. LEXIS 68935, 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) (quoting Pub. L. No. 115-391, 132 Stat. 5339 (2018)).

l yccases                                    11

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

15

*United States v. Cassidy*, No. 17-116S, 2020 U.S. Dist. LEXIS 72439, 2020 WL 1969303, at *2 (W.D.N.Y. Apr. 24, 2020) (citing 18 U.S.C. § 3582 (c)(1)(A)(i)).
16

*Connell*, 2020 U.S. Dist. LEXIS 81642, 2020 WL 2315858, at *4 (quoting *United States v. Russo*, No. 16-441, 2020 U.S. Dist. LEXIS 65390, 2020 WL 1862294, at *1 (S.D.N.Y. Apr. 14, 2020)).
17

Ex. A, Motion to Reduce Sentence [Doc. No. 545].
18

Ex. B, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-2].
19

Ex. B, Motion to Reduce Sentence [Doc. No. 545].
20

A denial of a compassionate release request by the General Counsel of the BOP "constitutes a final administrative decision" and "an inmate may not appeal the denial through the Administrative Remedy Procedure." 28 C.F.R. § 571.63(d).
21

Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 14.
22

*See United States v. Smith*, No. 07-3038, 2020 U.S. Dist. LEXIS 95461, 2020 WL 2844222, at *7 (N.D. Iowa June 1, 2020).
23

*Id.{2020 U.S. Dist. LEXIS 7}*
24

*United States v. Ebbers*, No. 02-1144-3, 432 F. Supp. 3d 421, 2020 WL 91399, at *7 (S.D.N.Y. Jan. 8, 2020).
25

*Osorto*, 2020 U.S. Dist. LEXIS 82661, 2020 WL 2323038, at *4 ("The First Step Act made no change to the substantive standard for compassionate release eligibility.").
26

Hopwood, *supra* note 8, at 107.
27

For example, suppose that Tidwell had filed the instant motion on February 23, 2020, after COVID-19 cases had been diagnosed in several states, and based on the government's position, the Court immediately denied the motion. *See* Daniel B. Jernigan, et. al., CENTERS FOR DISEASE CONTROL AND PREVENTION, *Update: Public Health Response to the Coronavirus Disease 2019 Outbreak - United States, February 24, 2020*, https://www.cdc.gov/mmwr/volumes/69/wr/mm6908e1 htm (last visited August 3, 2020). If Tidwell then filed a new request to the BOP that included the risk of COVID-19 and, after 30 days without the warden acting on the request, filed a new motion in this Court that included an increased new risk based on COVID-19 infiltrating the federal prison system on March 21, 2020 and the Butner Federal Correctional Complex on March 30, 2020, according to

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

the government's position, the Court would again have to deny Tidwell's motion in order to allow the BOP to evaluate how the more particularized risk of COVID-19 in the prison system impacts him. *See* Michael Balsamo, *First Federal Inmate Tests Positive for Coronavirus, AP Reports*, BLOOMBERG, https://www.bloomberg.com/news/articles/2020-03-21/ap-exclusive-1st-fed-inmate-tests-positive-for-coronavirus (March 21, 2020); Jonas Pope IV, *Two inmates at federal prison in NC test positive for COVID-19*, NEWS AND OBSERVER, https://www.newsobserver.com/news/coronavirus/article241631776 html (March 30, 2020). This cycle could keep repeating itself based on when the first federal prisoner died from COVID-19, *see* Bill Hutchinson, *1st federal inmate dies in prison hit hard by coronavirus after heartbreaking plea to judge*, ABC NEWS, https://abcnews.go.com/US/1st-federal-inmate-dies-prison-hit-hard-coronavirus/story?id=69996161 (April 7, 2020), when a study first showed that cancer patients appear more vulnerable to COVID-19, *see* M. Dai, et al., *Patients with Cancer Appear More Vulnerable to SARS-COV-2: A Multi-Center Study During the COVID-19{2020 U.S. Dist. LEXIS 8} Outbreak*, 10 CANCER DISCOVERY 6 (Apr. 28, 2020), https://cancerdiscovery.aacrjournals.org/content/10/6/783?iss=6, when reports indicated that six inmates at the Butner complex died from COVID-19 over an eight-day period, *see Dan Kane, Butner Federal Prison Begins Mass COVID Testing After Six Inmates Die in Eight Days*, NEWS AND OBSERVER (June 3, 2020), https://www.newsobserver.com/news/coronavirus/article243210251 html, or, at any time, if Tidwell obtains a new diagnosis showing that his cancer is progressing even more quickly than his previous diagnoses showed. Congress did not intend for situations where prisoners--including those like Tidwell with just months left to live--can be trapped in a never-ending loop of attempting to exhaust their administrative remedies.
28

FEDERAL BUREAU OF PRISONS, *COVID-19 Home Confinement Information*, https://www.bop.gov/coronavirus/ (last visited August 3, 2020).
29

*See United States v. Rodriguez*, No. 03-271-1, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020) (citing 28 U.S.C. § 994(t)); *see also United States v. Perez*, No. 17-513-3, 2020 U.S. Dist. LEXIS 57265, 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020).
30

U.S.S.G. § 1B1.13, comment n.1.
31

*Id.*
32

*Id.*
33

*Id.*
34

Ex. C, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 553] at 320; *see also id.* at 29; Ex. B, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-2] at 12 (warden explaining that: "Medical staff indicate inmate Tidwell has been diagnosed with a terminal condition. Inmate Tidwell has been diagnosed with Stage IV Prostate Cancer. Medical staff indicate his prognosis is eighteen months or less.").
35

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 24. The government argues that Tidwell does not have a terminal illness because the BOP Medical Director concluded that although Tidwell "does have a diagnosis of stage IV prostate cancer, he does not have end-of-life indicators that would establish a prognosis of terminal at this time." Ex. B, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-2] at 14. However, in addition to the prison medical staff determining that Tidwell had a life expectancy of 18 months, the Sentencing Commission's policy statement provides that "a specific prognosis of life expectancy" is not required and the BOP Medical Director conceded that Tidwell suffers from stage IV prostate cancer.
36

CENTERS FOR DISEASE CONTROL AND PREVENTION, *Cases of Coronavirus Disease (COVID-19) in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us html (last visited August 3, 2020).
37

*Martinez-Brooks v. Easter*, 20-00569, 2020 U.S. Dist. LEXIS 83300, 2020 WL 2405350, at *3 (D. Conn. May 12, 2020).
38

CENTERS FOR DISEASE CONTROL AND PREVENTION, *If You Are Immunocompromised, Protect Yourself From COVID-19*,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html (last visited August 3, 2020).
39

*Id.*
40

*See* Dai, et al., *supra* note 27; *see also United States v. Fandel*, No. 12-3009, 2020 U.S. Dist. LEXIS 132418, 2020 WL 4284802, at *5 (N.D. Iowa July 27, 2020) (explaining that "numerous other courts have found that serious, active cancer is a health condition which, amid the pandemic, presents an extraordinary and compelling reason for release.").
41

CENTERS FOR DISEASE CONTROL AND PREVENTION, *What to Know About Liver Disease and COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease html (last visited August 3, 2020) (hepatitis C); CENTERS FOR DISEASE CONTROL AND PREVENTION, *People with Certain Medical Conditions*,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions html (last visited August 3, 2020) (hypertension).
42

*Rodriguez*, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *8.
43

Gregg S. Gonsalves, et al., *Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and other Federal, State and Local Leaders from Public Health and Legal Experts in the United States*, (March 2, 2020),
https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.
44

lyccases                                    14

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

Joseph A. Bick, *Infection Control in Jails and Prisons*, 45(8) CLINICAL INFECTIOUS DISEASES 1047-1055, (Oct. 15, 2007), https://doi.org/10.1086/521910.
45

*Rodriguez*, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *8 (citing CENTERS FOR DISEASE CONTROL AND PREVENTION, *How to Protect Yourself*,
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html; Dr. Asaf Bitton, *Social distancing in the coronavirus pandemic - maintaining public health by staying apart*, BOSTON GLOBE (Mar. 14, 2020),
https://www.bostonglobe.com/2020/03/14/opinion/social-distancing-coronavirus-pandemic-maintainin g-public-health-by-staying-apart/).
46

CENTERS FOR DISEASE CONTROL AND PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*,
https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-d etention.html (last visited August 3, 2020).
47

*See BOP-Reported Positive Tests for COVID-19 Nationwide*, Federal Defenders of New York, https://federaldefendersny.org/ (last visited August 3, 2020).
48

FEDERAL BUREAU OF PRISONS, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited August 3, 2020); *Smith*, 2020 U.S. Dist. LEXIS 95461, 2020 WL 2844222, at *11; *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (explaining that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."). There are six inmates and two staff members at FMC Butner who are currently positive for COVID-19.
49

FEDERAL BUREAU OF PRISONS, *Population Statistics: Inmate Population Breakdown*, https://www.bop.gov/mobile/about/population statistics.jsp (last visited August 3, 2020).
50

BUREAU OF JUSTICE ASSISTANCE, *PREA Audit Report*,
https://www.bop.gov/locations/institutions/buh/PREA butner.pdf (last visited August 3, 2020).
51

Gonsalves, et al., *supra* note 45 (explaining that "[p]eople residing in close living quarters are especially vulnerable to COVID-19.").
52

FEDERAL BUREAU OF PRISONS, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited August 3, 2020); *see also Smith*, 2020 U.S. Dist. LEXIS 95461, 2020 WL 2844222, at *11.
53

*See id.*
54

*Smith*, 2020 U.S. Dist. LEXIS 95461, 2020 WL 2844222, at *11; *see also United States v. Myles*, No. 11-253, 2020 WL 4350604, at *3 (M.D. Tenn. July 29, 2020). The government argues that FMC Butner should be viewed in isolation and that the Court should not consider "notable outbreaks" at

lyccases                                          **15**

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

the other facilities on the campus. *See* Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 25 n.17. However, the outbreaks at the Butner complex began at one prison and then spread to another one of the prisons. *See Butner Federal Prison Begins Mass COVID Testing After Six Inmates Die in Eight Days, supra* note 28 ("The complex's first major outbreak happened at one of its two medium-security prisons, then spread to an adjacent minimum-security camp."). Moreover, the government concedes that "[u]nfortunately and inevitably, many inmates at various institutions have become ill, and more likely will in the weeks ahead." *See* Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 19.
55

*Rodriguez*, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *9.
56

*Ebbers*, 432 F. Supp. 3d 421, 2020 WL 91399, at *7.
57

*Rodriguez*, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *11-12 (quoting 18 U.S.C. § 3553(a)).
58

Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 26-27.
59

*See* Presentence Report at 9-11.
60

*Pepper v. United States*, 562 U.S. 476, 491-92, 131 S. Ct. 1229, 179 L. Ed. 2d 196 (2011); *see also United States v. Parker*, No. 98-749, 2020 U.S. Dist. LEXIS 89904, 2020 WL 2572525, at *11 (C.D. Cal. May 21, 2020). Although Congress has provided that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason," 28 U.S.C. § 994(t), "rehabilitation may be considered with other factors." *Rodriguez*, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *10 (quoting *United States v. Brown*, 411 F. Supp. 3d 446, 449 (S.D. Iowa 2019)); *see also* Hopwood, *supra* note 8, at 103 ("Congress no doubt limited the ability of rehabilitation *alone* to constitute extraordinary circumstances, so that sentencing courts could not use it as a full and direct substitute for the abolished parole system. Congress, however, contemplated that rehabilitation could be considered with other extraordinary and compelling reasons sufficient to resentence people in individual cases. Indeed, the use of the modifier 'alone' signifies that rehabilitation could be used in tandem with other factors to justify a reduction.").
61

Ex. E, Motion to Reduce Sentence [Doc. No. 545].
62

*United States v. Decator*, No. 95-202, 2020 U.S. Dist. LEXIS 60109, 2020 WL 1676219, at *4 (D. Md. Apr. 6, 2020). Prison records show that Tidwell has been sanctioned just 4 times—in 1998 for being absent from a work assignment, in 1999 for refusing a work assignment, in 2010 for refusing to obey an officer, and in 2019 for receiving money from another inmate's family. *See* Ex. A, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-1].
63

Ex. F, Motion to Reduce Sentence [Doc. No. 545].
64

lyccases                                          **16**

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

Prisoner Assessment Tool Targeting Estimated Risk and Needs. According to the BOP's website, "[t]he risk and needs assessment system is used to determine the risk and needs of inmates in BOP custody. Specifically, the system determines the recidivism risk of each inmate and assigns a recidivism risk score of minimum, low, medium, or high risk. The system also assesses each inmate and determines, to the extent practicable, the inmate's risk of violent or serious misconduct." FEDERAL BUREAU OF PRISONS, *First Step Act - Frequently Asked Questions*, https://www.bop.gov/inmates/fsa/faq.jsp#fsa_system (last visited June 12, 2020).
65

Ex. G, Motion to Reduce Sentence [Doc. No. 545].
66

*United States v. Regas*, 91-57, 2020 U.S. Dist. LEXIS 98402, 2020 WL 2926457, at *5 (D. Nev. June 3, 2020) (quoting *Dean v. United States*, 137 S. Ct. 1170, 1175, 197 L. Ed. 2d 490 (2017)); *see also Parker*, 2020 U.S. Dist. LEXIS 89904, 2020 WL 2572525, at *12.
67

Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 27.
68

*Regas*, 2020 U.S. Dist. LEXIS 98402, 2020 WL 2926457, at *5 (quoting *Parker*, 2020 U.S. Dist. LEXIS 89904, 2020 WL 2572525, at *12).
69

*Id.* (granting compassionate release to a defendant found guilty of CCE who served 27 years of a life sentence) (quoting *Parker*, 2020 U.S. Dist. LEXIS 89904, 2020 WL 2572525, at *12) (granting compassionate release to a former narcotics officer who formed a drug gang and served 22 years of his life sentence); *see also United States v. Gray*, 416 F. Supp. 3d 784, 790 (S.D. Ind. 2019) (granting compassionate release to an inmate who served "nearly two decades" of a life sentence); *United States v. Wong Chi Fai*, No. 93-1340, 2019 U.S. Dist. LEXIS 126774, 2019 WL 3428504, at *4 (E.D.N.Y. July 30, 2019) (granting compassionate release to a terminally ill inmate who served 26 years of his life sentence); *United States v. Pickard*, No. 00-40104, 2020 U.S. Dist. LEXIS 131749, 2020 WL 4260634, at *5 (D. Kan. July 24, 2020) ("Pickard's offenses were serious, but having spent two decades in prison he has been seriously punished."); *United States v. Gluzman*, No. 96-323, 2020 U.S. Dist. LEXIS 131749, 2020 WL 4233049, at *18 (S.D.N.Y. July 23, 2020).
70

Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 27.
71

*Id.*
72

*See* Ex. B, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-2] at 6-7. Tidwell's counsel has informed the Court that a United States Probation Officer in the District of Maryland has performed a home assessment and has approved the residence. *See* Tidwell's Motion to Reduce Sentence [Doc. No. 544] at 21 n.72.
73

Tidwell's Reply to Government's Response to Motion to Reduce Sentence [Doc. No. 555] at 11. The government argues that Tidwell's "prostate cancer is appropriately managed at the facility, and likely even better managed than it would be if he were left to fend for himself and find treatment on his own." Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552]

lyccases                                        17

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

at 25. The inquiry, however, is not whether the prison is able to manage the defendant's medical conditions; rather the Court must determine whether incarceration is *needed* to provide the defendant with necessary medical care. As Tidwell has represented that he will be continue his treatment at either the University of Maryland or Johns Hopkins University--both excellent hospitals--Tidwell does not need to remain in prison to receive care.
74

*Rodriguez*, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *12 (quoting 18 U.S.C. § 3553(a)). The government appears to argue that continued incarceration is necessary because Tidwell would be more at risk of contracting COVID-19 in Baltimore than in federal custody. *See* Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 25-26. In support, the government relies on the total number of COVID-19 cases in Baltimore. *See id.* at 26. However, the government fails to appreciate that Baltimore has a population of about 593,490 while there are only 128,601 federal inmates across all BOP-managed institutions and 886 inmates at FMC Butner. *See* United States Census Bureau, *QuickFacts, Baltimore city, Maryland (County)*, https://www.census.gov/quickfacts/fact/table/baltimorecitymarylandcounty/AGE295218 (last visited August 3, 2020); Federal Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited August 3, 2020). Regardless, upon release, Tidwell will be confined to his daughter's home where he will be able to socially distance from all non-family members while, on the Butner complex, the BOP has been unable to stop the spread of COVID-19.
75

*United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) (citations omitted).
76

*United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (emphasis added by Seventh Circuit).
77

S. Rep. No. 98-225, at 121 (1983).
78

*Ebbers*, 432 F. Supp. 3d 421, 2020 WL 91399, at *7.
79

*United States v. Gutierrez*, 251 F. App'x 804, 806 (3d Cir. 2007) (quoting *United States v. Vargas*, 477 F.3d 94, 98 & n.9 (3d Cir. 2007)); *Cf. United States v. Arrelucea-Zamudio*, 581 F.3d 142, 151 (3d Cir. 2009) (explaining that "express congressional . . . directive[s]" can "constrain a sentencing judge's discretion to vary from the Guidelines.").
80

*United States v. Jones*, 326 F. App'x 90, 92 (3d Cir. 2009) (quoting *United States v. Charles*, 467 F.3d 828, 833 (3d Cir. 2006)); *see also Pepper*, 562 U.S. at 504 (explaining that courts should not "elevate" this factor "above all others.").
81

The Court also notes that Tidwell's sentence cannot be compared to those of other defendants with similar offense profiles because Tidwell's incarceration has been significantly more uncomfortable and challenging than most inmates' due to his health conditions, which are not shared by the majority of similar defendants. *See United States v. McGraw*, No. 02-18, 2019 U.S. Dist. LEXIS 78370, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019) ("Finally, Mr. McGraw has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served by most inmates."); *see also United States v. Beck*, 425 F. Supp. 3d 573, 586 (M.D.N.C. 2019).

lyccases                                       18

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

82

U.S.S.G. § 1B1.13(2).

83

*Rodriguez*, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *11 (quoting 18 U.S.C. § 3142(g)).

84

*See* Ex. B, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-2] at 4.

85

*See id.* at 6-7.

86

*See Hill*, 2020 U.S. Dist. LEXIS 87751, 2020 WL 2542725, at *3. The Court also notes that determining that "extraordinary and compelling reasons" justify reducing Tidwell's sentence is consistent with the Sentencing Commission's policy statement that metastatic solid-tumor cancer constitutes a terminal illness that warrants a sentence reduction. *See* U.S.S.G. § 1B1.13, comment n.1.

lyccases                                   **19**

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

39581083

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)